**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE EVOQUA WATER TECHNOLOGIES CORP. SECURITIES LITIGATION | Master File No. 1:18-cv-10320-AJN<br><br>CLASS ACTION<br><br>DEMAND FOR JURY TRIAL |

**CONSOLIDATED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

I.  PRELIMINARY STATEMENT ..................................................... 1

II.  THE CLAIMS ASSERTED IN THIS COMPLAINT ...................... 6

III.  JURISDICTION AND VENUE ................................................. 8

IV.  THE EXCHANGE ACT PARTIES ............................................ 9

    A.  Plaintiffs ........................................................................ 9

    B.  Defendants .................................................................... 9

        1.  Evoqua ................................................................ 9

        2.  The Executive Defendants .................................. 10

        3.  Defendant AEA and Its Affiliated AEA Fund Defendants..... 12

V.  SUBSTANTIVE ALLEGATIONS ............................................ 14

    A.  Background Concerning Evoqua's Creation and Growth by Acquisition ................................................................. 14

    B.  Evoqua's IPO ............................................................... 16

    C.  Undisclosed Adverse Factors Affecting Evoqua's Business as of the IPO and Thereafter During the Class Period ................... 18

        1.  Evoqua's Systematic and Pervasive Termination of Its Most Experienced Sales Personnel ..................... 19

        2.  Evoqua's Elimination of Its Integration Team.......... 33

    D.  Evoqua's Improper Revenue-Inflating and Expense-Deflating Activities, in Violation of GAAP, Present a Materially Inflated Picture of Evoqua's Financial Performance and Prospects, and Help Further Conceal the True Extent of the Problems Plaguing the Company..................... 36

        1.  Improper Recognition of Revenue of Product Shipments that Were Subject to Broad Rights of Return ................... 37

        2.  Improper Recognition of Revenue on Product that the Customer Had Not Yet Agreed to Purchase, Including on Product Shipped to Third Party Storage Vendors ("Inventory Parking") ................... 39

3.    Improper Recognition of Revenue on Product that Evoqua Had Not Yet Shipped ........................................................................ 41

4.    Improper Recognition of Revenue on Product that Was Not Even Manufactured or Finished (Let Alone Shipped) ........................... 42

5.    Additional Former Employee Confirmations of Evoqua's Premature Revenue Recognition Practices .............................. 44

E.    Evoqua's Understatement of Expenses in Violation of GAAP .......................... 51

F.    Evoqua's Manipulation of Its Sales Backlog Report and Improper Inventory Accounting Further Inflates the Company's Reported Financial Performance ........................................................................ 51

G.    Evoqua's Heavy Reliance on Undisclosed "Channel Stuffing" Activities and Extraordinary Sales Incentives Prior to (and After) the IPO to Boost Revenue Further Conceal the Truth Concerning Evoqua's Financial Performance and Prospects ........................................................................ 54

H.    Evoqua's Secondary Offering ........................................................................ 58

I.    The Truth Concerning Evoqua's Business and Operations Begins to Emerge ........................................................................ 60

VI.    DEFENDANTS MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ....................... 63

A.    Initial Public Offering Prospectus (November 1, 2017) ....................... 63

B.    Fourth Quarter 2017 Earnings Call (December 1, 2017) ....................... 70

C.    Fourth Quarter 2017 Earnings Results Presentation (December 1, 2017) ........................................................................ 72

D.    Fiscal Year 2017 Financial Results Press Release ....................... 73

E.    2017 Form 10-K (December 4, 2017) ........................................................................ 74

F.    First Quarter 2018 Earnings Call (February 6, 2018) ....................... 77

G.    First Quarter 2018 Results Presentation (February 6, 2018) ....................... 79

H.    First Quarter 2018 Earnings Press Release (February 6, 2018) ....................... 80

I.    First Quarter 10-Q (February 7, 2018) ........................................................................ 81

J.    Gabelli & Co. 28th Annual Pump, Valve, and Water Systems Symposium (February 22, 2018) ........................................................................ 83

K.      Investor & Analyst Event at Pittsburgh HQ (February 28, 2018) ...................... 84

L.      Secondary Public Offering Prospectus (March 14, 2018) ................................... 85

M.      Second Quarter 2018 Earnings Press Release (May 8, 2018) ............................ 88

N.      Second Quarter 2018 Earnings Call (May 8, 2018)............................................ 88

O.      Second Quarter Form 10-Q (May 8, 2018)......................................................... 92

P.      Investor & Analyst Event at Tewksbury Facility (June 4, 2018) ....................... 95

Q.      Third Quarter 2018 Earnings Call (August 7, 2018) .......................................... 96

R.      Third Quarter 2018 Results Form 8-K (August 7, 2018)................................... 98

S.      Third Quarter Form 10-Q (August 7, 2018) ...................................................... 99

VII.    FALSE AND MISLEADING STATEMENTS IN EVOQUA'S SEC FILINGS
        (ITEM 303) ................................................................................................................ 101

VIII.   MATERIALLY FALSE AND MISLEADING FINANCIAL STATEMENTS
        IN VIOLATION OF GAAP ...................................................................................... 103

        A.      Overview of GAAP.............................................................................................. 103

        B.      Evoqua Violated GAAP by Improperly Recognizing Its Revenue .................. 104

IX.     CONTEMPORANEOUS TRADING.............................................................................. 109

X.      ADDITIONAL ALLEGATIONS OF SCIENTER........................................................ 111

        A.      Evoqua's IPO and SPO Provided Motive and Opportunity for
                Defendants to Sell Their Stock at Inflated Prices ................................................ 111

        B.      Defendants' Imputed Knowledge of Facts Critical to the Core
                Operations ........................................................................................................... 113

XI.     ADDITIONAL LOSS CAUSATION ALLEGATIONS ................................................ 116

XII.    PRESUMPTION OF RELIANCE – FRAUD ON THE MARKET .............................. 117

XIII.   INAPPLICABILITY OF STATUTORY SAFE HARBOR AND BESPEAKS
        CAUTION DOCTRINE .............................................................................................. 118

XIV.    CLASS ACTION ALLEGATIONS ................................................................................ 119

XV.     CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT........................................... 121

XVI.    SECURITIES ACT CLAIMS ................................................................. 127

XVII.   JURISDICTION AND VENUE ............................................................. 128

XVIII.  THE SECURITIES ACT PARTIES ....................................................... 129

    A.    The Securities Act Plaintiffs ......................................................... 129

    B.    The Securities Act Defendants ...................................................... 129

        1.    Evoqua ................................................................................ 129

        2.    The Executive Defendants ................................................. 130

        3.    The Director Defendants .................................................... 131

        4.    The Underwriter Defendants ............................................. 132

        5.    AEA: Evoqua's Controlling Stockholder ........................... 135

    C.    Materially False and Misleading Statements and Omissions in the
        Offering Materials ......................................................................... 136

        1.    Initial Public Offering Prospectus (November 1, 2017) ....... 136

        2.    2017 Form 10-K (December 4, 2017) .................................... 143

        3.    First Quarter 2018 Form 10-Q (February 7, 2018) ............... 146

        4.    Secondary Public Offering Prospectus (March 14, 2018) ...... 148

        5.    Materially False and Misleading Omissions in Evoqua's
        Offering Materials (Item 303) ................................................ 150

        6.    Materially Untrue and Misleading Financial Statements in
        Violation of GAAP ................................................................ 152

            (i)    Overview of GAAP ................................................... 152

            (ii)   Evoqua Violated GAAP by Improperly Recognizing
            Revenue ....................................................................... 153

XIX.    CLAIMS FOR RELIEF UNDER THE SECURITIES ACT ...................... 158

XX.     PRAYER FOR RELIEF ......................................................................... 163

XXI.    JURY DEMAND ................................................................................... 164

Lead Plaintiffs City of Omaha Police and Fire Retirement System and Louisiana Sheriffs' Pension & Relief Fund (together "Plaintiffs"), by and through their attorneys, and on behalf of all others similarly situated, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief are based on, among other things, their counsel's investigation, which includes without limitation: (a) a review and analysis of regulatory filings made by Defendant Evoqua Water Technologies Corporation ("Evoqua" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (b) a review and analysis of press releases and media reports issued and disseminated by the Company; (c) a review of other publicly available information concerning the Company, including news stories and court filings; and (d) investigative interviews with former Evoqua employees having first-hand knowledge of the Company's business and operations.

## I.     PRELIMINARY STATEMENT

1.     This federal securities class action, which asserts both strict liability-based claims under the Securities Act of 1933 (the "Securities Act') and fraud-based claims under the Securities Exchange Act of 1934 (the "Exchange Act"), arises from Defendants' materially false and misleading statements and omissions to investors concerning Evoqua's business and financial performance.  As set forth below, Defendants took Evoqua public in 2017 based on a misleading story of financial health and successful integration of recently acquired companies, using a materially defective Registration Statement and Prospectus (the "IPO Offering Materials").  As a result, the private equity fund that controlled Evoqua, defendant AEA and its affiliates (the "AEA Defendants", as defined below), as well as the Executive Defendants and Director Defendants (as defined below), were able to unload tens of millions of Evoqua shares onto unsuspecting investors, while lining their own pockets to the tune of over $500 million.  Less than a year after the Company

1

went public, however, Defendants' efforts to portray Evoqua as a financially healthy, growing and successfully integrated business collapsed in the face of startling disclosures of dismal performance and supposedly unexpected costs associated with integrating its earlier acquisitions. The resulting losses to Plaintiffs and other Class members were enormous.

2.     Evoqua is a water technology company that provides products and services such as wastewater treatment, water disinfection for pools, aquatic applications, and water purification to various industries, municipalities, waterparks, and other commercial or public entities.  AEA acquired Siemens Water Technologies LLC ("Siemens Water") from Siemens AG in 2013, and renamed the company "Evoqua."  Indeed, since Evoqua's formation, AEA has continued to control Evoqua at all relevant times, and Evoqua's own SEC filings note that it was a "controlled company" due to AEA's majority ownership of Evoqua's voting shares, its power to elect three of Evoqua's directors, and its admitted ability to "influence all major corporate decisions."

3.     In November 2017, AEA took Evoqua public, aided by a recently installed set of top executives that AEA had handpicked to "prepare" the Company for its initial public offering ("IPO").  Between Evoqua's IPO and its secondary public offering in March 2018 (the "SPO" and, together with the IPO, the "Offerings") – both of which were underwritten by the Underwriter Defendants (as defined below) – Defendants caused over ***$880 million worth*** of Evoqua common stock to be sold to investors pursuant to defective Offering Materials.  Of this total, controlling shareholder AEA and its affiliated AEA Defendants, together with the Individual Defendants, collectively reaped over ***$500 million*** in proceeds from the sale of their own Evoqua shares.

4.     Unbeknownst to investors, however, during the two years immediately preceding the IPO, the efforts to "prepare" the Company for its IPO consisted largely of implementing increasingly desperate, and undisclosed, measures that weakened it significantly.

5.     First, in an effort to significantly reduce its operating costs, Defendants implemented an aggressive program to cut roughly 600 of Evoqua's employees, particularly from the ranks of its most experienced (and most highly compensated) sales personnel.  (The IPO Prospectus stated that Evoqua had "nearly 600 sales and support personnel.").   Because a significant percentage of Evoqua's revenue is derived from supplying products and services for large-scale capital projects involving lengthy sales cycles of 1 to 3 (and as long as 5) years, the Company's ability to maintain and build upon its relationships with its larger commercial, industrial, and municipal customers (and prospective customers) was at all times vitally important to the Company's business.  Moreover, because of the long sales cycles involved, having a highly skilled and experienced sales staff was especially critical to maintaining, cultivating, and growing the Company's long-term relationships with these larger customers.  However, by implementing radical wholesale cuts to its sales force, which focused in particular on terminating the Company's most senior and most experienced (and highly compensated) sales personnel — and by replacing those terminated personnel (to the extent they were replaced) with vastly less experienced but correspondingly cheaper salespeople — the Company was predictably jeopardizing its future growth for the sake of short-term savings.

6.     Second, in an effort to mask stagnation in its organic growth, Evoqua acquired more than a half-dozen companies in the 1½ year period leading up to the IPO.  But contrary to the picture that Defendants painted for investors, they had not at all successfully integrated these acquisitions.  Moreover, in Evoqua's case the process was further exacerbated by its reduction-in-force activities which (in addition to culling the Company's most experienced sales professionals) had pushed out the Evoqua managers who had the most experience in integrating new acquisitions and various administrative personnel.  With its most experienced integration personnel terminated,

and unwilling to devote sufficient resources to integrating these acquisitions, Defendants misled investors concerning the success of Evoqua's growth-through-integration business model.

7. Third, as the date of the IPO approached and as the Company's organic growth remained stagnant, Evoqua engaged in increasingly aggressive tactics to artificially inflate its reported revenue, including fraudulent accounting manipulations in blatant violation of Generally Accepted Accounting Principles ("GAAP"). Evoqua's improper revenue-recognition practices included improperly recognizing revenue on (a) shipment of products that were subject to broad rights of return; (b) shipment of products that the customer had not yet agreed to purchase, including products shipped to third-party storage vendors ("inventory parking"); (c) products that had not been shipped at all; and (d) products that Evoqua *had not yet even manufactured*. In addition, Evoqua prematurely recognized revenue on service contracts before the revenue was earned or otherwise due. In conjunction with its recognition of revenue on non-GAAP "sales," Evoqua's top management further concealed the weakness in its business by offering increasingly steep discounts and extended payment terms to customers as the IPO approached, all in a desperate effort to "stuff the channels" and "pull forward" sales, and to thereby maximize reported *short-term* revenue at the expense of future bookings. Evoqua also further inflated its reported income by improperly deferring payment of its expenses.

8. While failing to disclose the truth about Evoqua's business and operations, in the IPO Offering Materials and their other public statements during the Class Period, Defendants trumpeted the Company's growth-through-acquisitions strategy as, *inter alia*, enabling it "*to accelerate our growth in our current addressable market*," and stressed that its purportedly "*experienced team dedicated to mergers and acquisitions*" had "*successfully completed eight*

4

*technology-enhancing and geography-expanding acquisitions since April 2016*."[1]  With respect to the stability and strength of Evoqua's vitally important sales force, the Offering Materials touted that Evoqua had "***energized [its] workforce and reduced employee turnover***," and would "***continue to invest in [its] sales force***" to "***maintain and enhance our customer relationships***." And in its IPO Offering Materials and post-IPO reports of its quarterly financial performance, Evoqua sought to further project financial health and growth.

9.      However, as further detailed below, the Offering Materials for the IPO and SPO, as well as Defendants' other Class Period statements identified in this Complaint, were materially false, misleading and incomplete in violation of the federal securities laws and Defendants' disclosure obligations in that they, *inter alia*, (a) presented materially false and misleading financial information in violation of GAAP; (b) failed to disclose that Evoqua's violations of GAAP and related "channel stuffing" activities had artificially inflated the Company's reported financial performance and the extent to which Evoqua was actually suffering from stagnant organic growth (*see* ¶¶78-109; 121-130 below); (c) failed to disclose how Evoqua had seriously put at risk its longer-term post-IPO prospects in exchange for short term cost savings by terminating its most experienced sales personnel and engaging in other reductions-in-force (*see* ¶¶45-72below); and (c) failed to disclose the extent to which it was experiencing serious and costly problems in trying to integrate the many companies it had acquired before the IPO (*see* ¶¶73-76 below).

10.      The truth concerning the state of Evoqua's business and operations finally began to publicly emerge less than a year after the Company went public.  Indeed, only a few months after the IPO, partial disclosures occurred on May 8, 2018, when Evoqua announced that it needed to reduce its earnings guidance, and again on August 7, 2018, when Evoqua announced earnings that

---

[1]      Emphasis in quotations is added throughout, unless stated otherwise.

fell short of Wall Street consensus estimates.  In response to both of these disclosures, Evoqua's stock price fell significantly.  But even these partial disclosures continued to conceal the full truth, as they did not disclose Evoqua's revenue inflating activities or the nature and extent of the Company's ongoing problems with trying to integrate its acquisitions.

11.     The truth concerning the state of Evoqua's business and operations was fully revealed only on October 30, 2018—just shy of 12 months from the IPO—when the Company announced materially decreased revenues and further reduced guidance, which it attributed to "acquisition integration issues," "supply chain disruptions," and "an extended delay on a large aquatics project."  The Company also disclosed that management had determined that Evoqua's business had to be re-structured—yet another stunning admission coming less than a year after the Company went public.  In response, Evoqua's stock price plummeted by *34.64%* in heavy trading, and securities analysts reported that the Company's disclosures had "*shocked investors*," brought the Officer Defendants' "*credibility into question*," and revealed that the Company's "*business is clearly riskier than initially thought*."  The Company lost over $544 million in market capitalization in a single day.

12.     Plaintiffs, on behalf of themselves and the Class they seek to represent, now bring this suit to recover the losses they have suffered as a result of Defendants' materially false, misleading, and incomplete statements.

## II.    THE CLAIMS ASSERTED IN THIS COMPLAINT

13.     As further set forth below, Plaintiffs assert two separate sets of claims.  Counts One and Two, as set forth in Part One of the Complaint, assert securities fraud claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  These claims are asserted against the Exchange Act Defendants, consisting of (1) Evoqua; (2) Defendant Ronald C. Keating ("Keating"), Evoqua's President and Chief Executive Officer; (3) Benedict J. Stas,

("Stas"), Evoqua's Executive Vice President and its Chief Financial Officer and Treasurer; (4) Kenneth Rodi ("Rodi"), Evoqua's Executive Vice President and its Products Segment President; and (5) Anthony Webster ("Webster"), Evoqua's Executive Vice President and its Chief Human Resource Officer.   These claims specifically incorporate all allegations and inferences from the facts alleged that these Defendants made the materially false, misleading, and incomplete statements and omissions alleged herein with scienter (i.e., intentionally or recklessly) in violation of Section 10(b) and Rule 10b-5 promulgated thereunder, and are liable as control persons under Section 20(a).   In addition, Count Three asserts insider trading claims pursuant to Section 20A of the Exchange Act against the Exchange Act Defendants, and alleges that these Defendants sold hundreds of millions of dollars' worth of Evoqua common stock to investors while in possession of material, nonpublic information concerning the Company.   The Section 20A claims also specifically incorporate all allegations and inferences from the facts alleged that support Plaintiffs' allegations that these Defendants made the materially false, misleading, and incomplete statements and omissions alleged in this Complaint with scienter (i.e., intentionally or recklessly).

14.   Counts Four, Five and Six, set forth in Part Two of the Complaint, assert strict liability and negligence claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act").   The non-fraud claims under Sections 11 and 12(a)(2) are asserted against Defendant Evoqua (as issuer); each member of Evoqua's board of directors (the "Board"), including CEO Keating, who signed the Offering Materials (the "Director Defendants"); Defendant CFO Stas, who also signed the Offering Materials; and each financial institution that acted as an underwriter in either of the Offerings (the "Underwriter Defendants"), which are statutorily liable for the materially untrue and misleading statements and omissions in the Offering

Materials.  In addition, Defendants Keating and Stas and Defendant AEA are named as "control person" Defendants under Section 15.

15.     Plaintiffs specifically disclaim any allegations of fraud or fraudulent intent in the separately pleaded non-fraud Securities Act claims asserted in Counts Four, Five, and Six, with the proviso that any challenged statements of opinion or belief made in connection with the Offering Materials are alleged to have been materially misstated statements of opinion or belief as of the date of the Offerings.

**PART ONE:**
**CLAIMS UNDER THE SECURITIES EXCHANGE ACT OF 1934**

**III.     JURISDICTION AND VENUE**

16.     The Exchange Act claims asserted in this Part One arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

17.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

18.     Venue is proper in this Judicial District under Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as Evoqua's securities trade on the New York Stock Exchange ("NYSE"), located within this Judicial District.

19.     In connection with the acts, conduct and other wrongs alleged in this Part One, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications and the facilities of a national securities exchange, the NYSE.

## IV.    THE EXCHANGE ACT PARTIES

### A.    Plaintiffs

20.    Lead Plaintiff City of Omaha Police and Fire Retirement System ("Omaha P+F"), as set forth in its previously filed certification, purchased Evoqua common stock during the Class Period and suffered damages as a result of the federal securities law violations and false and misleading statements and material omissions alleged in this Part One.

21.    Lead Plaintiff Louisiana Sheriffs' Pension & Relief Fund ("Louisiana Sheriffs"), as set forth in its previously filed certification, purchased Evoqua common stock during the Class Period and suffered damages, as a result of the federal securities law violations and false and misleading statements and material omissions alleged in this Part One.  In addition, Louisiana Sheriffs purchased Evoqua common stock in the Offerings traceable or pursuant to the false and misleading Registration Statements and was damaged thereby.

### B.    Defendants

#### 1.    Evoqua

22.    Defendant Evoqua is incorporated in Delaware, and its stock trades on the NYSE under the ticker symbol "AQUA."  The Company's corporate headquarters are located at 210 Sixth Avenue, Pittsburgh, Pennsylvania 15222.  Evoqua purports to be a leading provider of mission-critical water-treatment solutions, offering services, systems, and technologies to support a client's full water lifecycle needs.  Evoqua holds approximately 11% market share in the North American water-treatment market.  It focuses mainly on the North American region, which accounts for 86% of its total revenue.

23.    As of the IPO, Evoqua served its customers through three segments: Industrial, Municipal, and Products.  Evoqua's Industrial segment provides application-specific solutions and full lifecycle services for critical water applications, focusing on treating industrial process water,

utility water, and wastewater, so that its customers can meet often-stringent purity standards to ensure the elimination of water-borne impurities. Evoqua's Municipal segment provides engineered solutions and equipment to treat wastewater, purify drinking water, and provide odor and corrosion control for municipalities, and sells a broad portfolio of related products including filters, clarifiers, and aerators. Evoqua's Product segment sells differentiated technologies to a diverse set of water-treatment system specifiers, integrators, and end users globally, and also sells a broad range of filtration, disinfection, electrodeionization, and analyzer products through direct, indirect, and aftermarket sales channels.

### 2. The Executive Defendants

24. Defendant Ronald C. Keating ("Keating") has served at all relevant times as Evoqua's President and Chief Executive Officer and as a member of Evoqua's Board. Throughout the Class Period, Keating made statements in the Company's press releases and earnings conference calls, which, as alleged herein, contained material misrepresentations and omissions when made. At all relevant times, Keating made the false and misleading statements and omissions recklessly or with actual knowledge that they were false and misleading. Defendant Keating signed or authorized the signing of: the IPO Registration Statement, dated October 19, 2017, and all iterations thereof (the "2017 Registration Statement"), and the Prospectus, dated November 1, 2017 (the "2017 Prospectus" and collectively, with the 2017 Registration Statement, the "IPO Offering Materials"); the SPO Registration Statement, dated March 12, 2018, and all iterations (the "2018 Registration Statement"), the SPO Prospectus, dated March 14, 2018, and all iterations (the "2018 Prospectus" and collectively, with the 2018 Registration Statement, the "SPO Offering Materials"); Evoqua's Form 10-K for its fiscal year ended September 30, 2017 (the "2017 Form 10-K"); Evoqua's Form 10-Q for its fiscal quarter ended December 31, 2017 (the "1Q2018 Form 10Q"); Evoqua's Form 10-Q for its fiscal quarter ended March 31, 2018 (the "2Q2018 Form

10Q"); and Evoqua's Form 10-Q for its fiscal quarter ended June 30, 2018 (the "3Q2018 Form 10Q"). During the Class Period, Defendant Keating sold 338,271 shares of Evoqua stock for proceeds of approximately $7.2 million.

25.     Defendant Benedict J. Stas ("Stas") has served, at all relevant times, as Evoqua's Executive Vice President, Chief Financial Officer and Treasurer. Throughout the Class Period, Stas made statements in the Company's press releases and earnings conference calls, which, as alleged in this Complaint, contained material misrepresentations and omissions when made. At all relevant times, Stas made the false and misleading statements and omissions recklessly or with actual knowledge that they were false and misleading. Defendant Stas signed or authorized the signing of: the IPO Offering Materials, SPO Offering Materials, 2017 Form 10-K, 1Q2018 Form 10Q, 2Q2018 Form 10Q, and 3Q2018 Form 10Q. During the Class Period, Defendant Stas sold 99,993 shares of Evoqua stock for proceeds of approximately $2.1 million.

26.     Defendant Kenneth Rodi ("Rodi"), has served, at all relevant times, as Evoqua's Executive Vice President, Products Segment President. Prior to joining Evoqua in May 2016, Rodi served as Chief Executive Officer of Neptune-Benson from 2013 to 2016. During the Class Period, Defendant Rodi sold 64,594 shares of Evoqua stock for proceeds of approximately $1.3 million.

27.     Defendant Anthony Webster ("Webster") has served, at all relevant times, as Evoqua's Executive Vice President, Chief Human Resource Officer. Defendant Webster sold 22,545 shares of Evoqua stock for proceeds of approximately $479,000.

28.     The Executive Defendants possessed and exercised their power and authority to control the contents of the Company's SEC filings, press releases, and other market communications. The Executive Defendants were provided with copies of the Company's SEC

filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their control over the Company, and their access to material information available to them but not to the public, the Executive Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Executive Defendants are liable for the false statements and omissions pleaded herein.

### 3. Defendant AEA and Its Affiliated AEA Fund Defendants

29.     AEA Investors LP ("AEA") is a private investment firm headquartered in New York, New York with offices in Stamford, Connecticut, London, Munich and Shanghai. AEA focuses on leveraged buyouts and private equity investments in mid-market manufacturing, service, distribution, specialty chemicals, consumer products and business services companies. As of the IPO, AEA managed approximately $10 billion of capital for its investors. Prior to the IPO, AEA and its affiliates owned approximately 58.5% of Evoqua common stock. As part of the IPO, AEA and its affiliated AEA Fund Defendants (as defined below) sold 15,385,048 shares of Evoqua common stock for proceeds of approximately $260,315,000, retaining about 40.6% of the Company's common stock and approximately 70.7% of the voting power of the Company's outstanding common stock. As part of the SPO, AEA and the AEA Fund Defendants sold 10,953,746 shares of Evoqua common stock for approximately $233,150,000, retaining about 30.9% of the Company's common stock and approximately 52.5% of the voting power of the Company's outstanding common stock. Because of AEA's and its affiliates' controlling interest in Evoqua, AEA influenced and controlled, directly or indirectly, all of Evoqua's major corporate decisions.

30.     Evoqua's SEC filings identified AEA[2] as its "Sponsor" and stated that Evoqua was a "controlled company" under AEA, including due to AEA's holding and control over more than 50% of the voting power for the election of Evoqua's directors.  Evoqua's SEC filings likewise stated "because AEA controls a significant percentage of our common stock, it may influence all major corporate decisions."  Given the pervasive control that AEA exerted over Evoqua, the Company's SEC filings also stated that "the interests of AEA and its affiliates, including certain of our directors, may conflict with your interests as an owner of our common stock and those of the Company."

31.     Also named herein as additional Exchange Act Defendants are the affiliates of AEA (collectively, the "AEA Fund Defendants") listed below that also owned and sold Evoqua shares in the Offerings and/or managed or controlled AEA-affiliated entities that owned and sold such shares.  The AEA Fund Defendants are:

a)      AEA EWT Holdings LP ("AEA EWT Holdings"), which acted as the holder of record of the Evoqua stock owned by the AEA Defendants;

b)      AEA EWT Holdings GP LLC ("AEA EWT Holdings GP"), the general partner of AEA EWT Holdings;

c)      AEA Investors Fund V LP, the managing member of AEA EWT Holdings GP and a limited partner of AEA EWT Holdings;

d)      AEA Investors Participant Fund V LP, a member of AEA EWT Holdings GP and a limited partner of AEA EWT Holdings;

---

[2]     The Prospectus used the term "AEA" to include both AEA and its affiliated AEA Fund Defendants.  This Complaint, unless the context otherwise requires, also uses AEA to refer to and include both AEA and its affiliated AEA Fund Defendants.

e)      AEA Investors QP Participant Fund V LP, a member of AEA EWT Holdings GP and a limited partner of AEA EWT Holdings;

f)      AEA Investors Fund V-A LP, a member of AEA EWT Holdings GP and a limited partner of AEA EWT Holdings;

g)      AEA Investors Fund V-B LP, a member of AEA EWT Holdings GP and a limited partner of AEA EWT Holdings;

h)      AEA Investors PF V LLC, the general partner of each of AEA Investors Participant Fund V LP and AEA Investors QP Participant Fund V LP;

i)      AEA Investors LP, the sole member of AEA Investors PF V LLC;

j)      AEA Investors Partners V LP, the general partner of each of AEA Investors Fund V LP, AEA Investors Fund V-A LP, and AEA Investors Fund V-B LP; and

k)      AEA Management (Cayman) Ltd., the general partner of AEA Investors Partners V LP.

32.     AEA and the AEA Fund Defendants are sometimes collectively referred to herein as the "AEA Defendants."

33.     The Offering Materials stated that each AEA Defendant, other than AEA EWT Holdings, may be deemed to share beneficial ownership of the shares of Evoqua common stock held of record by AEA EWT Holdings.

## V.      SUBSTANTIVE ALLEGATIONS

### A.      Background Concerning Evoqua's Creation and Growth by Acquisition

34.     Evoqua was created in 2014 when AEA acquired the municipal, industrial and services water and wastewater treatment operations and assets of Siemens Water for approximately $730.6 million, net of cash, and renamed the acquired assets, Evoqua.   The Siemens Water

acquisition—referred to in Evoqua's SEC filings as the "AEA Acquisition" – was announced in November 2013 and closed in January 2014.

35.     Prior to the AEA Acquisition, Evoqua/Siemens Water had been the product of a series of acquisitions and combinations of pre-existing companies.  The business began as United States Filter Corporation ("US Filter"), which during the 1990s was formed through a series of acquisitions in an effort to produce a fully integrated one-stop shop solution for customers looking for water treatment services.  In 1999, US Filter was acquired by Vivendi S.A. ("Vivendi").  In the early 2000s, Vivendi spun off this recently acquired asset, which was inherited by Veoila Water Technologies ("Veoila").  In 2004, Veoila sold a portion of its water treatment business to Siemens AG, which operated it as Siemens Water.  As noted, AEA acquired Siemens Water and turned it into Evoqua in 2014.

36.     Under AEA's control, Evoqua developed a business model of expansion through acquisition.  These acquisitions were, to a substantial extent, a way for Evoqua to continue to appear to be growing its business and revenues, while its attempts to grow organically failed and without any investment in its own internal research and development.

37.     For example, in the one and a half years before its IPO, Evoqua completed eight acquisitions, including the following:

- April 2016:  Evoqua acquired Magneto Special Anodes B.V., a designer and manufacturer of anodes for the electrochemical industry, for approximately $26.5 million.  Magneto effectively became part of Evoqua's Product segment.

- April 2016:  Evoqua acquired Neptune-Benson, Inc. ("Neptune-Benson"), a leading provider of water filtration and disinfection products, for approximately $284 million.  Neptune-Benson effectively became part of Evoqua's Product segment.

- July 2016:  Evoqua acquired Valve and Filtration Systems, Ltd, a manufacturer of self-cleaning water filters and valves, for approximately $3 million.  Valve and Filtration effectively became part of Evoqua's Product segment.

- August 2016:  Evoqua acquired Delta Ultraviolet Corporation, a maker of UV-C technology based in California, for approximately $5 million.  Delta effectively became part of Evoqua's Product segment.

- November 2016:  Evoqua acquired Environmental Treatment Systems, Inc. ("ETS"), for approximately $11 million.  ETS purportedly complimented Evoqua's legacy wastewater portfolio with exposure to a broad set of industries, including food, wood, and textiles, and allowed Evoqua to insource manufacturing of dissolved air flotation units, the production of which was previously outsourced.  ETS effectively became part of Evoqua's Industrial segment.

- May 2017:  Evoqua acquired Noble Water Technologies, Inc., a provider of high-purity water equipment and services based in Texas, for approximately $8 million.  Noble Water effectively became part of Evoqua's Industrial segment.

- June 2017:  Evoqua acquired ADI Systems Inc., a provider of anaerobic digestion, aerobic treatment, biogas treatment, green energy recovery, and water-reuse technologies, as well as industrial wastewater cover liners and containment systems, for approximately $55 million.  ADI effectively became part of Evoqua's Industrial segment.

- June 2017:  Evoqua acquired Olson Irrigation Systems, a provider of irrigation components for industrial and agricultural markets, for approximately $9 million.  Olson effectively became part of Evoqua's Product segment.

38.     Evoqua's acquisitions were also part of AEA's and the Executive Defendants' plan to sell the flailing Company to public investors through a lucrative IPO.

**B.     Evoqua's IPO**

39.     Acquiring Siemens Water and the various other acquired companies described above and purportedly successfully integrating Evoqua's acquisitions were part of a plan by AEA and Company insiders to position the Company for a lucrative IPO.

40.      On October 10, 2017, Evoqua filed a Form S-1 Registration Statement for an initial public offering (the "IPO" or "Offering") of shares of its common stock.  The Registration Statement, as amended, was declared effective on November 1, 2017 (the "2017 Registration Statement").  The Prospectus, dated November 1, 2017, was filed on November 3, 2017 (the "2017 Prospectus" and collectively, with the 2017 Registration Statement, the "IPO Offering Materials").

On that same day, Evoqua announced the pricing of the Offering of 27,777,777 shares of common stock, of which 8,333,333 shares were being sold by the Company and 19,444,444 by selling stockholders, at $18.00 per share. The Offering of the 27,777,777 shares closed on November 6, 2017. The Underwriter Defendants exercised their option to purchase an additional 4,166,666 shares of common stock, which closed on November 7, 2017.

41. Before the IPO, AEA owned approximately 58.5% of Evoqua's common stock. As part of the Offering, AEA sold 25% of its Evoqua shares for approximately $260,315,012, retaining about 40.6% of the Company's common stock and approximately 70.7% of the voting power of the Company's outstanding common stock. Defendant Rodi sold 17% of his shares in the IPO for approximately $457,483.

42. In the IPO Offering Materials, Defendants misleadingly presented Evoqua as a profitable water technology company that had successfully integrated numerous accretive business acquisitions and was poised for continued growth. For example, these materials touted Evoqua's "***strategic acquisitions [that] will enable us to accelerate our growth in our current addressable market***" and the Company's purported "***experienced team dedicated to mergers and acquisitions that has successfully completed eight technology-enhancing and geography-expanding acquisitions since April 2016***." Thus, Defendants portrayed Evoqua as having rapidly and successfully integrated the numerous companies it had acquired such that they were adding value at the start and throughout the Class Period. Defendants' statements reassured investors because a critical issue for any company that grows inorganically through acquisitions – like Evoqua – is how it successfully it has integrated its acquisition targets.

43.     Analysts repeated Defendants' emphasis on acquisitions' importance for Evoqua and purported benefits for its business.  For example, RBC Capital wrote in an August 8, 2018 report:

> **M&A will be a key pillar of Evoqua's growth strategy, with a focus on bolt-ons that fill portfolio gaps.**  In terms of its M&A criteria, Evoqua is focusing on bolt-on or tuck-in deals, rather than entirely new platforms to its portfolio. Management's philosophy is to use M&A as a proxy for R&D, meaning that it will occasionally acquire new technology offerings to fill portfolio gaps rather than develop them in-house.  Other strategic priorities will be to extend the company's reach into new market verticals or geographies.

44.     Relatedly, because serial acquirers like Evoqua can be plagued by significant employee turnover, Defendants were also keen to assure investors of the stability and strength of Evoqua's sales force.  In that regard, the IPO Offering Materials boasted that Defendants had "***energized our workforce and reduced employee turnover***" and would "***continue to invest in [the Company's] sales force***," in order to "***maintain and enhance our customer relationships***."

## C.      Undisclosed Adverse Factors Affecting Evoqua's Business as of the IPO and Thereafter During the Class Period

45.     Unbeknownst to investors, in the period leading up to the IPO and the start of the Class Period, Evoqua was struggling to derive as much net income from its operations as Defendants had hoped to achieve in order to maximize the proceeds from the IPO.  Accordingly, Evoqua engaged in two significant cost-cutting measures.  These measures allowed Evoqua to materially reduce its reported expenses, but only at the cost of reducing its ability to generate future sales and significantly weakening Evoqua's business.  These two ill-advised measures were (a) systematically eliminating Evoqua's most experienced sales personnel (and replacing them with less expensive—but significantly less qualified and less experienced—sales personnel), and (b) sharply reducing the number of experienced Evoqua personnel who had previously been responsible for integrating Evoqua's various acquisitions (which in turn impaired Evoqua's ability

to efficiently and effectively integrate the eight companies that Evoqua acquired in the 20 months immediately preceding the IPO).  In addition, as further discussed below in §§V.D & V.G dealing with improper revenue recognition and related improper "channel stuffing", respectively, the Company had engaged in extraordinary measures to "pull forward" a huge number of "sales" (including non-GAAP sales) into the financial quarters immediately preceding the IPO, which, unbeknownst to investors, left Evoqua with a massively depleted sales backlog that would predictably result in fewer sales and reduced revenue after the IPO.

1. **Evoqua's Systematic and Pervasive Termination of Its Most Experienced Sales Personnel**

46.    In the two years preceding the IPO, in an effort to reduce its costs, Evoqua implemented a wide-scale program to terminate (either voluntarily or involuntarily) its most experienced sales personnel (and to opportunistically terminate more expensive employees in other positions with far less qualified replacements).  Evoqua management believed that this would reduce costs and improve Evoqua's net income and short-term financial performance, and make the Company more attractive to potential investors, prior to a hoped for sale or IPO in or around the second half of 2017.  However, the Company's program and resulting loss of Evoqua's most experienced sales employees resulted in an exodus of information and institutional knowledge from the Company, which adversely affected existing customer relations and had a significant negative impact on its ability (a) to generate new sales before the IPO, and (b) to generate revenue after the IPO.

47.    In addition to offering "voluntary" early retirement packages, Evoqua also instituted increased sales quotas that were, as a practical matter, impossible to achieve as part of a program that would serve its dual objectives of (a) significantly reducing the dollar amount of the commissions that the Company had to pay its sales personnel, while (2) simultaneously causing

many of Evoqua's most experienced sales staff to leave (because their total compensation was being slashed as a result of the Company's new quotas and commissions).  And although Evoqua did hire replacements for many of the experienced sales staff who had been effectively driven out of the Company prior to the IPO, and although those replacements were invariably significantly cheaper to employ, the replacement employees fell far short of having the kind of extensive experience, understanding of the market for Evoqua products and services, proven sales skills and established relationships with customers that were necessary to maintain (let alone increase) sales compared to what their terminated predecessors had generated.  For example:

48.     As stated by a former Evoqua employee who was a Senior Manager at the Company for over ten years and left in or around the second half of 2016 (the "**Former Senior Manager**"), defendant CEO Keating and Evoqua's top management, in anticipation of taking the Company public, had adopted a policy or practice of seeking to cut its employment costs by taking increasingly pro-active steps to replace its older and more experienced (and expensive) sales employees with far less experienced (and less qualified and effective) employees.  As the **Former Senior Manager** described, one of the ways that management caused the most experienced (and most highly compensated) members of its sales force to leave the Company was to raise their individual sales quotas to very difficult levels (which effectively slashed commissions and materially reduced their overall compensation unless they met the increased quotas).  In other words, even maintaining past levels of sales performance would not be enough to prevent the pay of these more experienced sales personnel from being cut substantially – which in turn also had the effect of making the Company's otherwise mediocre severance packages more attractive.  In addition, top management created new administrative burdens for its salesforce to go through before they could receive their commissions, which effectively created significant delays in

commission payments.  In sum, the **Former Senior Manager** characterized Evoqua as creating a "toxic environment" in the way sales targets were assigned and unreasonable goals were set, which was calculated to strongly encourage the most senior, highly compensated and experienced sales personnel to leave.

49.     As the **Former Senior Manager** further stated, although these measures were intended to and did result in materially increasing Evoqua's EBITDA in the period leading up to the IPO, they had negative medium and long-term effects by significantly reducing the amount of business (and related potential revenue) in the Company's sales funnel over time.  As the **Former Senior Manager** explained, the sales cycle in the water-treatment industry—particularly for larger and more expensive municipal or other custom projects—can take several years.  For example, for public projects, Evoqua (and its competitors) would submit a proposal/bid on an available project, which would be followed by hearings to discuss the merits of the various proposal/bids received. Even after a proposal is finally accepted, there may be years-long delays, while, for example, environmental assessments are completed or community groups voice their opinions, before a project is initiated.  After a project is completed, Evoqua may be called on to provide various post-project services or products necessary for the ongoing success of that project.  By eliminating the Company's most experienced sales teams with the deepest understanding of the long-term sales cycle and relevant customer relationships, the Company lost significant institutional knowledge and damaged its long-term sales and growth prospects.  A sales person who has stayed with the customer through the complete cycle would be much better equipped to handle the ins-and-outs of such a lengthy project, and to anticipate and address the customer's requirements with respect to ensuring the success of the project.

50.     While elimination of experienced sales personnel with the best understanding of Evoqua's business and customer relationships would not cause a significant loss in revenue in the short term (e.g., in revenue from projects that had already been approved and were underway), it would predictably have a material adverse impact on Evoqua's ability to procure larger project deals and long-term service contracts and generate future sales and service revenue that were necessary to generate growth and profits beginning in the next one to three years in the future. Moreover, concern about maintaining and expanding the Company's larger project and longer-term service business should have been a particular concern of senior management, because by 2016—although lack of organic growth was not an industry-wide problem—Evoqua was experiencing little organic growth in its core businesses, and was instead able to increase profits only by cutting costs, selling assets, and trying to acquire and successfully integrate other companies.  The implementation of this strategy—particularly the cost-cutting aspects that resulted in Evoqua's elimination of large numbers of its most experienced sales personnel and other senior managers – caused the Company to lose significant sales and business development expertise, which predictably made it significantly harder to generate future revenue growth in the medium to longer term.

51.     The **Former Senior Manager** also described how the he/she was made to leave Evoqua in or around the latter half of 2016 because, according to the Company, his/her position was being eliminated.  However, shortly after being terminated, the **Former Senior Manager** learned that his/her former position had been filled by a person who had no experience in the water treatment industry, but who was a friend of the Defendant CEO Keating.  The **Former Senior Manager** confirmed that a similar scenario of other senior managers being replaced by persons with little or no industry experience happened on many other occasions as part of Defendant

Keating's and top management's goal of forcing out Evoqua's more experienced and highly compensated personnel to make the Company's financial statements look better in the short-run.

52.     Similarly, as stated by another former employee, who started at Evoqua's predecessor, Siemens Water, in 2005 and stayed with the Company through late 2018, leaving as a Business Development Manager in Evoqua's Industrial segment (the "**Former Business Development Manager**"), Evoqua adopted a policy of offering early retirement to its older and most experienced employees about a year before the IPO.  The **Former Business Development Manager** believes that this policy was implemented to cut costs, as such employees were also more expensive.  If the employees failed to take the offer of early retirement, they were then effectively forced out through other means, such as creating impossibly high sales quotas or eliminating accrued time off.  Evoqua's elimination of its most experienced sales employees had a significant adverse impact on the business, as the terminated employees were not always replaced right away – and when they were replaced it seemed as though their replacements were always significantly younger and less experienced.

53.     The **Former Business Development Manager** also confirmed that Evoqua's policy of eliminating older and more experienced employees had a significant adverse impact on the business.  For example, this former employee heard many complaints that projects were not getting completed, because the experienced personnel who knew how to get things done (including senior engineers as well as senior sales personnel) were no longer there.  Bids and proposals, and follow-ups on those proposals, were taking much longer than they should have to be completed and given to customers or prospective customers.  Other projects were delayed, had missed deadlines, and were either not being completed or being completed late because there were simply not enough senior engineers left at Evoqua to get the work completed in a timely fashion.  As a

result, the **Former Business Development Manager** recalled that Evoqua became increasingly frustrated, with Evoqua losing business on new projects to its competitors because it was unable to turn in its bids on time, and losing business from existing customers.  This former employee also knew that Evoqua's service contract customers were being lost for the same reasons, namely, that because Evoqua was eliminating so many of its most experienced personnel, the Company was increasingly unable to respond in a timely or effective way for many of its customers, causing them to drop Evoqua.

54.     The **Former Business Development Manager** also described how (a) the sales cycle for his industrial customers' projects or other capital purchases could be a year or longer, after taking into account the time involved in identifying potential customers or new projects, and working with the customer to determine the best solution for the customer's needs (and which technologies and products would be required), with the nature of the solution being heavily dependent on the specific customer.  As a result, although Evoqua's policy or practice of cutting large numbers of its most experienced sales and other staff would cut costs in the short term, in the medium to longer term it would predictably cause Evoqua to lose sales.[3]

55.     Additionally, as confirmed by a former Evoqua Technical Sales Manager (the "**Former Technical Sales Manager**") who managed between 8 and 15 sales representatives in Evoqua's Filter Press Group (which was largely involved in making "capital sales" of significant capital equipment to industrial, chemical and pharmaceutical companies), and who was employed there from 2015 to 2018 (reporting to Mirka Wilderer, the Vice President and General Manager of

---

[3]     The **Former Business Development Manager** also stated that things continued to get worse at Evoqua after the IPO, as Company management decided to eliminate all cash bonuses for all employees by September 2018, and employees were told that they would receive restricted Evoqua stock grants instead (which would not vest unless the employee stayed with the Company for at least one year after the grant was made.  In addition, the Company eliminated accrued vacation days.  This former employee believed that these further policy changes were made because the Company was continuing to struggle and not meet its financial performance goals, and that such steps would help "boost its numbers."

Separation Technologies, and later Vice President and General Manager of Aftermarket Sales and eCommerce), Evoqua had adopted a regular policy or practice of forcing out its most experienced employees and replacing them with inexperienced personnel prior to the IPO.  This former employee also confirmed that Evoqua did so in part by using dramatically increased sales quotas to cut the compensation of its experienced sales personnel.  For example, although the **Former Technical Sales Manager** stated that his/her first year's sales quota (beginning in 2015) was reasonable and obtainable, by their second year the sales quotas "started getting crazy," so that "if you had a good year, they made the next year's goals unobtainable" so that the Company would not have to pay bonuses.  Moreover, in addition to pushing out experienced sales personnel by "playing" with their sales quotas in this manner, Evoqua forced out employees through other means, including by "writing people up for nonsense reasons" or other unfair criticism, reducing veteran employees' roles, and employing other conduct that seemed intended to "get rid" of people. This former employee also stated that he/she believed that the more experienced people were being deliberately pushed out for the purpose of replacing them with inexperienced—and less expensive—personnel (many of whom had no relevant water treatment equipment experience or knowledge), regardless of the adverse impact that that would ultimately have on sales.  The **Former Sales Manager** also observed these practices happening within his/her own division, and that they represented a sharp change compared to 2015 when (as in the Former Sales Manager's case) management required significant experience before hiring new sales managers or other technical sales staff personnel.

56.     Indeed, the **Former Technical Sales Manager** confirmed that Evoqua's practice of replacing many experienced employees with less-experienced or inexperienced individuals had a serious impact on Evoqua's ability to generate new business as replacement employees were, for

example, unable to answer customer questions.   Like the **Former Business Development Manager**, the **Former Technical Sales Manager** stressed that, although there were occasional instances where a customer needed a new product or piece of equipment immediately, most of the time their sales process involved long-term projects—and cultivating the relationship with the customer—with sales cycles often running one to five years.   However, as the IPO approached, senior management increasingly stressed "week-to-week" sales performance at the expense of cultivating larger, long-term projects in order to boost short-term equipment sales, such that management seemed to care only about what sales personnel could "bring in" on a weekly basis (with the "huge pressure" for short term sales also continuing after the IPO).   The pressures on the increasingly inexperienced sales force, the reduced pay, and the high level of turnover of corporate managers (for example, the **Former Technical Sales Manager's** division had four different managers from 2015 through 2018) resulted in what this former employee described, by the time of the IPO, as being a high level of internal turmoil at the Company, such that when the **Former Technical Sales Manager** left in 2018 "employees were always on edge, no matter what you did."

57.     As further stated by a former Evoqua Vice President of Sales (the "**Former VP of Sales**"), who worked at the Company from 2016 through January 2018 and who reported to James Kohosek, Evoqua's Executive Vice President and Chief Administrative Officer, Evoqua "retired" or otherwise terminated about 600 people in the years immediately preceding the IPO between 2015 and 2016, mostly in sales and administration.   (The IPO Prospectus stated that Evoqua had "nearly 600 sales and support personnel.").   The **Former VP of Sales** further stated that the reason that so many people were let go during that time was to reduce the Company's biggest cost— namely employee compensation—by replacing the terminated employees with younger and cheaper ones.   Indeed, the Former VP of Sales recalled that Defendant Webster, Evoqua's EVP

and Chief Human Resources Officer, received compensation of roughly $2 million in connection with the IPO (which the Former VP of Sales viewed as an unheard of amount for an HR professional at a company of Evoqua's size) and believed that it was for having cut so much of the Company's employment expense through job cuts and slashing employee compensation.

58.     The **Former VP of Sales**, like other former employees discussed above, also described Evoqua's use of "impossible" sales targets and how the salesforce had "serious issues" with the targets they were given.  For example, in the Municipal division, all bids and potential contracts for municipal projects are public information, such that the Company was able to know what reasonable sales targets would be in light of the universe of all potentially available municipal projects.  However, top management (at the level of the division head or the company CFO, Defendant Stas would then set sales targets that were literally impossible for the division to meet, as they were set at levels that were higher than the revenue that would be available from all known municipal works projects put out for bid, so that there would be no reasonable way for sales teams to achieve their quotas.  Top management's setting of unreasonable sales targets for its sales personnel and related "messing with their compensation" helped drive the loss of the Company's more skilled, experienced and (previously) motivated employees.  The **Former VP of Sales** (who also had involvement in salesforce training efforts) also stated that Evoqua did not have a good "onboarding" process to train the significantly cheaper new hires that were brought in to replace their more experienced predecessor.

59.     Unsurprisingly, the **Former VP of Sales** also confirmed that the loss of so many skilled and experienced Evoqua personnel had an adverse impact on the Company's sales and growth.  In particular, this former employee confirmed that Evoqua was "definitely" experiencing flat organic sales growth during his/her tenure—and that the reason for the flat growth was the

very high employee turnover, particularly in the sales force, that occurred prior to the IPO.  The **Former VP of Sales** also cited a particularly disastrous example of Evoqua's cost-cutting efforts involving "Project Capture," which was headed by Senior Vice President, Mitch Summerfield. "Project Capture" involved trying to reorganize Evoqua's Light Industry group, which was one of the Company's largest (if not the largest) business segment—but which was also in a "tailspin." As the **Former VP of Sales** stated, Summerfield instituted "draconian measures" to try to improve the segment's poor performance.  These measures included putting 80% of the division's sales force on a "performance improvement plan," eliminating entire corporate sales teams, having the prior sales director let go, and otherwise mistreating employees.  These draconian cost-cutting measures only exacerbated the division's problems, causing further loss of capital projects and service contracts—and also resulting in such a loss of trust by employees in this area, who felt "violated" by Summerfield's actions, that there was no way to fix the now worsened problems in the division without having to make even further wholesale personnel changes in the group. Summerfield himself was terminated in or around early 2018.

60.     Similarly, a former **Northwest District Operations Manager** (who reported to the General Manager of the Northwest Region, and who had started at Evoqua predecessor Siemens Water in late 2004 before finally leaving Evoqua in the fall of 2018), confirmed that Evoqua had aggressively used a combination of "early retirement" packages, cancellation of accrued paid time off, and reneging on bonus payments to "improve" the Company's financials, which he/she believed was to help facilitate the IPO and to thereafter maintain the Company's stock price.  This former manager recalled that most significant layoffs came in the period leading up to the IPO, with "groups of people" being laid off, or taking early retirement, every few months.  The biggest group of layoffs occurred when the VFP (the early retirement program) was rolled out—and

although over 200 employees left through the VFP program, that number did not include the many others who did not qualify for the VFP program but who were laid off as part of the implementation of "reduction-in-force" policies. This former manager noted that the layoffs—which included administrative and customer service functions—were so extensive that, by the time this employee left in 2018, he/she was doing the work of eight people, having been asked to take over branch management responsibilities for eight branches in Northwestern Canada, Washington State, and Northern California that had previously had their own managers.

61.    Similarly, a former employee in Evoqua's Dewatering division who had started at Evoqua predecessor Siemens Water in 2007 before finally leaving Evoqua in the fall of 2017 (the "**Former Inside Sales/Service Sales Rep**) also confirmed that Evoqua had begun to implement an "early retirement" program in around 2016 that was targeted at getting older employees—who were the ones with the most extensive knowledge of the Company's products and services—to leave. This former **Inside Sales/Service Sales Rep** recalled being told by colleagues who accepted the package that management had told them that accepting the plan was "the only way to go." As this former employee also stated, this program cost the Company a lot of talent and experience, as the terminated employees were replaced by younger, cheaper employees who didn't know the business, which adversely affected Company sales.

62.    Similarly, another veteran former Evoqua employee who started at Evoqua predecessor US Filter in 2005 and did not leave until the fall of 2018, and who had the title of Senior Sales Representative (the "**Former Senior Sales Rep**"), described how a large number of Evoqua personnel—many of whom had 20 or more years of experience—had been terminated in the year or two prior to the IPO, resulting in the loss of a "massive knowledge base" for the Company. This **Former Senior Sales Rep** recalled that by early 2017 Evoqua had implemented

what was known as its "VFP" policy, pursuant to which employees who were 60 years of age or older were offered an early retirement package. Eligible employees, however, would be given only a week or two to decide whether to accept their retirement proposal, and were told that if they did not take their offer the Company "did not know what their future held for them." Other employees were effectively forced to leave. Terminations initially appeared to be focused on administrative personnel (including billing and customer service staff), but then became more focused on cutting experienced sales staff.

63. The **Former Senior Sales Rep** also confirmed Senior Vice President Mitch Summerfield's role in implementing disastrous cost-cutting measures beginning in the first half of 2017. For example, Summerfield announced that all administrative staff hired in his division after approximately 2012 or 2014 would be terminated, with the result that its billing, book-keeping, and related work would be outsourced. Summerfield's "arrogance" also alienated many employees under his supervision. Between Evoqua's early retirement policies and the practices implemented by Summerfield, support services, administrative support, and sales staff in the Seattle office where the **Former Senior Sales Rep** worked were cut almost in half, requiring the remaining employees to "pick up the slack" without additional resources and outside contractors had to be hired to perform basic services such as customer installations.

64. In sum, as the **Former Senior Sales Rep** stated, Evoqua had been a good company, but it changed and went downhill once new top management was brought in to prepare the Company for its IPO by cutting experienced salespersons and customer service staff. These changes harmed Evoqua's relationships with its customers and damaged Evoqua's credibility and its ability to keep customers satisfied for the long term. By the time this former employee left, it

appeared instead that top management was now really only focused on maximizing equipment sales which had the shortest sales cycles, causing Evoqua to lose long-term customers.

65.     Indeed, as a result of Evoqua's staff cuts and sales force turnover, the **Former Senior Sales Rep** stated that Evoqua has continued to lose customers up until the present day (early 2019), based on (a) his/her conversations with current Evoqua employees that he/she has stayed in touch with and (b) his/her conversations with employees of the **Former Senior Sales Rep** new employer (a competitor of Evoqua) who has continued to gain new customers that had previously been Evoqua's before the IPO.

66.     A **Former Senior Sales Engineer** in Evoqua's Environmental Services division, who held that position from early 2014 through May 2018, also confirmed the Company's efforts to get rid of higher paid, more experienced sales personnel before the IPO.  This Former Senior Sales Engineer also described how, by the time of the IPO, the way the Company paid compensation to sales staff was: if you were at 80% or below your sales quota, you didn't get paid any commissions; if you were between 80% and 90%, you would get paid 50% of your commissions, which increased by 2% increments until you hit 90%; at 90% of your goal, you received 60% of commissions, which went up in increments of 4% until you hit 100% of goal; only if you made 100% would you get paid your full commissions.  Although this former employee had been a high performer, in the fall of 2017 he/she was given a sales quota that could not be reached "in my wildest dreams."   The **Former Senior Sales Engineer** stated that the above compensation structure was part of an effort to push out the higher paid employees.  This former employee had been invited to attend a "President's Council" meeting of roughly 30 high performing sales personnel in early 2017 at a "nice venue" with Defendant Keating and other members of Evoqua's executive leadership team, and recalled Keating saying that the Company

was going to go public and giving a preview of the pitch that he planned to give on the roadshow with potential investors. As someone who had been in the industry for many years, the **Former Senior Sales Engineer** also recalled thinking that it was curious and unrealistic for Keating to say that the Company was planning to grow by roughly 10% per year (which even the much better managed U.S. Filter could not achieve) —especially as the experienced people who knew the water business were increasingly no longer even working for Evoqua.

67.     The **Former Senior Sales Engineer** stated that suppliers showed a reluctance to work with Evoqua due to the fact that the Company had delayed payments, which was a common practice in the environmental services division.

68.     As confirmed by a **Former Technical Support & Sales Manager**, who worked at Evoqua or its predecessor for nearly a decade before leaving in late 2016 due to a $1,000,000 increase in his/her sales quota, the Company implemented a large buy-out program prior to the IPO that was targeted at its most senior employees, which a large number of those employees accepted. However, as the **Former Technical Support & Sales Manager** stated, because this program resulted in terminating a large percentage of the Company's most experienced employees, it did not appear to make any business sense other than to artificially decrease employee compensation expense, and s/he was never given any good business reason by management for striking so many experienced and capable employees from the Company's payroll.

69.     A former Evoqua Sales Compensation Administrator (the "**Former Sales Compensation Administrator**")—who worked at Evoqua from April 2016 through April 2017 and was tasked with calculating the commissions for sales reps—recalled doing calculations for senior staff who wanted to get rid of older sales reps and stated that it was "clear" that the Company

was forcing some of the older, seasoned sales reps out of the Company and "absolutely" hiring new people and paying them significantly less.

70.     Tellingly, Evoqua's own Offering Materials recognized the importance of experienced personnel, as they represented that the Company's "continued success depends on our ability to retain or attract skilled technical, engineering, sales and other key personnel, for whom competition is intense, both in retaining our existing employees and in replacing or finding additional employees."   As the Offering Materials also stated, "to maintain and enhance our customer relationships, we intend to continue to invest in our sales force."   Nowhere, however, did the Offering Materials describe how Evoqua's own policies and practices in the 24 months prior to the IPO had resulted in a sharp decline in the Company's retention of its older and most experienced employees and in their replacement by vastly less experienced personnel—and how as a result the Company's business and ability to have "continued success" had ***already*** been significantly impaired as of the IPO.

## 2.     Evoqua's Elimination of Its Integration Team

71.     As another part of its pre-IPO cost-cutting measures, Evoqua terminated personnel with the most experience integrating acquired companies.   Even those that were left did not understand the Company's processes and would prove ineffective in handling the integration of acquired companies.   Evoqua also attempted to cut costs by using the cheapest available systems that were not customized to handle the unique concerns that would arise from integrating the companies Evoqua acquired (for example, the field in the software for inputting part numbers would not take the full number Evoqua had assigned to it).   These cost-cutting measures had an adverse impact on the Company, as Evoqua itself recognized that its inability to properly integrate acquired companies would pose a threat to its growth strategy.   Yet that is precisely the undisclosed

route that Evoqua took.  After eliminating those with proven integration capabilities, Evoqua was left only with employees with no experience in this critical area.

72.     As stated by a former Evoqua employee who was hired around 1975 by an Evoqua predecessor and remained with the Company until leaving in late 2016 as a Director of Materials for Evoqua's services business (the "**Former Director of Materials**"), and who spent several years handling integration matters for Evoqua predecessors, Evoqua's efforts to integrate its pre-IPO acquisitions in 2016 and 2017 were adversely affected as Evoqua eliminated the individuals with the most experience integrating acquired companies.  The **Former Director of Materials** explained having a role of being responsible for the procurement, inventory, distribution, and maintenance in Evoqua's SAP systems (i.e., Systems, Applications, and Products) and working directly on the integration of Evoqua's acquisitions.

73.     The **Former Director of Materials** recounted that Evoqua's integration efforts were impacted by the fact that the group who did integration work—which had been led by Karen Dence—had "shrunk drastically."  As the **Former Director of Materials** stated, if a company does not know how to properly integrate an acquired company, then it is merely purchasing the company and hoping that the acquired company sends it cash.  The **Former Director of Materials** stated that it was "obvious" Evoqua had acquisition integration problems, including because the people who had worked on integrations were gone.  This former Evoqua employee cited Evoqua's acquisition of Neptune-Benson as an example of the ramifications that an unsuccessful integration can have on a company.  Indeed, when the **Former Director of Materials** left Evoqua, Neptune-Benson's operations had still not been properly integrated—for example, it continued to use a different accounting system from the rest of Evoqua and was not on the Company's SAP Enterprise Resource Planning ("ERP") tool.

74.     A former SAP Program Manager (the "**Former SAP Program Manager**")—who worked at Evoqua from October 2014 to March 2017 and was responsible for all aspects of the SAP system (i.e., Systems, Applications and Products)—reported seeing issues with SAP at Evoqua that were "not kosher."   According to the **Former SAP Program Manager**, SAP integration was a critical aspect of the integration of acquisitions and, indeed, everyone sat on the sidelines until the SAP team could integrate the acquisition into the system.  To start, the **Former SAP Program Manager** stated that Evoqua pressured higher paid employees to leave and brought in lower paid, less experienced employees.  Further, the **Former SAP Program Manager** stated that, while Evoqua had the capacity through its SAP ERP system to account accurately for inventory, it was "not doing it."  For example, the Company failed to track water filtering tanks that accounted for a large chunk of inventory.

75.     The **Former SAP Program Manager** also stated that Evoqua had issues with integration because it was unwilling to allocate sufficient resources to this task.  The **Former SAP Program Manager** pointed to the Neptune-Benson acquisition as an example of a poorly done integration—as it was "left out there" and not integrated for a long time.  In that regard, the **Former SAP Program Manager** stated that there was "no dedicated integration team" at Evoqua.  While Evoqua staff pushed for this function, including the **Former SAP Program Manager**, management never moved on it and sufficient resources were never allocated to it.  According to the **Former SAP Program Manager**, Evoqua did not know what it wanted to do with the inventory, did not know how to integrate the people (from the acquired companies) and did not know how to get synergies—yet Evoqua kept acquiring more and more companies.  But, according to the **Former SAP Program Manager**, there was no visible accretion from Evoqua's acquisitions.  Indeed, because the acquisitions were not meeting bonus targets, the **Former SAP**

**Program Manager** understood that they were not meeting growth projections.  It appeared to the **Former SAP Program Manager** that the Company was just buying other companies and "hop[ing] for the best" as a tactic to hide the lack of organic growth.

76.     The **Former SAP Program Manager** stated that AEA was "calling all the shots" at Evoqua, had "handpicked" CEO Keating and CFO Stas and then strong-armed them into doing the IPO.

77.     The **Former SAP Program Manager** also reported that Evoqua was booking revenue at the letter of intent stage and that service contracts were being recognized too early. According to the **Former SAP Program Manager**, "everything was frontloaded and aggressive." Relatedly, the **Former SAP Program Manager** stated that Evoqua was booking ongoing service contracts as "lump sum" acquisition-related costs, which was "flat out wrong."  An example was Evoqua's contract with a Cincinnati-based company called Itelligence. Evoqua had a service agreement with Itelligence, which the **Former SAP Program Manager** directly negotiated with Itelligence, for multiple full-time SAP related employees.  At first, Evoqua booked this cost as part of its day-to-day operations—but this was later reversed and the expense was labeled a "non-operating cost."

**D.     Evoqua's Improper Revenue-Inflating and Expense-Deflating Activities, in Violation of GAAP, Present a Materially Inflated Picture of Evoqua's Financial Performance and Prospects, and Help Further Conceal the True Extent of the Problems Plaguing the Company**

78.     In addition, in the period prior to the IPO (as well as after), Evoqua personnel engaged in practices that had the effect of artificially and materially inflating its reported revenue, income, and EBITDA, in violation of GAAP.  These improper practices and violations of GAAP, none of which were publicly disclosed, had the effect of presenting a materially inflated picture of Evoqua's financial performance, growth rate, and prospects as presented to investors in the IPO

Offering Materials (as well as subsequently issued financial statements), while also concealing the extent of Evoqua's inability to achieve organic growth. Evoqua's improper revenue-recognition practices included improperly recognizing revenue on (a) shipped products that were subject to broad rights of return; (b) shipped products that the customer had not yet agreed to purchase, including on products shipped to third party storage vendors ("inventory parking"); (c) products that had not been shipped at all; and (d) products that Evoqua had not yet even manufactured. In addition, Evoqua's reported income was further inflated as a result of its practice of improperly deferring its payment of expenses.

79.     As further alleged at ¶¶ 271-85, below ("Additional Allegations of Scienter"), for purposes of Plaintiffs' Exchange Act claims, Plaintiffs allege that the Exchange Act Defendants knew of or were recklessly indifferent to Evoqua's participation in the accounting violations and manipulations and related reporting of materially false or misleading financial statements as alleged herein, and engaged in such conduct to help conceal Evoqua's lack of organic growth and to otherwise permit Evoqua's stock to be issued in the IPO at an inflated price (and to thereafter help maintain an inflated price for the stock). As stated elsewhere, Plaintiffs exclude any allegations of fraudulent intent as to their Securities Act claims.

80.     Examples of Evoqua's improper revenue recognition and other accounting practices include the following:

### 1.  Improper Recognition of Revenue of Product Shipments that Were Subject to Broad Rights of Return

81.     As detailed in an Answer to Complaint and Counterclaim filed in *Evoqua Water Tech. et al v. Schuck, et. al*., No. C.A. PC2018-7572 (the "Schuck Filing") filed by Jennifer Schuck—who was Neptune-Benson's Director of Supply Chain before Evoqua acquired it in April 2016 and who then became Materials Manager at Evoqua's NB/Aquatics unit (reporting directly

to Andrew Creathorn ("Creathorn"), the Vice President and General Manager of Evoqua's NB/Aquatics Group—to inflate Evoqua's financial performance senior Company management would authorize deals that granted the customers broad rights to return the products.  For example, Schuck described the "Myrtha Pool Order" transaction, where Creathorn negotiated a contract for filters worth in excess of $1 million to be shipped in Evoqua's third fiscal quarter of 2017, ending June 30, 2017.  To boost the Company's revenue, as part of the deal Creathorn directed Scott Hyland, a Channel Specialist at NB/Aquatics, to agree to give the customer the option to return the filters at a later date.

82.     Similarly, at the end of the fourth quarter of 2017 (ending September 30, 2017), in an effort to help Evoqua create the appearance of meeting its year-end revenue and sales targets— which in turn would allow senior managers to qualify for increased bonuses and stock options— Schuck stated that Evoqua sales personnel had taken extraordinary steps to try to close a sale of 20 large 55" filters (normally valued at $3 million) that had been manufactured for use in connection with a large Mexican resort project.  However, despite offering steep price discounts and extended payment terms, efforts to close a sales agreement with the prospective customer were unsuccessful because the designs for the resort had not been completed.  Accordingly, in an effort to book the sale before year-end, Evoqua's upper management (including N/B-Aquatics Finance Director, Imran Parekh ("Parekh") resorted to use of even more aggressive incentives in an effort to sell the product, including by offering a 50% discount as well as verbal side assurances that the "sale" would be subject to the buyer's ability to return the product later (which would be "outside of the written contract" in order to disguise the "deceptive" nature of the purported sale.

> 2.     **Improper Recognition of Revenue on Product that the Customer Had Not Yet Agreed to Purchase, Including on Product Shipped to Third Party Storage Vendors ("Inventory Parking")**

83.     To artificially inflate their reported sales and related revenue, Evoqua personnel also booked revenue on the shipment of product where the customer had either not yet agreed to purchase the product at issue, or had only agreed to take delivery at a later date (including in situations where Evoqua personnel, knowing the customer's position, would instead arrange to ship the product to a third party storage vendor that, at Evoqua's expense, agreed to hold (or "park") the relevant product inventory until an end-user customer actually agreed to accept delivery and assume the risks and liabilities of ownership).[4]

84.     For example, as Schuck describes in her court filing, to improve Evoqua's year-end performance for fiscal 2016 (and to obtain a larger performance-based bonus and stock option award for himself), Creathorn was personally involved in organizing unusual arrangements to allow premature booking on an expensive project in China, known as "Ocean Park."  Although Evoqua knew that the customer did not actually need the product—which included 13 filters and multiple UV units—until two years later in late 2018, to improve Evoqua's 2016 financial statements, Evoqua shipped the product to be warehoused in Hong Kong.  Tellingly, to avoid internal scrutiny, although Evoqua agreed to pay for storage at $3,000 per month (for an estimated total cost of over $60,000), Evoqua arranged to have these costs nominally paid by one of NB/Aquatics' agents in Asia, with the understanding that Evoqua's N/B-Aquatics unit would reimburse the agent at a later date.

---

[4]     As further detailed in §VII below, GAAP precludes recognition of revenue upon the purported "sale" of a product where there is not a binding obligation to purchase the product at issue, or where the risk of loss has not yet passed to the buyer (because, e.g., the seller continues to be responsible for holding and storing the product).

85.     Schuck also described another project, named "American Dream," where Creathorn and Parekh (NB/Aquatics' Finance Director), with the knowledge and approval of Defendant Rodi, worked directly with NB/Aquatics planners to prematurely recognize revenue on a large project.  Specifically, in connection with this project, the Company purchased a number of shipping containers, which were loaded with expensive filters and used to store the product for over a year, until the customer actually needed them delivered to the job site.  To persuade the customer to go along with these arrangements, Schuck stated that Evoqua offered the customer deeply discounted prices and extended payment terms (as well as free storage).  Tellingly, to avoid internal scrutiny and disguise the dubious nature of the arrangements surrounding this transaction, Evoqua arranged to store the containers in which the product had been "parked" at a local facility owned by Bill Finnegan—a person with a pre-existing business relationship with N-B/Aquatics.

86.     As the Schuck Filing further states:

Coinciding with the early shipment of the [Ocean Park and American Dream] projects [in the fall of 2016], [N-B/Aquatics] Upper Management directed [its] Logistics Manager to negotiate a rate with [a] local freight forwarder, a company by the name of SEKO, to store filters off site at [SEKO's] facility.  This was the beginning of the practice of Upper Management directing [N-B/Aquatics'] Sales to offer deep discounts and extended payment terms for Customers to take product early [when actually Neptune-Benson, i.e., Evoqua] would store the filters locally at the freight forwarders' warehouse in order to deceptively inflate revenue and sales numbers.

87.     As Schuck's court filing further states, "The pressure at NB[/Aquatics] to reach targets in order to line the pockets of Upper Management and improve Evoqua's overall financials was immense….  The means to increase the sales and revenue [was] not hard work and marketing, [but] fraud and deception.  As a result of this stress, the Logistics Manager resigned and NB's Production Manager went out on sick leave, due to stress, for six months."

88.     In addition, as stated in the Schuck court filing, senior management pressured Sales to initiate last-minute "sales" and ship whatever filters were available, even if the size was incorrect

or not yet approved by the customer, so that the customer could be billed and Evoqua could (improperly) recognize the revenue.  Eventually, once the customer had actually approved the correct filter size (or, presumably, determined that the wrong sizes had been shipped), the original product would be returned from whatever storage facility had been used to park the inventory.

### 3. Improper Recognition of Revenue on Product that Evoqua Had Not Yet Shipped

89.   As stated in the Schuck Filing, immediately prior to the IPO Evoqua also implemented a temporary directive to allow the Company to recognize revenue on product "sales" that had not been shipped.  Specifically, for the third quarter of 2017, Finance Director Parekh directed Evoqua's NB/Aquatics' Sales department to adjust the delivery terms on all of its domestic projects from "delivery duty paid" ("DDP") to "ex-works" ("EXW").  The change was implemented to improve the Sales Team's ability to "ship" product by eliminating the requirement of actual delivery, thereby allegedly giving Evoqua a basis for recognizing the revenue on the product immediately on existing inventory on the grounds that Evoqua's delivery obligations had purportedly been satisfied by making the product available for customer pick-up at NB/Aquatics' facility—even though many customers had no interest in actually taking delivery until much later. As the Schuck Filing states:

> [In the] 3rd QTR of 2017, [Finance Director] Parekh applied his "creative accounting" methods to modify the terms of delivery on all open quotes and projects initiated by Sales … to default to EXW.  EXW was employed as a tool to further the business practice of billing and recognizing revenue for filters that were not yet approved and/or manufactured and shipped, as well [to allow] Sales to negotiate deals with Customers up to the last day of the month, to further inflate Evoqua's financial outlook.
>
> As a standard accounting practice, EXW is not considered a domestic delivery term and upon [the] close of [the] 3rd QTR internal auditors challenged Parekh's contractually revised delivery terms.  Upon reviewing the documentation, many of the Customers' terms of delivery on the purchase orders and/or signed quotes did not coincide with the delivery terms on the subsequent sales order.  To salvage the recognized revenue on these projects, Upper management nefariously directed

Sales to request [that] the Customer sign and back date a new PO and/or quote with delivery terms listed as EXW.  Even though Evoqua ultimately accepted the erroneous revenue for [the] 3rd QTR 2017, the delivery term EXW was ban[n]ed from use on any future domestic projects.

90.    In addition, as previously noted, senior management pressured Sales to initiate last-minute "sales" and ship whatever filters were available at quarter's end—even if the size was incorrect or not yet approved by the customer—so that the customer could be billed and Evoqua could (improperly) recognize the revenue.

### 4.    Improper Recognition of Revenue on Product that Was Not Even Manufactured or Finished (Let Alone Shipped)

91.    As stated in the Schuck Filing, Evoqua also recognized revenue on "sales" of product *that had not yet even been manufactured or finished*.

92.    As discussed in the immediately preceding section, in the period leading up to the IPO Evoqua's NB/Aquatics unit would ship "whatever filters were available" so that it could recognize revenue on "last minute" orders received before quarter's end – even if the size was incorrect or not yet approved by the customer.  However, even in circumstances where there was no filter available, Evoqua would get a local freight forwarder to sign off on a filter bill of lading (or "BOL," which is meant to be the written receipt given by a carrier for accepting goods), which would then be sent to Finance together with the project file for billing and revenue recognition. The filter that had actually been ordered would then be manufactured at a later date, and shipped directly from Evoqua's NB/Aquatics' finishing facility in Bridgeport, CT, to the freight forwarder's off-site location.

93.    Schuck also identified two specific examples from the end of Evoqua's fiscal third quarter where the Company booked revenue on large project filter orders before the manufacturing of the product had been finished or even started.  In the first of these two examples, Sunbelt Pools (which specializes in the construction of waterparks and large commercial-scale pools for

municipalities, universities, and country clubs) placed an order (the "Texas Sunbelt Order") for several fiberglass filters for use in connection with three large projects.  After the filters for *one* of the three Sunbelt projects were finished, Evoqua's NB/Aquatics unit shipped the product for that *one* project at the end of its third fiscal quarter of 2017 – but not until after first "staging" that product *three* separate times for pictures at Evoqua's Rhode Island facility.  Evoqua personnel then sent three separate bills of lading to Finance so that the customer would then be billed for – and Evoqua could promptly recognize revenue on—all three of the projects.  It was not until later that the filters for the other two projects were completed, allowing the product for the other two projects to actually be shipped to the customer.

94.    Schuck's Filing also describes how Creathorn and Defendant Rodi negotiated the sale of several project filters and a stock filter order with a customer, Neuman Pools (which bills itself as the United States' premier builder of aquatic facilities, including commercial and residential swimming pools and water parks), for ultimate use by Great Wolf Lodge (which operates 17 family waterpark resorts across the U.S.).  As a matter of its standard practices, Great Wolf Lodge requires that filters installed at its facilities have a special "access port," but Evoqua and its NB/Aquatics unit did not hold such custom filters in stock.  Nonetheless, after Creathorn and Defendant Rodi succeeded in getting the contract for this order executed, the order was sent to Sales for processing, and "shipped" during that last week.  However, it was not until months after the revenue was recognized on this transaction that the relevant filter specification approvals were received from the customer – and, as the Schuck Filing states, "[o]nly then did [NB/Aquatics] manufacture the filters that [had] already [been] invoiced and fraudulently marked as shipped."

95.    As the Schuck Filing states, the "Great Wolf," "Texas Sunbelt," "Myrtha Pool," and "Australia" Orders (discussed in ¶122) were just four of the "most blatant and excessive

examples of deceptive and unethical practices" at Evoqua.  Indeed, the revenue-recognition and related accounting manipulations involving Evoqua's and its NB/Aquatics unit's phony "shipments" of product that had not yet been manufactured were sufficiently extensive that the Company created a "second set of books" to help manage all of its deceptive practices.  This "second set of books" was kept outside of what Evoqua's NB/Aquatics unit maintained on its regular "ERP" accounting system, so that, for example, the second set of books would show correct filter inventory count by removing from "inventory" filters that should have been (but were in fact not) shipped earlier.

### 5. Additional Former Employee Confirmations of Evoqua's Premature Revenue Recognition Practices

96.     Other former Evoqua employees also confirmed that, in the period leading up to (as well as immediately after) the IPO, the Company engaged in premature and improper revenue recognition activities.  For example:

97.     The **Former Business Development Manager** also stated that he/she understood that Evoqua was "holding units" on behalf of customers that were not yet ready to take possession of the product.  Similarly, the same former employee recalled being told by Evoqua Product Engineers, in substance, that the Company had shipped products to customers, even though it understood that the products would not meet the customers' requirements.

98.     As the **Former Senior Manager** stated, Evoqua had a history of sporadically "bringing forward" revenues on long-term, multi-year service contracts with clients so that Evoqua could recognize the revenue in an earlier quarter, regardless of whether the relevant services had been performed at the time of billing.  What changed, however, beginning in 2016, was that the amount of revenue that was "pulled forward" began to increase substantially, and although the **Former Senior Manager** could not quantify the total amount of revenue that senior management

"brought forward" in this manner in 2016, the **Former Senior Manager** is certain that it was "significant."  In sum, instead of recognizing the revenue as the services were performed, Evoqua opportunistically recognized at quarter-end not only revenue on such contracts that had actually been earned or previously scheduled to be paid in that quarter, but would also recognize an additional amount for all or part of the revenue that Evoqua expected to earn (or was scheduled to be paid) in the next quarter.  For example, the **Former Senior Manager** noted that Evoqua had contracts to perform services related to the operations and maintenance of water treatment plants for utility companies, such as PSE&G and Consolidated Edison, which generated fees of approximately $50,000 per month.  Accordingly, "pulling forward" the revenue on such contracts could result in an extra $50,000 to $150,000 in revenue for a current quarter, but at the expense of the following quarter.

99.     Similarly, the **Former Senior Sales Rep** stated that he/she was told by his/her Operations manager that in September 2017, immediately before the IPO, the Company took all sales that were scheduled to be "booked" in October 2017 (the first quarter of fiscal year 2018), and pulled them forward into September 2017 so that the Company's financial statements for the fourth fiscal quarter and year ending September 30, 2017 would appear significantly stronger (at the expense of reduced bookings in the following quarter).  Even though delivery had not been made or services rendered, the Company chose to recognize the revenue in FY2017 rather than the first quarter of 2018 ("1Q2018").

100.    The **Former Senior Sales Rep** also stated that the Company took similar action to "pull forward" bookings in September 2018, when he/she was informed by an employee in the billing department that top management had instructed the billing department to invoice "everything" on projects or contracts that were scheduled to be completed, performed or shipped

in October though early November, regardless of whether projects were complete or services rendered, so that the customers could be invoiced before the end of September 2018 (the end of Evoqua's fiscal 2018).  This former employee understood this directive to apply to at least all branches nationwide in that employee's division (the High Purity Water division).  The **Former Senior Sales Rep** explained that management knew this early billing would result in customer complaints of premature billing and overbilling, and accordingly sales staff were ordered not to take any time off during this period so they would be available to address calls from irate customers.  As expected, Evoqua's early invoicing did indeed lead to numerous complaints from customers who knew that they had been billed for installations that were not yet complete and billed for service calls had not yet occurred.

101.    In addition, the counterclaim filed in *Evoqua Water Tech. et al v. Moriarty, et al*, No. C.A. PC2018-7572 (the "Moriarty Filing") filed by Mathew Moriarty, a former Evoqua Sales Representative and Sales Director at Neptune-Benson who then became a Channel Sales Director at Evoqua's NB/Aquatics unit until he was terminated around the time of the November 2017 IPO, further confirms that Evoqua was engaged in "cooking the books" in the run-up to the IPO.

102.    As stated in the Moriarty Filing, from April 2016 through June 2017, in an effort to artificially inflate Evoqua's financials in preparation for the next acquisition, under the direction of Defendant Rodi, Moriarty and others were directed to work with customers to convince them to take delivery of orders much earlier than the customers required.  Moriarty was informed that without doing this, Evoqua would fall very short of the required sales goals, which were artificially inflated.  Moriarty was therefore forced, *inter alia,* to try to build up Evoqua's backlog early by discounting to artificially inflate the Company's sales figures, even if it involved simply recording pending orders with merely a letter of intent, and even though "most all" of the orders included in

the Company's backlog "were not even approved by the customer," which Moriarty described as "cooking the books."

103.    By the June 2017 quarter, moreover, Evoqua's customers were becoming accustomed to Evoqua's willingness to offer substantial discounts in exchange for them agreeing to take delivery much earlier than customers needed the product—with many of those discounts being orchestrated by Evoqua management without Sales being involved.  Evoqua would beg customers for letters of intent for projects that would not be installed for months, if not years, and then request the customers to take delivery months (and sometimes years) before the customers would install the equipment, enticing them again with deep discounts and extended terms. Moriarty also stated that although June 2017 was "a record sales month" (and also the last month of the last fiscal quarter whose results would be included in the disclosure documents to be issued in conjunction with any potential sale or IPO), it was only a "record sales month" because of the efforts "to deliver as much product as possible through any means to artificially increase the sales numbers in preparation to be acquired and/or go public."  For example, a "large majority of Evoqua's large projects that were slated to ship [had] already been billed, and some paid for before the order was even shipped."

104.    As further stated in the Moriarty Filing, as a result of all of Evoqua's efforts to pull-up sales, by the time of the IPO Evoqua's backlog was "heavily depleted"—with the result that going forward "Evoqua now had to make up the lost sales from all the 'pull forwards' and discounts by offering even further concessions to customers."  Moreover, as the Moriarty Filing further alleged, "many products" that remained on Evoqua's backlog "were no longer active, but management refused to remove them as it would negatively affect the sales numbers and achieving the set goals [–] [a]gain, resorting to cooking the books."  Nonetheless, at around this time Evoqua

increased the NB/Aquatics unit's goals by 30% for 2018, which was not achievable "based on normal sales, [because] the baseline was the year [fiscal 2017] all the discounted sales and pull-forwards that [Evoqua had] used to artificially inflate the sales numbers."

105.    In addition, a former manager, who was employed by Neptune-Benson and then Evoqua's NB/Aquatics Group from April 2016 through his/her resignation in August 2017 as U.S. Sales Manager, Heat Exchange Applications (the "**Former US Sales Manager**") (reporting to a General Manager in Wisconsin named Mark Surprenant), confirmed that Evoqua would recognize book upon the receipt of a letter of intent, and without waiting for a signed contract or purchase order.  The **Former US Sales Manager** further stated that it was understood that this was done in order to increase revenues and meet the Company's short-term revenue projections.  By contrast, the **Former US Sales Manager** added that, for the purpose of determining sales employees' commissions, the revenue would not be recognized until the actual purchase order came in—which sometimes would not occur until months later.

106.    The **Former Inside Sales/Service Sales Rep**., who reported to Sean McGaughran, the Director of Aftermarket Sales, also described how Evoqua employees faced ever increasing pressure to book sales prematurely as the IPO approached (beginning in roughly late 2016 and continuing through 2017), "and the Company didn't care how it was done."  Moreover, this former employee, who worked in Evoqua's Industrial Group, also confirmed that recognition of revenue based on a mere letter of intent was not confined to Evoqua's Aquatics Group.  In particular, the **Former Inside Sales/Service Sales Rep** also recalled a specific instance of a large service retrofit contract worth approximately $400,000, and which included the sale of new filter plates of a different size, for one Evoqua's regular customers, Nunavik Nickel (a mining company).  As the **Former Inside Sales/Service Sales Rep** recalled, he/she was ordered by his/her boss, Mr.

McGaughran, to try to get the customer to sign a letter of intent for the $400,000 purchase before the close of Evoqua's fiscal third quarter ending June 30, 2017, so that the revenue on the transaction could be booked in that quarter without Evoqua having to wait for receipt of the actual purchase order. After the Company offered Nunavik Nickel a 10% discount as an incentive, he/she succeeded in getting the letter of intent before the close of the quarter. The actual purchase order, however, was not received until later in the following quarter. This former employee also confirmed that Evoqua frequently offered special discounts on larger orders near the end of a financial quarter during this time period so that the Company could book them before the quarter ended. The **Former Inside Sales/Service Sales Rep** also observed that year-over-year growth in organic sales was basically flat before the IPO and that the only "growth" was due to acquisitions and Evoqua's "playing games with sales."

107. Further, as confirmed by a former Technical Support and Sales Manager in the Dewatering Group (which was within the Industrial Division of Evoqua) (the "**Former Technical Support & Sales Manager**"), who was employed at Evoqua's predecessor, Siemens Water, in 2007 and who stayed at the Company through December 2016 (and who reported to Evoqua's Vice President and General Manager of Aftermarket Sales, Mirka Wilderer), Evoqua suddenly changed its revenue recognition practices in early 2016. Throughout this former employee's tenure at the Company, and consistent with the employee's understanding of industry standards, revenue was booked only when one had a physical copy of a purchase order (PO) or a signed contract in hand. Beginning in early 2016, however, this changed. As the **Former Technical Support & Sales Manager** stated, for larger deals, usually over $50,000, this former employee's boss (Wilderer) now told this former employee to book revenue upon receipt of "some form" of a mere "letter of intent" – even if it was in the form of a rather informal email. The Former Technical

Support & Sales Manager stated that he/she had never encountered this before, and thought it was very strange and uncomfortable.  The **Former Technical Support & Sales Manager** explained that, while Evoqua would book revenues upon only receiving a letter of intent, its sales staff were not compensated based on that sale until the contract was signed.

108.    The **Former Technical Support & Sales Manager** also confirmed that Evoqua pushed out the most senior and experienced people—and the consensus understanding was that this effort was to drive down compensation expenses, but at the expense of organic growth which as a result would no longer be sustainable.

109.    Similarly, the **North West District Operations Manager** confirmed that there was intense pressure from management to book revenue as soon as possible, and that (although s/he did not so) s/he believes that this pressure may well have led others to invoice projects before they were completed.  In particular, s/he recalled hearing at Company-wide town hall meetings and/or on other in-house conference calls references to billing being "pulled in" early for certain projects in order to improve the Company's revenue numbers for the quarter.  In addition, the **North West District Operations Manager** recalled a separate practice in which management ordered the branches to "push up" repeat equipment orders and service fees.   As this former manager explained, some Evoqua customers had service contracts for regular maintenance service and parts and were billed for each service call and each piece of equipment purchased, as opposed to having a flat-fee contract.  The "reports" for these services were normally automatically generated according to the schedule of service and part replacement.  However, in fiscal 2018 (the year ending September 30, 2018), management "ran the reports" manually to "push up" the orders into earlier quarters than they were otherwise scheduled to be generated, thereby recognizing revenue on those contracts early (at the expense of the subsequent period).

### E.    Evoqua's Understatement of Expenses in Violation of GAAP

110.    In addition to its improper revenue-recognition practices, Evoqua also delayed payment to vendors as a way to temporarily improve its financials.  According to Schuck, before the IPO in 3Q2017 and the fourth quarter of 2017 ("4Q2017"), the Aquatics Group withheld payments from vendors to improve its financials.

111.    Similarly, the **Former Senior Sales Engineer** stated that suppliers showed a reluctance to work with Evoqua due to the fact that the Company had delayed payments, which was a common practice in the environmental services division.

### F.    Evoqua's Manipulation of Its Sales Backlog Report and Improper Inventory Accounting Further Inflates the Company's Reported Financial Performance

112.    To improve its financial performance and to mask the erosion of its sales backlog from the illicit conduct described above, the NB/Aquatics group required that any new project initiated by the Sales team, regardless of the anticipated ship date, be recorded on the sales backlog report as scheduled to be shipped in the quarter the sale was initiated.  Because the sales backlog is an indicator of customer demand and future stability of the Company, Evoqua knowingly manipulated the sales backlog report to conceal the true state of the Company's revenue and future growth prospects.  As would be expected when sales are recognized before a customer signs a contract or Evoqua issues a purchase order, there were many cancelled orders that were already recorded as "shipped" in the sales backlog report.  Instead of removing these sales from the reports, Company management refused to remove the cancelled orders from the backlog reports, further concealing Evoqua's growth prospects and future revenue.  *See also* ¶104 above [Moriarty]

113.    Indeed, Evoqua touted its visibility into its future revenue as a "strength" in its Offering Materials.  For example, Evoqua stated:

> ***Stable, recurring flow of business with a large installed base drives superior topline visibility****.  We had high visibility into over 82% of our overall revenue at

the beginning of fiscal 2016. ***Approximately 58% of our revenue for fiscal 2016 was related to service, consumables and aftermarket parts that come from our repeat business and backlog***. A portion of this revenue is covered by annual and multi-year industrial contracts that had a 98% and 99% renewal rate in fiscal 2015 and 2016, respectively. We generate service and aftermarket revenue from a wide range of activities, including the regular delivery and installation of consumable ion-exchange replacement bottles across 25,000 industrial customer sites and the regular replacement of approximately 400,000 ultra-filtration membranes installed across 1,800 locations on 4-6 year cycles as of June 30, 2017. In particular, more than 80% of Industrial customers who purchased capital equipment during the two fiscal years ended September 30, 2015 and 2016 have also purchased services and/or aftermarket products over the past three years. ***Approximately 24% of our revenue for fiscal 2016 consisted of capital orders already contracted in backlog***. The remaining approximately 18% of revenue for the fiscal year ended September 30, 2016 represented book-to-bill projects, which we typically win and convert to revenue within the same fiscal year. For our capital related sales, we selectively focus on projects that we believe have the potential to produce continuing service, aftermarket and consumables sales. ***We believe the visibility and predictability we experience with our revenue enhances our ability to consistently drive profitability***.

However, because Evoqua's sales backlog report had knowingly been manipulated, the trustworthiness of that report in the Aquatics group had completed eroded as all sales had already been pulled forward, future sales were being recognized in the quarter they were initiated regardless of the anticipated ship date, and cancelled orders were not removed from the report. Schuck estimated that by the time of her departure in February 2018, approximately $2 million in cancelled sales were knowingly or recklessly included in the sales backlog report. Thus, contrary to indications by Evoqua, the Company had limited visibility into future revenue growth, as one of the main sources used to determine future sales and revenue could not be reasonably relied upon.

114. Evoqua also manipulated its inventory to mask its financial performance and future growth prospects. For example, as Schuck describes in her court filing, in April 2017, as she was reviewing an open order report, Schuck identified and confirmed that approximately $300,000

worth of Lawson Aquatics inventory listed in NB/Aquatics' ERP system could not be physically accounted for in the Wisconsin facility where the materials were supposed to be stored.

115.     During the course of her investigation, Schuck discovered that the Lawson Aquatics product line was being double received in the ERP system.  The senior buyer for the Aquatics group requested that the shipping department issue an open purchase order for the Lawson Aquatics vendor to be paid.  However, because the senior buyer was located in Rhode Island, the purchase order was issued for that location.  When the materials began arriving at the Wisconsin facility, there was no open purchase order available in the Wisconsin location to receive and pay for the materials.  The shipping department issued a new purchase order to receive the material in Wisconsin, resulting in the material being received twice in the ERP system.

116.     Schuck reported this discrepancy to Parekh and Creathorn and requested that the Lawson Aquatics product line be moved to a quality control ("QC") inventory location and that a physical count be performed on this line of products.  Parekh not only refused to move the inventory to a QC inventory location and perform a physical count of that product line, he ordered the Sales and Supply Chain to manage this entire product line on an Excel sheet outside the ERP accounting system.  This further complicated the inventory tracking process, as the ERP system could no longer be trusted to accurately reflect existing inventory.

117.     Schuck also discovered that when NB/Aquatics' finance team provided inventory counts to Company management, they would frequently be incorrect.  Schuck bought this information to the attention of Parekh, but was told that this was due to the existence of multiple facilities, NB/Aquatics' antiquated ERP system, as well as "creative accounting."

118.     Because of the Company's manipulation of the sales backlog report and improper inventory tracking, it became impossible to accurately track the Company's future revenue stream

and growth prospects.  Evoqua's conduct successful masked the Company's financial state from unsuspecting investors.

119.    In addition, the **Former VP of Sales** confirmed that "easily 10%" of the data in the Company's CRM system (used for tracking and managing the Company's sales pipeline/sales funnel information) was "bad," meaning that the prospective sales listed included deals that had either already closed, had stalled or been canceled, or had otherwise had their status misstated.  In addition, based on his/her participation in weekly leadership meetings with sales managers and directors from each major group (Municipal, Industrial, and Product), roughly 50% of the "pipeline" projects that they reviewed were not listed in the CRM system.  As a result, during this former employee's tenure, the Company's actual sales forecasts were based on "word of mouth" discussions, and ***not*** on data recorded in CRM or any other spreadsheets.  The failure of Evoqua's management teams to use the CRM to appropriately and accurately track all sales pipeline opportunities and to formulate sales forecasts seriously concerned this former Sales VP, as it made the Company's sales forecasts – particularly with respect to large capital projects—less accurate and reliable than they should have been.

120.    In addition, the **Former VP of Sales** confirmed that, although he/she was not responsible for managing inventory, s/he was aware that Evoqua had problems managing and accounting for its inventory.  For example, the Company's ability to get accurate inventory information for inventory stored at Evoqua's Rockford, IL warehouse was "questionable at best."

G.      **Evoqua's Heavy Reliance on Undisclosed "Channel Stuffing" Activities and Extraordinary Sales Incentives Prior to (and After) the IPO to Boost Revenue Further Conceal the Truth Concerning Evoqua's Financial Performance and Prospects**

121.    Evoqua also engaged in a range of other dubious and undisclosed "channel stuffing" practices which had the effect of concealing the extent to which Evoqua was struggling

to grow organically.  These additional practices (in addition to, e.g., offering broad rights of return) included offering customers steep discounts and extended payment terms of as long as 60, 90 or 120 days—and even indefinite "paid when paid" payment terms.

122.    Multiple sources confirm that Evoqua offered unusually deep discounts and unusually long extended payment terms to incentivize customers to purchase products, particularly at the end of financial quarters.  For example, Schuck pointed to the $1 million+ Myrtha Pool Order in the third quarter of 2017 as just one example from that quarter where senior management (in that case, Creathorn) offered a deep discount, "indefinite" payment terms ("paid when paid") and other sweeteners to close the deal.  Schuck also identified a large filter "stocking order" (the "Australia Order") from that same quarter that Creathorn and Parekh negotiated with an Australian entity (apparently a distributor) that was discounted and given extended payment terms.  In a meeting discussing this order, Creathorn stated that this stocking order was so large that Evoqua was unlikely to sell another filter in Australia for the next two years.

123.    As noted above, the **Former Inside Sales/Service Sales Rep** also confirmed that in the roughly one year period leading up to the IPO, Evoqua "increasingly played games with customers" in order to book sales, particularly by offering steep discounts on orders at the ends of fiscal quarters (such as on the previously described Nunavik Nickel deal) so that the Company could book them before the quarter ended.  This was a marked change from how the Company had operated in prior years; as this former employee put it, the Company stopped caring about customers' expectations and started to care only about booking numbers.  The result was a significant increase in the pressure on employees to "get the numbers in," and management's mindset became one of "anything to get the numbers in."  The **Former Inside Sales/Service Sales**

**Rep** also observed that year-over-year growth in organic sales was basically flat before the IPO— and that the only "growth" was due to acquisitions and Evoqua's "playing games with sales."

124.    The **Former Technical Sales Manager,** who managed between 8 and 15 sales representatives in the Filter Press Group whose customers included industrial, chemical and pharmaceutical companies, also confirmed that, by the time of the last few quarters prior to the IPO, senior management had started to put very heavy pressure on the salesforce to book whatever revenue they could by the end of each quarter, and had adopted a short-sighted strategy that was focused on trying to ramp up the Company's short-term sales numbers from smaller, short-term sales at the expense of cultivating larger projects and long-term customer relationships. Moreover, during this same time period, s/he was aware that management was increasingly authorizing unusually large discounts to customers to bring in sales more quickly, which were known as "short-sells." Although the **Former Technical Sales Manager** did not engage in such practices, the **Former Technical Sales Manager** recalled the example of a large mining project in Mexico, where Evoqua's Wilderer, among others, authorized large discounts to get the sale booked earlier.

125.    The **Former Technical Sales Manager** was also aware of management specifically pressuring a senior sales manager in the Eastern sales territory of the Separation Technology Group, Victor Van Hof, to offer "steep" discounts to close deals. Specifically, at some point prior to the IPO, he/she was on an in-house weekly sales conference call during which Wilderer told Van Hof to cut prices at quarter-end to levels that were lower than Van Hof was comfortable with to meet goals. The **Former Technical Sales Manager** stated he/she did not know the full details of what Van Hof was pressured to do, but he/she "knew something was going on" and that soon after the Separation Technology Group stopped holding sales team conference calls and replaced them with one-on-one calls with sales managers. The **Former Technical Sales**

**Manager** further stated that after the IPO the pressure to book short term sales continued to be "huge," and management simply "did not seem to care" about cultivating or supporting the development of long-term projects because they wouldn't boost revenue in the current month or quarter—even though developing such projects had historically been critical to her division's long-term performance, growth, and profitability.

126.    The **Former Senior Manager** also explained that as the IPO approached, management "absolutely" increased pressure on the sales team to bring in additional sales, by offering extended payment terms and deep discounts. The **Former Senior Manager** also explained that management did not understand the sales process or how to deal with customers and pushed the sales team to act outside of the Company's standard business practices. For example, according to the **Former Senior Manager** management pressured members of the municipal sales team to push municipal customers to place large ($1 million) orders earlier, even where the municipality could not approve the purchase until the council met.

127.    Such practices during the run-up to the IPO and the following quarters had the unfortunate—although altogether predictable—consequence of further adversely affecting the Company by undermining its future performance in exchange for artificially stimulated short-term sales results that could not reasonably be expected to be maintained. For example, as stated in the Moriarty filing, as of the IPO it was clear that it was simply "not achievable" to meet NB/Aquatics' sales targets for 2018 (which Evoqua was counting on to offset flat sales in other product segments) based on normal sales, "[because] the baseline was the year [fiscal 2017] [of] all the discounted sales and pull-forwards that [Evoqua had] used to artificially inflate the sales numbers."

128.    For example, as noted in the Schuck and Moriarty Filings and by the **Former Inside Sales/Service Sales Rep** and the **Former Technical Sales Manager**, Evoqua's customers soon

learned to refrain from placing any orders, even for current needs, until the end of a financial reporting period, as they knew that by doing so they would be offered increasingly deep discounts, increasingly long extended payment terms, and/or other "sweeteners."  As a result, the Company effectively undermined its own historic pricing structure and profitability.

129.    Further compounding the harm to the Company, by (a) aggressively seeking to recognize revenue on every potential sale or project as soon as possible—regardless of whether its customers had any current need for the product or were interested in actually taking delivery for many months or even years into the future, and (b) otherwise "stuffing its channels" and customer base with all the product they could possible need to satisfy end user demand for similarly long periods of time into the future, Evoqua was effectively stealing from the future to report inflated current sales and revenue levels that could not reasonably be sustained.

130.    As a result of these undisclosed practices, throughout the Class Period the truth concerning the state of Evoqua's business and operations was further concealed.

### H.    Evoqua's Secondary Offering

131.    On January 26, 2018, Evoqua filed a Form S-1 Registration Statement for a secondary public offering ("SPO") of shares of its common stock.  The final Registration Statement for the SPO was filed on March 12, 2018 and declared effective on March 14, 2018 (the "2018 Registration Statement").  The SPO Prospectus, dated March 14, 2018, was filed on March 16, 2018 (the "2018 Prospectus" and collectively, with the 2018 Registration Statement, the "SPO Offering Materials").  On March 14, 2018, Evoqua announced the pricing of the SPO of 17,500,000 shares of common stock to be sold by specified stockholders of the Company at $22.00 per share.  The SPO of 17,500,000 shares closed on March 19, 2018, and the Underwriter Defendants exercised their option to purchase an additional 2,625,000 shares of common stock, which closed on March 21, 2018.

132.    As of the SPO, AEA owned approximately 40.6% of the Company's common stock.  As part of the SPO, AEA sold 24% of its Evoqua shares for approximately $233,150,484, retaining about 30.9% of the Company's common stock and approximately 52.5% of the voting power of the Company's outstanding common stock.  Other insiders also sold significant percentages of their Evoqua shares in the SPO, including:

- Ronald Keating, President & CEO:  sold 44% of his shares for approximately $7,200,098;

- Benedict Stas, CFO and Treasurer:  sold 33% of his shares for approximately $2,128,351;

- Malcolm Kinnaird, EVP for Municipal Segment:  sold 77% of his shares for approximately $3,389,104;

- Kenneth Rodi, EVP for Applied Product Technologies:  sold 29% of his shares for approximately $799,379;

- Edward May, EVP for Supply Chain:  sold 51% of his shares for approximately $911,253;

- James Irwin, then-Vice President for Strategy and Corporate Development:  sold 27% of his shares for approximately $181,753;

- James Kohosek, EVP Corporate Strategy:  sold 44% of his shares for approximately $545,322;

- Anthony Webster, Chief Human Resources Officer:  sold 28% of his shares for approximately $479,870;

- Vincent Grieco, EVP and General Counsel:  sold 36% of his shares for approximately $489,087;

- Judd Gregg, Director:  sold 100% of his shares for approximately $600,471; and

- Martin Lamb, Director:  sold 29% of his shares for approximately $2,295,162.

133.    Following the SPO, Defendants continued to make materially false or misleading statements and omissions in press releases, quarterly investor conference calls, Form 10-Qs, and

investor presentations about the Company's financial results, disclosure controls, acquisitions, workforce, and "Risk Factors," as alleged in detail in §VI.M-S below.

## I.      The Truth Concerning Evoqua's Business and Operations Begins to Emerge

134.    On May 8, 2018, Evoqua announced its financial results for the second quarter of fiscal 2018, including revenue of $333.7 million and Adjusted EBITDA of $57.7 million. Although these results (secretly inflated by the improper accounting described above) met consensus estimates, the Company partially revealed the impact of the undisclosed sales-force attrition and channel stuffing alleged above by reducing its EBITDA guidance for fiscal 2018 from $235 million–$255 million to $235 million–$245 million, 5% below the prior consensus expectation.  J.P. Morgan analysts commented that "a weak start to 1H FCF and cut to FY guidance raise questions on the back-half FCF ramp as well as visibility on forward EBITDA targets."

135.    In response to the partial disclosure of the truth concerning the state of Evoqua's business and operations, Evoqua's stock price fell 8.4% from a close of $20.21 per share on May 7 to a close of $18.51 on May 8 on unusually heavy volume of 2.4 million shares.  However, as alleged below, Defendants continued to falsely reassure investors about the Company's integration of acquisitions and financial results.

136.    On August 7, 2018, Evoqua announced its financial results for the third quarter of fiscal 2018, including revenue of $342.5 million and Adjusted EBITDA of $58.0 million (at the low end of its prior guidance and $3 million or 5% below the consensus expectation).  The Company's guidance for the fiscal year remained unchanged, but RBC Capital Markets commented that "this is the company's second consecutive quarterly earnings disappointment since its Nov-2017 IPO," and J.P. Morgan stated that "we would expect the stock to underperform today given the 3Q miss and back-end loaded guide, with annual FCF seemingly tracking well below our prior expectations . . . ."

137.    In response to the poor results, Evoqua's stock fell from a close of $22.22 per share on August 6 to close at $20.27 on August 7 (down 8.8% in one day) and continued to fall on unusually heavy volume in the following days, closing at $17.61 on August 9 (down 19% in three days).  J.P. Morgan commented on August 8 that "the company needs to prove that earnings quality (i.e., restructuring add-backs) and FCF will improve."

138.    But even the poor third-quarter results were artificially inflated, and Defendants continued to falsely reassure investors, as alleged below.  Indeed, RBC Capital stated on August 8 that "the reaffirmed 2018 revenue and adjusted EBITDA guidance ranges suggest that the company is confident" that it "can recoup the entirety of the F3Q18 . . . shortfall before year-end . . . ."

139.    On October 30, 2018, Evoqua announced dismal preliminary financial results for the 4Q and FY2018, ended September 20, 2018.  The results were below the Company's and analysts' expectations—Evoqua lowered its financial forecasts for FY2018 and warned investors that it now expected revenues to be between $1.33 billion to $1.34 billion, an increase of approximately 7% to 7.4% over 2017 versus a prior expectation range of $1.34 billion to $1.37 billion, which would have represented an increase of 7% to 10% over the previous year.  The Company also expected full-year Adjusted EBITDA to be in the range of $213 million to $217 million, an increase of 2.6% to 4.5% over the previous year, versus a prior Adjusted EBITDA expectation range of $235 million to $245 million, which would have represented an increase of 13% to 18% over 2017.

140.    Evoqua acknowledged that the losses were primarily concentrated in the Product segment's aquatics business and the Municipal segment and that the shortfalls were primarily due to "acquisition system integration issues," "supply-chain disruptions" (which Evoqua said were

"influenced by tariffs"), and "an extended delay on a large aquatics project."  Evoqua would later

add that the losses were also attributable to the disposal of inventory resulting from the migration

of an operational business unit (i.e., Neptune-Benson) to a new ERP system.  The migration to the

new system laid bare many of the accounting problems that had plagued Neptune-Benson, as it

had not been fully integrated into the rest of Evoqua for over two years after it was acquired.

141.    Evoqua also announced a transition from a three-segment structure to a two-

segment operating model designed to better serve the needs of customers worldwide.  This new

structure combined the Municipal services business with the existing Industrial segment into a new

segment renamed Integrated Solutions and Services, a group entirely focused on engaging directly

with end-users.  The Products segment and Municipal products businesses were combined into a

new segment renamed Applied Product Technologies.  This segment is focused on developing

product platforms to be sold primarily through third-party channels.

142.    Upon announcement of the preliminary results, analysts downgraded the Company

and expressed concerns over the magnitude of the shortfall, credibility of management, and the

Company's ability to integrate future acquisitions.  For example, on October 31, 2018, analysts at

Berenberg Capital Markets stated:

> Pre-announcement shocks investors: AQUA negatively pre-announced its Q4 18
> EBITDA ~27% below consensus estimates and announced a restructuring
> yesterday.  The EBITDA shortfall was related to acquisition integration issues,
> supply chain disruptions influenced by tariffs, and a delay on a large aquatics
> project.  ***The magnitude of the miss shocked investors and caused the stock to sell
> off ~35%*** (vs. the S&P 500 +1.57%).  ***The Q4 18 preannouncement is on the heels
> of a weak Q3 18 report, which further brings credibility into question***.

143.    Also on October 31, 2018, analysts at Cowen, in a report titled "Downgrade:

Boulevard of Broken Dreams," downgraded Evoqua and stated that "[w]hile we see value in the

business plan—rolling up a fragmented process water treatment market—execution remains an

issue and ***investor trust has eroded materially***.  It will likely take time to regain and it is incumbent

on management to prove that consistent revenue and profitability growth can be achieved."  Cowen also stated that "*[b]roader issues surrounding M&A integration are the most concerning given that consistent acquisition is a core tenant of the company's operating plan*."

144.    On the same day, analysts at J.P. Morgan stated that the negative preliminary figures were "*surprising in magnitude*."  On November 1, 2018, analysts at Berenberg Capital Markets wrote in a report titled "Credibility Issues to Weigh; Reiterate Hold," that "[a]n EBITDA miss of 27% shows quite a *magnitude of disconnect* between Street expectations and management's ability to deliver. While some factors impacting Q418 may have been uncontrollable (i.e., a customer delaying a sale), others are within control (i.e., acquisition integration). *AQUA's business is clearly riskier than initially thought*, which should be reflected in its valuation."

145.    On the news of the dismal preliminary results, Evoqua's stock price plummeted $4.78 per share, or approximately *35%*, to close at $9.02 per share on October 30, 2018.

## VI.    DEFENDANTS MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

### A.    Initial Public Offering Prospectus (November 1, 2017)

146.    The Company's IPO Prospectus included misrepresentations and omissions about the Company's purportedly successful acquisitions, including the following statements:

> *Experienced management team with proven operational capabilities that has made Evoqua an employer of choice*.  We are highly dependent on our leadership team, which consists of industry veterans with a track record of executing effective strategies and achieving profitable growth. . . .  Our leadership developed and deployed standard operating processes under the Evoqua Growth System that repositioned the business and improved margins through operational programs and standards such as LEAN operating systems, service growth and ePro, among others. These programs, combined with our newly implemented sales methodology, Evoqua EDGE, have improved our free cash flow profile and growth prospects. *Our management team has also expanded our operations to new target markets and geographies and has demonstrated successful acquisition and integration capabilities*.  Our success depends to a significant extent on our ability to retain or

attract employees in senior management, skilled technical, engineering, sales and other key personnel.

After the AEA Acquisition, we began a transformation of our business into a global organization with an independent, professional management team.  We believe our transformation has made us into a premier partner and employer in our industry, resulting in differentiated capabilities and talent within our organization.

\* \* \*

***Continue to evaluate and pursue accretive tuck-in acquisitions to add new technologies, attractive geographic regions and end-markets***.  As a complement to our organic growth initiatives, we view tuck-in acquisitions as a key element of our overall growth strategy which will enable us to accelerate our growth in our current addressable market, new geographies and new end market verticals.  Our existing customer relationships, channels to market and ability to rapidly commercialize technologies provide a strong platform to drive growth in the businesses we acquire.  To capitalize on these opportunities we have built an experienced team dedicated to mergers and acquisitions that has successfully completed eight technology-enhancing and geography-expanding acquisitions since April 2016, including the addition of capabilities in the attractive aquatics market . . . .

\* \* \*

### Acquisitions

We believe that tuck-in acquisitions present a key opportunity within our overall growth strategy, which we will continue to evaluate strategically.  These strategic acquisitions will enable us to accelerate our growth in our current addressable market, as well as in new geographies and new end market verticals.  Our existing customer relationships, best-in-class channels to market and ability to rapidly commercialize technologies provide a strong platform to drive rapid growth in the businesses we acquire.  To capitalize on these opportunities, we have built an experienced team dedicated to mergers and acquisitions that has successfully completed eight technology-enhancing and geography-expanding acquisitions since April 2016, with purchase prices ranging from approximately $3.3 million to approximately $283.7 million, and pre-acquisition revenues ranging from approximately $3.1 million to approximately $55.7 million.  We will continue to actively evaluate acquisition opportunities that are consistent with our business strategy and financial model, and, although we may not be able to continue to identify suitable acquisition targets and implement our growth strategy, we currently have a pipeline which includes more than 60 potential targets, which has been developed proactively by our team as well as informed by our customer base.

147.    These statements were materially false and misleading because the Company had (i) engaged in the systematic and pervasive termination of experienced sales personnel that devastated the businesses that Evoqua had acquired, eroded the Company's ability to sustain current revenues and generate future growth and gave rise to significant delays in product delivery and the services provided by Evoqua; and (ii) likewise terminated critical integration personnel, including the most experienced employees, impeding the Company's ability to successfully integrate the numerous companies that it had acquired.

148.    The IPO Prospectus also included materially misleading "Risk Factors" about the Company's acquisitions:

> ***Our growth strategy includes acquisitions, and we may not be able to identify suitable acquisition targets or otherwise successfully implement our growth strategy***.
>
> Acquisitions have historically been a significant part of our growth strategy, and we expect to continue to grow through acquisitions in the future.  We expect to continue evaluating potential strategic acquisitions of businesses, assets and product lines.  We may not be able to identify suitable candidates, negotiate appropriate or favorable acquisition terms, obtain financing that may be needed to consummate such transactions or complete proposed acquisitions.  There is significant competition for acquisition and expansion opportunities in our businesses.
>
> In addition, acquisitions involve numerous risks, including (i) incurring the time and expense associated with identifying and evaluating potential acquisitions and negotiating potential transactions, resulting in management's attention being diverted from the operation of our existing business; (ii) using inaccurate estimates and judgments to evaluate credit, operations, funding, liquidity, business, management and market risks with respect to the target institution or assets; (iii) litigation relating to an acquisition, particularly in the context of a publicly held acquisition target, that could require us to incur significant expenses, result in management's attention being diverted from the operation of our existing business or delay or enjoin the transaction; (iv) failing to properly identify an acquisition candidate's liabilities, potential liabilities or risks; and (v) not receiving required regulatory approvals or such approvals being delayed or restrictively conditional. . . .

***We may have difficulty in operating or integrating any acquired businesses, assets or product lines profitably or in otherwise successfully implementing our growth strategy.***

The anticipated benefits from any potential acquisitions may not be achieved unless the operations of the acquired business assets or product lines are successfully integrated in an efficient, effective and timely manner.  The integration of our acquisitions will require substantial attention from management and operating personnel to ensure that the acquisition does not disrupt any existing operations, or affect our customers' opinions and perceptions of our services, products or customer support.

In addition, the integration of any acquisition includes numerous risks, including an acquired business not performing to our expectations, our not integrating it appropriately, failure to realize anticipated synergies and cost savings and difficulties, inefficiencies or cost overruns in integrating and assimilating the organizational cultures, operations, technologies, data, services and products of the acquired business with ours.

The process of integrating acquired businesses, assets and product lines could cause the interruption of, or delays in, the operation of our existing business, which could have a material adverse effect on our business, financial condition, results of operations or prospects.  Acquisitions also place a burden on our information, financial and operating systems and our employees and management.  ***Our ability to manage our growth effectively and integrate the operations of acquired businesses, assets or product lines, will require us to continue to attract, train, motivate, manage and retain key employees and to expand our information technology, operational and financial systems.  If we are unable to manage our growth effectively, we may spend time and resources on such acquisitions that do not ultimately increase our profitability or that cause loss of, or harm to, relationships with employees and customers***.

149.    These statements were materially false and misleading because the Company had (i) engaged in the systematic and pervasive termination of experienced sales personnel that devastated the businesses that Evoqua had acquired, eroded the Company's ability to sustain current revenues and generate future growth and gave rise to significant delays in product delivery and the services provided by Evoqua; and (ii) likewise terminated critical integration personnel, including the most experienced employees, impeding the Company's ability to successfully integrate the numerous companies that it had acquired; and (c) as a result, the risks described in

the "Risk Factors" had already materialized and were adversely affecting the Company's business and financial results and were not merely hypothetical future possibilities.

150.     The Company's IPO Prospectus also included misrepresentations and omissions about its investment in its sales and other personnel:

> ***Grow and further penetrate our existing customer base.  We believe our strong brands, leading position in highly fragmented markets, scalable and global offerings, leading installed base and unique ability to provide complete treatment solutions will enable us to capture a larger share of our existing customers' water treatment spend while expanding with existing and new customers into adjacent end-markets and underpenetrated regions, including by investing in our sales force and cross-selling to existing customers***.  Despite having the leading market share in the North American water treatment market, our share does not exceed 25% in any single market vertical according to Amane Advisors. Furthermore, our share of any given customer's water treatment related spend is often limited to select regions, thereby creating a significant opportunity to further penetrate existing customer accounts by offering additional solutions and serving more sites, both in current and new geographic regions. Our growth initiatives include both expanding our presence in our core North American market as well as replicating our leading position and strategies into underpenetrated global regions. For example, through innovative technologies such as IONPURE continuous electrodeionization and Defender aquatic regenerative media filtration systems, we have expanded our positions in markets such as Asia and the Middle East.
>
> ***In order to maintain and enhance our customer relationships, we intend to continue to invest in our sales force. Since fiscal 2014 we have increased the proportion of customer facing employees by over 25%, developed a best-in-class training program, restructured our customer relationship management system and realigned our compensation packages***.  Sales of our products, services and solutions to some of our customers are also accomplished, in part, through the efforts of third-party sales representatives.  Through direct sales efforts, outreach and education, we plan to continue to enhance our relationships and enable further adoption of our products, technologies and solutions by end customers and key influencers, including municipal representatives, engineering firms, designers and other system specifiers.  Our performance depends, in part, on our ability to attract, incentivize and retain third-party sales representatives that will be able to market and support our products effectively, and competition for sales personnel with established customer relationships is intense.
>
> *          *          *
>
> ***Operational investment***.  Our historical operating results reflect the impact of our ongoing investments to support our growth.  We have made significant investments in our business that we believe have laid the foundation for continued profitable

growth.  We believe that our strengthened sales force, mergers and acquisitions team, enhanced information systems, research, development and engineering investments and other factors enable us to support our operating model.

151.    These statements were materially false and misleading because the Company had (i) engaged in the systematic and pervasive termination of experienced sales personnel that devastated the businesses that Evoqua had acquired, eroded the Company's ability to sustain current revenues and generate future growth and gave rise to significant delays in product delivery and the services provided by Evoqua; and (ii) likewise terminated critical integration personnel, including the most experienced employees, impeding the Company's ability to successfully integrate the numerous companies that it had acquired.

152.    The IPO Prospectus also included a materially misleading "Risk Factor" about sales and other personnel:

> ***Failure to retain our existing senior management, skilled technical, engineering, sales and other key personnel or the inability to attract and retain new qualified personnel could materially adversely impact our ability to operate or grow our business***.
>
> Our success depends to a significant extent on our ability to retain or attract a significant number of employees in senior management, skilled technical, engineering, sales and other key personnel.  Since the AEA Acquisition, we have focused on creating a high performance culture, in which our employees are highly enabled, empowered and accountable.  Our inability to continue to develop and maintain our culture by empowering our senior management, other leaders and employees and promoting an entrepreneurial spirit, could result in our loss of key leaders and employees and have a material adverse effect on our business, financial condition, results of operations or prospects.
>
> Effective succession planning is also important to our long-term success, as a failure to ensure effective transfer of knowledge and smooth transitions involving key employees could hinder our strategic planning and execution. We have implemented a voluntary separation program intended to mitigate the risks associated with knowledge transfer, but we cannot guarantee that it will be effective or cost-efficient.
>
> We will need to continue to develop a roster of qualified talent to support business growth. Without a sufficient number of skilled employees, our operations and manufacturing quality could suffer. Our experienced sales team has also developed

a number of meaningful customer relationships that would be difficult to replace. Therefore, competition for qualified technical personnel and for sales personnel with established customer relationships is intense, both in retaining our existing employees and in replacing or finding additional suitable employees. There can be no assurance that the labor pool from which we hire our personnel will increase or remain stable, and any failure to retain our existing technical and sales personnel and other employees or to attract additional skilled personnel could have a material adverse effect our business, financial condition, results of operations or prospects.

153.    These statements were materially false and misleading because the Company had (i) engaged in the systematic and pervasive termination of experienced sales personnel that devastated the businesses that Evoqua had acquired, eroded the Company's ability to sustain current revenues and generate future growth and gave rise to significant delays in product delivery and the services provided by Evoqua; and (ii) likewise terminated critical integration personnel, including the most experienced employees, impeding the Company's ability to successfully integrate the numerous companies that it had acquired; and (iii) as a result, the risks described in this "Risk Factor" had already materialized and were adversely affecting the Company's business and financial results and were not merely hypothetical future possibilities.

154.    The IPO Prospectus also included the Company's revenue, net income, EBITDA, and expenses in the Prospectus Summary, Management's Discussion and Analysis of Financial Condition and Results of Operations, Unaudited Pro Forma Financial Information, Selected Historical Consolidated Financial Data, and Consolidated Financial Statements. Among other things, the IPO Prospectus reported:

For the fiscal year ended September 30, 2016, we generated revenue, net income and Adjusted EBITDA of $1.1 billion, $13.0 million and $160.1 million, respectively. For the fiscal year ended September 30, 2016, we generated pro forma revenue, pro forma net income and Adjusted EBITDA (pro forma as adjusted for contributions from insignificant completed acquisitions) of $1.2 billion, $16.8 million and $182.4 million, respectively.

155.    These statements were materially false and misleading because Defendants engaged in accounting misconduct that artificially and materially inflated Evoqua's reported

revenues, income, and EBITDA in violation of GAAP, including, but not limited to, by: (i) improper revenue recognition and (b) understatement of expenses.  These statements were also materially false and misleading because Evoqua also engaged in a range of other dubious and undisclosed "channel stuffing" practices which had the effect of concealing the extent to which Evoqua was struggling to grow organically.

156.    The IPO Prospectus also stated that the Company had incurred "[r]estructuring and related business transformation costs" related to severance costs, including:

> $16.9 million in fiscal 2016 . . . , a range of $19.8 million to $20.2 million in fiscal 2017, $16.9 million for the three months ended September 30, 2016 and a range of $0.9 million to $1.0 million in the three months ended September 30, 2017 related to our voluntary separation plan pursuant to which approximately 220 employees accepted separation packages . . . .

157.    This statement was materially false or misleading because the Company had actually pressured its more experienced and knowledgeable sales and integration employees to leave and had replaced them, if at all, with less experienced, less knowledgeable employees and because many experienced employees had left involuntarily.

**B.    Fourth Quarter 2017 Earnings Call (December 1, 2017)**

158.    On the Company's Q42017 earnings conference call on December 1, 2017, Defendant Keating stated that Evoqua had "aligned our RD&E spend to the highest market priorities and established a team delivering systematic M&A that augments our R&D and organic growth."

159.    Defendant Keating also made statements about the purported success of the Company's pre-IPO acquisitions:

> Our future growth will come from both organic sales and through a systematic M&A process. . . . We utilize M&A to fill gaps in our product portfolio to penetrate vertical market segments or to expand our geographic reach.  Our transactions have been accretive in year one, and we are very pleased with the performance of our last eight acquisitions. Overall, we are agnostic between M&A and R&D for new

product development, and we believe there is a large pipeline of outstanding opportunities at attractive multiples.  We expect to expand our service reach, enhance our technological capabilities, and accelerate our sales and profit growth rates through our disciplined M&A process.

* * *

In fact, what we do with the M&A is we really have it as a part of our strategic plan. We identify the targets around the areas I spoke around with product gaps, product portfolio gaps, vertical market extensions, and then geographic extension.

160.     Defendant Stas also made statements about the purported success of the Company's pre-IPO acquisitions:

[W]e are agnostic between RD&E product launches versus doing a small tuck-in acquisition, so they kind of behave the same way, and we look at them the same way in our mindset.  But what typically happens is when we do the acquisition, the acquisition grows faster because it's pulling through sales from the organic business.  And the organic area grows faster because it has a new product launch or a new capability within the portfolio. And we integrate them relatively fast.  So, trying to keep specific core business separate from the tuck-in acquisition becomes difficult after a few months.

161.     These statements were materially false and misleading because Defendants engaged in accounting misconduct that artificially and materially inflated Evoqua's reported revenues, income, and EBITDA in violation of GAAP, including, but not limited to, by: (i) improper revenue recognition and (ii) understatement of expenses.  These statements were also materially false and misleading because Evoqua also engaged in a range of other dubious and undisclosed "channel stuffing" practices, which had the effect of concealing the extent to which Evoqua was struggling to grow organically.

162.     Defendants also made materially false or misleading statements and omissions during the call about Evoqua's financial results.  Among other things, Defendant Stas stated:

For the fourth quarter, reported revenues were up approximately 12% to $360 million.  Pro forma revenues, normalizing for acquisitions in all periods, were up 8% driven by strong growth in the Industrial and Products segments.  Foreign exchange increased revenues by approximately $1.8 million.  Adjusted EBITDA

margins grew 140 basis points to 20% of sales for the quarter driven by leverage
on sales volume, growth as well as operational cost efficiencies.

163.    These statements were materially false and misleading because the Company had
(i) engaged in the systematic and pervasive termination of experienced sales personnel that
devastated the businesses that Evoqua had acquired, eroded the Company's ability to sustain
current revenues and generate future growth and gave rise to significant delays in product delivery
and the services provided by Evoqua; and (ii) likewise terminated critical integration personnel,
including the most experienced employees, impeding the Company's ability to successfully
integrate the numerous companies that it had acquired.

### C.    Fourth Quarter 2017 Earnings Results Presentation (December 1, 2017)

164.    On the same day, Evoqua filed with the SEC the quarterly results slide presentation
used during the conference call.   The presentation included material misrepresentations and
omissions about the Company's acquisitions, including "Continued profitable growth through
R&D and M&A . . . Established strategy to fill gaps through M&A" and "Opportunistic approach
to sourcing new technology and products between R&D and M&A . . . Deep reservoir of new
technologies driving growth today."

165.    The presentation also included materially false or misleading statements about
Evoqua's financial results, including:

Fourth Quarter 2017 Highlights (ended September 30, 2017)

- Consolidated Revenues of $356.5 million, up 11.6% year-over-year

- Net income of $13.0 million, up $12.8 million year-over-year

- Adjusted EBITDA of $71.4 million, up 20.1% year-over-year

Full Year 2017 Highlights

- Consolidated Revenues of $1.25 billion, a 9.7% increase year-over-year

- Net income of $6.4 million, a decline of $6.6 million year-over-year;

- Adjusted EBITDA of $207.7 million, up $47.6 million or 29.7% year-over-year

166.    These statements were materially false and misleading because the Company had (i) engaged in the systematic and pervasive termination of experienced sales personnel that devastated the businesses that Evoqua had acquired, eroded the Company's ability to sustain current revenues and generate future growth and gave rise to significant delays in product delivery and the services provided by Evoqua; and (ii) likewise terminated critical integration personnel, including the most experienced employees, impeding the Company's ability to successfully integrate the numerous companies that it had acquired.

### D.    Fiscal Year 2017 Financial Results Press Release

167.    Also on December 1, 2017, Evoqua issued a press release about its FY 2017 financial results, which stated:

> Evoqua reported revenues for the fourth quarter of 2017 of $356.5 million, an 11.6% increase as compared to the fourth quarter of the prior year. Net income for the quarter was $13.0 million, up $12.8 million year-over-year.  The Company delivered Adjusted EBITDA of $71.4 million in the fourth quarter 2017, an increase of 20.1% year-over-year.

> For the full year fiscal 2017, Evoqua reported revenues of $1.25 billion, a 9.7% increase year-over-year.   Net income for the year was $6.4 million and the Company delivered Adjusted EBITDA of $207.7 million for the full year fiscal 2017, a 29.7% increase over the prior year.

> "For both the quarter and full-year Evoqua employees generated record sales, net income and Adjusted EBITDA by focusing on our 38,000 customers across the world," said Ron Keating, Evoqua CEO.  "Following our successful initial public offering on November 2, we are well positioned to continue to capture organic and inorganic growth opportunities as we leverage our iconic brands and differentiated technologies to capitalize on favorable industry dynamics, and further strengthen our number one market position in North America."

168.    These statements were materially false and misleading because Defendants engaged in accounting misconduct that artificially and materially inflated Evoqua's reported

revenues, income, and EBITDA in violation of GAAP, including, but not limited to, by: (i) improper revenue recognition and (ii) understatement of expenses.  These statements were also materially false and misleading because Evoqua also engaged in a range of other dubious and undisclosed "channel stuffing" practices, which had the effect of concealing the extent to which Evoqua was struggling to grow organically.  These statements were also materially false and misleading because the Company had (i) engaged in the systematic and pervasive termination of experienced sales personnel that devastated the businesses that Evoqua had acquired, eroded the Company's ability to sustain current revenues and generate future growth and gave rise to significant delays in product delivery and the services provided by Evoqua; and (ii) likewise terminated critical integration personnel, including the most experienced employees, impeding the Company's ability to successfully integrate the numerous companies that it had acquired.

### E.    2017 Form 10-K (December 4, 2017)

169.    The Company's FY2017 annual report on Form 10-K filed on December 4, 2017, made materially false or misleading statements and omissions about the Company's acquisitions:

> ***Continue to evaluate and pursue accretive tuck-in acquisitions to add new technologies, attractive geographic regions and end-markets***.  As a complement to our organic growth initiatives, we view tuck-in acquisitions as a key element of our overall growth strategy which will enable us to accelerate our growth in our current addressable market, new geographies and new end market verticals.  Our existing customer relationships, channels to market and ability to rapidly commercialize technologies provide a strong platform to drive growth in the businesses we acquire.  To capitalize on these opportunities we have built an experienced team dedicated to mergers and acquisitions that has successfully completed eight technology-enhancing and geography-expanding acquisitions since April 2016, including the addition of capabilities in the attractive aquatics market . . . .

> * * *

> **Research, Development and Engineering**

> We utilize a disciplined, stage-gate process – consisting of development, field test, commercialization, supply chain and sourcing decisions – to identify and develop

new technologies to commercialize, focus our efforts on and engage early with supply-chain management to promote profitability.   We focus on tuck-in acquisitions as additional resources for new product innovation and development.

* * *

**Acquisitions**

We believe that tuck-in acquisitions present a key opportunity within our overall growth strategy, which we will continue to evaluate strategically.   These strategic acquisitions will enable us to accelerate our growth in our current addressable market, as well as in new geographies and new end market verticals.   Our existing customer relationships, best-in-class channels to market and ability to rapidly commercialize technologies provide a strong platform to drive rapid growth in the businesses we acquire.   To capitalize on these opportunities, we have built an experienced team dedicated to mergers and acquisitions that has successfully completed eight technology-enhancing and geography-expanding acquisitions since April 2016, with purchase prices ranging from approximately $3.3 million to approximately $283.7 million, and pre-acquisition revenues ranging from approximately $3.1 million to approximately $55.7 million.   We will continue to actively evaluate acquisition opportunities that are consistent with our business strategy and financial model, and, although we may not be able to continue to identify suitable acquisition targets and implement our growth strategy, we currently have a pipeline which includes more than 60 potential targets, which has been developed proactively by our team as well as informed by our customer base.

170.   These statements were materially false and misleading because Defendants engaged in accounting misconduct that artificially and materially inflated Evoqua's reported revenues, income, and EBITDA in violation of GAAP, including, but not limited to by: (i) improper revenue recognition and (ii) understatement of expenses.   These statements were also materially false and misleading because Evoqua also engaged in a range of other dubious and undisclosed "channel stuffing" practices, which had the effect of concealing the extent to which Evoqua was struggling to grow organically.

171.   The FY2017 Form 10-K also included materially false or misleading statements and omissions about the Company's financial results, including: "For the fiscal year ended September 30, 2017, we generated revenue, net income and Adjusted EBITDA of $1.2 billion, $6.4 million and $207.7 million, respectively.   For the fiscal year ended September 30, 2016, we

generated revenue, net income and Adjusted EBITDA of $1.1 billion, $13.0 million and $160.1 million, respectively."

172. These statements were materially false and misleading because the Company had (i) engaged in the systematic and pervasive termination of experienced sales personnel that devastated the businesses that Evoqua had acquired, eroded the Company's ability to sustain current revenues and generate future growth and gave rise to significant delays in product delivery and the services provided by Evoqua; and (ii) likewise terminated critical integration personnel, including the most experienced employees, impeding the Company's ability to successfully integrate the numerous companies that it had acquired.

173. The FY2017 Form 10-K also included materially false or misleading "Risk Factors" about the Company's acquisitions substantially identical to those in the IPO Prospectus, as quoted in ¶148.

174. These statements about the Company's acquisitions were materially false or misleading for the reasons discussed in ¶149.

175. The FY2017 Form 10-K also included a materially misleading "Risk Factor" about sales and other personnel substantially identical to the one in the IPO Prospectus, as quoted in ¶152.

176. These statements about the Company's personnel were materially false or misleading for the reasons discussed in ¶153.

177. The FY 2017 Form 10-K also included certifications under Section 302 of SOX by Defendants Keating and Stas that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period

covered by this report" and that these Defendants were "responsible for establishing and maintaining disclosure controls and procedures." The Form 10-K also disclosed that these Defendants had concluded that the disclosure controls were effective.

178.    These statements were materially false and misleading because the Company had (i) engaged in the systematic and pervasive termination of experienced sales personnel that devastated the businesses that Evoqua had acquired, eroded the Company's ability to sustain current revenues and generate future growth and gave rise to significant delays in product delivery and the services provided by Evoqua; and (ii) likewise terminated critical integration personnel, including the most experienced employees, impeding the Company's ability to successfully integrate the numerous companies that it had acquired. These statements were materially false and misleading because Defendants engaged in accounting misconduct that artificially and materially inflated Evoqua's reported revenues, income, and EBITDA in violation of GAAP, including, but not limited to, by: (i) improper revenue recognition and (ii) understatement of expenses. These statements were also materially false and misleading because Evoqua also engaged in a range of other dubious and undisclosed "channel stuffing" practices, which had the effect of concealing the extent to which Evoqua was struggling to grow organically.

## F.    First Quarter 2018 Earnings Call (February 6, 2018)

179.    On Evoqua's 1Q2018 quarterly earnings conference call, Defendant Keating touted the Company's purportedly successful acquisitions:

> *We aligned our RD&E spend to the highest market priorities and we established a systematic and targeted approach to M&A that augments our R&D and organic growth*. As you can see, the business has responded well, delivering solid and improving year-over-year sales and profitability results.

* * *

> *Our future growth will come from both organic sales initiatives and through a systematic M&A process*. Our industry is very fragmented. And while we're the

industry leader, we have just 11% market share.  We utilize M&A to fill gaps in our product portfolio to penetrate desirable vertical market segments and to expand our geographic reach.  Our transactions have been accretive in year one and we're very pleased with the performance of our acquisitions.

Overall, we're agnostic between M&A and R&D for new product development, and we believe that there is a very large pipeline of outstanding opportunities at attractive multiples.  We expect to expand our service reach, enhance our technological capabilities, and accelerate our sales and profitability growth rates through our disciplined M&A process.

As recently announced, we completed the acquisition of Pure Water Solutions on January 31. Pure Water is a strong ultrapure regional player with a service footprint across Colorado and New Mexico.  The company is focused on the pharmaceutical and laboratory, medical, commercial, industrial, and agricultural vertical markets. This geographic tuck-in transaction marks the ninth acquisition since April of 2016. As communicated in our strategy, we're focused on tuck-in organic-like-inorganic growth by expanding our service footprint and product offerings through acquisition.  Pure Water Solutions is yet another example of this successful strategy.

\* \* \*

Overall profitability showed expected improvement over the prior year as acquisitions, lower costs, and mix were strong contributing factors.

180.    Defendant Keating's statements were materially false and misleading because Defendants engaged in accounting misconduct that artificially and materially inflated Evoqua's reported revenues, income, and EBITDA in violation of GAAP, including, but not limited to, by: (i) improper revenue recognition and (ii) understatement of expenses.  These statements were also materially false and misleading because Evoqua also engaged in a range of other dubious and undisclosed "channel stuffing" practices, which had the effect of concealing the extent to which Evoqua was struggling to grow organically.

181.    Defendant Stas also stated that the Company's acquisitions favorably affected its EBITDA: "Adjusted EBITDA grew 7% versus the prior year and margins continued to expand. This was driven by operational cost efficiencies and synergies from acquired companies offsetting negative year-over-year timing related mix impacts."   He further stated that the Industrial

segment's "EBITDA grew over 25% and margins expanded to 24% of sales, a 230 basis points improvement over the prior year. EBITDA improvement was driven by volume leverage, cost initiatives and acquisition synergies."

182. Defendant Stas also stated that revenue and adjusted EBITDA were the Company's key financial metrics and gave a bullish forecast:

> As we enter our first year as a public company, revenue growth and adjusted EBITDA will be our primary financial metrics. We are reaffirming our outlook. We expect total reported revenues to be in the range of $1.33 billion to $1.36 billion, representing growth of approximately 7% to 9%. Adjusted EBITDA is expected to be in the range of $235 million to $255 million, representing growth of approximately 13% to 23%.

183. Defendant Stas's statements were materially false and misleading because Defendants engaged in accounting misconduct that artificially and materially inflated Evoqua's reported revenues, income, and EBITDA in violation of GAAP, including, but not limited to, by: (i) improper revenue recognition and (b) understatement of expenses. These statements were also materially false and misleading because Evoqua also engaged in a range of other dubious and undisclosed "channel stuffing" practices which had the effect of concealing the extent to which Evoqua was struggling to grow organically.

### G. First Quarter 2018 Results Presentation (February 6, 2018)

184. On the same day as the 1Q2018 conference call, Evoqua filed with the SEC the slides used during the call. The slides reported 1Q2018 revenue of $297.1 million (up 6.1% from 1Q2017) and adjusted EBITDA of $40 million (up 7.4% from 1Q2017) and stated that these results were favorably affected by acquisitions: "4.8% [of 6.1% revenue growth] from tuck-in acquisitions" and "Accretive impact of acquisitions [on Adjusted EBITDA]." The slides also stated: "Develop and commercialize new technologies...Established strategy to fill gaps through M&A…Opportunistic approach to R&D and M&A…Deep M&A pipeline."

185.    These statements were materially false and misleading because Defendants engaged in accounting misconduct that artificially and materially inflated Evoqua's reported revenues, income, and EBITDA in violation of GAAP, including, but not limited to by: (i) improper revenue recognition and (ii) understatement of expenses.   These statements were also materially false and misleading because Evoqua also engaged in a range of other dubious and undisclosed "channel stuffing" practices, which had the effect of concealing the extent to which Evoqua was struggling to grow organically.   These statements were materially false and misleading because the Company had (i) engaged in the systematic and pervasive termination of experienced sales personnel that devastated the businesses that Evoqua had acquired, eroded the Company's ability to sustain current revenues and generate future growth and gave rise to significant delays in product delivery and the services provided by Evoqua; and (ii) likewise terminated critical integration personnel, including the most experienced employees, impeding the Company's ability to successfully integrate the numerous companies that it had acquired.

### H.    First Quarter 2018 Earnings Press Release (February 6, 2018)

186.    On February 6, 2018, Evoqua issued a press release announcing its Q2 2018 results, which was filed with the SEC as part of a Form 8-K signed by Defendant Stas.   The press release stated:

> Evoqua reported revenues for the first quarter of fiscal 2018 of $297.1 million, an increase of $17.2 million or 6.1% as compared to the first quarter of the prior year. Revenue growth was driven by an increase in organic service revenues in the Industrial segment associated with account penetration in the power, hydrocarbon processing and chemical processing markets and from recently acquired businesses. Net loss for the quarter was $3.0 million, an improvement of $10.2 million or 77.2% year-over-year.   Adjusted EBITDA was $40.0 million in the first quarter of fiscal 2018, an increase of $2.7 million or 7.4% year-over-year.   The improvement in Adjusted EBITDA was driven by an increase in revenues and related gross margin as well as a decrease in operating expenses year-over-year.
>
> "For the first quarter, Evoqua generated record sales and Adjusted EBITDA led by strong growth in the Industrial segment, complemented by the realization of

continued operational efficiency benefits," said Ron Keating, Evoqua CEO. "Fiscal 2018 is off to a strong start. We continue to be well positioned to capture organic and inorganic growth opportunities across our business segments."

187. These statements were materially false and misleading because Defendants engaged in accounting misconduct that artificially and materially inflated Evoqua's reported revenues, income, and EBITDA in violation of GAAP, including, but not limited to, by: (i) improper revenue recognition and (ii) understatement of expenses. These statements were also materially false and misleading because Evoqua also engaged in a range of other dubious and undisclosed "channel stuffing" practices, which had the effect of concealing the extent to which Evoqua was struggling to grow organically.

**I.      First Quarter 10-Q (February 7, 2018)**

188. On February 7, 2018, Evoqua filed its 1Q2018 quarterly report on Form 10-Q, which was signed by Defendants Evoqua, Keating, and Stas.

189. Under the heading "Operational Excellence," the Form 10-Q stated: "We believe that continuous improvement of our operations, processes and organizational structure is a key driver of our earnings growth. Since fiscal 2014, we have realigned our organizational structure, achieved significant cost savings through operational efficiencies and revitalized our culture, which has energized our workforce and reduced employee turnover."

190. These statements were materially false and misleading because the Company had (i) engaged in the systematic and pervasive termination of experienced sales personnel that devastated the businesses that Evoqua had acquired, eroded the Company's ability to sustain current revenues and generate future growth and gave rise to significant delays in product delivery and the services provided by Evoqua; and (ii) likewise terminated critical integration personnel, including the most experienced employees, impeding the Company's ability to successfully integrate the numerous companies that it had acquired.

81

191.     The 10-Q also stated that Defendants Keating and Stas had evaluated the Company's disclosure controls and procedures and determined that they were effective at the end of the quarter. The Form 10-Q also included SOX certifications of the report's accuracy substantially identical to the ones in the 2017 Form 10-K, cited in ¶177.  These statements and certifications were materially false or misleading for the reasons discussed in ¶178.

192.     The Form 10-Q also stated that there had been no material changes in the "Risk Factors" included in the 2017 Form 10-K, as quoted in ¶¶148, 152. These "Risk Factors" remained materially false or misleading for the reasons discussed in ¶¶149, 153.

193.     The Form 10-Q also reported the Company's financial results. Among other things, the quarterly report stated that:

> Revenues increased $17,179, or 6.1%, to $297,051 in the three months ended December 31, 2017 from $279,872 in the three months ended December 31, 2016.
>
> ***
>
> Revenues from product sales increased $7,363, or 4.5%, to $169,658 in the three months ended December 31, 2017 from $162,295 in the three months ended December 31, 2016.  The increase in product revenues was primarily due to the acquisitions of ETS, ADI and Olson, which accounted for $10,167 in revenues.
>
> ***
>
> Adjusted EBITDA increased $2,742, or 7.4%, to $39,981 for the three months ended December 31, 2017 from $37,239 for the three months ended December 31, 2016.  Benefits derived from restructuring and operational efficiencies that were implemented in the current and prior fiscal year, as well as increased volume and accretive profitability associated with organic revenue growth and prior year acquisitions, provided for the increase in Adjusted EBITDA, offset somewhat by the timing variances in operating profit in the Municipal and Products segments.

194.     These statements were materially false and misleading because Defendants engaged in accounting misconduct that artificially and materially inflated Evoqua's reported revenues, income, and EBITDA in violation of GAAP, including, but not limited to, by: (i) improper revenue recognition and (ii) understatement of expenses.  These statements were also

materially false and misleading because Evoqua also engaged in a range of other dubious and undisclosed "channel stuffing" practices, which had the effect of concealing the extent to which Evoqua was struggling to grow organically.

**J.     Gabelli & Co. 28th Annual Pump, Valve, and Water Systems Symposium (February 22, 2018)**

195.    On February 22, 2018, Defendants Keating and Stas spoke to investors and analysts at the Gabelli & Co. water conference. The slides accompanying these Defendants' presentations touted Evoqua's "M&A–Supplementing long-term organic growth" through "Continued profitable growth through R&D and M&A."   The slides also stated: Develop and commercialize new technologies...Established strategy to fill gaps through M&A…Opportunistic approach to R&D and M&A…Deep M&A pipeline."

196.    These statements were materially false and misleading because the Company had (i) engaged in the systematic and pervasive termination of experienced sales personnel that devastated the businesses that Evoqua had acquired, eroded the Company's ability to sustain current revenues and generate future growth and gave rise to significant delays in product delivery and the services provided by Evoqua; and (ii) likewise terminated critical integration personnel, including the most experienced employees, impeding the Company's ability to successfully integrate the numerous companies that it had acquired.

197.    The slides also reported 1Q2018 revenue of $297.1 million (up 6.1% from Q12017) and adjusted EBITDA of $40 million (up 7.4% from Q12017) and stated that these results were favorably affected by acquisitions: "4.8% [of 6.1% revenue growth] from tuck-in acquisitions" and "Accretive impact of acquisitions [on Adjusted EBITDA]."

198.    These statements were materially false and misleading because Defendants engaged in accounting misconduct that artificially and materially inflated Evoqua's reported

revenues, income, and EBITDA – and understated expenses including, but not limited to, by: (i) improper revenue recognition and (ii) understatement of expenses.  These statements were also materially false and misleading because Evoqua also engaged in a range of other dubious and undisclosed "channel stuffing" practices, which had the effect of concealing the extent to which Evoqua was struggling to grow organically.

K.    **Investor & Analyst Event at Pittsburgh HQ (February 28, 2018)**

199.    On February 28, 2018, Defendant Keating spoke at an investor visit to the Company's headquarters. The slides for his presentation touted the Company's "Value-enhancing investments internally and through M&A" and stressed the Company's "Built out dedicated M&A team and standardized execution."  The slides also stated that "M&A is a key, low risk strategy for growth that leverages existing capacity and market channels."  As part of "Evoqua's Multi-Pronged Growth Strategy," the slides stated that M&S would "Drive acquisition strategy and complement internal RD&E."

200.    These statements were materially false and misleading because the Company had: (i) engaged in the systematic and pervasive termination of experienced sales personnel that devastated the businesses that Evoqua had acquired, eroded the Company's ability to sustain current revenues and generate future growth, and gave rise to significant delays in product delivery and the services provided by Evoqua; and (ii) likewise terminated critical integration personnel, including the most experienced employees, impeding the Company's ability to successfully integrate the numerous companies that it had acquired.

201.    Also, at the investor visit, Defendant Stas presented the Company's financial results. Among other things, the slides for his presentation reported 1Q2018 revenue of $297.1 million (up 6.1% from 1Q2017) and adjusted EBITDA of $40 million (up 7.4% from 1Q2017) and

stated that these results were favorably affected by acquisitions: "4.8% [of 6.1% revenue growth] from tuck-in acquisitions" and "Accretive impact of acquisitions [on Adjusted EBITDA]."

202.    These statements were materially false and misleading because Defendants engaged in accounting misconduct that artificially and materially inflated Evoqua's reported revenues, income, and EBITDA in violation of GAAP, including, but not limited to, by: (i) improper revenue recognition; and (ii) understatement of expenses.  These statements were further materially false and misleading because Evoqua also engaged in a range of other dubious and undisclosed "channel stuffing" practices, which had the effect of concealing the extent to which Evoqua was struggling to grow organically.

**L.    Secondary Public Offering Prospectus (March 14, 2018)**

203.    The SPO Prospectus contained substantially the same statements as the IPO Prospectus about the Company's "Experienced management team with proven operational capabilities that has made Evoqua an employer of choice" and that it was "Continu[ing] to evaluate and pursue accretive tuck-in acquisitions to add new technologies, attractive geographic regions and end-markets," which are quoted more fully in ¶146.  These statements remained materially false or misleading for the reasons discussed in ¶147.

204.    The SPO Prospectus also stated:

> ***Commercialize and drive adoption of nascent and newly acquired technologies by leveraging our sales channels and application expertise***. We offer a full range of services, systems and technologies that we continually develop to meet our customers' evolving water lifecycle needs. We develop our technologies through in-house research, development and engineering and targeted tuck-in, technology-enhancing and geography-expanding acquisitions and have a reservoir of recently launched technologies and a pipeline of new offerings designed to provide customers with innovative, value-enhancing solutions. ***Furthermore, we have successfully completed ten technology-enhancing and geography-expanding acquisitions since April 2016 to add new capabilities and cross-selling opportunities in areas such as electrochemical and electrochlorination cells, regenerative media filtration, anodes, UV and ozone disinfection and aerobic and anaerobic biological treatment technologies***. We must continue to develop and

acquire new products, services and solutions to successfully compete in our markets.

We believe a key differentiator for our technology development program is our strong record of incorporating new technologies into the comprehensive solutions we provide to our customers across our platform. We are able to rapidly scale new technologies using our leading direct and third-party sales channels and our relationships with key influencers, including municipal representatives, engineering firms, designers and other system specifiers. Through our service network, we have a direct view of our customers' water needs which allows us to focus on developing and acquiring the most relevant and sought-after solutions.

*We believe our continued investment in driving penetration of our recently launched technologies, robust pipeline of new capabilities and best-in-class channels to market will allow us to continue to address our customer needs across the water lifecycle.*

205.    These statements were materially false and misleading because the Company had: (i) engaged in the systematic and pervasive termination of experienced sales personnel that devastated the businesses that Evoqua had acquired, eroded the Company's ability to sustain current revenues and generate future growth, and gave rise to significant delays in product delivery and the services provided by Evoqua; and (ii) likewise terminated critical integration personnel, including the most experienced employees, impeding the Company's ability to successfully integrate the numerous companies that it had acquired.

206.    The SPO Prospectus also contained substantially the same "Risk Factors" as the IPO Prospectus that are quoted more fully in ¶¶148, 152 ("Risk Factors" headed "*Our growth strategy includes acquisitions, and we may not be able to identify suitable acquisition targets or otherwise successfully implement our growth strategy*"; "*We may have difficulty in operating or integrating any acquired businesses, assets or product lines profitably or in otherwise successfully implementing our growth strategy*"; and "*Failure to retain our existing senior management, skilled technical, engineering, sales and other key personnel or the inability to attract and retain new qualified personnel could materially adversely impact our ability to*

*operate or grow our business.*").  These "Risk Factors" remained materially false or misleading for the reasons discussed in ¶¶149, 153.

207.    The SPO Prospectus also presented information about the Company's financial results, including that "[f]or the fiscal year ended September 30, 2017, we generated revenue, net income and Adjusted EBITDA of $1.2 billion, $6.4 million and $207.7 million, respectively."  The SPO Prospectus incorporated by reference the FY2017 Form 10-K, 1Q2018 Form 10-Q, and the Form 8-Ks dated December 20, 2017, January 9, 2018, and March 12, 2018, which included the false or misleading statements discussed in ¶¶169, 186, 189.

208.    These statements were materially false and misleading because Defendants engaged in accounting misconduct that artificially and materially inflated Evoqua's reported revenues, income, and EBITDA in violation of GAAP, including, but not limited to, by: (i) improper revenue recognition; and (ii) understatement of expenses.  These statements were also materially false and misleading because Evoqua also engaged in a range of other dubious and undisclosed "channel stuffing" practices, which had the effect of concealing the extent to which Evoqua was struggling to grow organically.

209.    The SPO Prospectus also stated that the Company had incurred "[r]estructuring and related business transformation costs" related to severance costs, including:

> $16.9 million in fiscal 2016 . . . , $20.1 million in fiscal 2017 . . . related to our voluntary separation plan pursuant to which approximately 220 employees accepted separation packages, $10.2 million for the three months ended December 31, 2016 and $0.4 million for the three months ended December 31, 2017 . . . .

210.    This statement was materially false or misleading because the Company was actually pressuring its more experienced and knowledgeable sales and integration employees to leave and had replaced them, if at all, with less experienced, less knowledgeable employees and because many experienced employees had left involuntarily.

**M.     Second Quarter 2018 Earnings Press Release (May 8, 2018)**

211.    On May 8, 2018, Evoqua issued a press release announcing its 2Q2018 results, which was filed with the SEC as part of a Form 8-K signed by Defendant Stas.  The press release stated:

> Revenues for the second quarter of fiscal 2018 were $333.7 million, an increase of $33.8 million or 11.3% as compared to the second quarter of the prior year. Revenue growth was led by increases in the Industrial segment related to capital projects in the power market, remediation projects and revenues from recently acquired businesses.  Additionally, the Products segment contributed to year-over-year growth through volume increases across multiple divisions.

> Net income for the quarter was $13.0 million, an improvement of $8.1 million or 165.2% year-over-year.  Diluted EPS for the quarter was $0.10 per share on 119.2 million weighted average shares outstanding.

> Adjusted EBITDA was $57.7 million in the second quarter of fiscal 2018, an increase of $13.8 million or 31.3% year-over-year.  The improvement in Adjusted EBITDA was driven by the increase in revenues and related profit as well as a decrease in operating expenses year-over-year.

212.    These statements were materially false and misleading because Defendants engaged in accounting misconduct that artificially and materially inflated Evoqua's reported revenues, income, and EBITDA in violation of GAAP, including, but not limited to, by: (i) improper revenue recognition; and (ii) understatement of expenses.  These statements were also materially false and misleading because Evoqua also engaged in a range of other dubious and undisclosed "channel stuffing" practices, which had the effect of concealing the extent to which Evoqua was struggling to grow organically.

**N.     Second Quarter 2018 Earnings Call (May 8, 2018)**

213.    On May 8, 2018, Defendant Keating spoke on Evoqua's quarterly earnings conference call.  He touted the Company's supposedly successful acquisitions:

> ***Our future growth will come from both organic sales initiatives and through systematic M&A process***. Our industry is very fragmented and while we are the industry leader, we still have only an approximate 12% market share. We utilize

M&A to fill gaps in our product portfolio, to penetrate desirable vertical market segments or to expand our geographic reach. ***Our transactions have been accretive in year one and we're very pleased with the performance of our acquisitions. We believe tuck-in acquisitions are low risk by nature and we expect to seamlessly integrate the businesses into our organization***.

Overall, we're agnostic between M&A and R&D for new product development and we believe there is a larger pipeline of outstanding opportunities at attractive multiples. We expect to expand our service reach, enhance our technological capabilities and accelerate our sales and profitability growth rates through our disciplined M&A process.

As recently announced, we completed the acquisition of Pacific Ozone in March. We are very pleased to have Pacific as a part of the Evoqua family. Pacific Ozone is a manufacturer of high end integrated ozone systems, targeting multiple industrial markets, including bottled water, beverage, food processing and industrial process water applications. The addition of Pacific filled the portfolio gap and brings with it over 5,000 installations in more than 30 countries. The Pacific leadership team will join the Evoqua team to help us build a larger and more global ozone disinfection business. . . .

214.    These statements were materially false and misleading because the Company had:

(i) engaged in the systematic and pervasive termination of experienced sales personnel that devastated the businesses that Evoqua had acquired, eroded the Company's ability to sustain current revenues and generate future growth, and gave rise to significant delays in product delivery and the services provided by Evoqua; and (ii) likewise terminated critical integration personnel, including the most experienced employees, impeding the Company's ability to successfully integrate the numerous companies that it had acquired.

215.    Defendant Keating also stated that acquisitions favorably affected the Company's financial results:

We're very pleased with our second quarter results. Revenue growth for the quarter was up double digits, primarily driven by growth from our Industrial and Products segment s and acquired companies.  We were very pleased that all three segments reported double-digit year-over-year EBITDA growth for the quarter.  Our growth and profitability initiatives are in place and we're making solid progress in each segment.   We believe we're taking market share and delivering compelling solutions to our customers.  We are pleased with the performance through the first

half of the year and we are very well positioned to see continued profitable growth organically and through M&A for the full-year.

216.    These statements were materially false and misleading because the Company had: (i) engaged in the systematic and pervasive termination of experienced sales personnel that devastated the businesses that Evoqua had acquired, eroded the Company's ability to sustain current revenues and generate future growth, and gave rise to significant delays in product delivery and the services provided by Evoqua; and (ii) likewise terminated critical integration personnel, including the most experienced employees, impeding the Company's ability to successfully integrate the numerous companies that it had acquired.  These statements were also materially false and misleading because Defendants engaged in accounting misconduct that artificially and materially inflated Evoqua's reported revenues, income, and EBITDA in violation of GAAP, including, but not limited to, by: (i) improper revenue recognition; and (ii) understatement of expenses.  These statements were also materially false and misleading because Evoqua also engaged in a range of other dubious and undisclosed "channel stuffing" practices, which had the effect of concealing the extent to which Evoqua was struggling to grow organically.

217.    Defendant Stas also spoke during the quarterly earnings conference call.  Among other things, he said:

> For the second quarter, reported revenues were up over 11% to $334 million, pro forma revenues normalizing for acquisitions were up almost 7%, driven by growth in the Industrial and Products segment and acquisitions contributed more than 4%.
>
> * * *
>
> Second quarter adjusted EBITDA grew by approximately 31% versus the prior year to $58 million, 17.3% of sales, a 270 basis point expansion in EBITDA margins.
>
> * * *
>
> For the third quarter, we expect adjusted EBITDA to grow in the range of approximately 5% to 10% over the prior year. For the full-year, we expect total reported revenues to be in the range of $1.34 billion to $1.37 billion, an increase of

$10 million to the high end and the low ends of the original range and representing growth of approximately 7% to 10% over the prior year.

Adjusted EBITDA is now expected to be in the range of $235 million to $245 million, a $10 million reduction to the high end of the previous range.

218.   These statements were materially false and misleading because Defendants engaged in accounting misconduct that artificially and materially inflated Evoqua's reported revenues, income, and EBITDA in violation of GAAP, including, but not limited to, by: (i) improper revenue recognition; and (ii) understatement of expenses.  These statements were also materially false and misleading because Evoqua also engaged in a range of other dubious and undisclosed "channel stuffing" practices, which had the effect of concealing the extent to which Evoqua was struggling to grow organically.

219.   In response to an analyst's question about whether acquired businesses had higher margins than Evoqua's legacy businesses, Defendant Stas again touted the Company's successful integration of acquisitions:

> We got to remember those acquired businesses also include some synergies as well that's helping those margins.  Again, these are good businesses.  And we're also seeing some cross-selling of those businesses.  Some of these projects that we are winning that Ron talked about earlier across divisional selling is directly a result of the acquisitions where we are now having a more comprehensive solution in the marketplace.  So all of this leads to good news for the future, but again, the acquired businesses are nice businesses that have been accretive.

220.   These statements were materially false and misleading because the Company had: (i) engaged in the systematic and pervasive termination of experienced sales personnel that devastated the businesses that Evoqua had acquired, eroded the Company's ability to sustain current revenues and generate future growth, and gave rise to significant delays in product delivery and the services provided by Evoqua; and (ii) likewise terminated critical integration personnel, including the most experienced employees, impeding the Company's ability to successfully integrate the numerous companies that it had acquired.

**O.     Second Quarter Form 10-Q (May 8, 2018)**

221.     On May 8, 2018, Evoqua filed its 2Q2018 quarterly report on Form 10-Q, which was signed by Defendants Evoqua, Keating, and Stas.

222.     Under the heading "Product and Technology Development," the 2Q2018 Form 10-Q stated:

> We develop our technologies through in-house research, development and engineering and targeted tuck-in, technology-enhancing and geography-expanding acquisitions. We have a reservoir of recently launched technologies and a strong pipeline of new offerings designed to provide customers with innovative, value-enhancing solutions. ***Furthermore, we have successfully completed ten technology-enhancing and geography-expanding acquisitions since April 2016 to add new capabilities and cross selling opportunities in areas such as electrochemical and electrochlorination cells, regenerative media filtration, anodes, UV disinfection and aerobic and anaerobic biological treatment technologies***. We are able to rapidly scale new technologies using our leading direct and third-party sales channels and our relationships with key influencers, including municipal representatives, engineering firms, designers and other system specifiers. ***We believe our continued investment in driving penetration of our recently launched technologies, robust pipeline of new capabilities and best-in-class channels to market will allow us to continue to address our customer needs across the water lifecycle***.

223.     Under the heading "Operational Excellence," the 2Q2018 Form 10-Q stated: "We believe that continuous improvement of our operations, processes and organizational structure is a key driver of our earnings growth. Since fiscal 2014, we have realigned our organizational structure, achieved significant cost savings through operational efficiencies and revitalized our culture, which has energized our workforce and reduced employee turnover."

224.     These statements were materially false and misleading because the Company had: (i) engaged in the systematic and pervasive termination of experienced sales personnel that devastated the businesses that Evoqua had acquired, eroded the Company's ability to sustain current revenues and generate future growth, and gave rise to significant delays in product delivery and the services provided by Evoqua; and (ii) likewise terminated critical integration personnel,

including the most experienced employees, impeding the Company's ability to successfully integrate the numerous companies that it had acquired.

225.    The 2Q2018 Form 10-Q also stated that Defendants Keating and Stas had evaluated the Company's disclosure controls and procedures and determined that they were effective at the end of the quarter.   The 2Q2018 Form 10-Q also included SOX certifications of the report's accuracy substantially identical to the ones in the 2017 Form 10-K, cited in ¶177.  These statements and certifications were materially false or misleading for the reasons discussed in ¶178.

226.    The 2Q2018 Form 10-Q also stated that there had been no material changes in the "Risk Factors" included in the 2017 Form 10-K, as quoted in ¶¶148, 152.  These "Risk Factors" remained materially false or misleading for the reasons discussed in ¶¶149, 153.

227.    The 2Q2018 Form 10-Q also reported the Company's financial results.   Among other things, the quarterly report stated that:

> Revenues increased $33,789, or 11.3%, to $333,690 in the three months ended March 31, 2018 from $299,901 in the three months ended March 31, 2017. Revenues increased $50,967, or 8.8%, to $630,740 in the six months ended March 31, 2018 from $579,773 in the six months ended March 31, 2017.
>
> * * *
>
> Revenues from product sales increased $31,759, or 19.9%, to $191,701 in the three months ended March 31, 2018 from $159,942 in the three months ended March 31, 2017.  The increase in product revenues was primarily due to the growth in capital projects of $14,393 year-over-year in addition to revenue from the acquisitions of Noble, ADI, Olson, Pure Water and Pacific Ozone, which accounted for $10,238 of increased revenues.  Aftermarket and other component product sales also had organic revenue growth of $3,319.  The remaining increase of $3,809 was due to gains from foreign currency translation.
>
> Revenues from product sales increased $43,433, or 14.2%, to $349,724 in the six months ended March 31, 2018 from $306,291 in the six months ended March 31, 2017.  The increase in product revenues was primarily due to the acquisitions of Noble, ADI, Olson, Pure Water and Pacific Ozone, which accounted for $19,121 of the growth in revenues year-over-year.  Growth in capital projects resulted in an increase of $11,577 and aftermarket and other component product sales had organic

growth of $6,888.  The remaining increase of $5,847 was due to gains from foreign currency translation.

Revenues from services increased $2,030, or 1.5%, to $141,989 in the three months ended March 31, 2018 from $139,959 in the three months ended March 31, 2017. The main driver of this increase was the timing of the delivery of services as compared to the prior year.  The remaining increase was due to $486 recognized from the Noble and Pure Water acquisitions.

Revenues from services increased $7,534, or 2.8%, to $281,016 in the six months ended March 31, 2018 from $273,482 in the six months ended March 31, 2017. The increase was driven mainly by organic revenue growth, including volume driven increases in Industrial service revenue of approximately $6,378 associated with account penetration in the power, hydrocarbon processing and chemical processing markets.  Another $922 was recognized from the Noble and Pure Water acquisitions.  The remaining $234 was the result of timing of delivery of services in the current period as compared to the prior period.

\* \* \*

Adjusted EBITDA increased $13,771, or 31.3%, to $57,700 for the three months ended March 31, 2018 from $43,929 for the three months ended March 31, 2017. Adjusted EBITDA increased $16,510, or 20.3%, to $97,681 for the six months ended March 31, 2018 from $81,171 for the six months ended March 31, 2017. Benefits derived from restructuring and operational efficiencies that were implemented in the current and prior fiscal year, as well as increased volume and accretive profitability associated with organic revenue growth and current and prior year acquisitions, provided for the increase in Adjusted EBITDA.

228.    These statements were materially false and misleading because Defendants engaged in accounting misconduct that artificially and materially inflated Evoqua's reported revenues, income, and EBITDA in violation of GAAP, including, but not limited to, by: (i) improper revenue recognition; and (ii) understatement of expenses.  These statements were also materially false and misleading because Evoqua also engaged in a range of other dubious and undisclosed "channel stuffing" practices, which had the effect of concealing the extent to which Evoqua was struggling to grow organically.

**P.      Investor & Analyst Event at Tewksbury Facility (June 4, 2018)**

229.    On June 4, 2018, Defendant Keating spoke at an investor presentation at Tewksbury.   Among other things, his presentation slides mentioned the Company's FY2017 revenue of $1.247 billion and Adjusted EBITDA of $208 million.

230.    These statements were materially false and misleading because Defendants engaged in accounting misconduct that artificially and materially inflated Evoqua's reported revenues, income, and EBITDA in violation of GAAP, including, but not limited to, by: (i) improper revenue recognition; and (ii) understatement of expenses.  These statements were also materially false and misleading because Evoqua also engaged in a range of other dubious and undisclosed "channel stuffing" practices, which had the effect of concealing the extent to which Evoqua was struggling to grow organically.

231.    Defendant Keating's presentation also stated that among "Evoqua's multi-pronged growth levers" was "Drive ***acquisition strategy*** and complement internal RD&E . . . technologies, markets, geographies"; that one of its "Competitive differentiators" was that was the "Preferred acquisition partner"; and that its "Internal capabilities enabling profitable growth" included "Acquisition process and integration" and "Cross selling strategy."

232.    These statements were materially false and misleading because the Company had: (i) engaged in the systematic and pervasive termination of experienced sales personnel that devastated the businesses that Evoqua had acquired, eroded the Company's ability to sustain current revenues and generate future growth, and gave rise to significant delays in product delivery and the services provided by Evoqua; and (ii) likewise terminated critical integration personnel, including the most experienced employees, impeding the Company's ability to successfully integrate the numerous companies that it had acquired.

**Q.      Third Quarter 2018 Earnings Call (August 7, 2018)**

233.    During the Company's 3Q2018 earnings conference call on August 7, 2018, Defendant Keating described the Company's purportedly successful acquisitions and their purportedly favorable financial impact:

> We've seen the industrial wastewater market emerging, and we have taken actions to leverage our capabilities and products internally as well as through our acquisition strategy, enhancing our market-leading position.
>
> ***
>
> ***We continue to invest in our Products segment, both organically and through M&A to broaden and enhance our portfolio of solutions***. Our 2016 Neptune Benson platform acquisition positioned us solidly in the aquatics market. This acquisition was followed by five additional tuck-in acquisitions that fill product portfolio gaps within our Products segment and broadened our capabilities to penetrate other industrial markets. Overall we're largely agnostic between R&D and M&A as we refine and enhance our technology capabilities.
>
> ***
>
> Overall third quarter revenues were up double digits which follows a double-digit growth in the second quarter. Revenue growth was balanced between pro forma organic growth and acquisitions. Overall, adjusted EBITDA was up more than 5% versus last year's third quarter.
>
> *  *  *
>
> Since 2016, we've generated a compound annual growth rate of almost 10% for total sales with product sales growing more than 15% and service sales growth over 3%. Product sales have exhibited strong growth as we've positioned the company to capture industrial wastewater share, have increased our emphasis in our Products segment sales strategies and included our expanded portfolio from our acquisitions.
>
> *  *  *
>
> ***Our future revenue growth will come from both organic sales initiatives and through a systematic M&A process***. We utilize M&A to fill gaps in our product portfolio to penetrate desirable vertical market segments or to expand our geographic reach. We believe tuck-in acquisitions are low risk and capital efficient by nature and we are successfully integrating these businesses into our organization. We floated the ProAct Services acquisition, on July 26 and are very pleased to welcome the ProAct employees into the Evoqua family. ProAct's March 2018, trailing 12 months sales of approximately $54 million and EBITDA of

approximately $12 million will be a strong addition to Evoqua and to our Industrial segment.

\* \* \*

Since 2016, we have completed 11 acquisitions. We have used these transactions to fill portfolio, vertical market or geographic gaps in our Industrial and Products segments. These transactions have accelerated our penetration into new and existing markets while expanding our suite of customer offerings and enhancing our capital growth rate reflected in our results. We will see the same follow-on service and aftermarket growth from these acquisitions that we also experienced in the traditional Evoqua business. Overall, we are agnostic between M&A and R&D for new product development, and we believe that there's a very large pipeline of outstanding opportunities at attractive multiples. We expect to expand our service reach, enhance our technological capabilities and accelerate our sales and profitability growth rates through our disciplined M&A process. Going forward, acquisition candidates continue to be mined through multiple channels, and we believe that we have become the acquirer of choice

234.    These statements were materially false and misleading because the Company had:

(i) engaged in the systematic and pervasive termination of experienced sales personnel that devastated the businesses that Evoqua had acquired, eroded the Company's ability to sustain current revenues and generate future growth, and gave rise to significant delays in product delivery and the services provided by Evoqua; and (ii) likewise terminated critical integration personnel, including the most experienced employees, impeding the Company's ability to successfully integrate the numerous companies that it had acquired.  These statements were also materially false and misleading because Defendants engaged in accounting misconduct that artificially and materially inflated Evoqua's reported revenues, income, and EBITDA in violation of GAAP, including, but not limited to, by: (i) improper revenue recognition; and (ii) understatement of expenses.   These statements were also materially false and misleading because Evoqua also engaged in a range of other dubious and undisclosed "channel stuffing" practices, which had the effect of concealing the extent to which Evoqua was struggling to grow organically.

235.    Also during the call, Defendant Stas spoke about the Company's financial results. Among other things, he said that: "For the third quarter, reported revenues increased approximately 10% to $343 Million. . . . Third quarter adjusted EBITDA grew by 5.2% versus the prior year to $58 million or 16.9% of sales. . . . Adjusted EBITDA [in the Industrial segment] grew 11% to over $38 million, driven by volume increases and acquisitions which offset negative price cost impacts . . . ."

236.    These statements were materially false and misleading because Defendants engaged in accounting misconduct that artificially and materially inflated Evoqua's reported revenues, income, and EBITDA in violation of GAAP, including, but not limited to, by: (i) improper revenue recognition; and (ii) understatement of expenses.  These statements were also materially false and misleading because Evoqua also engaged in a range of other dubious and undisclosed "channel stuffing" practices, which had the effect of concealing the extent to which Evoqua was struggling to grow organically.

**R.    Third Quarter 2018 Results Form 8-K (August 7, 2018)**

237.    Also on August 7, 2018, Evoqua filed a Form 8-K signed by Defendant Stas, which included the Company's quarterly earnings press release and the slides used during that day's conference call.  Among other things, the slides in the Form 8-K reported that 3Q2018 revenue was $342.5 million, up 10.1% from the prior year's third quarter, of which 5.2% was "from tuck-in acquisitions," and Adjusted EBITDA was $58 million, up 5.2% from the prior year's third quarter, due to "Accretive impact of acquisitions."

238.    These statements were materially false and misleading because Defendants engaged in accounting misconduct that artificially and materially inflated Evoqua's reported revenues, income, and EBITDA in violation of GAAP, including, but not limited to, by: (i) improper revenue recognition; and (ii) understatement of expenses.  These statements were also

materially false and misleading because Evoqua also engaged in a range of other dubious and undisclosed "channel stuffing" practices, which had the effect of concealing the extent to which Evoqua was struggling to grow organically.

239.    The 3Q2018 slide presentation stated that among the "Key themes coming out of Q3," were "Enhancing product offering portfolio and vertical market penetration through M&A and RD&E" and "Filling out product portfolio gaps, targeted vertical market offerings and geographic expansion via M&A along with hig [sic] ROI capital expenditures and working capital investments."    The presentation also stated that among the Company's "Key investment highlights" was its "Proven organic and inorganic growth platform."

240.    These statements were materially false and misleading because the Company had: (i) engaged in the systematic and pervasive termination of experienced sales personnel that devastated the businesses that Evoqua had acquired, eroded the Company's ability to sustain current revenues and generate future growth, and gave rise to significant delays in product delivery and the services provided by Evoqua; and (ii) likewise terminated critical integration personnel, including the most experienced employees, impeding the Company's ability to successfully integrate the numerous companies that it had acquired.

**S.    Third Quarter Form 10-Q (August 7, 2018)**

241.    On August 7, 2018, Evoqua filed its 3Q2018 quarterly report on Form 10-Q, which was signed by Defendants Evoqua, Keating, and Stas.

242.    Under the headings "Product and Technology Development" and "Operational Excellence," the 3Q2018 Form 10-Q included substantially the same statements as the 2Q2018 Form 10-Q quoted in ¶¶189, 222.

243.    These statements were materially false and misleading because the Company had: (i) engaged in the systematic and pervasive termination of experienced sales personnel that

devastated the businesses that Evoqua had acquired, eroded the Company's ability to sustain current revenues and generate future growth, and gave rise to significant delays in product delivery and the services provided by Evoqua; and (ii) likewise terminated critical integration personnel, including the most experienced employees, impeding the Company's ability to successfully integrate the numerous companies that it had acquired.

244.    The 3Q2018 Form 10-Q also stated that Defendants Keating and Stas had evaluated the Company's disclosure controls and procedures and determined that they were effective at the end of the quarter.   The 3Q2018 Form 10-Q also included SOX certifications of the report's accuracy substantially identical to the ones in the 2017 Form 10-K, cited in ¶177.  These statements and certifications were materially false or misleading for the reasons discussed in ¶178.

245.    The 3Q2018 Form 10-Q also stated that there had been no material changes in the "Risk Factors" included in the 2017 Form 10-K, as quoted in ¶¶148, 152.  These "Risk Factors" remained materially false or misleading for the reasons discussed in ¶¶149, 153.

246.    The 3Q2018 Form 10-Q also reported the Company's financial results.   Among other things, the quarterly report stated that:

> Revenues increased $31,333, or 10.1%, to $342,475 in the three months ended June 30, 2018 from $311,142 in the three months ended June 30, 2017. Revenues increased $82,299, or 9.2%, to $973,215 in the nine months ended June 30, 2018 from $890,916 in the nine months ended June 30, 2017.
>
> * * *
>
> Revenues from product sales increased $32,226, or 19.2%, to $200,478 in the three months ended June 30, 2018 from $168,252 in the three months ended June 30, 2017. The increase in product revenues was primarily due to the growth in capital projects of $13,837 year-over-year in addition to revenue from the acquisitions of Noble, ADI, Olson, Pure Water and Pacific Ozone, which accounted for $12,842 of increased revenues. . . .
>
> Revenues from product sales increased $75,659, or 15.9%, to $550,202 in the nine months ended June 30, 2018 from $474,543 in the nine months ended June 30, 2017. The increase in product revenues was primarily due to growth in capital

projects which resulted in an increase of $31,743. The acquisitions of Noble, ADI, Olson, Pure Water and Pacific Ozone accounted for another $31,774 of the growth in revenues year-over-year. . . .

Revenues from services increased $893, or 0.6%, to $141,997 in the three months ended June 30, 2018 from $142,890 in the three months ended June 30, 2017. The main driver of this increase was $753 recognized from the Noble and Pure Water acquisitions in addition to the timing of the delivery of services as compared to the prior year.

Revenues from services increased $6,640, or 1.6%, to $423,013 in the nine months ended June 30, 2018 from $416,373 in the nine months ended June 30, 2017. The increase was driven mainly by timing of delivery of services in the current period as compared to the prior period. Another $1,842 was recognized from the Noble and Pure Water acquisitions.

* * *

Adjusted EBITDA increased $2,882, or 5.2%, to $58,013 for the three months ended June 30, 2018 from $55,131 for the three months ended June 30, 2017. Adjusted EBITDA increased $19,378, or 14.2%, to $155,681 for the nine months ended June 30, 2018 from $136,303 for the nine months ended June 30, 2017. Benefits derived from restructuring and operational efficiencies that were implemented in the current and prior fiscal year, as well as increased volume and accretive profitability associated with organic revenue growth and current and prior year acquisitions, provided for the increase in Adjusted EBITDA.

247.   These statements were materially false and misleading because Defendants engaged in accounting misconduct that artificially and materially inflated Evoqua's reported revenues, income, and EBITDA in violation of GAAP, including, but not limited to, by: (i) improper revenue recognition; and (ii) understatement of expenses.  These statements were also materially false and misleading because Evoqua also engaged in a range of other dubious and undisclosed "channel stuffing" practices, which had the effect of concealing the extent to which Evoqua was struggling to grow organically.

## VII.   FALSE AND MISLEADING STATEMENTS IN EVOQUA'S SEC FILINGS (ITEM 303)

248.   Evoqua's IPO Offering Materials, and all filings incorporated by reference therein, and SPO Offering Materials, and all filings incorporated by reference therein, failed to disclose

information required to be disclosed therein by Item 303 (17 C.F.R. §229.303).  Item 303 requires

the disclosure of "any known trends or any known demands, commitments, events or uncertainties

that will result in or that are reasonably likely to result in the registrant's liquidity increasing or

decreasing in any material way."  Item 303 further requires disclosure of "any known trends or

uncertainties that have had or that the registrant reasonably expects will have a material favorable

or unfavorable impact on net sales or revenues or income from continuing operations."

249.    Importantly, the SEC has stated that Item 303 is "intended to give the investor an

opportunity to look at the company through the eyes of management by providing both a short and

long-term analysis of the business of the company . . .  with particular emphasis on the registrant's

prospects for the future."  Management's Discussion and Analysis of Financial Condition and

Results of Operation, Securities Act Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989).

Thus, "material forward-looking information regarding known material trends and uncertainties is

required to be disclosed as part of the required discussion of those matters and the analysis of their

effects."  Commission Guidance Regarding Management's Discussion and Analysis of Financial

Condition and Results of Operation, Securities Act Release No. 8350, 2003 WL 22996757, at *11

(Dec. 29, 2003)

250.    Therefore, Item 303 required disclosure of: (1) Evoqua's termination of hundreds

of sales and administration personnel; (2) failure to adequately integrate its acquired companies;

and (3) the Company's improper recognition of revenue through the tactics described herein.  Each

of these issues represented known trends or uncertainties that were reasonably expected to have a

material unfavorable impact on the Company's business, sales, revenues, and/or income from

continuing operations.  Indeed, the elimination of hundreds of experienced sales personnel created

uncertainty surrounding Evoqua's ability to maintain the level of sales it reported in the IPO and

SPO Offering Materials and, thus, had a material unfavorable impact on the Company's sales and business prospects. Evoqua's failure to adequately integrate its numerous acquisitions likewise had a material unfavorable impact on the Company's business, revenues, and income from continuing operations. Further, Evoqua's improper revenue-recognition practices, such as the premature recognition of revenue, had a material unfavorable impact on the Company's business uncertainty around the prospects of future revenue growth, as the Company would ultimately be forced to confront that its project and sales backlog was of no value as revenue on those had already been recognized. Evoqua's SEC filings failed to disclose this information and thus failed to comply with Item 303.

## VIII. MATERIALLY FALSE AND MISLEADING FINANCIAL STATEMENTS IN VIOLATION OF GAAP

### A. Overview of GAAP

251. GAAP include those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) provides that financial statements filed with the SEC that are not presented in accordance with GAAP will be presumed to be misleading despite footnotes or other disclosures. The Financial Accounting Standards Board ("FASB"), the entity that holds the authority to promulgate GAAP, has codified GAAP into a numbered scheme called the "Accounting Standards Codification" ("ASC"), which has been adopted as the framework for financial reporting for all public filers. In addition, the FASB has issued guidance in the form of FASB Concept Statements ("FASCON"), which set the objectives, qualitative characteristics, and other concepts used in the development of GAAP and which reflect the underlying basis and framework for the promulgation of accounting standards.

252.     Financial statements (including footnote disclosures) are a central feature of financial reporting.  One of the fundamental objectives of financial reporting is to provide accurate and reliable information concerning an entity's financial performance during the period being presented.  FASCON No. 8, *Conceptual Framework for Financial Reporting* ("FASCON 8"), which, as its title provides, represents, along with a number of other FASCONs, the framework for financial accounting, states that "[t]he objective of general purpose financial reporting is to provide financial information about the reporting entity that is useful to existing and potential investors, lenders, and other creditors in making decisions about providing resources to the entity." FASCON 8, ¶OB2.

253.     Because investors, lenders, and other creditors generally cannot require reporting entities to provide information directly to them and must rely on financial reports for much of the financial information they need to make rational decisions regarding the entity, they are considered to be the primary users to whom general purpose financial reports are directed.  *Id.* ¶OB5.

### B.     Evoqua Violated GAAP by Improperly Recognizing Its Revenue

254.     Evoqua represented that the financial statements found in the IPO Offering Materials, SPO Offering Materials, 2017 Form 10-K, 1Q2018 Form 10Q, 2Q2018 Form 10Q, 3Q2018 Form 10Q, and 2018 Form 10-K were all prepared in accordance with GAAP.  Indeed, each of these filings (with the exception of the SPO Offering Materials), specifically state that:

> ***Sales of goods and services are recognized when persuasive evidence of an arrangement exists, the price is fixed or determinable, collectability is reasonably assured and delivery has occurred or services have been rendered***.

> \* \* \*

> For sales of aftermarket parts or products with a low level of customization and engineering time, ***we recognize revenues at the time title and risks and rewards of ownership pass, which is generally when products are shipped or delivered to the customer as we have no obligation for installation***. Sales of short-term service arrangements are recognized as the services are performed, and sales of long-term

service arrangements are typically recognized on a straight-line basis over the life of the agreement.

* * *

For certain arrangements where there is significant customization to the product, we recognize revenue under the provisions of ASC 605-35, *Revenue Recognition – Construction-Type and Production-Type Contracts*. These products include large capital water treatment projects, systems and solutions for municipal and industrial applications. ***Revenues from construction-type contracts are generally recognized under the percentage-of-completion method, based on the input of costs incurred to date as a percentage of total estimated contract costs***. The nature of the contracts are generally fixed price with milestone billings. Approximately $203.1 million, $218.6 million and $240.2 million of revenues from construction-type contracts were recognized on the percentage-of-completion method during the periods ending September 30, 2015, 2016 and 2017, respectively. Contract revenues and cost estimates are reviewed and revised quarterly at a minimum and the cumulative effect of such adjustments are recognized in current operations. The amounts of such adjustments have not been material.

255.     In reality, these representations were materially false and misleading, as Defendants knowingly or recklessly caused Evoqua to issue financial statements that were predicated on fraudulent financial manipulations.  In particular, Evoqua's financial statements artificially and improperly inflated the Company's revenue by employing fraudulent revenue recognition practices, including the use of outside vendors to store allegedly "sold" products when the risk of loss had not passed, recognition of revenue each quarter on fictitious sales and shipments on products, channel stuffing with unreported right of return, and premature recognition of revenue – all of which caused Evoqua's reported revenue during the Class Period to be materially overstated.

256.     FASCON No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises* ("FASCON 5"), states that "guidance for recognition of revenues and gains is intended to provide an acceptable level of assurance of the existence and amounts of revenues and gains before they are recognized" and that recognition of revenue involves consideration of

two factors: that the purported revenue or gain is (a) being realized or realizable; and (b) being earned.  ¶83; *see also* ASC 605-10-25(1).

257.    FASCON 5 specifically provides that in recognizing revenue "[t]he two conditions (being realized or realizable and being earned) are usually met by the time product or merchandise is delivered or services are rendered to customers, and revenues from manufacturing and selling activities and gains and losses from sales of other assets are commonly recognized at time of sale (usually meaning delivery)."  ¶84(a).  FASCON 5 also provides that "[i]f product is contracted for before production, revenues may be recognized by a percentage-of-completion method as earned—as production takes place—provided reasonable estimates of results at completion and reliable measures of progress are available."  *Id*. ¶84(c).

258.    Additionally, ASC 605-15-25(1) provides that

If an entity sells the product but gives the buyer a right to return the product, revenue from the sales transaction shall be recognized at the time of the sale only if all of the following conditions are met:

   i.     The seller's price to the buyer is substantially fixed or determinable at the date of sale.
   ii.    The buyer has paid the seller, or the buyer is obligated to pay the seller and the obligation is not contingent on resale of the product. If the buyer does not pay at the time of the sale and the buyer's obligation to pay is contractually or implicitly excused until the buyer resells the product, then this condition is not met.
   iii.   The buyer's obligation to the seller would not be changed in the event of theft or physical destruction or damage of the product.
   iv.    The buyer acquiring the product for resale has economic substance apart from that provided by the seller. This condition relates primarily to buyers that exists on paper, that is, buyers that have little or no physical facilities or employees.  It prevents entities from recognizing sales revenue on transactions with parties that the sellers have established primarily for the purpose of recognizing such sales revenue.
   v.     The seller does not have significant obligations for future performance to directly bring about resale of the product by the buyer.
   vi.    The amount of future returns can be reasonably estimated (see paragraphs 605-15-25-3 through 25-4).  Because detailed record

keeping for returns of each product line might be costly in some cases, thos Subtopic permits reasonable aggregations and approximums of product returns.  As explained in paragraph 605-15-15-2, exchanges for ultimate customers of one item for another of the same kind, quality, and price, (for example one color or size for another) are not considered returns for purposes of this Subtopic.

Sales revenue and cost of sales that are not recognized at time of sale because the foregoing conditions are not met shall be recognized either when the return privilege has substantially expired or if those conditions subsequently are met, whichever occurs first.

259.    Further, ASC 605-35-25 provides for the recognition of revenue in "Construction-Type and Production-Type Contracts" and states that "the basic accounting policy decision is the choice between two generally accepted methods: the percentage-of-completion method including units of delivery and the completed-contract method."  Evoqua purported to use the percentage-of-completion method.

260.    Additionally, the SEC in "Codification of Staff Accounting Bulletins: Topic 13 Revenue Recognition" ("SAB 13") also references FASCON 5 and provides that "revenue generally is realized or realizable and earned when all of the following criteria are met: [a] Persuasive evidence of an arrangement exists; [b] Delivery has occurred or services have been rendered; [c] The seller's price to the buyer is fixed or determinable; [and] [d] Collectability is reasonably assured."

261.    SAB 13 also provides that:

The staff believes that delivery generally is not considered to have occurred unless the customer has taken title and assumed the risks and rewards of ownership of the products specified in the customer's purchase order or sales agreement. Typically this occurs when a product is delivered to the customer's delivery site (if the terms of the sale are "FOB destination") or when a product is shipped to the customer (if the terms are "FOB shipping point").

262.    As stated above, contrary to all assertions in the Class Period SEC filings, Defendants failed to comply with GAAP.  For example, Evoqua would offer deep discounts to

incentivize customers to take products earlier than needed, even if the customers lacked capacity to take the products.  In exchange, Evoqua would store the excess products at local storage facilities at its own expense and recognize revenue upon delivery to the storage facilities.  Evoqua's recognition of revenue was in error, as the customer had not recognized "the risk and rewards of ownership" of the products, as the delivery of the products was not made to the customer, but rather a facility paid for by Evoqua.

263.    Evoqua would also improperly recognize revenue where that revenue had not been realized or realizable and earned.  For example, Evoqua would improperly recognize revenue on products that had not been shipped at all and on products that Evoqua **had not yet even manufactured**.  In addition, Evoqua prematurely recognized revenue on service contracts before the service had actually been rendered.  Evoqua's premature recognition of revenue is in direct violation of GAAP, as the product had not been delivered to the customer or the intended services rendered.  In other words, the revenue was not "realized or realizable and earned."

264.    In addition, with its recognition of revenue on non-GAAP "sales," Evoqua further concealed the weakness in its business by offering increasingly steep discounts and extended payment terms to customers as the IPO approached, all in a desperate effort to "stuff the channels" and "pull-forward" sales, and to thereby maximize reported **short-term** revenue at the expense of future bookings.  Evoqua also further inflated its reported income by improperly deferring payment of its expenses.

265.    The above accounting practices constituted serious breaches of GAAP.  Defendants knew, or recklessly disregarded, that Evoqua issued financial statements that violated GAAP in a blatant attempt to manipulate Evoqua's revenue and to inflate the market price of its shares.

IX.    **CONTEMPORANEOUS TRADING**

266.    During the Class Period, Plaintiffs relied on the integrity of the market for Evoqua, which was presumed to be determined by ordinary supply and demand and free from manipulation, distortion, and insider trading on the basis of material, nonpublic information.

267.    As set forth above, the SEC declared the IPO Registration Statement effective on November 1, 2017.  The IPO was priced at $18.00 per share on November 1, 2017.  The close of the IPO Offering of 27,777,777 shares took place on November 6, 2017, and the close of the sale of the additional 4,166,666 shares, pursuant to the underwriter's option to purchase additional shares, took place on November 7, 2017.

268.    As also set forth above, the SEC declared the SPO Registration Statement effective after close of the market on March 14, 2018.  The SPO was priced at $22.00 per share on the morning of March 15, 2018, prior to the opening of the market.  The close of the SPO Offering of 17,500,000 shares took place on March 19, 2018, and the close of the sale of the additional 2,625,000 shares, pursuant to the underwriters' option to purchase additional shares, took place on March 21, 2018.

269.    Evoqua, the AEA Fund Defendants, and the Executive Defendants sold stock through the Offerings while in possession of material, nonpublic information as alleged herein, including concerning: (a) Evoqua's systematic and pervasive termination of experienced sales personnel that devastated the businesses that Evoqua had acquired, eroded the Company's ability to sustain current revenues and generate future growth, and that gave rise to significant delays in product delivery and the services provided by Evoqua; (b) Evoqua's termination of critical integration personnel, including the most experienced employees, impeding the Company's ability to successfully integrate the numerous companies that it had acquired; (c) Evoqua's failure to adequately integrate the numerous companies it had acquired; and (d) accounting improprieties

and other misconduct that artificially and materially inflated Evoqua's reported revenues, income, and EBITDA – and understated expenses – in violation of GAAP and other dubious and undisclosed "channel stuffing" practices which, even if not prohibited by GAAP, had the effect of concealing the extent to which Evoqua was struggling to grow organically.

**Evoqua, the AEA Defendants, and the**
**Executive Defendants' Insider Sales**

| Insider | Shares Sold | Proceeds | Percent of Holdings | Offering |
|---|---|---|---|---|
| Evoqua | 8,333,333 | $149,999,994 | n/a | IPO |
| AEA[5] | 15,385,048 | $260,315,012 | 25% | IPO |
| AEA | 10,953,746 | $233,150,484 | 24% | SPO |
| Kenneth Rodi | 27,038 | $457,483 | 29% | SPO |
| Kenneth Rodi | 37,556 | $799,379 | 17% | IPO |
| Ronald C. Keating | 338,271 | $7,200,098 | 44% | SPO |
| Benedict Stas | 99,993 | $2,128,351 | 33% | SPO |
| Anthony Webster | 22,545 | $479,870 | 28% | SPO |

270.    As set forth in their sworn certifications previously filed in this action, Plaintiffs purchased Evoqua common stock during the Class Period on the dates and for the prices indicated, and thus traded contemporaneously with the Exchange Act Defendants.  For example, among other things, Louisiana Sheriffs purchased 3,744 shares of Evoqua common stock on March 13, 2018; 18,840 shares of Evoqua common stock on March 15, 2018; 2,594 shares of Evoqua common stock on March 16, 2018; and 7,638 shares of Evoqua common stock on March 20, 2018.

---

[5]     The totals listed for AEA include sales by each of the AEA Fund Defendants.

X.    **ADDITIONAL ALLEGATIONS OF SCIENTER**

271.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

A.    **Evoqua's IPO and SPO Provided Motive and Opportunity for Defendants to Sell Their Stock at Inflated Prices**

272.    Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.  Defendants, by virtue of their association with and control over the Company, which made them privy to confidential information, participated in the fraudulent scheme designed to mask Evoqua's costs-cutting measures and resulting negative impact on sales, Evoqua's inability to properly integrate acquired companies, and Evoqua's improper revenue recognition practices.

273.    AEA, the AEA Fund Defendants, and the Executive Defendants engaged in this scheme in order to inflate the price of Evoqua's securities and to enhance the value of their personal Evoqua securities and allow for profitable insider sales yielding proceeds in excess of $500 million, generating huge insider trading profits.

274.    In addition, Defendants' insider sales are probative of the Exchange Act Defendants' scienter and are part of Defendants' scheme, artifice to defraud or acts, practices, or course of business in violation of §10(b) and Rule 10b-5.  While Defendants were issuing materially false and misleading statements about the Company's business and concealing negative information and trends, each of the Executive Defendants, AEA, and the AEA Fund Defendants,

who or which had access to confidential information and were aware of the truth about the Company and its business, were benefitting from this illegal course of conduct by selling large blocks of the Company's stock at artificially inflated prices in the Offerings, without disclosing the materially adverse facts about the Company that they were privy to.  Such sales were unusual in their amount and in their timing.

275.    The following table shows the heavy insider sales of AEA (including the AEA Fund Defendants) and the Executive Defendants during the Class Period:

| Insider | Shares Sold | Proceeds | Percent of Holdings | Offering |
|---|---|---|---|---|
| AEA[6] | 15,385,048 | $260,315,012 | 25% | IPO |
| | 10,953,746 | $233,150,484 | 24% | SPO |
| Kenneth Rodi | 27,038 | $457,483 | 17% | IPO |
| | 37,556 | $799,379 | 29% | SPO |
| Ronald C. Keating | 338,271 | $7,200,098 | 44% | SPO |
| Benedict Stas | 99,993 | $2,128,351 | 33% | SPO |
| Anthony Webster | 22,545 | $479,870 | 28% | SPO |

276.    In addition to the sales outlined above, numerous other directors and employees also engaged in large-scale sales of their Evoqua shares, reflecting a Company-wide lack of confidence in the publicly stated optimism and highly positive remarks and expectations.

---

[6]    The totals listed for AEA include sales by each of the AEA Fund Defendants.

**B.      Defendants' Imputed Knowledge of Facts Critical to the Core Operations**

277.    Defendants Keating, Stas, Rodi, and Webster have been CEO, CFO, Product Segment President, and Chief Human Resources Officer, respectively, of Evoqua for many years. They were well informed of integral business issues, such as the Company's growth prospects, serial acquisitions and integration problems that plagued the process, termination of experience sales personnel, and financial state.   Consequently, their experience and responsibilities necessarily informed them that the aforementioned statements made during the Class Period were materially false and misleading.

278.    Defendant Keating has served on Evoqua's Board and as President and CEO since December 2014.  Prior to joining Evoqua, Defendant Keating served as President and CEO of Contech Engineered Solutions, an infrastructure site solutions provider, from 2007 to 2014. Keating received an M.B.A. from the Kellogg School of Management at Northwestern University and received a B.S. in Industrial Distribution from Texas A&M University.  According to the IPO Prospectus, Keating was specifically selected to serve on the Board because of his "perspective, management, leadership experience and operational expertise" on Evoqua business that he had developed in his role as President and CEO.

279.    Defendant Stas has served as Executive Vice President, CFO, and Treasurer since March 2015.  Prior to joining Evoqua, Defendant Stas held a variety of senior financial and business roles at Kennametal Inc., a supplier of tooling and industrial materials, from 1997 to 2015, including roles as Vice President Finance of Business Groups from 2010 to 2013 and as Vice President of Manufacturing.

280.    Defendant Rodi served as Executive Vice President, Products Segment President since October 2016.  The Product segment is considered Evoqua's "most global business and most

profitable segment."  Prior to joining Evoqua in May 2016, Rodi served as CEO of Neptune-Benson from 2013 to 2016.  Rodi received a B.S. in Accounting from Marquette University.

281.    Defendant Webster served as Executive Vice President, Chief Human Resource Officer since March 2016.  Prior to joining Evoqua, Webster served as Vice President of Human Resources, Europe & Americas, for Glaxo Smith Kline Consumer Health, a joint venture between Novartis and Glaxo Smith Kline plc.  Defendant Webster was personally involved in the mass terminations to reduce the employee expenses at Evoqua.  He received compensation of roughly $2 million in connection with the IPO for having cut so much of the Company's employment expense through job cuts and slashing employee compensation.

282.    Indeed, Evoqua highly touted the experience that its management brought to the table.  According to the IPO Prospectus:

> Experienced management team with proven operational capabilities that has made Evoqua an employer of choice. ***We are highly dependent on our leadership team, which consists of industry veterans with a track record of executing effective strategies and achieving profitable growth***.  Ron Keating, our CEO, is a highly experienced executive with a strategic, commercial and operational background developed in senior roles, where he reshaped organizations and corporate portfolios for growth.  Ben Stas, our CFO, has held a variety of senior financial and business roles in the capital goods sector. ***Our leadership developed and deployed standard operating processes under the Evoqua Growth System that repositioned the business and improved margins through operational programs*** and standards such as LEAN operating systems, service growth and ePro, among others. These programs, combined with our newly implemented sales methodology, Evoqua EDGE, have improved our free cash flow profile and growth prospects. ***Our management team has also expanded our operations to new target markets and geographies and has demonstrated successful acquisition and integration capabilities***. Our success depends to a significant extent on our ability to retain or attract employees in senior management, skilled technical, engineering, sales and other key personnel.

283.    Evoqua itself is a holding company with no operations of its own other than ownership of equity interests of its subsidiaries.  Its operations are conducted almost entirely through its subsidiaries, and Evoqua's ability to generate cash to meet its obligations or to pay

dividends, if any, is highly dependent on the earnings of, and receipt of funds from, its subsidiaries through dividends or intercompany loans.   Evoqua is divided into three segments, with the Industrial segment representing 51% of revenue; Product segment representing 26% of revenue; and Municipal segment representing 23% of revenue.

284.   Evoqua considers the Product segment as its "most global business and most profitable segment with an EBITDA margin of approximately 24%."   Further, Evoqua's Product segment is "comprised of five businesses, including aquatics and disinfection which was one of our highest margin businesses. The aquatics and disinfection business represented approximately 48% of the Product segment's 2018 full year adjusted EBITDA compared to 63% in 2017. The aquatics product line within the aquatics and disinfection business is primarily comprised of Neptune-Benson."

285.   In announcing Evoqua's FY2018 results, Defendant Keating stated that "ERP integration at Neptune-Benson, supply chain disruptions influenced by tariffs, and the delay of a large aquatics project primarily led to our fourth quarter challenges. These primary factors were concentrated in our Products Segment's aquatics product line, Neptune-Benson, and in our Municipal Segment."   In light of the importance of the Neptune-Benson acquisition, one of the largest by far prior to the IPO, the Company's strategy of using acquisitions as a proxy for research and development, and to offset less than expected organic growth, the importance of the Product segment in particular, and the growth prospects of the Company, Defendants can be presumed to have had knowledge of adverse facts affecting this strategy and attempts to mask public disclosure of these facts.   Likewise, Defendants' steady repetition of specific statements to investors concerning the importance and focus spent on these key strategic objectives further supports their knowledge of these adverse facts.

## XI.   ADDITIONAL LOSS CAUSATION ALLEGATIONS

286.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.   Throughout the Class Period, Evoqua's stock price was artificially inflated as a result of Defendants' materially false and misleading statements and omissions.

287.   As alleged above, on May 8, 2018, Evoqua announced its financial results for 2Q2018 and reduced its EBITDA guidance for FY2018 from $235 million–$255 million to $235 million–$245 million, 5% below the prior consensus expectation.   In response to the partial disclosure of the truth about the impact of the previously undisclosed problems described above, Evoqua's stock price fell 8.4% from a close of $20.21 per share on May 7 to a close of $18.51 on May 8 on unusually heavy volume of 2.4 million shares.

288.   As also alleged above, on August 7, 2018, Evoqua announced 3Q2018 Adjusted EBITDA of $58.0 million (at the low end of its prior guidance and $3 million or 5% below the consensus expectation).   In response to these poor results reflecting the impact of the previously undisclosed problems described above, Evoqua's stock fell from a close of $22.22 per share on August 6 to close at $20.27 on August 7 (down 8.8% in one day) and continued to fall on unusually heavy volume in the following days, closing at $17.58 on August 9 (down 19% in three days).

289.   As set forth above, on October 30, 2018, Evoqua announced negative financial results for 4Q and FY2018.   Evoqua attributed the negative results to "acquisition system integration issues," "supply-chain disruptions" (which Evoqua said were "influenced by tariffs"), and "an extended delay on a large aquatics project."   In response, analysts downgraded the Company and expressed concerns over the magnitude of the shortfall, "credibility" of management, fact that "investor trust has eroded materially," and the Company's ability to integrate future acquisitions, which was "most concerning given that consistent acquisition is a

core tenant of the company's operating plan."  Indeed, an analyst at Berenberg Capital stated that "***AQUA's business is clearly riskier than initially thought***."

290.    This negative news concerning Evoqua's financial health caused Evoqua's stock price to plummet $4.78 per share, or approximately ***35%***, from $13.80 per share at the close on October 29, 2018 to $9.02 per share on October 30 on extremely heavy trading volume.

291.    It was entirely foreseeable that Defendants' materially false and misleading statements and omissions discussed herein would artificially inflate the price of Evoqua securities. Thus, the stock price decline described above was directly and proximately caused by Defendants' materially false and misleading statements and omissions.

## XII.   PRESUMPTION OF RELIANCE – FRAUD ON THE MARKET

292.    Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts;

(b)     the omissions and misrepresentations were material;

(c)     the Company's stock traded in an efficient market;

(d)     the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)     Plaintiffs and the other members of the Class purchased Evoqua common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

293.    At all relevant times, the market for Evoqua's common stock was efficient for the following reasons, among others:

(a)     as a regulated issuer, Evoqua filed periodic public reports with the SEC;

(b)     Evoqua regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; and

(c)     Evoqua's stock traded on the NYSE, an efficient market.

294.    As a result of the foregoing, the market for Evoqua's securities promptly digested current information regarding Evoqua from all publicly available sources and reflected such information in Evoqua's stock price.  Under these circumstances, all purchasers of Evoqua's securities at relevant times suffered similar injury through their purchases of Evoqua's securities at artificially inflated prices, and a presumption of reliance applies.

295.    In addition, Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are predicated in part upon material omissions of fact that Defendants had a duty to disclose.

## XIII.  INAPPLICABILITY OF STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

296.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements described in this Complaint. Many of the specific statements described herein were not identified as "forward-looking" when made.  To the extent that there were any forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements described herein,

Defendants are liable for those false forward-looking statements because at the time each was made, the particular speaker knew that the particular forward-looking statement was false or misleading, and/or that the forward-looking statement was authorized and/or approved by an executive officer of Evoqua who knew that those statements were false or misleading when made.

## XIV.   CLASS ACTION ALLEGATIONS

297.   Plaintiffs bring this action as a class action, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), on behalf of a class consisting of all persons and entities that purchased, or otherwise acquired, the securities of Evoqua during the Class Period, seeking to pursue remedies under the Exchange Act and the Securities Act (the "Class").  Excluded from the Class are Defendants; the officers and directors of the Company, at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which any of the Defendants have, or had, a controlling interest.

298.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Evoqua common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Millions of Evoqua shares were traded publicly during the Class Period on the NYSE.  Record owners and other members of the Class may be identified from records maintained by Evoqua or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

299.   Plaintiffs' claims are typical of the claims of Class members, who were all similarly affected by Defendants' wrongful conduct in violation of the federal securities laws.  Further,

Plaintiffs will fairly and adequately protect the interests of Class members and have retained counsel competent and experienced in class and securities litigation.

300.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the Exchange Act was violated by Defendants;

(b)    whether Defendants omitted and/or misrepresented material facts;

(c)    whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    whether Defendants knew, or recklessly disregarded, that their statements were false and misleading;

(e)    whether the price of Evoqua common stock was artificially inflated; and

(f)    the extent of damage sustained by Class members and the appropriate measure of damages.

301.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable.  Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for Class members to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XV.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I
**Violation of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder
(Against Evoqua, Defendant Keating, and Defendant Stas)**

302.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

303.   This Count is asserted on behalf of all members of the Class against Evoqua and Defendants Keating and Stas for violations of §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

304.   These Defendants carried out a plan, scheme, and course of conduct which was intended to, and did: (a) deceive the investing public, including Plaintiffs and the other Class members, as alleged herein; and (b) cause Plaintiffs and the other members of the Class to purchase Evoqua securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, each of these Defendants took the actions set forth herein.

305.   During the Class Period, these Defendants disseminated or approved the false statements specified herein, among others, which they knew, or deliberately disregarded, were materially misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

306.   These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to

maintain artificially high market prices for Evoqua securities in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

307.    These Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business and future prospects of Evoqua as specified herein.

308.    These Defendants employed devices, schemes, and artifices to defraud while in possession of material, adverse nonpublic information, and engaged in acts, practices, and a course of conduct, as alleged herein, in an effort to assure investors of Evoqua's value and performance and continued substantial growth, which included the making of, or participation in the making of, false statements of material facts and omitting to state material facts necessary in order to make the statements made about Evoqua and its business operations and future prospects, in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Evoqua securities.

309.    As described above, these Defendants acted with scienter throughout the Class Period in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. These Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the Company's results and growth prospects, thereby artificially inflating the price of its securities. As demonstrated by these Defendants' omissions and misstatements of the Company's business strategy, these Defendants, if they did not have actual

knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

310.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Evoqua securities was artificially inflated.   In ignorance of the fact that market prices of Evoqua's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by these Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to, or recklessly disregarded, by these Defendants, but not disclosed in public statements by Defendants, Plaintiffs and the other members of the Class acquired Evoqua securities at artificially high prices and were, or will be, damaged thereby.

311.    At the time of said misrepresentations and omissions, Plaintiffs and the other members of the Class were ignorant of their falsity and believed them to be true.   Had Plaintiffs, the other members of the Class, and the marketplace known the truth regarding the Company's business, which was not disclosed by Defendants, Plaintiffs and the other members of the Class would not have purchased, or otherwise acquired, their Evoqua securities, or if they had acquired such securities, they would not have done so at the artificially inflated prices that they paid.

312.    By virtue of the foregoing, these Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

313.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities.

314.    This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchase of securities giving rise to the cause of action.

## COUNT II
**Violation of Section 20(a) of the Exchange Act**
**(Against the Executive Defendants and the AEA Fund Defendants)**

315.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

316.    The Executive Defendants acted as controlling persons of Evoqua within the meaning of §20(a) of the Exchange Act, 15 U.S.C. §78t(a), as alleged herein.  By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Executive Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading.  The Executive Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to have been misleading prior to, and/or shortly after, these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

317.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations, as alleged herein, and exercised the same.

318.     As set forth above, Evoqua and the Executive Defendants each violated §10(b) and Rule 10b-5 promulgated thereunder by their acts and omissions, as alleged in this Complaint.

319.     By virtue of their positions as controlling persons, the Executive Defendants are liable pursuant to §20(a) of the Exchange Act.   As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's securities.

320.     In addition, by virtue of its ownership stake and power to appoint three members of the Evoqua Board, AEA had the power to control or influence Evoqua and the particular transactions giving rise to the securities violations, as alleged herein, and exercised the same.  By virtue of its position as a controlling person, AEA is liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's securities.

321.     This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchase of securities giving rise to the cause of action.

## COUNT III
### Violations of Section 10(b) and 20A of the Exchange Act and Rule 10b-5 Promulgated Thereunder for Insider Trading
### (Against All Exchange Act Defendants)

322.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

323.     This Count is asserted for violations of §20A of the Exchange Act, 15 U.S.C. §78t-1, on behalf of Louisiana Sheriffs and all other members of the Class, who purchased shares of Evoqua common stock contemporaneously with the sale of Evoqua common stock, by the Exchange Act Defendants – Evoqua, the Executive Defendants, and the AEA Fund Defendants –

while they were in possession of material, nonpublic information, as alleged herein, including concerning Evoqua's true business and financial condition.

324.    Section 20A(a) of the Exchange Act provides that:

Aany person who violates any provision of the [Exchange Act] or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased securities of the same class.

325.    As set forth herein, the Exchange Act Defendants violated §10(b) of the Exchange Act, Rule 10b-5 and §20(a) of the Exchange Act for the reasons stated in Counts I and II above. Additionally, the Exchange Act Defendants further violated §10(b) of the Exchange Act, Rule 10b-5, and Rule 10b5-1 (17 C.F.R. §240.10b5-1) by selling shares of Evoqua common stock while in possession of material, nonpublic adverse information concerning Evoqua's true business and financial condition, which information they had a duty to disclose, and which they failed to disclose in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as more fully alleged herein.

326.    Contemporaneously with the Exchange Act Defendants' insider sales of Evoqua common stock, Louisiana Sheriffs and the other Class members purchased shares of Evoqua common stock on a national securities exchange and in an open and efficient market, while the Exchange Act Defendants were in possession of material, nonpublic information they had a duty to disclose, but failed to disclose, as alleged herein, including information concerning Evoqua's true business and financial condition.

327.    Louisiana Sheriffs and the other members of the Class have been damaged as a result of the violations of the Exchange Act alleged herein.

328.    By reason of the violations of the Exchange Act alleged herein, the Exchange Act Defendants are liable to Louisiana Sheriffs and the other members of the Class who purchased

shares of Evoqua common stock contemporaneously with the Exchange Act Defendants' sales of Evoqua common stock during the Class Period.

329.    Louisiana Sheriffs and the other members of the Class, who purchased contemporaneously with the Exchange Act Defendants' insider sales of Evoqua securities, seek disgorgement by the Exchange Act Defendants of profits gained or losses avoided from the Exchange Act Defendants' transactions in Evoqua common stock contemporaneous with the §20A Plaintiffs and the other members of the Class.

330.    This action was brought within five years after the date of the last transaction that is the subject of the Exchange Act Defendants' violation of Section 20A, and, with respect to the underlying violations of Section 10(b) of the Exchange Act alleged in this Count and in Count One above, was brought within five years after the date of the last transaction that violated Section 20A of the Exchange Act by the Exchange Act Defendants.

### PART TWO:
### CLAIMS UNDER THE SECURITIES ACT OF 1933

## XVI.   SECURITIES ACT CLAIMS

331.    In this Part Two and in Counts III-V below (the "Securities Act Claims"), Plaintiffs assert strict-liability and negligence claims under §§11, 12(a)(2), and 15 of the Securities Act. Plaintiffs incorporate the above factual allegations by reference, but expressly disclaim any allegations of scienter or fraud for these Securities Act claims, except that any challenged statements of opinion or belief are alleged to have been materially misstated statements of opinion or belief.  Among other things, Plaintiffs disclaim the allegations of scienter or fraud in §X above.

332.    The Securities Act Claims arise out of Evoqua's approximately $499 million November 6, 2017 initial public offering of 27,777,777 shares of common stock at $18 per share

("IPO") and its approximately $385 million March 19, 2018 secondary public offering of 17,500,000 shares of common stock at $22 per share (the "SPO") (collectively, the "Offerings").

333.    The IPO was conducted pursuant to a Registration Statement filed on October 10, 2017, as amended over time, on SEC Form S-1 ("IPO Registration Statement"), and incorporated a prospectus filed the same day and amended over time (collectively, the "IPO Offering Materials").

334.    The SPO was conducted pursuant to a Registration Statement filed on March 12, 2018, as amended over time, on SEC Form S-1 ("IPO Registration Statement"), and incorporated a prospectus filed the same day and amended over time (collectively, the "SPO Offering Materials").

335.    The IPO Offering Materials and the SPO Offering Materials are collectively referred to in this Part Two of the Complaint as the "Offering Materials."

336.    Each of the Offerings was a firm-commitment offering, in which the Underwriter Defendants, as defined below, purchased shares from Evoqua and sold them to the investing public.

337.    This action was brought within one year after the discovery of the untrue statements and omissions in the Offering Materials (and within one year after this discovery should have been made in the exercise of reasonable diligence) and within three years of the Offerings.

## XVII.   JURISDICTION AND VENUE

338.    The claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§77k, 77*l*, 77o).

339.    This Court has jurisdiction over these claims under Section 22 of the Securities Act (15 U.S.C. §77v).

340.    Venue is proper in this Judicial District under Section 22 of the Securities Act (15 U.S.C. §77v(a)).  Many of the acts and transactions alleged herein, including the dissemination of materially untrue and misleading statements, occurred in substantial part in this Judicial District, and Evoqua's stock trades on the NYSE, located within this Judicial District.

341.    In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate wire and telephone communications, and the facilities of the NYSE, a national securities exchange.

## XVIII.  THE SECURITIES ACT PARTIES

### A.    The Securities Act Plaintiffs

342.    Lead Plaintiff City of Omaha Police and Fire Retirement System ("Omaha P+F"), as stated in its previously filed certification, purchased Evoqua common stock during the Class Period and suffered damages as a result of the federal securities law violations and untrue or misleading statements and material omissions alleged herein.

343.    Lead Plaintiff Louisiana Sheriffs' Pension & Relief Fund ("Louisiana Sheriff"), as stated in its previously filed certification, purchased Evoqua common stock during the Class Period and suffered damages as a result of the federal securities law violations and untrue or misleading statements or material omissions alleged herein. In addition, Louisiana Sheriff purchased Evoqua common stock in the IPO and the SPO pursuant or traceable to the untrue and misleading Registration Statements and was damaged thereby.

### B.    The Securities Act Defendants

#### 1.  Evoqua

344.    Defendant Evoqua is incorporated in Delaware, and its stock trades on the NYSE under the ticker symbol "AQUA."  The Company's corporate headquarters are located at 210 Sixth

Avenue, Pittsburgh, Pennsylvania 15222.  Evoqua purports to be a leading provider of mission-critical water-treatment solutions, offering services, systems, and technologies to support a client's full water lifecycle needs.  Evoqua holds approximately 11% market share in the North American water-treatment market.  It focuses mainly on the North American region, which accounts for 86% of its total revenue.

345.    As of the IPO, Evoqua served its customers through three segments: Industrial; Municipal; and Products.  Evoqua's Industrial segment provides application-specific solutions and full lifecycle services for critical water applications, focusing on treating industrial process water, utility water, and wastewater, so that its customers can meet often stringent purity standards to ensure the elimination of water-borne impurities.  Evoqua's Municipal segment provides engineered solutions and equipment to treat wastewater, purify drinking water, and provide odor and corrosion control for municipalities, and sells a broad portfolio of related products including filters, clarifiers, and aerators.  Evoqua's Product segment sells differentiated technologies to a diverse set of water-treatment system specifiers, integrators, and end users globally, and also sells a broad range of filtration, disinfection, electrodeionization, and analyzer products through direct, indirect, and aftermarket sales channels.

### 2.    The Executive Defendants

346.    Defendant Ronald C. Keating ("Keating") has served at all relevant times as Evoqua's President and Chief Executive Officer and as a member of Evoqua's board of directors. Defendant Keating signed or authorized the signing of the IPO Offering Materials; the SPO Offering Materials; Form 10-K, for the fiscal year ended September 30, 2017 (the "2017 Form 10-K"); and Form 10-Q for the quarterly period ended December 31, 2017 (the "1Q2018 Form 10-Q").

347.    Defendant Benedict J. Stas ("Stas") has served, at all relevant times, as Evoqua's Executive Vice President, Chief Financial Officer and Treasurer. Defendant Stas signed or authorized the signing of the IPO Offering Materials, SPO Offering Materials, 2017 Form 10-K, and 1Q2018 Form 10Q.

### 3.    The Director Defendants

348.    Defendant Martin Lamb ("Lamb") was, at all relevant times, Chairman of the Board of Directors of the Company. Defendant Lamb also served on AEA's European Advisory Board. Defendant Lamb signed or authorized the signing of the IPO Registration Statement, the FY 2017 Form 10-K, and the SPO Registration Statement.

349.    Defendant Nick Bhambri ("Bhambri") was, at all relevant times, a director of the Company.  Defendant Bhambri signed or authorized the signing of the IPO Registration Statement, the FY 2017 Form 10-K, and the SPO Registration Statement.

350.    Defendant Gary Cappeline ("Cappeline") was, at all relevant times, a director of the Company and an Operating Partner of AEA.  Defendant Cappeline signed or authorized the signing of the IPO Registration Statement, the FY 2017 Form 10-K, and the SPO Registration Statement.

351.    Defendant Judd Gregg ("Gregg") was, at all relevant times, a director of the Company.  Defendant Gregg signed or authorized the signing of the IPO Registration Statement, the FY 2017 Form 10-K, and the SPO Registration Statement.

352.    Defendant Brian R. Hoesterey ("Hoesterey") was, at all relevant times, a director of the Company and a Partner with AEA.  Defendant Hoesterey signed or authorized the signing of the IPO Registration Statement, the FY 2017 Form 10-K, and the SPO Registration Statement.

353.    Defendant Vinay Kumar ("Kumar") was, at all relevant times, a director of the Company and a Partner with AEA.  Defendant Kumar signed or authorized the signing of the IPO Registration Statement, the FY 2017 Form 10-K, and the SPO Registration Statement.

354.    Defendant Peter M. Wilver ("Wilver") joined the Board of Directors on January 9, 2018.  Defendant Wilver signed or authorized the signing of the SPO Registration Statement.

355.    The Director Defendants each participated in the preparation of and signed (or authorized the signing of) the Registration Statements.  Defendant Evoqua and the Director and Executive Defendants who signed (or authorized the signing of) the Registration Statements and the documents incorporated in the SPO Registration Statement by reference are strictly liable for the materially untrue and misleading statements and omissions in or incorporated into the Registration Statements.

### 4.    The Underwriter Defendants

356.    Defendant Credit Suisse (USA) LLC ("Credit Suisse") served as a lead Underwriter in each of the Offerings.

357.    Defendant J.P. Morgan Securities LLC ("JP Morgan") served as a lead Underwriter in each of the Offerings.

358.    Defendant RBC Capital Markets, LLC ("RBC") served as an Underwriter in each of the Offerings.

359.    Defendant Citigroup Global Markets Inc. ("Citigroup") served as an Underwriter in each of the Offerings.

360.    Defendant Goldman Sach & Co. LLC ("Goldman Sachs") served as an Underwriter in each of the Offerings.

361.    Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") served as an Underwriter in each of the Offerings.

362.    Defendant Robert W. Baird & Co. Incorporated ("Baird") served as an Underwriter in each of the Offerings.

363.    Defendant Raymond James & Associates, Inc. ("James") served as an Underwriter in each of the Offerings.

364.    Defendant Stifel, Nicolaus & Company, Incorporated ("Stifel") served as an Underwriter in each of the Offerings.

365.    Defendant Wells Fargo Securities, LLC ("Wells Fargo served as an Underwriter in each of the Offerings.

366.    Defendant Cowen and Company, LLC ("Cowen") served as an Underwriter for the SPO.

367.    Each Underwriter Defendant purchased the shares of common stock it had agreed to purchase (*see infra*), as well as its allocable shares attributed to an option granted to the underwriters to purchase an additional 4,166,666 shares of common stock in the IPO and 2,625,000 shares of common stock in the SPO.  The Underwriter Defendants each served as a financial advisor for and assisted in the preparation and dissemination of the Company's materially untrue and misleading Registration Statements and Prospectuses.

368.    The below chart sets forth the number of shares purchased by each Underwriter Defendant in the IPO:

| Underwriter | Number of Shares |
| --- | --- |
| Credit Suisse Securities (USA) LLC | 7,794,118 |
| J.P. Morgan Securities LLC | 7,794,118 |
| RBC Capital Markets, LLC | 4,041,394 |
| Citigroup Global Markets Inc. | 1,782,407 |
| Goldman Sachs & Co. LLC | 1,782,407 |
| Morgan Stanley & Co. LLC | 1,273,148 |
| Robert W. Baird & Co. Incorporated | 1,018,518 |
| Raymond James & Associates, Inc. | 763,889 |
| Stifel, Nicolaus & Company, Incorporated | 763,889 |
| Wells Fargo Securities, LLC | 763,889 |
| Total | 27,777,777 |

369.     The below chart sets forth the number of shares purchased by each Underwriter Defendant in the SPO:

| Underwriter | Number of Shares |
|---|---|
| J.P. Morgan Securities LLC | 4,725,000 |
| Credit Suisse Securities (USA) LLC | 3,850,000 |
| RBC Capital Markets, LLC | 2,800,000 |
| Citigroup Global Markets Inc. | 1,225,000 |
| Goldman Sachs & Co. LLC | 1,225,000 |
| Morgan Stanley & Co. LLC | 875,000 |
| Robert W. Baird & Co. Incorporated | 700,000 |
| Cowen and Company, LLC | 525,000 |
| Raymond James & Associates, Inc. | 525,000 |
| Stifel, Nicolaus & Company, Incorporated | 525,000 |
| Wells Fargo Securities, LLC | 525,000 |
| Total | 17,500,000 |

370.     The Underwriter Defendants are primarily investment banking houses which specialize, *inter alia*, in underwriting public offerings of securities.  As the underwriters of the IPO and SPO, the Underwriter Defendants earned lucrative underwriting fees for their participation in the IPO and SPO.

371.     In addition, the Underwriter Defendants met with potential investors and presented highly favorable but materially untrue or materially misleading information about the Company, its business, products, plans, assets, and financial prospects, or omitted to disclose material information required to be disclosed under the federal securities laws and applicable regulations promulgated under those laws.

372.     Representatives of the Underwriter Defendants also assisted Evoqua, AEA, the Executive Defendants in planning the IPO and SPO. They also purported to conduct an adequate and reasonable investigation into the business, operations, products, assets, and plans of the Company, an undertaking known as a "due diligence" investigation. During their due diligence, the Underwriter Defendants had continual access to confidential corporate information concerning the Company's business, financial condition, products, plans, assets, and growth prospects.   A

reasonable investigation into the truthfulness and accuracy of the Offering Materials, including the statements incorporated by reference, would have revealed that the Offering Materials contained untrue and misleading statements and omissions, as alleged below.   None of the Underwriter Defendants made a reasonable investigation into the truthfulness and accuracy of the Offering Materials.

### 5.        AEA: Evoqua's Controlling Stockholder

373.    AEA Investors LP ("AEA")[7] is a private investment firm headquartered in New York, New York with offices in Stamford, Connecticut, London, Munich, and Shanghai.   AEA focuses on leveraged buyouts and private-equity investments in mid-market manufacturing-service, distribution, specialty-chemicals, consumer-products, and business-services companies. As of the IPO, AEA managed approximately $10 billion of capital for its investors.   Before the IPO, AEA owned approximately 58.5% of Evoqua common stock.   As part of the IPO, AEA sold 15,385,048 shares of Evoqua common stock for proceeds of approximately $260,315,000, retaining about 40.6% of the Company's common stock and approximately 70.7% of the voting power of the Company's outstanding common stock.   As part of the SPO, AEA sold 10,953,746 shares of Evoqua common stock for approximately $233,150,000, retaining about 30.9% of the Company's common stock and approximately 52.5% of the voting power of the Company's outstanding common stock.   AEA designated Defendants Cappeline, Hoesterey, and Kumar as its designees on Evoqua's Board.   Because of AEA's controlling interest in Evoqua, AEA influenced and controlled all of Evoqua's major corporate decisions.

---

[7]     AEA refers to all of its affiliates who also hold shares of Evoqua's common stock, including but not limited to AEA EWT Holdings LP; AEA EWT Holdings GP LLC; AEA EWT Holdings GP; AEA Investors Fund V LP; AEA Investors Participant Fund V LP; AEA Investors QP Participant Fund V LP; AEA Investors Fund V-A LP; AEA Investors Fund V-B LP; AEA Investors PF V LLC; AEA Investors Partners V LP; AEA Management (Cayman) Ltd.

374. Evoqua's SEC filings identified AEA as its "Sponsor" and stated that Evoqua was a "controlled company" under AEA, including due to AEA's holding and control of more than 50% of the voting power for the election of Evoqua's directors. Evoqua's SEC filings likewise stated that "because AEA controls a significant percentage of our common stock, it may influence all major corporate decisions." Evoqua also entered into a management agreement with AEA for advisory and consulting services. The agreement required Evoqua to pay AEA an annual management fee of approximately $4.0 million per year following the AEA Acquisition and continuing for as long as AEA, either directly or indirectly, owns any of Evoqua's or its subsidiaries' equity (this agreement was terminated in connection with the IPO). Given the pervasive control that AEA exerted over Evoqua, the Company's SEC filings also stated that "the interests of AEA and its affiliates, including certain of our directors, may conflict with your interests as an owner of our common stock and those of the Company."

C. **Materially False and Misleading Statements and Omissions in the Offering Materials**

1. **Initial Public Offering Prospectus (November 1, 2017)**

375. The Company's IPO Prospectus included untrue statements and omissions about the Company's purportedly successful acquisitions, including the following statements:

> ***Experienced management team with proven operational capabilities that has made Evoqua an employer of choice***. We are highly dependent on our leadership team, which consists of industry veterans with a track record of executing effective strategies and achieving profitable growth. . . . Our leadership developed and deployed standard operating processes under the Evoqua Growth System that repositioned the business and improved margins through operational programs and standards such as LEAN operating systems, service growth and ePro, among others. These programs, combined with our newly implemented sales methodology, Evoqua EDGE, have improved our free cash flow profile and growth prospects. ***Our management team has also expanded our operations to new target markets and geographies and has demonstrated successful acquisition and integration capabilities***. Our success depends to a significant extent on our ability to retain or attract employees in senior management, skilled technical, engineering, sales and other key personnel.

136

After the AEA Acquisition, we began a transformation of our business into a global organization with an independent, professional management team. We believe our transformation has made us into a premier partner and employer in our industry, resulting in differentiated capabilities and talent within our organization.

\* \* \*

***Continue to evaluate and pursue accretive tuck-in acquisitions to add new technologies, attractive geographic regions and end-markets***. As a complement to our organic growth initiatives, we view tuck-in acquisitions as a key element of our overall growth strategy which will enable us to accelerate our growth in our current addressable market, new geographies and new end market verticals. Our existing customer relationships, channels to market and ability to rapidly commercialize technologies provide a strong platform to drive growth in the businesses we acquire. To capitalize on these opportunities we have built an experienced team dedicated to mergers and acquisitions that has successfully completed eight technology-enhancing and geography-expanding acquisitions since April 2016, including the addition of capabilities in the attractive aquatics market . . . .

\* \* \*

### Acquisitions

We believe that tuck-in acquisitions present a key opportunity within our overall growth strategy, which we will continue to evaluate strategically. These strategic acquisitions will enable us to accelerate our growth in our current addressable market, as well as in new geographies and new end market verticals. Our existing customer relationships, best-in-class channels to market and ability to rapidly commercialize technologies provide a strong platform to drive rapid growth in the businesses we acquire. To capitalize on these opportunities, we have built an experienced team dedicated to mergers and acquisitions that has successfully completed eight technology-enhancing and geography-expanding acquisitions since April 2016, with purchase prices ranging from approximately $3.3 million to approximately $283.7 million, and pre-acquisition revenues ranging from approximately $3.1 million to approximately $55.7 million. We will continue to actively evaluate acquisition opportunities that are consistent with our business strategy and financial model, and, although we may not be able to continue to identify suitable acquisition targets and implement our growth strategy, we currently have a pipeline which includes more than 60 potential targets, which has been developed proactively by our team as well as informed by our customer base.

376.    These statements were materially untrue and misleading because the Company had

(i) engaged in the systematic and pervasive termination of experienced sales personnel that

devastated the businesses that Evoqua had acquired, eroded the Company's ability to sustain

current revenues and generate future growth, and gave rise to significant delays in product delivery and the services provided by Evoqua; and (ii) likewise terminated critical integration personnel, including the most experienced employees, impeding the Company's ability to successfully integrate the numerous companies that it had acquired.

377.   The IPO Prospectus also included materially misleading "Risk Factors" about the Company's acquisitions:

> ***Our growth strategy includes acquisitions, and we may not be able to identify suitable acquisition targets or otherwise successfully implement our growth strategy.***
>
> Acquisitions have historically been a significant part of our growth strategy, and we expect to continue to grow through acquisitions in the future. We expect to continue evaluating potential strategic acquisitions of businesses, assets and product lines. We may not be able to identify suitable candidates, negotiate appropriate or favorable acquisition terms, obtain financing that may be needed to consummate such transactions or complete proposed acquisitions. There is significant competition for acquisition and expansion opportunities in our businesses.
>
> In addition, acquisitions involve numerous risks, including (i) incurring the time and expense associated with identifying and evaluating potential acquisitions and negotiating potential transactions, resulting in management's attention being diverted from the operation of our existing business; (ii) using inaccurate estimates and judgments to evaluate credit, operations, funding, liquidity, business, management and market risks with respect to the target institution or assets; (iii) litigation relating to an acquisition, particularly in the context of a publicly held acquisition target, that could require us to incur significant expenses, result in management's attention being diverted from the operation of our existing business or delay or enjoin the transaction; (iv) failing to properly identify an acquisition candidate's liabilities, potential liabilities or risks; and (v) not receiving required regulatory approvals or such approvals being delayed or restrictively conditional. . . .
>
> ***We may have difficulty in operating or integrating any acquired businesses, assets or product lines profitably or in otherwise successfully implementing our growth strategy***.
>
> The anticipated benefits from any potential acquisitions may not be achieved unless the operations of the acquired business assets or product lines are successfully integrated in an efficient, effective and timely manner. The integration of our acquisitions will require substantial attention from management and operating

personnel to ensure that the acquisition does not disrupt any existing operations, or affect our customers' opinions and perceptions of our services, products or customer support.

In addition, the integration of any acquisition includes numerous risks, including an acquired business not performing to our expectations, our not integrating it appropriately, failure to realize anticipated synergies and cost savings and difficulties, inefficiencies or cost overruns in integrating and assimilating the organizational cultures, operations, technologies, data, services and products of the acquired business with ours.

The process of integrating acquired businesses, assets and product lines could cause the interruption of, or delays in, the operation of our existing business, which could have a material adverse effect on our business, financial condition, results of operations or prospects. Acquisitions also place a burden on our information, financial and operating systems and our employees and management. ***Our ability to manage our growth effectively and integrate the operations of acquired businesses, assets or product lines, will require us to continue to attract, train, motivate, manage and retain key employees and to expand our information technology, operational and financial systems. If we are unable to manage our growth effectively, we may spend time and resources on such acquisitions that do not ultimately increase our profitability or that cause loss of, or harm to, relationships with employees and customers***.

378.   These statements were materially untrue and misleading because the Company had (i) engaged in the systematic and pervasive termination of experienced sales personnel that devastated the businesses that Evoqua had acquired, eroded the Company's ability to sustain current revenues and generate future growth, and gave rise to significant delays in product delivery and the services provided by Evoqua; and (ii) likewise terminated critical integration personnel, including the most experienced employees, impeding the Company's ability to successfully integrate the numerous companies that it had acquired; and (iii) as a result, the risks described in the "Risk Factors" had already materialized and were adversely affecting the Company's business and financial results and were not merely hypothetical future possibilities.

379.   The Company's IPO Prospectus also included untrue statements and omissions about its investment in its sales and other personnel:

***Grow and further penetrate our existing customer base. We believe our strong brands, leading position in highly fragmented markets, scalable and global offerings, leading installed base and unique ability to provide complete treatment solutions will enable us to capture a larger share of our existing customers' water treatment spend while expanding with existing and new customers into adjacent end-markets and underpenetrated regions, including by investing in our sales force and cross-selling to existing customers***. Despite having the leading market share in the North American water treatment market, our share does not exceed 25% in any single market vertical according to Amane Advisors. Furthermore, our share of any given customer's water treatment related spend is often limited to select regions, thereby creating a significant opportunity to further penetrate existing customer accounts by offering additional solutions and serving more sites, both in current and new geographic regions. Our growth initiatives include both expanding our presence in our core North American market as well as replicating our leading position and strategies into underpenetrated global regions. For example, through innovative technologies such as IONPURE continuous electrodeionization and Defender aquatic regenerative media filtration systems, we have expanded our positions in markets such as Asia and the Middle East.

***In order to maintain and enhance our customer relationships, we intend to continue to invest in our sales force. Since fiscal 2014 we have increased the proportion of customer facing employees by over 25%, developed a best-in-class training program, restructured our customer relationship management system and realigned our compensation packages***. Sales of our products, services and solutions to some of our customers are also accomplished, in part, through the efforts of third-party sales representatives. Through direct sales efforts, outreach and education, we plan to continue to enhance our relationships and enable further adoption of our products, technologies and solutions by end customers and key influencers, including municipal representatives, engineering firms, designers and other system specifiers. Our performance depends, in part, on our ability to attract, incentivize and retain third-party sales representatives that will be able to market and support our products effectively, and competition for sales personnel with established customer relationships is intense.

\* \* \*

*Operational investment*. Our historical operating results reflect the impact of our ongoing investments to support our growth. We have made significant investments in our business that we believe have laid the foundation for continued profitable growth. We believe that our strengthened sales force, mergers and acquisitions team, enhanced information systems, research, development and engineering investments and other factors enable us to support our operating model.

380.    These statements were materially untrue and misleading because the Company had

(i) engaged in the systematic and pervasive termination of experienced sales personnel that

devastated the businesses that Evoqua had acquired, eroded the Company's ability to sustain current revenues and generate future growth and gave rise to significant delays in product delivery and the services provided by Evoqua; and (ii) likewise terminated critical integration personnel, including the most experienced employees, impeding the Company's ability to successfully integrate the numerous companies that it had acquired.

381.    The IPO Prospectus also included a materially misleading "Risk Factor" about sales and other personnel:

> ***Failure to retain our existing senior management, skilled technical, engineering, sales and other key personnel or the inability to attract and retain new qualified personnel could materially adversely impact our ability to operate or grow our business.***
>
> Our success depends to a significant extent on our ability to retain or attract a significant number of employees in senior management, skilled technical, engineering, sales and other key personnel. Since the AEA Acquisition, we have focused on creating a high performance culture, in which our employees are highly enabled, empowered and accountable. Our inability to continue to develop and maintain our culture by empowering our senior management, other leaders and employees and promoting an entrepreneurial spirit, could result in our loss of key leaders and employees and have a material adverse effect on our business, financial condition, results of operations or prospects.
>
> Effective succession planning is also important to our long-term success, as a failure to ensure effective transfer of knowledge and smooth transitions involving key employees could hinder our strategic planning and execution. We have implemented a voluntary separation program intended to mitigate the risks associated with knowledge transfer, but we cannot guarantee that it will be effective or cost-efficient.
>
> We will need to continue to develop a roster of qualified talent to support business growth. Without a sufficient number of skilled employees, our operations and manufacturing quality could suffer. Our experienced sales team has also developed a number of meaningful customer relationships that would be difficult to replace. Therefore, competition for qualified technical personnel and for sales personnel with established customer relationships is intense, both in retaining our existing employees and in replacing or finding additional suitable employees. There can be no assurance that the labor pool from which we hire our personnel will increase or remain stable, and any failure to retain our existing technical and sales personnel and other employees or to attract additional skilled personnel could have a material adverse effect our business, financial condition, results of operations or prospects.

382.    These statements were materially untrue and misleading because the Company had (i) engaged in the systematic and pervasive termination of experienced sales personnel that devastated the businesses that Evoqua had acquired, eroded the Company's ability to sustain current revenues and generate future growth, and gave rise to significant delays in product delivery and the services provided by Evoqua; and (ii) likewise terminated critical integration personnel, including the most experienced employees, impeding the Company's ability to successfully integrate the numerous companies that it had acquired; and (iii) as a result, the risks described in this "Risk Factor" had already materialized and were adversely affecting the Company's business and financial results and were not merely hypothetical future possibilities.

383.    The IPO Prospectus also included the Company's revenue, net income, EBITDA, and expenses in the Prospectus Summary, Management's Discussion and Analysis of Financial Condition and Results of Operations, Unaudited Pro Forma Financial Information, Selected Historical Consolidated Financial Data, and Consolidated Financial Statements. Among other things, the IPO Prospectus reported:

> For the fiscal year ended September 30, 2016, we generated revenue, net income and Adjusted EBITDA of $1.1 billion, $13.0 million and $160.1 million, respectively. For the fiscal year ended September 30, 2016, we generated pro forma revenue, pro forma net income and Adjusted EBITDA (pro forma as adjusted for contributions from insignificant completed acquisitions) of $1.2 billion, $16.8 million and $182.4 million, respectively.

384.    These statements were materially untrue and misleading because Defendants engaged in accounting misconduct that artificially and materially inflated Evoqua's reported revenues, income, and EBITDA including, but not limited to, by: (i) improper revenue recognition and (b) understatement of expenses. These statements were also materially untrue and misleading because Evoqua also engaged in a range of other dubious and undisclosed "channel stuffing"

practices which had the effect of concealing the extent to which Evoqua was struggling to grow organically.

385.     The IPO Prospectus stated that the Company had incurred "[r]estructuring and related business transformation costs" related to severance costs, including

> $16.9 million in fiscal 2016 . . . , a range of $19.8 million to $20.2 million in fiscal 2017, $16.9 million for the three months ended September 30, 2016 and a range of $0.9 million to $1.0 million in the three months ended September 30, 2017 related to our voluntary separation plan pursuant to which approximately 220 employees accepted separation packages . . . .

386.     This statement was materially untrue or misleading because the Company had actually pressured its more experienced and knowledgeable sales and integration employees to leave and had replaced them, if at all, with less experienced, less knowledgeable employees and because many experienced employees had left involuntarily.

## 2.     2017 Form 10-K (December 4, 2017)

387.     The Company's FY2017 annual report on Form 10-K filed on December 4, 2017, which was later incorporated by reference in the SPO Offering Materials, made materially untrue or misleading statements about the Company's acquisitions:

> ***Continue to evaluate and pursue accretive tuck-in acquisitions to add new technologies, attractive geographic regions and end-markets***. As a complement to our organic growth initiatives, we view tuck-in acquisitions as a key element of our overall growth strategy which will enable us to accelerate our growth in our current addressable market, new geographies and new end market verticals. Our existing customer relationships, channels to market and ability to rapidly commercialize technologies provide a strong platform to drive growth in the businesses we acquire. To capitalize on these opportunities we have built an experienced team dedicated to mergers and acquisitions that has successfully completed eight technology-enhancing and geography-expanding acquisitions since April 2016, including the addition of capabilities in the attractive aquatics market . . . .

* * *

**Research, Development and Engineering**

We utilize a disciplined, stage-gate process – consisting of development, field test, commercialization, supply chain and sourcing decisions – to identify and develop new technologies to commercialize, focus our efforts on and engage early with supply-chain management to promote profitability. We focus on tuck-in acquisitions as additional resources for new product innovation and development.

\* \* \*

**Acquisitions**

We believe that tuck-in acquisitions present a key opportunity within our overall growth strategy, which we will continue to evaluate strategically. These strategic acquisitions will enable us to accelerate our growth in our current addressable market, as well as in new geographies and new end market verticals. Our existing customer relationships, best-in-class channels to market and ability to rapidly commercialize technologies provide a strong platform to drive rapid growth in the businesses we acquire. To capitalize on these opportunities, we have built an experienced team dedicated to mergers and acquisitions that has successfully completed eight technology-enhancing and geography-expanding acquisitions since April 2016, with purchase prices ranging from approximately $3.3 million to approximately $283.7 million, and pre-acquisition revenues ranging from approximately $3.1 million to approximately $55.7 million. We will continue to actively evaluate acquisition opportunities that are consistent with our business strategy and financial model, and, although we may not be able to continue to identify suitable acquisition targets and implement our growth strategy, we currently have a pipeline which includes more than 60 potential targets, which has been developed proactively by our team as well as informed by our customer base.

388.    These statements were materially untrue and misleading because the Company had (i) engaged in the systematic and pervasive termination of experienced sales personnel that devastated the businesses that Evoqua had acquired, eroded the Company's ability to sustain current revenues and generate future growth, and gave rise to significant delays in product delivery and the services provided by Evoqua; and (ii) likewise terminated critical integration personnel, including the most experienced employees, impeding the Company's ability to successfully integrate the numerous companies that it had acquired.

389.    The FY2017 Form 10-K also included materially untrue or misleading statements about the Company's financial results, including: "For the fiscal year ended September 30, 2017, we generated revenue, net income and Adjusted EBITDA of $1.2 billion, $6.4 million and $207.7

million, respectively. For the fiscal year ended September 30, 2016, we generated revenue, net income and Adjusted EBITDA of $1.1 billion, $13.0 million and $160.1 million, respectively."

390.   These statements were materially untrue and misleading because Defendants engaged in accounting misconduct that artificially and materially inflated Evoqua's reported revenues, income, and EBITDA including, but not limited to by: (i) improper revenue recognition and (b) understatement of expenses. These statements were also materially untrue and misleading because Evoqua also engaged in a range of other dubious and undisclosed "channel stuffing" practices which had the effect of concealing the extent to which Evoqua was struggling to grow organically.

391.   The FY2017 Form 10-K also included materially untrue or misleading "Risk Factors" about the Company's acquisitions substantially identical to those in the IPO Prospectus, as quoted in ¶376.

392.   These statements about the Company's acquisitions were materially untrue or misleading for the reasons discussed in ¶377.

393.   The FY2017 Form 10-K also included a materially misleading "Risk Factor" about sales and other personnel substantially identical to the one in the IPO Prospectus, as quoted in ¶380.

394.   These statements about the Company's personnel were materially untrue or misleading for the reasons discussed in ¶381.

395.   The FY 2017 Form 10-K also included certifications under Section 302 of SOX by Defendants Keating and Stas that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period

covered by this report" and that these Defendants were "responsible for establishing and maintaining disclosure controls and procedures." The Form 10-K also disclosed that these Defendants had concluded that the disclosure controls were effective.

396.    These statements were materially untrue or misleading because Defendants engaged in accounting misconduct that artificially and materially inflated Evoqua's reported revenues, income, and EBITDA in violation of GAAP, including, but not limited to by: (i) improper revenue recognition and (b) understatement of expenses.   These statements were also materially untrue and misleading because Evoqua also engaged in a range of other dubious and undisclosed "channel stuffing" practices which had the effect of concealing the extent to which Evoqua was struggling to grow organically.

### 3.    First Quarter 2018 Form 10-Q (February 7, 2018)

397.    On February 7, 2018, Evoqua filed its 1Q2018 quarterly report on Form 10-Q, which was signed by Defendants Evoqua, Keating, and Stas.  The 1Q2018 Form 10-Q was later incorporated by reference in the SPO Offering Materials.

398.    Under the heading "Operational Excellence," the Form 10-Q stated: "We believe that continuous improvement of our operations, processes and organizational structure is a key driver of our earnings growth.  Since fiscal 2014, we have realigned our organizational structure, achieved significant cost savings through operational efficiencies and revitalized our culture, which has energized our workforce and reduced employee turnover."

399.    These statements were materially untrue or misleading because the Company had (i) engaged in the systematic and pervasive termination of experienced sales personnel that devastated the businesses that Evoqua had acquired, eroded the Company's ability to sustain current revenues and generate future growth, and gave rise to significant delays in product delivery and the services provided by Evoqua; and (ii) likewise terminated critical integration personnel,

including the most experienced employees, impeding the Company's ability to successfully integrate the numerous companies that it had acquired.

400.     The 10-Q also stated that Defendants Keating and Stas had evaluated the Company's disclosure controls and procedures and determined that they were effective at the end of the quarter.   The Form 10-Q also included SOX certifications of the report's accuracy substantially identical to the ones in the 2017 Form 10-K, cited in ¶394.   These statements and certifications were materially untrue or misleading for the reasons discussed in ¶395.

401.     The Form 10-Q also stated that there had been no material changes in the "Risk Factors" included in the 2017 Form 10-K, as quoted in ¶¶376, 380.   These "Risk Factors" remained materially untrue or misleading for the reasons discussed in ¶¶377, 381.

402.     The Form 10-Q also reported the Company's financial results. Among other things, the quarterly report stated that:

> Revenues increased $17,179, or 6.1%, to $297,051 in the three months ended December 31, 2017 from $279,872 in the three months ended December 31, 2016.

> * * *

> Revenues from product sales increased $7,363, or 4.5%, to $169,658 in the three months ended December 31, 2017 from $162,295 in the three months ended December 31, 2016. The increase in product revenues was primarily due to the acquisitions of ETS, ADI and Olson, which accounted for $10,167 in revenues.

> * * *

> Adjusted EBITDA increased $2,742, or 7.4%, to $39,981 for the three months ended December 31, 2017 from $37,239 for the three months ended December 31, 2016. Benefits derived from restructuring and operational efficiencies that were implemented in the current and prior fiscal year, as well as increased volume and accretive profitability associated with organic revenue growth and prior year acquisitions, provided for the increase in Adjusted EBITDA, offset somewhat by the timing variances in operating profit in the Municipal and Products segments.

403.     These statements were materially untrue and misleading because Defendants engaged in accounting misconduct that artificially and materially inflated Evoqua's reported

revenues, income, and EBITDA – and understated expenses – in violation of GAAP, including, but not limited to by: (i) improper revenue recognition and (b) understatement of expenses. These statements were also materially untrue and misleading because Evoqua also engaged in a range of other dubious and undisclosed "channel stuffing" practices which, even if not prohibited by GAAP, had the effect of concealing the extent to which Evoqua was struggling to grow organically.

### 4. Secondary Public Offering Prospectus (March 14, 2018)

404.    The SPO Prospectus contained substantially the same statements about the Company's "Experienced management team with proven operational capabilities that has made Evoqua an employer of choice" and "Continu[ing] to evaluate and pursue accretive tuck-in acquisitions to add new technologies, attractive geographic regions and end-markets" as the IPO Prospectus, which are quoted more fully in ¶374. These statements remained materially untrue or misleading for the reasons discussed in ¶375.

405.    The SPO Prospectus also stated:

***Commercialize and drive adoption of nascent and newly acquired technologies by leveraging our sales channels and application expertise***. We offer a full range of services, systems and technologies that we continually develop to meet our customers' evolving water lifecycle needs. We develop our technologies through in-house research, development and engineering and targeted tuck-in, technology-enhancing and geography-expanding acquisitions and have a reservoir of recently launched technologies and a pipeline of new offerings designed to provide customers with innovative, value-enhancing solutions. ***Furthermore, we have successfully completed ten technology-enhancing and geography-expanding acquisitions since April 2016 to add new capabilities and cross-selling opportunities in areas such as electrochemical and electrochlorination cells, regenerative media filtration, anodes, UV and ozone disinfection and aerobic and anaerobic biological treatment technologies***. We must continue to develop and acquire new products, services and solutions to successfully compete in our markets.

We believe a key differentiator for our technology development program is our strong record of incorporating new technologies into the comprehensive solutions we provide to our customers across our platform. We are able to rapidly scale new

technologies using our leading direct and third-party sales channels and our relationships with key influencers, including municipal representatives, engineering firms, designers and other system specifiers. Through our service network, we have a direct view of our customers' water needs which allows us to focus on developing and acquiring the most relevant and sought-after solutions.

*We believe our continued investment in driving penetration of our recently launched technologies, robust pipeline of new capabilities and best-in-class channels to market will allow us to continue to address our customer needs across the water lifecycle*.

406.    These statements were materially untrue or misleading because the Company had (i) engaged in the systematic and pervasive termination of experienced sales personnel that devastated the businesses that Evoqua had acquired, eroded the Company's ability to sustain current revenues and generate future growth, and gave rise to significant delays in product delivery and the services provided by Evoqua; and (ii) likewise terminated critical integration personnel, including the most experienced employees, impeding the Company's ability to successfully integrate the numerous companies that it had acquired.

407.    The SPO Prospectus also contained substantially the same "Risk Factors" as the IPO Prospectus that are quoted more fully in ¶¶376, 380 ("Risk Factors" headed "*Our growth strategy includes acquisitions, and we may not be able to identify suitable acquisition targets or otherwise successfully implement our growth strategy*," "*We may have difficulty in operating or integrating any acquired businesses, assets or product lines profitably or in otherwise successfully implementing our growth strategy*," and "*Failure to retain our existing senior management, skilled technical, engineering, sales and other key personnel or the inability to attract and retain new qualified personnel could materially adversely impact our ability to operate or grow our business*"). These "Risk Factors" remained materially untrue or misleading for the reasons discussed in ¶¶377, 381

408.     The SPO Prospectus also presented information about the Company's financial results, including that "[f]or the fiscal year ended September 30, 2017, we generated revenue, net income and Adjusted EBITDA of $1.2 billion, $6.4 million and $207.7 million, respectively." The SPO Prospectus incorporated by reference the FY2017 Form 10-K and 1Q2018 Form 10-Q, which included the untrue or misleading statements discussed in ¶¶ 388, 401.

409.     These statements were materially untrue and misleading because Defendants engaged in accounting misconduct that artificially and materially inflated Evoqua's reported revenues, income, and EBITDA in violation of GAAP, including, but not limited to by: (i) improper revenue recognition and (b) understatement of expenses. These statements were also materially untrue and misleading because Evoqua also engaged in a range of other dubious and undisclosed "channel stuffing" practices which had the effect of concealing the extent to which Evoqua was struggling to grow organically.

410.     The SPO Prospectus stated that the Company had incurred "[r]estructuring and related business transformation costs" related to severance costs, including

> $16.9 million in fiscal 2016 . . . , $20.1 million in fiscal 2017 . . . related to our voluntary separation plan pursuant to which approximately 220 employees accepted separation packages, $10.2 million for the three months ended December 31, 2016 and $0.4 million for the three months ended December 31, 2017 . . . .

411.     This statement was materially untrue or misleading because the Company was actually pressuring its more experienced and knowledgeable sales and integration employees to leave and had replaced them, if at all, with less experienced, less knowledgeable employees and because many experienced employees had left involuntarily.

### 5.     Materially False and Misleading Omissions in Evoqua's Offering Materials (Item 303)

412.     Evoqua's Offering Materials, and all filings incorporated by reference, failed to disclose information required to be disclosed in those documents by Item 303 of Regulation S-K

(17.C.F.R. §229.303). Item 303 requires the disclosure of "any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way." Item 303 further requires disclosure of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

413.    Importantly, the SEC has stated that Item 303 is "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company . . . with particular emphasis on the registrant's prospects for the future."  Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989). Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects."  Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 8350, 2003 WL 22996757, at *11 (December 29, 2003).

414.    Therefore, Item 303 required disclosure of (1) Evoqua's termination of hundreds of experienced sales and administration personnel; (2) failure to adequately integrate its acquired companies; and (3) the Company's improper recognition of revenue through the tactics described herein.  Each of these issues represented known trends or uncertainties that were reasonably expected to have a material unfavorable impact on the Company's business, sales, revenues and/or income from continuing operations.  Indeed, the elimination of hundreds of experienced sales personnel created uncertainty surrounding Evoqua's ability to maintain the level of sales it reported

in the IPO and SPO Offering Materials and, thus, had a material unfavorable impact on the Company's sales and business prospects. Evoqua's failure to adequately integrate its numerous acquisitions likewise had a material unfavorable impact on the Company's business, revenues and income from continuing operations. Further, Evoqua's improper revenue-recognition practices, such as the premature recognition of revenue, had a material unfavorable impact on the Company's business and created uncertainty around the prospects of future revenue growth as the Company would ultimately be forced to confront that its project and sales backlog was of no value as revenue on those had already been recognized. Evoqua's SEC filings failed to disclose this information and thus failed to comply with Item 303.

### 6. Materially Untrue and Misleading Financial Statements in Violation of GAAP

#### (i) Overview of GAAP

415. GAAP include those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) provides that financial statements filed with the SEC that are not presented in accordance with GAAP will be presumed to be misleading despite footnotes or other disclosures. The Financial Accounting Standards Board ("FASB"), the entity that holds the authority to promulgate GAAP, has codified GAAP into a numbered scheme called the Accounting Standards Codification ("ASC"), which has been adopted as the framework for financial reporting for all public filers. In addition, the FASB has issued guidance in the form of FASB Concept Statements ("FASCON"s), which set the objectives, qualitative characteristics, and other concepts used in the development of GAAP and which reflect the underlying basis and framework for the promulgation of accounting standards.

416.    Financial statements (including footnote disclosures) are a central feature of financial reporting.  One of the fundamental objectives of financial reporting is to provide accurate and reliable information concerning an entity's financial performance during the period being presented.  FASCON No. 8, *Conceptual Framework for Financial Reporting* ("FASCON 8"), which, as its title provides, represents, along with a number of other FASCONs, the framework for financial accounting, states that "[t]he objective of general purpose financial reporting is to provide financial information about the reporting entity that is useful to existing and potential investors, lenders, and other creditors in making decisions about providing resources to the entity." FASCON 8, ¶OB2.

417.    Because investors, lenders, and other creditors generally cannot require reporting entities to provide information directly to them and must rely on financial reports for much of the financial information they need to make rational decisions regarding the entity, they are considered to be the primary users to whom general purpose financial reports are directed. FASCON 8, ¶OB5.

### (ii)    Evoqua Violated GAAP by Improperly Recognizing Revenue

418.    Evoqua represented that the financial statements found in the IPO Offering Materials, SPO Offering Materials, 2017 Form 10-K, and 1Q2018 Form 10Q were prepared in accordance with GAAP. Indeed, each of these filings (with the exception of the SPO Offering Materials, which incorporated this statement by reference) specifically stated that:

> ***Sales of goods and services are recognized when persuasive evidence of an arrangement exists, the price is fixed or determinable, collectability is reasonably assured and delivery has occurred or services have been rendered***.

> \* \* \*

> For sales of aftermarket parts or products with a low level of customization and engineering time, ***we recognize revenues at the time title and risks and rewards of ownership pass, which is generally when products are shipped or delivered to the customer as we have no obligation for installation***. Sales of short-term service arrangements are recognized as the services are performed, and sales of long-term

service arrangements are typically recognized on a straight-line basis over the life of the agreement.

\* \* \*

For certain arrangements where there is significant customization to the product, we recognize revenue under the provisions of ASC 605-35, *Revenue Recognition—Construction-Type and Production-Type Contracts*. These products include large capital water treatment projects, systems and solutions for municipal and industrial applications. ***Revenues from construction-type contracts are generally recognized under the percentage-of-completion method, based on the input of costs incurred to date as a percentage of total estimated contract costs***. The nature of the contracts are generally fixed price with milestone billings. Approximately $203.1 million, $218.6 million and $240.2 million of revenues from construction-type contracts were recognized on the percentage-of-completion method during the periods ending September 30, 2015, 2016 and 2017, respectively. Contract revenues and cost estimates are reviewed and revised quarterly at a minimum and the cumulative effect of such adjustments are recognized in current operations. The amounts of such adjustments have not been material.

419.    In reality, these representations were materially untrue and misleading, as Evoqua's financial statements overstated the Company's operating revenue by employing accounting practices that were contrary to GAAP including, but not limited to, (i) improper revenue recognition and (b) understatement of expenses.  Evoqua also engaged in a range of other dubious and undisclosed "channel stuffing" practices which had the effect of concealing the extent to which Evoqua was struggling to grow organically.

420.    FASCON No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises* ("FASCON 5"), states that "guidance for recognition of revenues and gains is intended to provide an acceptable level of assurance of the existence and amounts of revenues and gains before they are recognized" and that recognition of revenue involves consideration of two factors: that the purported revenue or gains is (a) being realized or realizable and (b) being earned.  ¶83; *see also* ASC 605-10-25(1).

421.    FASCON 5 specifically provides that in recognizing revenue "[t]he two conditions (being realized or realizable and being earned) are usually met by the time product or merchandise

is delivered or services are rendered to customers, and revenues from manufacturing and selling

activities and gains and losses from sales of other assets are commonly recognized at time of sale

(usually meaning delivery)." ¶84 (a). FASCON 5 also provides that "[i]f product is contracted

for before production, revenues may be recognized by a percentage-of-completion method as

earned – as production takes place – provided reasonable estimates of results at completion and

reliable measures of progress are available." *Id*. ¶84(c).

422.    Additionally, ASC 605-15-25(1) provides that

If an entity sells the product but gives the buyer a right to return the product, revenue from the sales transaction shall be recognized at the time of the sale only if all of the following conditions are met:

vii.    The seller's price to the buyer is substantially fixed or determinable at the date of sale.

viii.   The buyer has paid the seller, or the buyer is obligated to pay the seller and the obligation is not contingent on resale of the product. If the buyer does not pay at the time of the sale and the buyer's obligation to pay is contractually or implicitly excused until the buyer resells the product, then this condition is not met.

ix.     The buyer's obligation to the seller would not be changed in the event of theft or physical destruction or damage of the product.

x.      he buyer acquiring the product for resale has economic substance apart from that provided by the seller. This condition relates primarily to buyers that exists on paper, that is, buyers that have little or no physical facilities or employees. It prevents entities from recognizing sales revenue on transactions with parties that the sellers have established primarily for the purpose of recognizing such sales revenue.

xi.     The seller does not have significant obligations for future performance to directly bring about resale of the product by the buyer.

xii.    The amount of future returns can be reasonably estimated (see paragraphs 605-15-25-3 through 25-4). Because detailed record keeping for returns of each product line might be costly in some cases, thos Subtopic permits reasonable aggregations and approximations of product returns. As explained in paragraph 605-15-15-2, exchanges for ultimate customers of one item for another of the same kind, quality, and price, (for example one

color or size for another) are not considered returns for purposes of this Subtopic.

Sales revenue and cost of sales that are not recognized at time of sale because the foregoing conditions are not met shall be recognized either when the return privilege has substantially expired or if those conditions subsequently are met, whichever occurs first.

423.    Further, ASC 605-35-25 provides for the recognition of revenue in "Construction-Type and Production-Type Contracts" and states that the "the basic accounting decision is the choice between two generally accepted methods: the percentage-of-completion method including units of delivery and the completed-contract method." Evoqua purports to use the percentage-of-completion method.

424.    Additionally, the SEC in "Codification of Staff Accounting Bulletins: Topic 13 Revenue Recognition" ("SAB 13") also references FASCON 5 and provides that "revenue generally is realized or realizable and earned when all of the following criteria are met: [a] Persuasive evidence of an arrangement exists; [b] Delivery has occurred or services have been rendered; [c] The seller's price to the buyer is fixed or determinable; [and] [d] Collectability is reasonably assured."

425.    SAB 13 also provides that:

Tthe staff believes that delivery generally is not considered to have occurred unless the customer has taken title and assumed the risks and rewards of ownership of the products specified in the customer's purchase order or sales agreement. Typically this occurs when a product is delivered to the customer's delivery site (if the terms of the sale are "FOB destination") or when a product is shipped to the customer (if the terms are "FOB shipping point").

426.    As alleged above, contrary to all assertions in the Class Period SEC filings, Defendants failed to comply with GAAP. For example, Evoqua would offer deep discounts to incentivize customers to take products earlier than needed, even if the customers lacked capacity to take the product. In exchange, Evoqua would store the excess products at local storage facilities

at its own expense and recognize revenue upon delivery to the storage facility.  Evoqua's recognition of revenue was contrary to GAAP, as the customer had not recognized "the risk and rewards of ownership" of the products because the delivery of the product was not made to the customer, but rather a facility paid for by Evoqua.

427.    Evoqua would also improperly recognize revenue where that revenue had not been realized or realizable and earned.  For example, Evoqua would improperly recognizing revenue on products that had not been shipped at all and that Evoqua *had not yet even manufactured*.  In addition, Evoqua prematurely recognized revenue on service contracts before the service had actually been rendered.  Evoqua's premature recognition of revenue is in direct violation of GAAP, as the product had not been delivered to the customer or the intended services rendered.  In other words, the revenue was not "realized or realizable and earned."

428.    In addition, with its recognition of revenue on non-GAAP "sales," Evoqua further concealed the weakness in its business by offering increasingly steep discounts and extended payment terms to customers as the IPO approached, all in a desperate effort to "stuff the channels" and "pull-forward" sales, and thereby maximize reported *short-term* revenue at the expense of future bookings.  Evoqua also further inflated its reported income by improperly deferring payment of its expenses.  Evoqua's premature recognition of revenue under these circumstance violated GAAP, as the product had not been delivered to the customer or the intended services rendered. In other words, the revenue was not "realized or realizable and earned."

429.    The above accounting practices constituted serious breaches of GAAP.

## XIX.  CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### COUNT IV
**Violations of Section 11 of the Securities Act**
**(Against Evoqua, the Executive Defendants, the Director Defendants,**
**and the Underwriter Defendants)**

430.    Plaintiffs reallege every allegation contained above as if fully alleged in this Count, only to the extent, however, that the allegations do not allege fraud, scienter, or the intent of the Defendants to defraud Plaintiffs or members of the Class.

431.    This Count is based on Defendants' statutory liability for untrue and materially misleading statements or omissions in the Offering Materials.  This Count does not sound in fraud, and any allegations of knowing or reckless misrepresentations or omissions in the Offering Materials are excluded from this Count, except that any challenged statements of opinion or belief are alleged to have been materially untrue statements of opinion or belief when made at the time of the Offerings.

432.    This Count is asserted against Evoqua, the Executive Defendants, the Director Defendants (with respect to Offerings occurring during their tenures as a director), and the Underwriter Defendants (with respect to Offerings underwritten by them) for violations of §11 of the Securities Act, 15 U.S.C. §77k, on behalf of all persons who acquired shares of Evoqua common stock pursuant or traceable to the Offering Materials.

433.    As alleged above, the Offering Materials contained untrue statements and omissions of material fact concerning, among other things, Evoqua's sales personnel, integration of acquisitions, and financial results.

434.    As an issue of the registered securities, Evoqua is strictly liable for the untrue statements of material fact and material omissions alleged in this Count.

435.    None of the other Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Materials were accurate and complete in all material respects.  Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged in this Count.

436.    Class members did not know, nor in the exercise of reasonable diligence could they have known, that the Offering Materials contained untrue statements of material fact and omitted to state material facts required to be stated or necessary to make the statements identified above not misleading when they purchased or acquired the registered securities.  As a direct and proximate result of the acts and omissions of the Defendants named in this Count in violation of the Securities Act, the Class suffered substantial damage in connection with its purchase of Evoqua common stock sold through the Offerings.

437.    This claim is brought within one year of discovery of the untrue statements and omissions in the Offering Materials and within three years of their effective dates.

438.    By reason of the foregoing, the Defendants named in this Count are liable under §11 of the Securities Act to members of the Class who purchased or otherwise acquired the securities sold pursuant or traceable to the Offering Materials.

### COUNT V
#### Violations of Section 12(a)(2) of the Securities Act
#### (Against Evoqua and the Underwriter Defendants)

439.    Plaintiffs reallege every allegation contained above as if fully alleged in this Count, only to the extent, however, that the allegations do not allege fraud, scienter, or the intent of the Defendants to defraud Plaintiffs or members of the Class.

440.    This Count is based on Evoqua and Underwriter Defendants' statutory liability for untrue and materially misleading statements or omissions in the Offering Materials.  This Count

does not sound in fraud, and any allegations of knowing or reckless misrepresentations or omissions in the Offering Materials are excluded from this Count, except that any challenged statements of opinion or belief are alleged to have been materially untrue statements of opinion or belief when made and at the time of the Offerings.

441.    This Count is asserted by Louisiana Sheriffs against Evoqua and the Underwriter Defendants (with respect to Offerings underwritten by them) for violations of §12(a)(2) of the Securities Act, 15 U.S.C. §77*l*(a)(2), on behalf of all persons who acquired shares of Evoqua common stock pursuant to the Offering Materials.

442.    Evoqua and the Underwriter Defendants were sellers, offerors, or solicitors of purchasers of the shares offered pursuant to the Registration Statements.

443.    As alleged above, the Offering Materials contained untrue statements and omissions of material fact concerning, among other things, Evoqua's sales personnel, integration of acquisitions, and financial results.

444.    By means of the Offering Materials (as well as instruments of transportation and communication in interstate commerce and the mails), the Defendants named in this Count, through the Offerings, which were public offerings, solicited and sold Evoqua common stock to members of the Class.

445.    As the issuer of the registered securities, Evoqua is strictly liable for the untrue statements and omissions of material facts, as described in this Part Two.

446.    None of the Underwriter Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Materials were accurate and complete in all material respects.   Had they exercised reasonable care, these

Defendants would have known of the material misstatements and omissions, as alleged in this Part Two.

447.     Class members purchased Evoqua stock pursuant to the materially untrue or misleading Offering Materials.  Class members did not know, nor in the exercise of reasonable diligence could they have known, that the Offering Materials contained untrue statements of material fact and omitted to state material facts required to be stated or necessary to make the statements identified above not misleading when they purchased Evoqua stock.

448.     This action is brought within one year of the date of when Plaintiffs discovered, or reasonably could have discovered, the facts upon which this Count is based and within three years of the date that the securities upon which this Count is brought were sold to the public.

449.     By reason of the foregoing, Evoqua and the Underwriter Defendants are liable for violations of §12(a)(2) of the Securities Act to Class members who purchased securities sold pursuant to the Offering Materials.  These Class members also have the right to rescind and recover the consideration paid for these securities upon tender of their stock to the Underwriter Defendants, and to recover rescissory damages to the extent they have already sold the securities.

**COUNT VI**
**Violations of Section 15 of the Securities Act**
**(Against the Executive Defendants and AEA)**

450.     Plaintiffs reallege every allegation contained above as if fully alleged in this Count, only to the extent, however, that the allegations do not allege fraud, scienter, or the intent of the Defendants to defraud Plaintiffs or members of the Class.

451.     This Claim does not sound in fraud, and any allegations of knowing or reckless misrepresentations or omissions in the Offering Materials are specifically excluded from this Count, except that any challenged statement of opinion or belief made in connection with the

Offerings is alleged to have been a materially untrue statement of opinion or belief when made and at the time of the Offerings.

452.     This Count is asserted against the Executive Defendants and AEA for violations of §15 of the Securities Act, 15 U.S.C. §77o, on behalf of all persons who acquired shares of Evoqua common stock pursuant or traceable to the Offering Materials.

453.     Evoqua is strictly liable under §§11 and 12(a)(2) for untrue statements and omissions of material fact in the Offering Materials.

454.     The Executive Defendants and AEA, by virtue of their positions, voting power, ownership, rights as against Evoqua, and specific acts were, at the time of the wrongs alleged in this Part Two of the Complaint, controlling persons of Evoqua within the meaning of §15 of the Securities Act.  These Defendants also had the power and influence, and exercised the same, to cause Evoqua to engage in the acts described in this Part Two, including by causing Evoqua to conduct the Offerings pursuant or traceable to the Offering Materials.

455.     Specifically, with respect to AEA, throughout the Class Period, AEA: (i) maintained a controlling interest in both Evoqua's common stock and its voting securities; (ii) had the power to appoint, and did appoint, three of the Board's directors; and (iii) hand-picked Evoqua's senior executive team, including the Executive Defendants.

456.     AEA exercised its control over Evoqua to cause the Company to conduct the Offerings, and its representatives on the Evoqua Board signed all of the Registration Statements pursuant to which the Offerings were conducted.

457.     As alleged above, in its public filings during the Class Period, Evoqua identified AEA as its "Sponsor" and stated that Evoqua was a "controlled company" under AEA, including due to AEA's holding and control over more than 50% of the voting power for the election of

Evoqua's directors.  Evoqua's SEC filings likewise stated "because AEA controls a significant percentage of our common stock, it may influence all major corporate decisions."  Given the pervasive control that AEA exerted over Evoqua, the Company's SEC filings also stated that "the interests of AEA and its affiliates, including certain of our directors, may conflict with your interests as an owner of our common stock and those of the Company."

458.    During their tenures as officers or directors of Evoqua, the Executive Defendants were controlling persons of the Company within the meaning of §15 of the Securities Act.  By reason of their positions of control and authority as officers or directors of Evoqua, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of in this Part Two of the Complaint.

459.    As more fully described above, the Executive Defendants caused Evoqua to conduct the Offerings and signed the Registration Statements pursuant to which the Offerings were conducted.  Moreover, in their capacities as senior corporate officers of the Company, the Executive Defendants had direct involvement in the day-to-day operations of the Company and in the Offerings.  As a result of the foregoing, the Executive Defendants, together and individually, were controlling persons of Evoqua within the meaning of Section 15 of the Securities Act.

460.    By virtue of the conduct alleged in this Part Two, the Executive Defendants and AEA are liable for the aforesaid wrongful conduct and are liable to members of the Class who purchased Evoqua common stock pursuant or traceable to the Offering Materials.

## XX.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.    Declaring this action to be a proper class action under Fed. R. Civ. P. 23, certifying Plaintiffs as Class Representatives, and appointing Plaintiffs' counsel as Co-Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiffs and all other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

## XXI.  JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED:  March 28, 2019

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

*/s/ William C. Fredericks*
William C. Fredericks (WF-1576)
Donald A. Broggi (DB-9661)
Randy Moonan (RM-3338)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
wfredericks@scott-scott.com
dbroggi@scott-scott.com
rmoonan@scott-scott.com

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ Jeremy P. Robinson*
Jeremy P. Robinson
Hannah Ross
Jai K. Chandresekhar
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile:  (212) 554-1444
jeremy@blbglaw.com
hannah@blbglaw.com
jai@blbglaw.com

*Co-Lead Counsel for Lead Plaintiffs and the Proposed Class*

164

Robert D. Klausner
Stuart A. Kaufman
**KLAUSNER, KAUFMAN, JENSEN
& LEVINSON, P.A.**
7080 Northwest 4th Street
Plantation, FL 33317
Telephone: (954) 916-1202
Facsimile:  (954) 916-1232
bob@robertdklausner.com
stu@robertdklausner.com

*Additional Counsel for Lead Plaintiff Louisiana
Sheriffs' Pension & Relief Fund*