UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE EVOQUA WATER TECHNOLOGIES CORP.
SECURITIES LITIGATION

Civ. A. No. 1:18-cv-10320-AJN

**MEMORANDUM OF LAW IN SUPPORT OF THE EVOQUA DEFENDANTS' MOTION
TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

### TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... iii

TABLE OF ABBREVIATIONS ...................................................................................... xii

PRELIMINARY STATEMENT ......................................................................................... 1

FACTUAL BACKGROUND ............................................................................................. 4

ARGUMENT ................................................................................................................... 9

I.      THE EXCHANGE ACT CLAIMS SHOULD BE DISMISSED ....................................... 9

     A.    Plaintiffs Do Not Plead Any Actionable Misstatements or Omissions ................10

         1.    The Allegations Concerning The Company's Reduction-in-Force Activities and Integration Issues Fail to Adequately Plead Falsity .......... 10

             a.    The Company Disclosed the Voluntary Separation Plan .................. 11

             b.    Statements About Integration Were Not False or Misleading .......... 17

         2.    Plaintiffs Advance No Factual Allegations Supporting Their Challenge To Statements about Evoqua's Operations, M&A Activity, Severance Costs, and Management Team ................................ 23

         3.    Certain Challenged Statements Are Inactionable Opinions..................... 25

         4.    Certain Challenged Statements Are Inactionable Puffery ....................... 27

         5.    Certain Challenged Statements Are Inactionable Forward-Looking Statements ................................................................................................. 28

         6.    The Revenue Recognition Allegations Fail to Adequately Plead Material Misstatements or Omissions........................................................ 32

             a.    Plaintiffs Fail to Adequately Allege Materiality ............................... 33

             b.    Plaintiffs Fail to Adequately Allege Any False or Misleading Statement ..................................................................................... 37

         7.    Plaintiffs Fail to Adequately Plead an Item 303 Violation ...................... 39

     B.    The Complaint Fails to Adequately Allege Scienter ..............................................41

         1.    The Complaint Fails to Plead Particularized Facts Giving Rise to a Strong Inference of Conscious Misbehavior or Recklessness ................. 42

             a.    The Complaint Lacks Well-Pleaded Facts Suggesting that Keating, Stas, and Webster Acted With Scienter............................................. 43

i

| | | b. | The Allegations Against Rodi Do Not Support Scienter .................. 45 |

|  |  | c. | The Complaint Fails to Plead Corporate Scienter ........................... 46 |

|  | 2. | Plaintiffs' Motive Allegations Fail as a Matter of Law and Logic .......... 47 |

|  | 3. | Plaintiffs' "Core Operations" Allegations Are Insufficient .................... 51 |

|  | 4. | Taken Together, Plaintiffs' Allegations Fail to Support a Strong Inference of Scienter .................................................................. 52 |

| C. | The Complaint Fails to Adequately Plead Loss Causation .................................... 53 |

| D. | The Control Person Claim (Count II) Should Be Dismissed ............................... 59 |

| E. | The Insider Trading Claim (Count III) Should Be Dismissed ............................. 59 |

| II. | THE SECURITIES ACT CLAIMS SHOULD BE DISMISSED .................................. 60 |

| A. | Rule 9(b) Applies to the Securities Act Claims .................................................... 60 |

| B. | Whether Rule 9(b) or Rule 8 Is Applied, the Section 11 and 12(a)(2) Claims (Counts IV and V) Should Be Dismissed ................................................... 62 |

|  | 1. | Plaintiffs Do Not Plead Any Material Misstatements or Omissions ........ 62 |

|  | 2. | The Complaint Negates Loss Causation ................................................. 63 |

|  | 3. | Plaintiffs Lack Standing to Bring the 12(a)(2) Claim ............................. 64 |

| C. | The Control Person Claim (Count VI) Should Be Dismissed ............................. 66 |

| CONCLUSION ........................................................................................................................... 66 |

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adolor Corp. Sec. Litig.*,
  616 F. Supp. 2d 551 (E.D. Pa. 2009) ....................................................................41

*In re AFC Enters. Sec. Litig.*,
  348 F. Supp. 2d 1363 (N.D. Ga. 2004), *aff'd sub nom.*, *Exec. Risk Indem., Inc.*
  *v. AFC Enters.*, 279 F. App'x 793 (11th Cir. 2008) ...............................................48

*Alaska Elec. Pension Fund v. Adecco S.A.*,
  371 F. Supp. 2d 1203 (S.D. Cal. 2005), *aff'd*, 256 F. App'x 74 (9th Cir. 2007)....................34

*Alaska Elec. Pension Fund v. Adecco S.A.*,
  434 F. Supp. 2d 815 (S.D. Cal. 2006)...............................................................36, 37

*Alaska Laborer Emp'rs Ret. Fund v. Scholastic Corp.*,
  2010 WL 3910211 (S.D.N.Y. Sept. 30, 2010).............................................50, 56, 58

*In re Am. Express Co. Sec. Litig.*,
  2008 WL 4501928 (S.D.N.Y. Sept. 26, 2008), *aff'd sub nom.*, *Slayton v. Am.*
  *Express Co.*, 604 F.3d 758 (2d Cir. 2010) ..................................................44, 45, 46

*Andropolis v. Red Robin Gourmet Burgers, Inc.*,
  505 F. Supp. 2d 662 (D. Colo. 2007)....................................................................53

*In re Aratana Therapeutics Inc. Sec. Litig.*,
  315 F. Supp. 3d 737 (S.D.N.Y. 2018)....................................................................49

*In re ARIAD Pharms. Sec. Litig.*,
  842 F.3d 744 (1st Cir. 2016)...............................................................................64

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...............................................................................9, 39, 62

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)...................................................................................59

*In re Axis Capital Holdings Ltd. Sec. Litig.*,
  456 F. Supp. 2d 576 (S.D.N.Y. 2006)....................................................................61

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
  980 F. Supp. 2d 564 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014).......................17

*Barilli v. Sky Solar Holdings, Ltd.*,
  2019 WL 2250445 (S.D.N.Y. May 23, 2019) .......................................................47

*Barrett v. PJT Partners, Inc.*,
  2017 WL 3995606 (S.D.N.Y. Sept. 8, 2017).........................................................47

*In re Bausch & Lomb, Inc. Sec. Litig.*,
  592 F. Supp. 2d 323 (W.D.N.Y. 2008) ...............................................................49

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..............................................................................9, 39, 62

*Belodoff v. Netlist, Inc.*,
  2008 WL 2356699 (C.D. Cal. May 30, 2008) .......................................................61

*Bettis v. Aixtron SE*,
  2016 WL 7468194 (S.D.N.Y. Dec. 20, 2016) ...............................................14, 15

*Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*,
  2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) .......................................................63

*Bldg. Trades United Pension Tr. Fund v. Kenexa Corp.*,
  2010 WL 3749459 (E.D. Pa. Sept. 27, 2010) .....................................................51

*Bd. of Trs. of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel Oao*,
  811 F. Supp. 2d 853 (S.D.N.Y. 2011), *aff'd sub nom.*, *Frederick v. Mechel
  OAO*, 475 F. App'x 353 (2d Cir. 2012) .......................................................17, 51

*Bond Opportunity Fund v. Unilab Corp.*,
  2003 WL 21058251 (S.D.N.Y. May 9, 2003), *aff'd*, 87 F. App'x 772
  (2d Cir. 2004).......................................................................................13

*Borochoff v. GlaxoSmithKline PLC*,
  2008 WL 2073421 (S.D.N.Y. May 9, 2008), *aff'd sub nom.*, *Avon Pension
  Fund v. GlaxoSmithKline PLC*, 343 F. App'x 671 (2d Cir. 2009) .........................50

*In re Bristol-Myers Squibb Sec. Litig.*,
  312 F. Supp. 2d 549 (S.D.N.Y. 2004)...............................................................49

*Brodsky v. Yahoo! Inc.*,
  630 F. Supp. 2d 1104 (N.D. Cal. 2009) .............................................................37

*Brodzinsky v. FrontPoint Partner LLC*,
  2012 WL 1468507 (D. Conn. Apr. 26, 2012)................................................59, 60

*C.D.T.S. No. 1 & A.T.U. Local 1321 Pension Plan v. UBS AG*,
  2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013), *aff'd sub nom.*, *Westchester
  Teamsters Pension Funds v. UBS AG,* 604 F. App'x 5 (2d Cir. 2015)...................42

*Caiafa v. Sea Containers Ltd.*,
  525 F. Supp. 2d 398 (S.D.N.Y. 2007)...................................................16, 38, 65

*Calif. Pub. Emps.' Ret. Sys. v. Chubb Corp.*,
    394 F.3d 126 (3d Cir. 2004)................................................................................37

*Campo v. Sears Holding Corp.*,
    635 F. Supp. 2d 323 (S.D.N.Y. 2009), *aff'd*, 371 F. App'x 212 (2d Cir. 2010)......................44

*Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*,
    543 F. App'x 72 (2d Cir. 2013) ......................................................................54, 55

*In re Century Aluminum Co. Sec. Litig.*,
    729 F.3d (9th Cir. 2013) ................................................................................64

*Chill v. Gen. Elec. Co.*,
    101 F.3d 263 (2d Cir. 1996)............................................................................41

*In re Citigroup, Inc. Sec. Litig.*,
    330 F. Supp. 2d 367 (S.D.N.Y. 2004), *aff'd sub nom.*, *Albert Fadem Tr. v.*
    *Citigroup Inc.*, 165 F. App'x 928 (2d Cir. 2006)................................................................53

*City of Brockton Ret. Sys. v. Shaw Grp., Inc.*,
    540 F. Supp. 2d 464 (S.D.N.Y. 2008)................................................................49

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Axonyx, Inc.*,
    374 F. App'x 83 (2d Cir. 2010) ......................................................................44

*City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*,
    963 F. Supp. 2d 1092 (E.D. Wash. 2013) ......................................................................19

*City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.*,
    967 F. Supp. 2d 771 (S.D.N.Y. 2013)................................................................48, 59

*City of Warwick Mun. Emps. Pension Fund v. Rackspace Hosting, Inc.*,
    2019 WL 452051 (S.D.N.Y. Feb. 5, 2019)......................................................................40

*In re Coty Inc. Sec. Litig.*,
    2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) ................................................................40, 41

*Cozzarelli v. Inspire Pharm., Inc.*,
    549 F.3d 618 (4th Cir. 2008) ......................................................................50

*In re Downey Sec. Litig.*,
    2009 WL 736802 (C.D. Cal. Mar. 18, 2009)......................................................................58

*In re Duke Energy Corp. Sec. Litig.*,
    282 F. Supp. 2d 158 (S.D.N.Y. 2003)................................................................33, 34

*ECA & Local 134 IBEW Joint Pension Tr. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)........................................................................34, 41, 66

*Ernst & Ernst v. Hochfelder,*
   425 U.S. 185 (1976)...................................................................................59

*In re eSpeed, Inc. Sec. Litig.,*
   457 F. Supp. 2d 266 (S.D.N.Y. 2006).......................................................50

*In re Fairway Grp. Holdings Corp. Sec. Litig.,*
   2015 WL 4931357 (S.D.N.Y. Aug. 19, 2015)........................................23, 27

*In re Ferrellgas Partners, LP, Sec. Litig.,*
   2018 WL 2081859 (S.D.N.Y. Mar. 30, 2018), *aff'd*, 764 F. App'x 127
   (2d Cir. 2019)................................................................22, 24, 27, 52

*Foley v. Transocean Ltd.,*
   861 F. Supp. 2d 197 (S.D.N.Y. 2012).......................................................43

*Ford v. VOXX Int'l Corp.,*
   2016 WL 3982466 (E.D.N.Y. July 22, 2016)...............................................44

*Fort Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co.,*
   862 F. Supp. 2d 322 (S.D.N.Y. 2012).......................................................64

*In re Francesca's Holdings Corp. Sec. Litig.,*
   2015 WL 1600464 (S.D.N.Y. Mar. 31, 2015)..........................................14, 58

*Friedman v. Endo Int'l PLC,*
   2018 WL 2021561 (S.D.N.Y. Apr. 27, 2018)...............................................40

*Friedman v. Endo Int'l PLC,*
   2018 WL 446189 (S.D.N.Y Jan. 16, 2018), *aff'd sub nom., Steamfitters'*
   *Indus. Pension Fund v. Endo Int'l PLC,* 2019 WL 1890764 (2d Cir. Apr. 29,
   2019)...............................................................................22, 40

*Garber v. Legg Mason, Inc.,*
   537 F. Supp. 2d 597 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 665 (2d Cir. 2009)...............33, 40

*Gen. Partner Glenn Tongue v. Sanofi,*
   816 F.3d 199 (2d Cir. 2016).............................................................25, 27

*In re Gildan Activewear, Inc.,*
   636 F. Supp. 2d 261 (S.D.N.Y. 2009).......................................................49

*Gregory v. ProNAi Therapeutics, Inc.,*
   297 F. Supp. 3d 372 (S.D.N.Y. 2018), *aff'd*, 757 F. App'x 35 (2d Cir. 2018)...............28, 38

*Halperin v. eBanker USA.com, Inc.,*
   295 F.3d 352 (2d Cir. 2002)..............................................................29

*Harris v. AmTrust Fin. Servs., Inc.*,
    135 F. Supp. 3d 155 (S.D.N.Y. 2015), *aff'd*, 649 F. App'x 7 (2d Cir. 2016) ............................9

*In re IAC/InterActiveCorp Sec. Litig.*,
    478 F. Supp. 2d 574 (S.D.N.Y. 2007) ..................................................................16, 39

*Iron Workers Local No. 25 Pension Fund v. Oshkosh Corp.*,
    2010 WL 1287058 (E.D. Wis. Mar. 30, 2010) ........................................................22, 23

*Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*,
    32 F.3d 697 (2d Cir. 1994) .......................................................................................59

*Janbay v. Canadian Solar, Inc.*,
    2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ..........................................................33, 46

*Janbay v. Canadian Solar, Inc.*,
    2013 WL 1287326 (S.D.N.Y. 2013) ...........................................................................56

*Johnson v. Sequans Commc'ns S.A.*,
    2013 WL 214297 (S.D.N.Y. Jan. 17, 2013) ................................................................64

*Jui-Yang Hong v. Extreme Networks, Inc.*,
    2017 WL 1508991 (N.D. Cal. Apr. 27, 2017) ..................................................... *passim*

*Karacand v. Edwards*,
    53 F. Supp. 2d 1236 (D. Utah 1999) ..........................................................................29

*In re KeySpan Corp. Sec. Litig.*,
    2003 U.S. Dist. LEXIS 20964 (E.D.N.Y. Nov. 21, 2003) ..............................................48

*Kinra v. Chicago Bridge & Iron Co.*,
    2018 WL 2371030 (S.D.N.Y. May 24, 2018) ...............................................................42

*In re LeapFrog Enters., Inc. Sec. Litig.*,
    2006 WL 2192116 (N.D. Cal. Aug. 1, 2006) ...............................................................16

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005) ......................................................................................54

*Lighthouse Fin. Grp. v. Royal Bank of Scot. Grp., PLC*,
    902 F. Supp. 2d 329 (S.D.N.Y. 2012), *aff'd sub nom.*, *IBEW Local Union No.
    58 Pension Trust Fund & Annuity Fund v. Royal Bank of Scot. Grp., PLC*, 783
    F.3d 383 (2d Cir. 2015) ............................................................................................61

*In re Lone Pine Res., Inc.*,
    2014 WL 1259653 (S.D.N.Y. Mar. 27, 2014) ..............................................................34

*Lopez v. CTPartners Exec. Search, Inc.*,
  173 F. Supp. 3d 12 (S.D.N.Y. 2016).................................................................39

*Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*,
  2017 WL 3891676 (D. Del. Sept. 6, 2017) ...............................................61, 62

*Lucescu v. Zafirovski*,
  2018 WL 1773134 (S.D.N.Y. Apr. 11, 2018).....................................................42

*In re Lululemon Sec. Litig.*,
  14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015)........15, 19, 38, 48

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
  26 F. Supp. 3d 278 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015).......................15

*Malin v. XL Capital Ltd.*,
  499 F. Supp. 2d 117 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir 2009) ...........19, 38, 43

*Martin v. Quartermain*,
  732 F. App'x 37 (2d Cir. 2018) ........................................................................25

*McCasland v. Formfactor Inc.*,
  2008 WL 2951275 (N.D. Cal. July 25, 2008).....................................................42

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
  272 F. Supp. 2d 243 (S.D.N.Y. 2003).................................................................63

*In re Merrill Lynch Tyco Research Sec. Litig.*,
  2004 WL 305809 (S.D.N.Y. Feb. 18, 2004)........................................................55

*In re Metawave Commc'ns Corp. Sec. Litig.*,
  298 F. Supp. 2d 1056 (W.D. Wash. 2003)..........................................................16

*In re Morgan Stanley Info. Fund Sec. Litig.*,
  592 F.3d 347 (2d Cir. 2010)..............................................................................65

*In re MSC Indus. Direct Co. Sec. Litig.*,
  283 F. Supp. 2d 838 (E.D.N.Y. 2003) ...............................................................37

*In re Mun. Mortg. & Equity, LLC*,
  876 F. Supp. 2d 616 (D. Md. 2012), *aff'd sub nom.*, Yates v. Mun. Mortg. &
  Equity, LLC, 744 F.3d 874 (4th Cir. 2014)...........................................................65

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)............................................................................21, 37

*Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*,
　300 F. Supp. 3d 551 (S.D.N.Y. 2018), *aff'd sub nom.*, *Ark. Pub. Emps. Ret.*
　*Sys. v. Xerox Corp.*, 2019 WL 2394302 (2d Cir. June 6, 2019) ..............................28

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
　135 S. Ct. 1318 (2015) ......................................................................................25, 27, 63

*In re Omnicom Grp., Inc. Sec. Litig.*,
　541 F. Supp. 2d 546 (S.D.N.Y. 2008), *aff'd,* 597 F.3d 501 (2d Cir. 2010) ...........................58

*Osher v. JNI Corp.*,
　256 F. Supp. 2d 1144 (S.D. Cal. 2003) ......................................................................50

*In re Party City Sec. Litig.*,
　147 F. Supp. 2d 282 (D.N.J. 2001) ...........................................................................50

*Pearlstein v. BlackBerry Ltd.*,
　93 F. Supp. 3d 233 (S.D.N.Y. 2015), *aff'd sub nom.*, *Cox v. Blackberry Ltd.*,
　660 F. App'x 23 (2d Cir. 2016) ...............................................................................51

*PetEdge, Inc. v. Garg*,
　234 F. Supp. 3d 477 (S.D.N.Y. 2017)................................................................45, 46

*Plumbers & Steamfitters Local 773 Pension Fund v. Can. Imperial Bank of*
　*Commerce*,
　694 F. Supp. 2d 287 (S.D.N.Y. 2010).........................................................................50

*Police & Fire Ret. Sys. of Detroit v. La Quinta Holdings Inc.*,
　2017 WL 4082482 (S.D.N.Y Aug. 24, 2017), *aff'd*, 735 F. App'x 11 (2d Cir.
　2018) ......................................................................................................................62

*Pub. Emps. Ret. Sys. v. Merrill Lynch & Co.*,
　714 F. Supp. 2d 475 (S.D.N.Y. 2010).........................................................................64

*In re Razorfish, Inc. Sec. Litig.*,
　2001 WL 1111502 (S.D.N.Y. Sept. 21, 2001).......................................................22

*Reilly v. U.S. Physical Therapy, Inc.*,
　2018 WL 3559089 (S.D.N.Y. July 23, 2018) ................................................48, 49

*Rombach v. Chang*,
　355 F.3d 164 (2d Cir. 2004)..................................................................... *passim*

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*,
　75 F.3d 801 (2d Cir. 1996)..........................................................................................50

*Sanofi Sec. Litig. v. Meeker*,
　87 F. Supp. 3d 510 (S.D.N.Y. 2015)........................................................................27

*Santa Fe Indus., Inc. v. Green,*
   430 U.S. 462 (1977).............................................................................................52

*In re Sierra Wireless, Inc. Sec. Litig.,*
   482 F. Supp. 2d 365 (S.D.N.Y. 2007)..............................................................35, 38

*Slayton v. Am. Express Co.,*
   604 F.3d 758 (2d Cir. 2010).............................................................................28, 31

*SRM Global Fund Ltd. P'Ship v. Countrywide Fin. Corp.,*
   2010 WL 2473595 (S.D.N.Y. June 17, 2010), *aff'd*, 448 F. App'x 116 (2d Cir.
   2011) ...................................................................................................................12

*Steamfitters' Indus. Pension Fund v. Endo Int'l PLC,*
   2019 WL 1890764 (2d Cir. Apr. 29, 2019) .......................................................39, 40

*Stratte-McClure v. Morgan Stanley,*
   776 F.3d 94 (2d Cir. 2015)...................................................................................39

*In re SuperCom Inc. Sec. Litig.,*
   2018 WL 4926442 (S.D.N.Y. Oct. 10, 2018) ........................................................29

*Taubenfeld v. Hotels.com,*
   385 F. Supp. 2d 587 (N.D. Tex. 2004) .................................................................28

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.,*
   531 F.3d 190 (2d Cir. 2008)..................................................................................46

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
   551 U.S. 308 (2007)......................................................................................... *passim*

*In re Tempur Sealy Int'l, Inc. Sec. Litig.,*
   2019 WL 1368787 (S.D.N.Y. Mar. 26, 2019) .......................................................27

*Thomas v. Shiloh Indus., Inc.,*
   2017 WL 1102664 (S.D.N.Y. Mar. 23, 2017) .......................................................52

*In re Tibco Software, Inc. Sec. Litig.,*
   2006 WL 2844421 (N.D. Cal. Sept. 29, 2006) ..................................................43, 46

*Tyler v. Liz Claiborne, Inc.,*
   814 F. Supp. 2d 323 (S.D.N.Y. 2011)..............................................................51, 52

*In re UBS AG Sec. Litig.,*
   2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom.*, *City of Pontiac
   Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014) .................38, 66

*In re Vantive Corp. Sec. Litig.*,
 283 F.3d 1079 (9th Cir. 2002) ...........................................................................33

*VNB Realty, Inc. v. Bank of Am. Corp.*,
 2013 WL 5179197 (S.D.N.Y. Sept. 16, 2013)...................................................38

*Wozniak v. Align Tech., Inc.*,
 2011 WL 2269418 (N.D. Cal. June 8, 2011) .....................................................28

*In re Xinhua Fin. Media, Ltd. Sec. Litig.*,
 2009 WL 464934 (S.D.N.Y. Feb. 25, 2009) ......................................................25

*Yung v. Lee*,
 432 F.3d 142 (2d Cir. 2005) ..............................................................................64

**Statutes, Rules, and Regulations**

15 U.S.C. § 77k ...........................................................................................................62

15 U.S.C. § 77l ............................................................................................................62

15 U.S.C. § 77z-2 ........................................................................................................62

15 U.S.C. § 78t-1 .........................................................................................................59

15 U.S.C. § 78u-4 ..................................................................................................10, 32

15 U.S.C. § 78u-5 ................................................................................28, 29, 30, 31, 32

Federal Rule of Civil Procedure 8 ..............................................................................62

Federal Rule of Civil Procedure 9(b)...........................................................9, 60, 61, 62

Federal Rule of Civil Procedure 12(b)(6) ...................................................................41

17 C.F.R. § 229.303(a)(3)(ii) ......................................................................................39

SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ....................................................2, 9, 41, 59

SEC Rule 10b5-1, 17 C.F.R. § 240.10b5-1 ................................................................59

TABLE OF ABBREVIATIONS

| ABBREVIATION | DESCRIPTION | EXHIBIT[1] |
|---|---|---|
| **Evoqua Water Technologies Corp. Exchange Act Filings** | | |
| 10/3/17 S-1 | Evoqua Water Technologies Corp. Registration Statement, filed with the SEC on Form S-1 on October 3, 2017 | 2 |
| IPO Prospectus | Evoqua Water Technologies Corp. Prospectus, filed with the SEC on Form 424B4 on November 3, 2017 | 3 |
| 12/1/17 8-K | Evoqua Water Technologies Corp. Current Report, filed with the SEC on Form 8-K on December 1, 2017 | 4 |
| 12/4/17 10-K | Evoqua Water Technologies Corp. Annual Report for the year ended September 30, 2017, filed with the SEC on Form 10-K on December 4, 2017 | 5 |
| 2/7/18 10-Q | Evoqua Water Technologies Corp. Quarterly Report for the quarter ended December 31, 2018, filed with the SEC on Form 10-Q on February 7, 2018 | 6 |
| 3/12/18 S-1 | Evoqua Water Technologies Corp. Registration Statement, filed with the SEC on Form S-1 on March 12, 2018 | 7 |
| SPO Prospectus | Evoqua Water Technologies Corp. Prospectus, filed with the SEC on Form 424B4 on March 16, 2018 | 8 |

---

[1]     The documents listed herein are attached to the accompanying Declaration of Samuel P. Groner, dated June 26, 2019 ("Groner Decl.").

| 5/8/18 8-K | Evoqua Water Technologies Corp. Current Report, filed with the SEC on Form 8-K on May 8, 2018 | 9 |
|---|---|---|
| 5/8/18 10-Q | Evoqua Water Technologies Corp. Quarterly Report for the quarter ended March 31, 2018, filed with the SEC on Form 10-Q on May 8, 2018 | 10 |
| 8/7/18 8-K | Evoqua Water Technologies Corp. Current Report, filed with the SEC on Form 8-K on August 7, 2018 | 11 |
| 10/30/18 8-K | Evoqua Water Technologies Corp. Current Report, filed with the SEC on Form 8-K on October 30, 2018 | 12 |
| 11/27/18 8-K | Evoqua Water Technologies Corp. Current Report, filed with the SEC on Form 8-K on November 27, 2018 | 13 |
| 12/11/18 10-K | Evoqua Water Technologies Corp. Annual Report for the year ended September 30, 2018, filed with the SEC on Form 10-K on December 11, 2018 | 14 |
| **Forms 3 and Forms 4** | | |
| 11/1/17 Keating Form 3 | Ronald C. Keating Form 3, filed November 1, 2017 | 15 |
| 11/1/17 Stas Form 3 | Benedict J. Stas Form 3, filed November 1, 2017 | 16 |
| 11/1/17 Webster Form 3 | Anthony Webster Form 3, filed November 1, 2017 | 17 |
| 11/8/17 Keating Form 4 | Ronald C. Keating Form 4, filed November 8, 2017 | 18 |
| 11/8/17 Stas Form 4 | Benedict J. Stas Form 4, filed November 8, 2017 | 19 |

| 3/21/18 Keating Form 4 | Ronald C. Keating Form 4, filed March 21, 2018 | 20 |
|---|---|---|
| 3/21/18 Stas Form 4 | Benedict J. Stas Form 4, filed March 21, 2018 | 21 |
| 6/20/18 Webster Form 4 | Anthony Webster Form 4, filed June 20, 2018 | 22 |
| **Other** | | |
| 8/7/18 Call Tr. | Transcript of the Evoqua Water Technologies Corp. August 7, 2018 Earnings Call | 23 |
| 2/28/18 Investor Day Tr. | Transcript of the February 28, 2018 Evoqua Water Technologies Corp. Investor and Analyst Event | 24 |
| R.I. Compl. | Verified Complaint filed by Evoqua Water Technologies LLC and Neptune-Benson LLC on October 22, 2018 in *Evoqua Water Technologies, LLC, et al. v. Moriarty, et al.*, C.A. No. PC/2018-7572, Superior Court, State of Rhode Island | 25 |
| Moriarty Counterclaim | Defendants Matthew Moriarty, KA WAI PRO, LLC, KW, LLC and KA WAI PRO, INC.'s Answer to Complaint and Counterclaim filed on November 13, 2018 in *Evoqua Water Technologies, LLC, et al. v. Moriarty, et al.*, C.A. No. PC/2018-7572, Superior Court, State of Rhode Island | 26 |
| Schuck Counterclaim | Defendant Jennifer Schuck's Answer to Complaint and Counterclaim filed on November 26, 2018 in *Evoqua Water Technologies, LLC, et al. v. Moriarty, et al.*, C.A. No. PC/2018-7572, Superior Court, State of Rhode Island | 27 |

| | | |
|---|---|---|
| R.I. Litigation 4/18/19 Tr. | Transcript of Decision by the Honorable Justice Sarah Taft-Carter on April 18, 2019 in *Evoqua Water Technologies, LLC, et al. v. Moriarty, et al.*, C.A. No. PC/2018-7572, Superior Court, State of Rhode Island | 28 |
| R.I. Litigation 5/13/19 Order | May 13, 2019 Order Granting Plaintiffs' Motion for a Preliminary Injunction in *Evoqua Water Technologies, LLC, et al. v. Moriarty, et al.*, C.A. No. PC/2018-7572, Superior Court, State of Rhode Island | 29 |
| 4/23/19 Decision | April 23, 2019 Decision of Referee, State of Rhode Island and Providence Plantations Board of Review for The Department of Labor and Training, on Evoqua Water Technologies Corp.'s appeal of the March 20, 2019 Decision of Department of Labor and Training Director on Jennifer Schuck's claim for employment security benefits | 30 |

## PRELIMINARY STATEMENT

This case presents a classic example of the very type of "fraud by hindsight" that courts uniformly reject under the federal securities laws. Plaintiffs seek to recast as supposed fraud the announcements by Evoqua Water Technologies Corp. (the "Company" or "Evoqua") in 2018 that, while its revenues continued to grow and the Company remained profitable, its revenue and earnings fell short of forecasts and market expectations. Without a single alleged corrective disclosure or so-called "revelation," and without factual allegations pleading that a single, prior disclosure was untrue—much less intentionally deceptive—Plaintiffs have manufactured a theory of a secret conspiracy, supposedly afoot since before Evoqua's 2017 initial public offering ("IPO"), to snooker investors because Evoqua's senior management must have known that Evoqua was destined to disappoint the market in the year after its IPO.

To do so, Plaintiffs rely exclusively on a handful of former lower-level Company employees (now serving as "confidential witnesses"), many of whom took early retirement packages as part of Evoqua's publicly announced and fully disclosed voluntary separation plan, and who were therefore gone before the IPO and before the earnings announcements at issue, while others claim to have the ability to read the minds of senior management without any factual predicate that they ever so much as spoke to those executives. Plaintiffs posit that, without these departed employees, the Company was bound to disappoint the market because there was no way it could have continued to operate its business and integrate subsequent acquisitions relying on its thousands of other employees or on less experienced replacements. And, as Plaintiffs' theory goes, the Company must have been lying when it expressed confidence in the Company's future because a handful of these former employees insist that nobody could have done their jobs as well as they did. This is the core of Plaintiffs' theory of falsity underlying their claims under both the Securities Act of 1933 (the "Securities Act") with respect

to Evoqua's IPO and later secondary public offering ("SPO") and Section 10(b) of the Securities

Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5.

On top of this, Plaintiffs layer a second (and unrelated) theory that the Company must

have been inflating its earnings in prior periods because nothing else could explain the

Company's disappointing earnings at the close of the putative class period.  As a threshold

matter, Plaintiffs ask this Court to simply ignore the fact that the Company has not restated any

of its financial statements and that, even after the Company disclosed certain weaknesses in

internal controls related to revenue recognition (a month *after* the close of the putative class

period), its auditors issued an unqualified opinion on the Company's financial statements for all

periods and management determined that the Company's consolidated financial statements fairly

represent, in all material respects, the financial position and result of operations of the Company

for the periods presented.  Plaintiffs' theory of financial fraud is again predicated exclusively on

confidential witnesses, *none* of whom worked in the Company's accounting department.  Not

surprisingly, the Complaint offers no insight into how any of these individuals, most of whom

were sales personnel, could have known how any transaction was actually recorded in the

Company's accounting records (much less whether such transactions were recorded correctly).

Moreover, for this theory, Plaintiffs rely heavily on allegations made by two disgruntled,

former Company employees whom Evoqua had sued for violating their non-compete covenants

and for misappropriating Company information.  In response to Evoqua's complaint, these

individuals made a host of scurrilous allegations against the Company, which Plaintiffs have

imported into their own Complaint.  But a third-party's allegations from another lawsuit are

improper and insufficient to state a claim.  And the wisdom of that rule is plainly apparent here,

given that just three weeks after Plaintiffs filed their Complaint, the judge presiding over

Evoqua's lawsuit against these former employees determined that one of them was untruthful and unreliable.  In a parallel proceeding, another tribunal found the other former employee's claim to be similarly unsupported by any "credible testimony or evidence."  In other words, the crux of Plaintiffs' allegations of accounting fraud rests on the word of individuals whose testimony has either been found by a judge to be "a complete fabrication" or judicially rejected as not believable or supported.

As noted above, the Complaint asserts two categories of fatally flawed claims: (a) Exchange Act claims against the Company, Ronald C. Keating, Benedict J. Stas, Anthony J. Webster, and Kenneth A. Rodi (the "Executive Defendants"), and AEA Investors LP ("AEA") and certain funds affiliated with AEA (together with the Executive Defendants and the Company, the "Exchange Act Defendants"); and (b) Securities Act claims against the Company, Keating, Stas, members of the Company's board of directors (the "Board"), the underwriters of the Company's IPO and/or SPO, and AEA (the "Securities Act Defendants").

Both the Exchange Act and Securities Act claims fail because Plaintiffs have not adequately pled that any challenged statement was materially false or misleading at the time it was made.  The claims also fail because the Complaint negates loss causation (*i.e.*, Plaintiffs plead that factors other than the alleged misstatements or omissions caused any losses to investors).  Further, the Exchange Act claims fail for the additional, independently dispositive reason that the Complaint does not plead with particularity facts giving rise to a strong inference of an intent to defraud, commonly referred to as scienter.  Scienter is not amenable to group pleading and must be separately pled and individually supportable as to each defendant.  Here, not only is the fraud itself not well pled, but there are no well pled facts tying any of the Executive Defendants to the supposed fraud.  None of the former employees cited in the

Complaint are alleged to have had any meaningful interactions with the Company's senior leadership that would have provided those employees with knowledge about the state of mind of Evoqua's executives at the time of the challenged statements.

For these reasons, Defendants respectfully move to dismiss the Complaint for failure to state a viable claim for relief.

## FACTUAL BACKGROUND[2]

*The Company and Its Business*.  Evoqua is a leading provider of cost-effective and reliable water treatment systems and services to municipalities and industrial customers.  During the Class Period,[3] Evoqua served its customers through three segments: Industrial, Municipal, and Products.  IPO Prospectus at 3.

*The Executive Defendants*.  Ronald C. Keating has served on the Company's Board and as its President and CEO since December 2014.  ¶ 278.  Benedict J. Stas has served as the Company's Executive Vice President, CFO and Treasurer since March 2015.  ¶ 279.  Anthony J. Webster has served as Executive Vice President, Chief Human Resources Officer since March 2016.  ¶ 281.  Kenneth A. Rodi served as Evoqua's Executive Vice President, Products Segment President.  ¶ 280.

*The Director Defendants*.  Martin Lamb, Nick Bhambri, Gary Cappeline, Judd Gregg, Brian R. Hoesterey, Vinay Kumar, and Peter M. Wilver, along with Keating (collectively, the "Director Defendants") are members of Evoqua's Board of Directors.  ¶¶ 348-54.

---

[2]     The facts and characterizations of facts are drawn from documents that can be considered on this motion, including: (i) the operative complaint [ECF No. 42] (the "Complaint," cited as "¶") and documents referenced in it, (ii) Evoqua's SEC filings, and (iii) other published, historical information of which the Court may take judicial notice.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 322-23 (2007).  This Memorandum's citation of the Complaint's allegations for the purposes of this motion should not be taken as Defendants' endorsement of the facts as described therein.  Unless otherwise noted, all emphases are added and all citations are omitted.

[3]     Although the Complaint does not explicitly define the class period, it appears that Plaintiffs are alleging a putative class period beginning with the Company's IPO on November 6, 2017 and continuing until October 30, 2018, which we will assume to be the claimed "Class Period."

***The AEA Fund Defendants***.  The Complaint names as defendants AEA and certain funds affiliated with AEA.  ¶ 31.  Before the IPO, Evoqua was majority-owned by certain AEA affiliates.  IPO Prospectus at ii.

***The Underwriter Defendants***.  Credit Suisse Securities (USA) LLC, J.P. Morgan Securities LLC, RBC Capital Markets, LLC, Citigroup Global Markets Inc., Goldman Sachs & Co. LLC, Morgan Stanley & Co. LLC, Robert W. Baird & Co. Incorporated, Raymond James & Associates, Inc., Stifel, Nicolaus & Company, Incorporated, Wells Fargo Securities, LLC, and Cowen and Company, LLC (collectively, the Underwriter Defendants") acted as underwriters of the Company's IPO and/or SPO.  ¶¶ 356-66.

***Pre-IPO Activities***.  In its IPO prospectus, Evoqua explained that "[a]cquisitions have historically been a significant part of [its] growth strategy" and that it expected that it would "continue to grow through acquisitions in the future."  IPO Prospectus at 30.  In particular, it stated that in April 2016 the Company had acquired all of the "outstanding capital stock of privately held Neptune-Benson, a leading manufacturer of high-quality water filtration and disinfection products for the commercial, industrial and municipal water markets" and that, in connection with the Neptune-Benson acquisition, it "created a new Aquatics and Disinfection division, which [it] subsequently merged into [its] Products Segment."  IPO Prospectus at 47; *see also id.* at iv, 73, 88.  Evoqua expressly warned investors that one of the risks associated with acquisitions is that the Company might "have difficulty in operating or integrating any acquired businesses, assets, or product lines profitably."  *Id.* at 30.  The Company also cautioned that "[t]he process of integrating acquired businesses … could cause the interruption of, or delays in, the operation of our existing business, which could have a material adverse effect on our business, financial condition, results of operations or prospects."  *Id*. at 31.

The Company also disclosed in its IPO prospectus that it had "implemented a voluntary separation program [VSP] intended to mitigate the risks associated with knowledge transfer" and cautioned that it "cannot guarantee that it will be effective or cost-efficient."  *Id.* at 32.  The Company explained that "the VSP plan include[d] severance payments to employees as a result of streamlining business operations for efficiency, elimination of redundancies, and reorganizing business processes."  *Id.* at F-30.

**The Two Stock Offerings**.  On October 3, 2017, Evoqua filed a Registration Statement that was declared effective, as amended, on November 1, 2017.  10/3/17 S-1; ¶ 40.  The IPO closed on November 6, 2017, and thus Evoqua became a publicly traded company.  IPO Prospectus; ¶ 40.  Evoqua later conducted its SPO, filing a Registration Statement that was declared effective on March 14, 2018 and a prospectus on March 16, 2018.  3/12/18 S-1; ¶ 131; SPO Prospectus.  The SPO closed on March 19, 2018.  ¶ 131.

**Disclosure of 2Q18 and 3Q18 Financial Results**.  On May 8, 2018, Evoqua announced its financial results for 2Q18, and, while Evoqua announced that both its revenues and Adjusted EBITDA were up from the prior quarter and from the same quarter in the prior year, it lowered its full-year FY18 Adjusted EBITDA guidance, reducing the top of its guidance range from $255 million to $245 million.[4]  5/8/18 8-K, Ex. 99.1 at 1; *id.*, Ex. 99.2 at 19.  On August 7, 2018, Evoqua announced its financial results for 3Q18.  Its revenues and Adjusted EBITDA again were higher than the prior quarter and year over year, and Evoqua did not alter its FY18 guidance.  8/7/18 8-K, Ex. 99.1 at 1; *compare* 5/8/18 8-K, Ex. 99.2 at 19 *with* 8/7/18 8-K, Ex. 99.2 at 18.

**Evoqua Sues Two Disloyal Former Employees**.  On October 22, 2018, the Company filed a lawsuit in Rhode Island Superior Court against two former employees, Jennifer Schuck

---

[4]     Evoqua's fiscal year ends on September 30 of each year.  12/11/18 10-K at 3.  Therefore, its fiscal quarters correspond to the three month periods ending December 31, March 31, June 30, and September 30.

and Matthew Moriarty, alleging that they had breached their non-competition, non-disclosure, and non-solicitation agreements with the Company and the Company's code of ethics and business conduct.  R.I. Compl. [Groner Decl. Ex. 25].  Plaintiffs in this case specifically rely upon the Rhode Island litigation.  ¶¶ 81-95, 101-04, 114-17, 127-28.  Evoqua's complaint in Rhode Island alleges that Moriarty and Schuck stole proprietary information from the Company to create a filter product on behalf of a competitor that was similar to an Evoqua product and solicited Evoqua employees and customers.  R.I. Compl. ¶¶ 78-109.  In November 2018, Moriarty and Schuck filed counterclaims against Evoqua relating to Evoqua's supposed failure to pay Moriarty earned commissions and theories of constructive discharge (Moriarty Counterclaim ¶¶ 52-69; Schuck Counterclaim ¶¶ 52-65), and, in that context, included conclusory allegations that the Company had engaged in certain improper revenue recognition practices.

In January 2019, the Rhode Island court held a hearing on Evoqua's preliminary injunction motion.  *See* R.I. Litigation 4/18/19 Tr. at 3-4.  The court granted the Company's motion and characterized parts of Moriarty's testimony as "completely absurd" and a "complete fabrication."  *Id.* at 15.  On May 13, 2019, the court entered an order memorializing its issuance of the preliminary injunction.  *See* R.I. Litigation 5/13/19 Order.

In yet another Rhode Island proceeding, Schuck sought unemployment benefits on the theory that she had been constructively discharged because the Company was supposedly engaged in "egregious," "unethical," and "illegal" conduct in which she would not participate. But her story also did not withstand scrutiny, and the Rhode Island Department of Labor Board of Review rejected it in a decision that found "[t]here is no credible testimony or evidence to support" her allegations.  4/23/19 Decision ¶ 3.

*Disclosure of 4Q18 and FY18 Financial Results*.  On October 30, 2018, Evoqua announced its preliminary financial results for 4Q18 and FY18.  10/30/18 8-K, Ex. 99.1 at 1. The Company announced that while revenues and Adjusted EBITDA would both be up from the prior year, they would not be up as significantly as previously forecasted.  *Id*.  The Company stated that it expected $1.33 billion to $1.34 billion in revenues, an increase of about 7.0% to 7.4% over FY17, as compared to a prior expectation range of $1.34 billion to $1.37 billion (which would have been an increase of 7.0% to 10.0% over the previous year).  *Id*.  The Company also announced expected full-year Adjusted EBITDA to be between $213 million and $217 million, an increase of 2.6% to 4.5% over the previous year, versus a "prior Adjusted EBITDA expectation range [of] $235 million to $245 million, which would have represented an increase of 13% to 18% over 2017."  *Id*.  CEO Keating stated that as the Company "evaluate[d] [its] preliminary results, [it was] disappointed with [its] full-year performance," and that while most business units were performing well, its "challenges were primarily concentrated in the Product segment's aquatics business and the Municipal segment."  *Id*.  He explained that "[t]hese combined shortfalls are primarily due to acquisition system integration issues, supply chain disruptions influenced by tariffs and an extended delay on a large aquatics project," and that "[t]he majority of [Evoqua's] businesses are performing in-line with expectations."  *Id*.

*Revenue Recognition Review*.  A month after the putative class period, on December 11, 2018, Evoqua disclosed in its annual report that the Company had identified certain accounting internal control weaknesses related to revenue recognition.  12/11/18 10-K at 136-37.  The Company further disclosed that (a) those issues did not result in any reported misstatements or require or warrant any adjustments to the Company's previously reported financial statements; (b) management had determined that the Company's consolidated financial statements fairly

represented, in all material respects, the financial position and result of operations of the Company for the periods presented, in conformity with Generally Accepted Accounting Principles ("GAAP"); and (c) the Company's external auditor, Ernst & Young LLP ("Ernst & Young"), had issued an unqualified opinion on the Company's financial statements. *Id*.

***This Lawsuit***.  Just one week after the October 30, 2018 disclosure, this putative class action was filed.  On April 3, 2019, following their appointment as lead plaintiffs, Louisiana Sheriffs' Pension & Relief Fund ("Louisiana Sheriffs") and City of Omaha Police and Fire Retirement System ("City of Omaha," and collectively, "Plaintiffs") filed the current Complaint.

ARGUMENT

## I.   THE EXCHANGE ACT CLAIMS SHOULD BE DISMISSED

To state a claim under Section 10(b) of the Exchange Act and SEC Rule 10b-5, a plaintiff must adequately allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 168-69 (S.D.N.Y. 2015), *aff'd*, 649 F. App'x 7 (2d Cir. 2016).  Securities fraud claims are subject to both the requirements of Rule 9(b) of the Federal Rules of Civil Procedure, which requires plaintiffs to "state[] with particularity … the circumstances constituting fraud," as well as the "[e]xacting pleading requirements" set forth in the PSLRA and explicated by the Supreme Court in *Tellabs*, 551 U.S. at 313, 319, 323, and the plausibility requirements of *Twombly* and *Iqbal*.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

At its core, the Complaint alleges that Defendants told the public "a misleading story of financial health and successful integration of recently acquired companies" while supposedly (a) "jeopardizing its future growth for the sake of short-term savings" through cuts to its sales

9

force and other reduction-in-force activities, (b) experiencing "serious and costly problems in trying to integrate the many companies it had acquired before the IPO," and (c) engaging in "increasingly aggressive tactics to artificially inflate its reported revenue," including purported "fraudulent accounting manipulations in blatant violation of GAAP." ¶¶ 1, 5-7, 9.  As shown below, the Exchange Act claims should be dismissed because the Complaint is devoid of well-pleaded facts suggesting (a) the existence of any material misrepresentations or omissions (falsity); (b) that Defendants intended to defraud investors (scienter); or (c) that the alleged misconduct caused investors any losses (loss causation).

### A.    Plaintiffs Do Not Plead Any Actionable Misstatements or Omissions

To plead falsity, a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement ... is made on information and belief, ... state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1)(B).  In other words, Plaintiffs "must do more than say the statements ... were false and misleading; they must demonstrate with specificity why and how that is so."  *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).  The allegations in the Complaint fall well short of this exacting standard.

> 1.    The Allegations Concerning The Company's Reduction-in-Force
>       <u>Activities and Integration Issues Fail to Adequately Plead Falsity</u>

Plaintiffs allege that, prior to the IPO, the Company "engaged in two significant cost-cutting measures," namely "(a) systematically eliminating Evoqua's most experienced sales personnel (and replacing them with less expensive—but significantly less qualified and less experienced—sales personnel), and (b) sharply reducing the number of experienced Evoqua personnel who had previously been responsible for integrating Evoqua's various acquisitions (which in turn impaired Evoqua's ability to efficiently and effectively integrate the eight

companies that Evoqua acquired in the 20 months immediately preceding the IPO)." ¶ 45; *see also*, *e.g.*, ¶ 147.  These allegations fail to show fraud because Evoqua informed investors, <u>*both prior to and throughout the Class Period*</u>, that it had initiated a voluntary separation plan, that there was no guarantee that it would be effective or cost-efficient, and that a failure to ensure effective transfer of knowledge from departing employees to their replacements could materially adversely impact the Company's ability to operate its business.

        a.    *The Company Disclosed the Voluntary Separation Plan*

Prior to its IPO, Evoqua informed investors that it had "initiated a Voluntary Separation Plan (VSP)," which included "severance payments to employees as a result of streamlining business operations for efficiency, elimination of redundancies, and reorganizing business processes."  10/3/17 S-1 at F-30, F-78.  The Company explained that because effective succession planning was important to its long-term success and "a failure to ensure effective transfer of knowledge and smooth transitions involving key employees could hinder [its] strategic planning and execution," the Company had implemented the VSP, which was "intended to mitigate the risks associated with knowledge transfer," *i.e.*, the risk that when skilled sales and other personnel would leave the Company, their knowledge would not be effectively transferred to employees taking on their roles and responsibilities.  *Id.* at 28.  The VSP was commenced during the fourth quarter of the fiscal year ended September 30, 2016 and concluded during early 2018.  12/4/17 10-K at 121-22; 5/8/18 10-Q at 23-24.

The Company disclosed to investors the risks associated with the VSP and any other personnel changes, noting that it "cannot guarantee that [the VSP] will be effective or cost-efficient."  10/3/17 S-1 at 28.  Critically, the Company warned investors that:

- its "success depends to a significant extent on [its] ability to retain or attract a significant number of employees in … sales and other key personnel,"

- "[f]ailure to retain [its] existing … sales or other key personnel or the inability to attract and retain new qualified personnel could materially adversely impact [its] ability to operate or grow [its] business,"

- "loss of key leaders and employees" could "have a material adverse effect on [its] business, financial condition, results of operations or prospects,"

- its "experienced sales team has … developed a number of meaningful customer relationships that would be difficult to replace" and "competition for qualified technical personnel and for sales personnel with established customer relationships is intense,"

- "[e]ffective succession planning is … important to [its] long-term success," and

- "a failure to ensure effective transfer of knowledge and smooth transitions involving key employees could hinder [its] strategic planning and execution."

10/3/17 S-1 at 28.  Throughout the Class Period, the Company continued to describe the VSP and to warn that departures of key sales personnel with meaningful customer relationships could negatively affect Evoqua's business.  *See, e.g.*, 12/4/17 10-K at 26, 121-22; 12/11/18 10-K at 111; *see SRM Global Fund Ltd. P'Ship v. Countrywide Fin. Corp.*, 2010 WL 2473595, at *8 (S.D.N.Y. June 17, 2010) ("[T]here can be no omission where the allegedly omitted facts are disclosed."), *aff'd*, 448 F. App'x 116 (2d Cir. 2011).

Indeed, the Complaint *acknowledges* that Evoqua disclosed the VSP in the IPO Prospectus, including that, as of the date of the IPO, "approximately 220 employees [had] accepted separation packages" and the Company warned that the departures of key sales personnel with meaningful customer relationships could materially adversely affect Evoqua's business.  ¶¶ 152, 156 (quoting IPO Prospectus at 18, 32); *see also* ¶¶ 60, 62, 209 (similar). Plaintiffs assert that these warnings were somehow misleading because the risks described supposedly "had already materialized and were adversely affecting the Company's business and financial results and were not merely hypothetical future possibilities" as of November 2017, when the first of the challenged statements was made.  ¶ 153.  However, the Complaint lacks any

well-pleaded facts suggesting that the VSP was having *any* negative impact, much less that these

risks had materialized in November 2017 or at the time of any other challenged statements.  *See*

*Bond Opportunity Fund v. Unilab Corp.,* 2003 WL 21058251, at *10 (S.D.N.Y. May 9, 2003)

("To be actionable, a statement or omission must have been misleading at the time it was made;

liability cannot be imposed on the basis of subsequent events."), *aff'd*, 87 F. App'x 772 (2d Cir.

2004).  In fact, in FY18, the Company's Adjusted EBITDA *increased* over the previous year,

hardly the performance that would have been expected if the VSP was adversely affecting the

Company's business and financial results as of November 2017.  12/11/18 10-K at 4, 63.[5]

Plaintiffs' *only* support for their allegations of falsity concerning the challenged

statements about the Company's reduction-in-force activities are statements by ten former

Company employees, most of whom had been sales personnel before leaving the Company

during the period when the VSP was being implemented.  These allegations are legally irrelevant

because they (a) were made by individuals who left the Company before the VSP was concluded

and thus would have no knowledge about what impact (if any) the VSP had on Evoqua's

business following its implementation; (b) are not pled with particularity and assert only

conclusions without factual support; (c) are in line with Evoqua's public disclosures; and/or

(d) do not suggest that any of the challenged statements were false *at the time they were made*.

For example, the "Former Senior Manager" cited in the Complaint left the Company "in

or around the latter half of 2016," when the VSP had just gotten under way, and alleges that

her/his replacement "had no experience in the water treatment industry" (¶ 51) but does not

---

[5]      Because what matters for purposes of the claims at issue here is whether, at the time the challenged
statements were made, employee departures were having a negative impact on the Company, the Court need not
resolve whether Plaintiffs have adequately pled that the Company supposedly "effectively forced out through other
means" employees who did not opt to participate in the VSP.  ¶¶ 52, 55 (alleging that Evoqua "reduc[ed] veteran
employees' roles," raised their sales quotas, eliminated accrued time off, "[wrote] people up for nonsense reasons,"
and conveyed "other unfair criticism").

allege that s/he has any knowledge about how that replacement (or other new hires) performed during the Class Period.  The Former Senior Manager—who was gone from the Company for a year before the November 2017 statements (the first statements challenged in the Complaint) were made—thus does not and could not profess to know about the effect of the VSP on the Company's operations at the time of the challenged statements.  *See In re Francesca's Holdings Corp. Sec. Litig.*, 2015 WL 1600464, at *14 (S.D.N.Y. Mar. 31, 2015) (confidential witness who left company in early 2011 could not "speak to" company's performance in 2013).

Moreover, the only information provided is consistent with the Company's disclosures about the VSP, but just portrayed in a negative light.  *Compare* ¶ 48 (statement by the Former Senior Manager that Evoqua management "adopted a policy or practice of seeking to cut its employment costs by taking increasingly pro-active steps to replace older and more experienced … sales employees with far less experienced … employees") *with* 2/28/18 Investor Day Tr. at 42 (explaining that Evoqua had "remov[ed] a lot of older individuals from the organization that wanted to retire" and "reinvigorate[d] [Evoqua's] work forces"); *see also Bettis v. Aixtron SE*, 2016 WL 7468194, at *9 (S.D.N.Y. Dec. 20, 2016) (complaint failed to adequately allege falsity where confidential witness's statements "in no way contradict[ed] or undermine[d] [company]'s statement to investors"); *Jui-Yang Hong v. Extreme Networks, Inc.*, 2017 WL 1508991, at *16 (N.D. Cal. Apr. 27, 2017) ("[t]he claims of CW1 and CW3 that top sales performers were replaced with … personnel who they believed had no experience or understanding of [the company]'s legacy projects … tends *to lend credence to Defendants' statements* that there was a plan that involved making significant cuts in personnel").[6]

---

[6]      Like the Former Senior Manager, the "Former Technical Support & Sales Manager" and the "Former Inside Sales/Service Sales Rep" left the Company before the VSP was concluded or its impact could be known and simply confirm its existence, offering no facts about its impact on the Company's operations at the time of the challenged statements.  ¶¶ 61, 68.

Similarly, the "Former Sales Compensation Administrator," who left the Company in April 2017 midway through the implementation of the VSP and months prior to the IPO, reported that s/he did "calculations for senior staff who wanted to get rid of older sales reps and stated that it was 'clear' that the Company was forcing some of the older, seasoned sales reps out of the Company and 'absolutely' hiring new people and paying them significantly less."  ¶ 69. Again, this witness does not profess to have any knowledge about the impact (if any) of the VSP, and her/his statements (setting aside the negative spin) are not inconsistent with Defendants' Class Period statements about the VSP.  *See Bettis*, 2016 WL 7468194, at *9.[7]

By way of further example, the statements by the "Former Business Development Manager," the "Former Technical Sales Manager," the "Former VP of Sales," and the "Former Senior Sales Engineer" about how the Company supposedly persuaded older employees to retire (¶¶ 52-53, 55, 57, 66) likewise are consistent with (albeit while again applying a negative spin to) Evoqua's statements.  Their statements that the loss of these older employees "had a significant adverse impact on the business" (¶¶ 52-53), "had a serious impact on Evoqua's ability to generate new business," (¶ 56) and "had an adverse impact on the Company's sales and growth" (¶ 59), and the Former VP of Sales' statement that the Company "was 'definitely' experiencing flat organic sales growth during his/her tenure" (*id*.) are not pled with adequate specificity because they are wholly conclusory and do not "specify the amount" or magnitude of

---

[7]   The "Northwest District Operations Manager" and the "Former Senior Sales Rep" likewise provide descriptions of the VSP that are consistent with the Company's disclosures.  ¶¶ 60, 62.  The Former Senior Sales Rep's statement (¶ 65) that "Evoqua has continued to lose customers up until the present day (early 2019)" is conclusory—it provides no information on any particular customer that was lost and how much business that customer accounted for—and provides no pertinent information about any negative impact of the VSP on Evoqua's business at the time of the challenged statements, which were made between November 2017 and August 2018 (¶¶ 146-247).  *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 579-81 (S.D.N.Y. 2014) (complaint failed to adequately plead falsity because "[n]o CW sets forth facts that suggest that any of the alleged statements were false *when they were made*"), *aff'd*, 604 F. App'x 62 (2d Cir. 2015); *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 290 (S.D.N.Y. 2014) ("without contemporaneous falsity, there can be no fraud"), *aff'd*, 616 F. App'x 442 (2d Cir. 2015).

the supposed impact of the VSP on Evoqua's business.  *Caiafa v. Sea Containers Ltd.*, 525 F.

Supp. 2d 398, 411 n.10 (S.D.N.Y. 2007); *see also In re Metawave Commc'ns Corp. Sec. Litig.*,

298 F. Supp. 2d 1056, 1070 (W.D. Wash. 2003) ("a shared opinion among confidential witnesses

does not necessarily indicate either falsity or a strong inference of scienter if the allegations

themselves are not specific enough").[8]

Nor do those witness statements specify that these supposed effects of the VSP were felt

by Evoqua "at the time of a particular statement."  *In re LeapFrog Enters., Inc. Sec. Litig*., 2006

WL 2192116, at *1 (N.D. Cal. Aug. 1, 2006); *see also Caiafa*, 525 F. Supp. 2d at 411 n.10

(allegation that company's financial statements overstated the value of ferries and container

assets was not adequately pled because the statements attributed to confidential witnesses failed

"to specify the amount by which the containers were overvalued, and at what times," *i.e.*, they

failed "to specify the date of such overvaluation in relation to the Class Period").  Indeed, in both

FY17 and FY18, the Company's Adjusted EBITDA grew, hardly the performance that would

have been expected if the VSP was adversely affecting the Company's business and financial

results.  12/4/17 10-K at 6; 12/11/18 10-K at 4.

Accordingly, none of the purported statements of the confidential witnesses provides any

factual support that the challenged statements concerning employee departures were materially

---

[8]      Similarly, the Former Senior Sales Engineer's statement that "suppliers showed a reluctance to work with
Evoqua" (¶ 67) pleads no particularized facts about the identity of those suppliers, when they showed this supposed
reluctance to work with Evoqua, what actions (if any) they took because of that alleged reluctance, or what impact
(if any) there was on Evoqua's business.  And the Former Business Development Manager's statement about
hearing "complaints that projects were not getting completed" or were delayed, purportedly leading to the loss of
business (¶ 53), does not specify which were the alleged projects in question, their value, how much business was
lost, when the business was lost, or the effect of these purported lost business opportunities on Evoqua's business as
a whole.  *See In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 592 (S.D.N.Y. 2007) (dismissing
plaintiffs' claim regarding defendant's "bad business practices" when allegations were stated in general terms
"without names, dates, places, or other details" that would allow the court to evaluate whether confidential witnesses
were actually in a position to know).

false or misleading.[9]

b.     *Statements About Integration Were Not False or Misleading*

Plaintiffs also challenge (a) Evoqua's statement that "[o]ur management team ... has demonstrated successful acquisition and integration capabilities"; (b) Evoqua's statement that it was "successfully integrating [tuck-in acquisitions] into our organization"; (c) Stas's statements that "[w]e got to remember those acquired businesses also include some synergies as well that's helping those margins," Evqoua was winning projects "directly [as] a result of the acquisitions," and "the acquired businesses are nice businesses that have been accretive"; and (d) Keating's statement that "[o]ur transactions have been accretive in year one."  ¶¶ 146, 213, 219, 233.

Plaintiffs allege that the challenged statements above were supposedly false or misleading at the time they were made because Evoqua supposedly had already seen the financial impact of its purported decision to "engage[] in the systematic and pervasive termination of experienced sales personnel that devastated the businesses that Evoqua had acquired, eroded the Company's ability to sustain current revenues and generate future growth and gave rise to significant delays in product delivery services provided by Evoqua" and "likewise terminated critical integration personnel, including the most experienced employees, impeding the Company's ability to successfully integrate the numerous companies that it had acquired."  ¶¶ 147, 214, 220, 234.[10]

---

[9]     Plaintiffs' allegations that Sarbanes-Oxley certifications by Keating and Stas contained in the FY17 10-K and subsequent 10-Qs (¶¶ 177, 191, 225, 244) were themselves false or misleading fail because Plaintiffs have not adequately pled that the documents containing those certifications "contained untrue statements or material omissions" and, therefore, they "have failed to plead sufficiently that the Sarbanes-Oxley certifications were false or misleading." *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 583 n.4 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014).

[10]    Although Plaintiffs repeat this refrain dozens of times, "repetition is not a substitute for particularity under the PSLRA." *Bd. of Trs. of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel Oao*, 811 F. Supp. 2d 853, 878 n.15 (S.D.N.Y. 2011), *aff'd sub nom.*, *Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012).

As an initial matter, Plaintiffs ask the Court to simply disregard Evoqua's repeated warnings to investors that it "may have difficulty in operating or integrating any acquired businesses, assets or product lines profitably or in otherwise successfully implementing [its] growth strategy" and that "[i]f we are unable to manage our growth effectively, we may spend time and resources on such acquisitions that do not ultimately increase our profitability or that cause loss of, or harm to, relationships with employees and customers." ¶¶ 148-49.[11]  Moreover, as described below in greater detail, Plaintiffs' allegations fail because (a) they are based entirely on comments by confidential witnesses who left the Company well before the Class Period and so have no relevant knowledge of the state of affairs at the time the challenged statements were made; (b) there is no contradiction between the challenged statements and the witnesses' purported observations; and (c) the challenged statements constitute both inactionable opinion statements and inactionable corporate puffery.

*First,* the *entire* basis for Plaintiffs' allegations are statements by two confidential witnesses *who left the Company well before the Class Period*—the "Former Director of Materials" and the "Former SAP Program Manager" (¶¶ 71-77).  The Former Director of Materials left the Company in "late 2016" (¶ 72), a year before the November 2017 IPO that marked the start of the Class Period, and the Former SAP Program Manager left the Company in March 2017 (¶ 74), about eight months before the Class Period.  Even *if* the Company was having problems integrating Neptune-Benson's operations "when the Former Director of Materials left Evoqua" in late 2016 (¶ 73), and even *if* insufficient resources had been allocated

---

[11]     Plaintiffs also challenge the Company's statement that its "experienced team dedicated to mergers and acquisitions … successfully completed eight technology-enhancing and geography-expanding acquisitions since April 2016." ¶¶ 8, 42, 146, 169; *see also* ¶¶ 204, 222, 233 (similar).  But the Complaint itself makes clear that Evoqua *did* successfully complete eight acquisitions during that timeframe, and Plaintiffs themselves list the acquisitions in question and which segment of Evoqua each acquired company became a part of upon the successful completion of each acquisition.  ¶ 37.

to integration of acquired businesses as of the date of the Former SAP Program Manager's March 2017 departure from Evoqua (¶¶ 74-75), that does not shed light on whether the challenged, integration-related statements, which were made in November 2017, May 2018, and August 2018, respectively, were false or misleading "when they were made." *Lululemon*, 14 F. Supp. 3d at 579-81.

In *Lululemon*, the court held that even though a confidential witness stated that the company was having product testing problems in the Spring of 2012, prior to the class period, this "sa[id] nothing about" whether the company was experiencing testing problems the following March and thus did not "render the company's statements about its quality control testing—on March 21, 2013—false or misleading." *Id.*; *see also Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 141 (D. Conn. 2007) (dismissing complaint because allegations based on confidential witnesses "pertain[ed] to the time period before the Class Period, and there [was] no allegation that these problems continued into the Class Period"), *aff'd*, 312 F. App'x 400 (2d Cir 2009); *City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1128-29 (E.D. Wash. 2013) (dismissing complaint for failure to adequately plead falsity where complaint relied on statements by confidential witnesses who were not employed at the company during the class period). Here too, Plaintiffs rely on confidential witnesses who have no knowledge about any integration-related issues at the time of the challenged statements.

*Second*, even if the statements by these witnesses said something about events during the Class Period (and they do not), "the observations and experiences of these [confidential witnesses] do not speak directly to the falsity of the alleged statements." *Extreme Networks*, 2017 WL 1508991, at *16. In *Extreme Networks*, the plaintiffs alleged that the company had defrauded investors by "tout[ing] the success of the integration" of a business acquired by the

19

company, and the plaintiffs "primarily rel[ied] on the accounts of the [confidential witnesses] to support their allegations" that the company experienced integration problems immediately after the acquisition and that those problems "worsened throughout the Class Period." *Id.* at *3, 15. In dismissing the plaintiffs' claims, the court explained that the complaint "fail[ed] to allege a contradiction between the contents of Defendants' public representations and any undisclosed adverse facts," that the defendants "never claimed a perfect integration," and that "the reasons Plaintiffs offer as to why the statements are false or misleading bear no connection to the substance of the statements themselves." *Id.* at *15, 17.

Here, there is no contradiction between the challenged statements and the confidential witnesses' alleged accounts. The witnesses do not challenge the management team's successful integration "capabilities." ¶ 146. They each point to the Neptune-Benson acquisition as a poor integration, but they say nothing about the integration of the *other seven companies* that Evoqua had acquired since April 2016. *See supra* at 18 n.11. Moreover, the challenged statement merely stated that Evoqua was "successfully integrating" tuck-in acquisitions (¶ 233), not that those acquisitions had already been fully integrated. More importantly, the very earnings call transcript Plaintiffs cite makes clear that the acquisitions that Evoqua was "successfully integrating" did *not* include Neptune-Benson, which, as noted therein, was a "platform acquisition," not a tuck-in acquisition. 8/7/18 Call Tr. at 2, 4; *see also* 12/1/17 8-K, Ex. 99.2 at 9 (comparing the Neptune-Benson "platform" acquisition with seven "tuck-in" acquisitions). In light of the fact that Defendants did not assert that the integrations were complete or had gone perfectly or even that the Neptune-Benson acquisition was one of the ones that the Company was successfully integrating, nothing in the witnesses' statements contradicts anything that Defendants told investors.

20

There likewise is no contradiction between Stas's statement that "the acquired businesses ... have been accretive" (¶ 219) or Keating's statement that "[o]ur transactions have been accretive in year one" (¶ 213) and the Former SAP Program Manager's statement that "there was no *visible* accretion from Evoqua's acquisitions" (¶ 75).  As noted, the Former SAP Program Manager left Evoqua in March 2017, so her/his statements about the alleged state of affairs at an unspecified time in or before March 2017 does not and cannot contradict Stas's and Keating's statements in May 2018 (or Keating's similar statements in December 2017 and February 2018, ¶¶ 159, 179) that the acquisitions had been accretive.[12]  And the Former SAP Program Manager merely stated that there was no "visible" accretion, by which s/he presumably meant that the accretion was not visible to her/him.  ¶ 75.  The Company's CEO and CFO would have had greater insight into whether Evoqua's acquisitions were accretive than a program manager.

Indeed, contemporaneously with Stas's and Keating's challenged statements, Evoqua disclosed Adjusted EBITDA growth of 31.3% and Adjusted EBITDA margins of 17.3%, which were attributable, in part, to the "[a]ccretive impact of acquisitions."  5/8/18 8-K, Ex. 99.2 at 12; *see* ¶ 227 (acknowledging Evoqua disclosed in 2Q18 that its "increase in Adjusted EBITDA" was attributable to, among other things, "accretive profitability associated with organic revenue growth and current and prior year acquisitions"); ¶¶ 193, 246 (same, as to 1Q18 and 3Q18); ¶ 162 (acknowledging Evoqua disclosed EBITDA growth in 4Q17).  The Complaint does not adequately "support the probability that a person in the position occupied by the source would possess the information alleged" about whether the acquisitions were meeting growth projections at the time of the challenged statements.  *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000).

---

[12]    Nor does the Former SAP Manager's statement that "the acquisitions were not meeting bonus targets," which s/he "understood" to mean "that they were not meeting growth projections" (¶ 75) at an unspecified time before s/he left the Company in March 2017, contradict any public statements by Evoqua.

*Third*, none of the challenged integration-related statements can give rise to a securities fraud claim because they are inactionable opinion statements.  A "company's statements suggesting that it was 'successful' in integrating acquisitions" are "simply expressions of confidence that reflect judgments about management's general ability," which "cannot be fraudulent because they are matters of opinion."  *Iron Workers Local No. 25 Pension Fund v. Oshkosh Corp.*, 2010 WL 1287058, at *22 (E.D. Wis. Mar. 30, 2010); *see also Friedman v. Endo Int'l PLC*, 2018 WL 446189, at *2, 5 (S.D.N.Y Jan. 16, 2018) (holding that "[m]ost, if not all," alleged "material misrepresentations and omissions regarding the acquisition and integration" of a company, including that the "acquisition and integration was going extremely well," "qualify as expressions of opinion or expectation"), *aff'd sub nom. Steamfitters' Indus. Pension Fund v. Endo Int'l PLC*, 2019 WL 1890764 (2d Cir. Apr. 29, 2019).  Here, there are no well-pleaded facts suggesting that the relevant Defendants did not believe their opinions about the management team's demonstration of "successful acquisition and integration capabilities" or that they did not believe that Evoqua was "successfully integrating [tuck-in acquisitions] into our organization" at the time they made those statements.  ¶¶ 146, 233.  Nor are there well-pleaded facts concerning Defendants' inquiries, knowledge, or other bases for offering the challenged opinions.  *See infra Sec.* I.A.3 & n.15.

*Fourth*, the challenged integration-related statements cannot give rise to a securities fraud claim because statements such as these—about the success that a company has had integrating an acquired company—"have been found to be examples of [inactionable] corporate optimism."  *Extreme Networks*, 2017 WL 1508991, at *11; *see also In re Razorfish, Inc. Sec. Litig.*, 2001 WL 1111502, at *2-3 (S.D.N.Y. Sept. 21, 2001) (similar).  That is because "'integration' is far too loose and uncertain a term on which to premise a claim of securities fraud."  *In re Ferrellgas*

*Partners, LP, Sec. Litig.*, 2018 WL 2081859, at *12 (S.D.N.Y. Mar. 30, 2018), *aff'd*, 764 F.

App'x 127 (2d Cir. 2019); *see also Extreme Networks*, 2017 WL 1508991, at *12 ("CEOs and

executives of companies that merge with or acquire other companies often describe ongoing

mergers as smooth, rapid, and successful — which courts regularly deem corporate puffery.").

For these reasons, the challenged statements are inactionable puffery.  *See infra Sec.* I.A.4.

> 2.   Plaintiffs Advance No Factual Allegations Supporting Their
>      Challenge To Statements about Evoqua's Operations, M&A
>      Activity, Severance Costs, and Management Team

The Complaint is devoid of facts suggesting that any of the Company's statements about

its operations, M&A activity, severance costs, and management team were false or misleading.

*Operations*.  Plaintiffs challenge the statement in Evoqua's 2/7/18 10-Q that "[s]ince

fiscal 2014, we have realigned our organizational structure, achieved significant cost savings

through operational efficiencies and revitalized our culture, which has energized our workforce

and reduced employee turnover."  ¶ 189.  The Complaint lacks well-pleaded facts suggesting that

any of those statements was false.  For example, it does not cite any data showing that, in the

three fiscal years beginning in FY14, Evoqua did not in fact achieve significant cost savings.

Similarly, Plaintiffs cite no data about the amount of employee turnover in FY14 against which

to compare the subsequent data.  In any event, vague statements about the revitalization of the

Company's culture and the fact that that revitalization "energized" the workforce and reduced

employee turnover are not the sort of "determinate or verifiable" statements that can serve as a

basis for a securities fraud claim.  *In re Fairway Grp. Holdings Corp. Sec. Litig.*, 2015 WL

4931357, at *21 (S.D.N.Y. Aug. 19, 2015); *see also Iron Workers*, 2010 WL 1287058, at *22.

Similarly, Plaintiffs challenge Evoqua's statement that "[s]ince fiscal 2014 we have

increased the proportion of customer facing employees by over 25%, developed a best-in-class

training program, restructured our customer relationship management system and realigned our

compensation packages." ¶ 150.  Again, there are no well-pleaded allegations that any of these

statements was false: no comparison of data between FY14 and later fiscal years, no internal

documents cited suggesting any of these statements was untrue, no witnesses suggesting any of

these statements was not fully accurate.  For example, the witnesses cited in the Complaint

provide no information about the proportion of customer facing employees and whether that

number increased or decreased between FY14 and the November 2017 IPO.  Moreover, the

statement about the "best-in-class" training program is not actionable.  *Ferrellgas*, 2018 WL

2081859, at *11 (statement about "best-in-class capabilities" was inactionable puffery).

    ***M&A Activity***.  For similar reasons, the challenged (and generalized) statements about

mergers and acquisitions—such as that Evoqua "utilize[s] M&A to fill gaps in our product

portfolio to penetrate vertical market segments or to expand our geographic reach" (¶ 159) and

other similar statements about potential M&A targets (*e.g.*, ¶¶ 146, 159) and the Company's

M&A strategy (*e.g.*, ¶ 179)—are inactionable.  The Complaint lacks any allegations that

Evoqua's M&A *strategy* was not what it said it was.

    ***Severance Costs***.  Plaintiffs challenge the statements in the IPO Prospectus and the SPO

Prospectus quantifying the amounts of "'[r]estructuring and related business transformation

costs' related to severance costs" incurred by the Company in FY16 and FY17.  ¶¶ 156, 209

(quoting IPO Prospectus at 18 & SPO Prospectus at 21).  Plaintiffs allege that those statements

were false or misleading because Evoqua supposedly put pressure on "its more experienced and

knowledgeable sales and integration employees to leave and had replaced them, if at all, with

less experienced, less knowledgeable employees and because many experienced employees had

left involuntarily." ¶¶ 157, 210.  This is *a non sequitur*.  Plaintiffs plead no facts suggesting that

the numerical data provided by the Company about its restructuring and related business transformation costs was in any way inaccurate.

***Management Team***.  Plaintiffs challenge the statement in the IPO Prospectus and SPO Prospectus that one of Evoqua's strengths was its "[e]xperienced management team with proven operational capabilities."  ¶¶ 146, 203.  Plaintiffs allege that this statement was false and misleading because the Company had "engaged in the systematic and pervasive termination of experienced sales personnel," with allegedly dire consequences, and purportedly "terminated critical integration personnel, including the most experienced employees."  ¶ 147.  But Plaintiffs misleadingly omitted from their citations of the IPO Prospectus and the SPO Prospectus the sentences that immediately follow, which make clear that the "[e]xperienced management team" to which the disclosures refer consisted of its "leadership team," and, in particular, its CEO and CFO.  IPO Prospectus at 10; SPO Prospectus at 10.[13]  There are no allegations, of course, that any of the leadership team was terminated, or that they were not "experienced" or lacked "proven operational capabilities."  In any event, these statements are inactionable puffery.  *See In re Xinhua Fin. Media, Ltd. Sec. Litig.*, 2009 WL 464934, at *8 (S.D.N.Y. Feb. 25, 2009) ("soft adjectives" describing management as "strong" and "experienced" were non-actionable puffery).

### 3.   Certain Challenged Statements Are Inactionable Opinions

Not only are all of the challenged integration-related statements inactionable opinion statements (*supra* Sec. I.A.1.b), but many other challenged statements likewise are statements of opinion that are not actionable under the Supreme Court's seminal opinion in *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1327 (2015):[14]

---

[13]      Plaintiffs include these sentences later in the Complaint.  *See* ¶ 282.

[14]      Although *Omnicare* arose in the context of a Section 11 claim, the Second Circuit has applied it in the context of Section 10(b) claims as well.  *See Gen. Partner Glenn Tongue v. Sanofi*, 816 F.3d 199, 209-14 (2d Cir. 2016); *Martin v. Quartermain*, 732 F. App'x 37, 40-42 (2d Cir. 2018).

- "*We believe* the visibility and predictability we experience with our revenue enhances our ability to consistently drive profitability." ¶ 113.

- "*We believe* that continuous improvement of our operations, processes and organizational structure is a key driver of our earnings growth." ¶¶ 189, 223, 242.

- "*We believe* a key differentiator for our technology development program is our strong record of incorporating new technologies into the comprehensive solutions we provide to our customers across our platform." ¶ 204.

- "*We believe* our transformation has made us into a premier partner and employer in our industry, resulting in differentiated capabilities and talent within our organization." ¶ 146.

- "*We believe* that tuck-in acquisitions present a key opportunity within our overall growth strategy, which we will continue to evaluate strategically.  These strategic acquisitions will enable us to accelerate our growth in our current addressable market, as well as in new geographies and new end market verticals." ¶¶ 146, 169; *see also* ¶ 213 ("*We believe* tuck-in acquisitions are low risk by nature…."); ¶¶ 179, 213 ("*[W]e're very pleased* with the performance of our acquisitions….)."

- "*We believe* our strong brands, leading position in highly fragmented markets, scalable and global offerings, leading installed base and unique ability to provide complete treatment solutions will enable us to capture a larger share of our existing customers' water treatment spend while expanding with existing and new customers into adjacent end-markets and underpenetrated regions, including by investing in our sales force and cross-selling to existing customers." ¶ 150.

- "*We believe* our continued investment in driving penetration of our recently launched technologies, robust pipeline of new capabilities and best-in-class channels to market will allow us to continue to address our customer needs across the water lifecycle." ¶¶ 204, 222.

- "*We're very pleased* with our second quarter results….*We believe* we're taking market share and delivering compelling solutions to our customers. *We are pleased* with the performance through the first half of the year and *we are very well positioned* to see continued profitable growth organically and through M&A for the full-year." ¶ 215; *see also* ¶¶ 167, 186 (similar).

Here, Plaintiffs fail to plead facts that, if true, would be sufficient to show either (a) that

"'the speaker did not hold the belief she professed' or 'the supporting fact[s] she supplied were

untrue'" or (b) for "opinions, though sincerely held and otherwise true as a matter of fact, …

[that] the speaker omits information whose omission makes the statement misleading to a

26

reasonable investor." *Sanofi*, 816 F.3d at 210 (citing *Omnicare*, 135 S. Ct. at 1327, 1332).  Just

as the Complaint fails to adequately plead facts concerning the state of mind of Defendants for

purposes of pleading scienter (*infra* Sec. I.B.), so, too, it fails to adequately plead facts (much

less particularized facts) suggesting that they "did not genuinely believe what they were saying at

the time they said it." *Sanofi Sec. Litig. v. Meeker*, 87 F. Supp. 3d 510, 531 (S.D.N.Y. 2015).[15]

### 4.  Certain Challenged Statements Are Inactionable Puffery

In addition to the integration-related statements and other puffing statements discussed

above (*supra* Secs. I.A.1.b & I.A.2), many other challenged statements are also inactionable

"expressions of puffery and corporate optimism." *Rombach*, 355 F.3d at 174.  For example,

statements such as that key elements of Evoqua's strategy were to "commercialize and drive

adoption of nascent and newly acquired technologies by leveraging [its] sales channels and

application expertise" (¶ 204; SPO Prospectus at 11-12), that Evoqua was an "employer of

choice" (¶¶ 146, 203), and that Evoqua was "well positioned to continue to capture organic and

inorganic growth opportunities" (¶¶ 167, 186) are not "determinate or verifiable." *Fairway*,

2015 WL 4931357, at *21.  Similarly, statements that "[p]roduct sales have exhibited *strong*

growth" (¶ 233), "Fiscal 2018 is off to a *strong* start" (¶ 186), and that Evoqua's "existing

customer relationships, *best-in-class channels* to market and ability to rapidly commercialize

technologies *provide a strong platform* to drive rapid growth in the businesses [it] acquire[s]"

(¶¶ 146, 169) are the sort of "vague, optimistic statements" that courts regularly deem to be

immaterial puffery.  *Ferrellgas*, 2018 WL 2081859, at *11 (statement about "best-in-class

---

[15]      Nor do Plaintiffs "identify particular (and material) facts going to the basis for the [Defendants']
opinion[s]—facts about the inquiry [Defendants] did or did not conduct or the knowledge [they] did or did not
have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement
fairly and in context." *In re Tempur Sealy Int'l, Inc. Sec. Litig.*, 2019 WL 1368787, at *9 n.114 (S.D.N.Y. Mar. 26,
2019) (quoting *Omnicare*, 135 S. Ct. at 1332).  The Complaint lacks any facts—much less the requisite particular
and material facts—concerning Defendants' inquiries, knowledge, or other bases for offering the challenged
opinions. *Infra* Sec I.B.

capabilities" was inactionable puffery); *see also Taubenfeld v. Hotels.com*, 385 F. Supp. 2d 587,

593 (N.D. Tex. 2004) ("generalized positive statements about strong growth … are immaterial as

a matter of law"); *Wozniak v. Align Tech., Inc.*, 2011 WL 2269418, at *4 (N.D. Cal. June 8,

2011) (statement that "[w]e are pleased that we are off to a strong start in 2007" was "non-

actionable puffing").

5.      Certain Challenged Statements Are
        Inactionable Forward-Looking Statements

A substantial portion of the challenged statements are "forward-looking" and thus qualify

for protection under the PSLRA's "disjunctive" safe harbors, *Slayton v. Am. Express Co.*, 604

F.3d 758, 765-66 (2d Cir. 2010) (for statements other than ones made in connection with the

IPO) and/or the "bespeaks caution" doctrine (for all forward-looking statements).  *See Gregory*

*v. ProNAi Therapeutics, Inc.*, 297 F. Supp. 3d 372, 398 (S.D.N.Y. 2018) (while PSLRA's safe

harbor "does not apply to statements made in connection with an initial public offering … the

bespeaks-caution doctrine … does"), *aff'd*, 757 F. App'x 35 (2d Cir. 2018).

The PSLRA's first safe harbor bars liability if an identified forward-looking statement is

"accompanied by meaningful cautionary statements identifying important factors that could

cause actual results to differ materially from those in the forward-looking statement[s]."

15 U.S.C. § 78u-5(c)(1)(A)(i).  Where the forward-looking statement is accompanied by

meaningful cautionary language, this safe harbor "is available … without regard to the scienter

with which [the statement] was made."  *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*,

300 F. Supp. 3d 551, 573 n.12 (S.D.N.Y. 2018), *aff'd sub nom.*, *Ark. Pub. Emps. Ret. Sys. v.*

*Xerox Corp.*, 2019 WL 2394302 (2d Cir. June 6, 2019).  It is also irrelevant whether the risks

that ultimately materialized are identical to those in the warnings.  The sole question is whether

the important factors identified "*could* cause actual results to differ materially from those in the

forward-looking statement[.]"  15 U.S.C. § 78u-5(c)(1)(A)(i).  If so, no liability will attach even

if "the particular factor that ultimately cause[d] the forward-looking statement not to come true"

was not disclosed.  *Karacand v. Edwards*, 53 F. Supp. 2d 1236, 1243 (D. Utah 1999); *see also In*

*re SuperCom Inc. Sec. Litig.*, 2018 WL 4926442, at *26 (S.D.N.Y. Oct. 10, 2018) (similar).

Similarly, "[u]nder the bespeaks caution doctrine, alleged misrepresentations in a stock

offering are immaterial as a matter of law if it cannot be said that any reasonable investor could

consider them important in light of adequate cautionary language set out in the same offering."

*Rombach*, 355 F.3d at 173.  Stated differently, when cautionary language is present, the bespeaks

caution doctrine mandates that courts "analyze the allegedly fraudulent materials in their entirety

to determine whether a reasonable investor would have been misled" and that the "touchstone of

the inquiry is not whether isolated statements within a document were true, but whether

defendants' representations or omissions, considered together and in context, would affect the

total mix of information and thereby mislead a reasonable investor regarding the nature of the

securities offered."  *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002).

Here, the Complaint challenges numerous forward-looking statements about Evoqua's

business plans, future performance, and projections.  In addition to the opinion statements

discussed above, many of which are forward-looking, the following are additional challenged

forward-looking statements:

- "In order to maintain and enhance our customer relationships, we *intend* to continue to invest in our sales force."  ¶ 150.[16]

- The Company listed as one of the "key elements" of its "growth strategy" to "*[c]ontinue to evaluate and pursue* accretive tuck-in acquisitions to add new

---

[16]     Plaintiffs mistakenly assert (¶¶ 8, 44) that Evoqua stated that it "*would* 'continue to invest in [its] sales force.'"  In fact, however, Evoqua consistently stated that it "*intend[ed]* to continue to invest in [its] sales force" (IPO Prospectus at 11, 140; SPO Prospectus at 11), which Plaintiffs accurately cite later in the Complaint.  *See* ¶¶ 70, 150.  The Complaint contains no facts suggesting that the Company's statement of its intentions was untrue.

technologies, attractive geographic regions and end-markets." IPO Prospectus at 11, 12 (cited in part in ¶ 146).

- "We *expect* to expand our service reach, enhance our technological capabilities, and accelerate our sales and profitability growth rates through our disciplined M&A process." ¶¶ 159, 179, 213, 233.

- "*Our future growth will* come from both organic sales and through a systematic M&A process." ¶¶ 159, 179; *see also* ¶¶ 213, 233 (similar).

- "*We expect* total reported revenues to be in the range of $1.33 billion to $1.36 billion, representing growth of approximately 7% to 9%. Adjusted EBITDA *is expected* to be in the range of $235 million to $255 million, representing growth of approximately 13% to 23%." ¶ 182; *see also* ¶ 217 (similar).

These and similar statements are classic forward-looking statements. *See* 15 U.S.C. § 78u-5(i)(1)(A)-(D). Evoqua made clear in the filings containing the statements that statements using terminology such as "will," "expect," "believe," and "intend" (and "other comparable terminology"), as well as other statements about "expectations, beliefs, plans, strategies, objectives, prospects, assumptions, or future events or performance[,] ... are forward-looking statements." *E.g.*, IPO Prospectus at 60. Evoqua cautioned investors that its forward-looking statements "are only predictions and involve known and unknown risks and uncertainties, many of which are beyond [the Company's] control . . . ." *Id.* Evoqua warned that "[t]hese and other important factors … may cause … actual results, performance or achievements to differ materially" from those "expressed or implied by these forward-looking statements." *Id.* Evoqua warned investors about the uncertainties inherent in its forward-looking statements—and listed the topics about which it was making forward-looking statements—on the very first pages of each of its 10-Ks and 10-Qs, under a capitalized, bolded note stating "**CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS**." *E.g.*, 12/4/17 10-K at 3.

Most significantly, the Company specifically warned investors about the particular risk factors that could materially affect its future performance. Evoqua repeatedly warned investors

that "[f]ailure to retain our existing senior management, skilled technical engineering, sales and other key personnel or the inability to attract and retain new qualified personnel could materially adversely impact [its] ability to operate or grow [its] business." IPO Prospectus at 32; 12/4/17 10-K at 26. Evoqua also disclosed risk factors related to integration of acquired companies, stating, among other things, that "[o]ur growth strategy includes acquisitions, and we may not be able to identify suitable acquisition targets or otherwise successfully implement our growth strategy," "[w]e may have difficulty in operating or integrating any acquired businesses, assets or product lines profitably or in otherwise successfully implementing our growth strategy," and "[t]he process of integrating acquired businesses … could cause the interruption of, or delays in, the operation of our existing business, which could have a material adverse effect on our business, financial condition, results of operations or prospects." IPO Prospectus at 30-31. In other words, looking at the total mix of information that Evoqua made available to investors about the risk factors that could materially affect its future performance, a reasonable investor would not have been misled by the challenged forward-looking statements. For these reasons, the PSLRA's first safe harbor and the bespeaks cautions doctrine, as applicable, shield the Company from liability in connection with the challenged forward-looking statements.

The PSLRA's second safe harbor provides that, even if a company did not identify risk factors, forward-looking statements are inactionable unless the complaint pleads *specific facts* suggesting defendants had "*actual knowledge*" that the statement was false. 15 U.S.C. § 78u-5(c)(1)(B); *see also Slayton*, 604 F.3d at 773 ("[B]ecause the safe harbor specifies an 'actual knowledge' standard for forward-looking statements, 'the scienter requirement for forward-looking statements is stricter than for statements of current fact ....'"). For these purposes, a showing of recklessness is insufficient. *Id.*

As discussed below (*infra Sec.* I.B), Plaintiffs plead *no* facts suggesting that Defendants had "actual knowledge" that any challenged statement was false when made.  Conclusory allegations such as that "Defendants acted with scienter in that Defendants knew, *or recklessly disregarded*, that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading" (¶ 272) are insufficient.  *See* 15 U.S.C. § 78u-5(c)(1)(B).  Moreover, a conclusory allegation of knowledge does not satisfy the PSLRA's particularized pleading requirements.  *See* 15 U.S.C. § 78u-4(b)(2)(A); *Tellabs*, 551 U.S. at 313-14.  Accordingly, the challenged statements are protected by the second safe harbor.[17]

### 6. The Revenue Recognition Allegations Fail to Adequately Plead Material Misstatements or Omissions

Plaintiffs allege that Evoqua engaged in a variety of improper revenue recognition practices to mask a lack of organic growth and to inflate revenue in violation of GAAP, and that these alleged practices "had the effect of presenting a materially inflated picture of Evoqua's financial performance, growth rate, and prospects as presented to investors in the IPO Offering Materials (as well as subsequently issued financial statements)."  ¶¶ 7, 78.  The Complaint alleges therefore that Evoqua's descriptions of its revenue recognition practices were materially false and misleading and that the Company misrepresented that its financial statements were prepared in accordance with GAAP.  ¶¶ 254-55.  These allegations fail because Plaintiffs (a) do not adequately allege the materiality of the alleged revenue recognition issues or that any of the published financial data was actually wrong; and (b) rely exclusively on confidential witnesses without *any* relevant knowledge of the Company's revenue recognition practices.

---

[17]     In addition, the challenged forward-looking statements are also statements of opinion that are inactionable because Plaintiffs fail to adequately plead facts concerning Defendants' state of mind.  *See supra* Sec. I.A.3.

a.      *Plaintiffs Fail to Adequately Allege Materiality*

It is well settled that "[t]o prove a violation of the federal securities laws, plaintiffs must show that there is a 'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'"  *In re Duke Energy Corp. Sec. Litig.*, 282 F. Supp. 2d 158, 160 (S.D.N.Y. 2003).  As a threshold matter, it is critical that nowhere in the Complaint do Plaintiffs adequately allege that any of the Company's published financial results were wrong.  Nor is there any allegation (nor could there be) that any financial results were restated or that the auditors withdrew any of their opinions.  All Plaintiffs offer is the generic and unsupported allegation that revenues were somehow, somewhere, and by some unspecified amount, overstated.  *See Janbay v. Canadian Solar, Inc.*, 2012 WL 1080306, at *6 (S.D.N.Y. Mar. 30, 2012) (complaint dismissed where "[n]o facts [we]re alleged to place the purported value of the [transaction at issue] within the context of [the company's] total financial picture" and there were no "attempt[s] to approximate the magnitude or degree of [the alleged] misstatements"); *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 613 (S.D.N.Y. 2008) (dismissing complaint alleging the defendant company "experienced a dramatic increase in integration-related expenses in excess of its internal budget" but failing "to describe in any way the magnitude of the increase, the initial projections, or by how much the actual costs exceeded the internal budget" and holding that "[t]he pleadings are simply too conclusory, as they offer no possibility at all of assessing materiality as a matter of law"), *aff'd*, 347 F. App'x 665 (2d Cir. 2009).

In determining whether allegations that defendants improperly inflated revenues satisfy the materiality test, courts compare the amounts by which the revenues were allegedly inflated to the company's total revenues during the relevant period.  *See Duke Energy*, 282 F. Supp. 2d at 160; *see also In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1091 (9th Cir. 2002) (affirming

dismissal where there was "no sufficient allegation of the amounts by which revenues were allegedly overstated"); *Alaska Elec. Pension Fund v. Adecco S.A.*, 371 F. Supp. 2d 1203, 1214 & n.2 (S.D. Cal. 2005) (holding that plaintiffs must "show that accounting fraud was material to the company's overall financial condition" and that complaint lacked requisite factual allegations about "the amount of … revenue inflation" and "quantifying the impact" on Company's financial statements), *aff'd*, 256 F. App'x 74 (9th Cir. 2007).  That is because "illegality of a financial nature … must still be assessed, for disclosure purposes, by its economic impact.  Otherwise, every time a giant corporation failed to disclose a petty theft in its mailroom, it would be liable under the securities laws."  *Duke Energy*, 282 F. Supp. 2d at 161-62 (dismissing claim where "arguably illegal" accounting practices only resulted in a "minuscule 0.3% inflation of revenues").

Here, the Complaint lacks any allegations about the amount by which Evoqua's revenues were allegedly inflated by purportedly improper revenue recognition practices or how that figure compared to the company's total revenues.  The only contracts for which Plaintiffs quantify the supposed effect of the alleged misconduct cover "filters worth in excess of $1 million," "a large service retrofit contract worth approximately $400,000," and "approximately $300,000 worth of … inventory."  ¶¶ 81, 106, 114.  Cumulatively, those contracts account ***for only about 0.14% of Evoqua's $1.2 billion in revenue*** for fiscal 2017.  12/4/17 10-K at 6.  *See In re Lone Pine Res., Inc.*, 2014 WL 1259653, at *4 (S.D.N.Y. Mar. 27, 2014) (an "impact of less than 5%" is "presumptively immaterial"); *see also ECA & Local 134 IBEW Joint Pension Tr. v. JP Morgan Chase Co.*, 553 F.3d 187, 204 (2d Cir. 2009) (similar).  Moreover, the Complaint lacks well-pleaded allegations that any such revenue recognition practices affected annual (as opposed to quarterly) results.

Plaintiffs also allege that, in connection with certain "contracts to perform services related to the operations and maintenance of water treatment plants for utility companies" (which purportedly "generated fees of approximately $50,000 per month"), the Company supposedly "pull[ed] forward" the revenue on those contracts, which "could result in an extra $50,000 to $150,000 in revenue for a current quarter, but at the expense of the following quarter." ¶ 98. Even assuming the high end of Plaintiffs' estimate and that the "pulling forward" of revenue *did* result (rather than "could" result) in an extra $150,000 in a particular quarter, and even assuming that the "following quarter" occurred in the following fiscal year (meaning that it would affect the current fiscal year's revenues, which is not pled), $150,000 of additional revenue, even when combined with the $1.7 million of contracts described above, would still constitute only a miniscule fraction of the Company's revenues.[18]

What is more, the Former Senior Manager conceded that s/he "could not quantify the total amount of revenue" that supposedly was "'brought forward' in this manner in 2016" before she left the Company later that year (a year before the IPO and the beginning of the Class Period). ¶¶ 51, 98. Her/his conclusory "certain[ty] that it was 'significant'" (¶ 98) is not entitled to any weight in the legal analysis, nor is Plaintiffs' conclusory allegation that the allegedly improper revenue recognition practices "had the effect of presenting a materially inflated picture of Evoqua's financial performance, growth rate, and prospects," because the Complaint pleads no basis for why the witness would have the requisite knowledge of these topics—these are just conclusory statements parroting Plaintiffs' narrative. ¶ 78. *See In re Sierra Wireless, Inc. Sec.*

---

[18]    Similarly, the Complaint alleges that Evoqua's disclosure regarding its backlog was false and misleading (¶ 113) but fails to quantify the supposed effect on Evoqua's total revenue.  The Complaint merely notes that "Schuck estimated that by the time of her departure in February 2018, approximately $2 million in cancelled sales were knowingly or recklessly included in the sales backlog report."  *Id.*  Even assuming that that "estimate" was accurate and that the supposed $2 million figure was not divided between two fiscal years, it still would represent an immaterial amount (about 0.149%) of Evoqua's $1.34 billion in yearly revenue.  12/11/18 10-K at 4.

*Litig.*, 482 F. Supp. 2d 365, 376 (S.D.N.Y. 2007) (dismissing complaint where confidential witness had "an unspecified role (if any) at [the company] during the class period," complaint did not indicate that s/he "would be in a position to know" the relevant facts, and her/his statement "merely parrot[ed] the conclusory allegations contained in the complaint"); *Alaska Elec. Pension Fund v. Adecco S.A.*, 434 F. Supp. 2d 815, 825 (S.D. Cal. 2006) ("Although the Amended Complaint alleges the 'outstanding receivables from CW5's branch were indicative of receivables outstanding at Adecco's more than 1500 North American offices,' that conclusion is not supported by allegations of any confidential witness who would be in a position to make that extrapolation. …"), *aff'd*, 256 F. App'x 74 (9th Cir. 2007).  Nor are there any allegations quantifying the effect (if any) of the allegedly improper revenue recognition practices on Evoqua's Adjusted EBITDA or other financial metrics.  Because the Complaint lacks well-pleaded allegations that the supposed revenue recognition issues were material, it lacks any adequate basis for its allegations that the purported "accounting misconduct … artificially and materially inflated Evoqua's reported revenues, income, and EBITDA in violation of GAAP." ¶¶ 155, 161, 183, 185, 198, 202, 228.

And this is wholly unsurprising, given that Evoqua disclosed that, while there had been "material weakness in [its] internal controls," the Company's consolidated financial statements nevertheless "fairly represent[ed], in all material respects" the Company's financial position and were in conformity with GAAP.  12/11/18 10-K at 137.  In conjunction with that disclosure, Ernst & Young "issued an unqualified opinion on [Evoqua]'s financial statements" without the need for any restatement of Evoqua's financial statements.  *Id.*

b.      *Plaintiffs Fail to Adequately Allege*
*Any False or Misleading Statement*

Plaintiffs' allegations concerning Evoqua's revenue recognition practices and related

disclosures again are based entirely on the statements of former employees.  These individuals,

however, are not "described in the complaint with sufficient particularity to support the

probability that a person in the position occupied by the source would possess the information

alleged."  *Novak*, 216 F.3d at 314; *see also Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1114-

16 (N.D. Cal. 2009) ("Plaintiffs must describe with particularity these CWs' roles in [the]

revenue recognition process and that they had personal knowledge of Defendants' accounting

decisions.").

Here, there are no well-pleaded allegations about what roles (if any) these individuals

played in Evoqua's revenue recognition process.  Rather, their job titles[19] are akin to the "sales

manager" whom the court in the *Adecco* case referred to as a "low-level employee[]" who would

not have been privy to company-wide financial information.  434 F. Supp. 2d at 825 & n.3.

Plaintiffs do not allege that any of these individuals had "any connection with [the] accounting

department or that their work responsibilities would provide them a basis for knowing the details

of the accounting."  *In re MSC Indus. Direct Co. Sec. Litig.*, 283 F. Supp. 2d 838, 847 (E.D.N.Y.

2003); *see also Calif. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 152 (3d Cir. 2004)

("Plaintiffs attempt to substantiate claims of accounting fraud by reference to a number of former

employees who held positions that would not appear to render them privy to the company's

bookkeeping practices, let alone the specific accounting that went into the company's financial

---

[19]      Their job titles (as described by Plaintiffs) are as follows: Former Senior Sales Rep, Former US Sales
Manager, Former Inside Sales/Service Sales Rep., Former Technical Support & Sales Manager, Former Senior Sales
Engineer, Former Technical Sales Manager, Channel Sales Director of N/B-Aquatics, Materials Manager of N/B-
Aquatics, Former Business Development Manager, Former Senior Manager, and North West District Operations
Manager.  ¶¶ 81, 97-101, 105-11, 124.

reporting."); *Sierra Wireless*, 482 F. Supp. 2d at 376 (witness was not "in a position to know" relevant facts and was merely parroting complaint's conclusory allegations). Moreover, four of the witnesses making revenue recognition allegations left Evoqua long before the Class Period (¶¶ 48, 74, 105, 107) and, as such, their statements necessarily "pertain[ed] to the time period before the Class Period" and provide no relevant facts about whether "these problems continued into the Class Period." *Malin*, 499 F. Supp. 2d at 141; *see also ProNAi Therapeutics*, 297 F. Supp. 3d at 409 ("allegations about an unspecified time period cannot supply specific contradictory facts available to Defendants at the time of an alleged misstatement"); *Lululemon*, 14 F. Supp. 3d at 580-81.

Notably, the revenue recognition allegations rely *heavily* on the counterclaims brought by Schuck and Moriarty against Evoqua in the Rhode Island litigation, but Plaintiffs' counsel do not claim to have ever spoken to either Schuck or Moriarty. As such, the Court need not (and should not) consider these "parroted" allegations, which "are taken directly from uncorroborated allegations embedded in a complaint in another action. …" *In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *17 n.17 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom.*, *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014); *see also Caiafa*, 525 F. Supp. 2d at 411 ("[A]llegations ... contained in pleadings from an unrelated lawsuit ... are inadmissible."); *VNB Realty, Inc. v. Bank of Am. Corp.*, 2013 WL 5179197, at *7 (S.D.N.Y. Sept. 16, 2013) (counsel has a "non-delegable responsibility" to "validate the truth and legal reasonableness of the papers filed"). Indeed, the court in the Rhode Island litigation recently held that parts of Moriarty's testimony were "a complete fabrication." 4/18/19 R.I. Litigation Tr. at 15. And the Rhode Island Department of Labor Board of Review found Schuck's claims of "illegal" and "unethical" behavior to be wholly unsupported and not credible. 4/23/19 Decision ¶ 3. As such,

the allegations sourced to Schuck and Moriarty should not be given weight in the analysis—

particularly given the *Twombly/Iqbal* burden that the story be "plausible."  *See*

*IAC/InterActiveCorp*, 478 F. Supp. 2d at 592 (courts consider, among other factors, "the

reliability of the sources" cited by plaintiffs).

7.    <u>Plaintiffs Fail to Adequately Plead an Item 303 Violation</u>

Item 303 of Regulation S-K instructs registrants to "[d]escribe any known trends or

uncertainties that have had or that the registrant reasonably expects will have a material

favorable or unfavorable impact on net sales or revenues or income from continuing operations."

17 C.F.R. § 229.303(a)(3)(ii).  Plaintiffs allege that Evoqua failed to disclose the following

supposed "trends or uncertainties": "(1) Evoqua's termination of hundreds of sales and

administration personnel; (2) failure to adequately integrate its acquired companies; and (3) the

Company's improper recognition of revenue through the tactics described herein."  ¶ 250.

Plaintiffs Item 303 allegations fail for several reasons.

*First,* none of these are the type of "trends or uncertainties" covered by Item 303.

Plaintiffs refer to the alleged terminations and the purported integration and revenue recognition

issues as "tactics" or a misguided corporate "strategy" (¶¶ 5-7, 50, 124), and it is well-settled that

"business strategy decision[s] … [are] not the type of disclosure Item 303 requires."

*Steamfitters' Indus. Pension Fund v. Endo Int'l PLC*, 2019 WL 1890764, at *3 (2d Cir. Apr. 29,

2019).  For example, in *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 105-06 (2d Cir. 2015),

the Second Circuit contrasted the "deteriorating … subprime mortgage market[]"—a trend that

the court found needed to be disclosed under Item 303 in the circumstances of that case—with a

company's "internal business strategies," which the SEC "has never gone so far as to require a

company to announce. …"  *See also Lopez v. CTPartners Exec. Search, Inc.*, 173 F. Supp. 3d 12,

35 (S.D.N.Y. 2016) (Second Circuit has only held that an Item 303 violation was adequately pled

39

in circumstances where plaintiff alleged "trends in market conditions," *i.e.*, "the downward trend

in the real estate market" or "a deteriorating subprime mortgage market"). The *Endo* case is

instructive. There, the plaintiffs alleged that "Defendants had formed a secret plan, concealed

from investors, to radically restructure the Qualitest business model upon its integration with

Par," laid off employees, and abandoned certain business lines. *Friedman v. Endo Int'l PLC*,

2018 WL 2021561, at *2 (S.D.N.Y. Apr. 27, 2018). The Second Circuit affirmed the district

court's dismissal of the complaint and held that those allegations (which parallel some of the

allegations here) were insufficient to require disclosure under Item 303 because they reflected

"internal business strategies." *Endo*, 2019 WL 1890764, at *2-3.

> *Second,* as shown above *(supra* Sec. I.A.1.a), Evoqua repeatedly disclosed the VSP to

investors; to the extent it could be classified as a "trend," the "trend" was fully disclosed.

> *Third*, as shown above (*supra* Sec. I.A.6), the revenue recognition allegations fail to

plead materiality, as required for an Item 303 violation. *See City of Warwick Mun. Emps.*

*Pension Fund v. Rackspace Hosting, Inc.*, 2019 WL 452051, at *8 (S.D.N.Y. Feb. 5, 2019).

> *Fourth*, as shown below (*infra* Sec. I.B), there are no well-pleaded allegations that any

integration or revenue recognition issues were actually known to the Company (or, for that

matter, to any other Defendant) during the Class Period. *See Garber*, 537 F. Supp. 2d at 614

(Item 303 requires that "defendants were actually aware of the trend"); *In re Coty Inc. Sec. Litig.*,

2016 WL 1271065, at *5 (S.D.N.Y. Mar. 29, 2016) (holding that "a plaintiff must allege facts

that raise a plausible inference that the company's management was aware of a trend that would

materially impact the company's financial condition"). For this purpose, the "conclusory

assertion" that "negative trends were discussed within the Company at senior levels" is

insufficient; rather, "facts establishing that the defendant had knowledge of the purported trend" must be pled "with some specificity." *Id.* at *7. No such facts have been pled.

### B.      The Complaint Fails to Adequately Allege Scienter

To state an Exchange Act claim, Plaintiffs must factually allege that each defendant acted with scienter, *i.e.*, "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs,* 551 U.S. at 313, 319. In determining whether Plaintiffs have met their statutory burden of pleading a "strong inference" of scienter, the Court "must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 324. "[A]n inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314; *see also In re Adolor Corp. Sec. Litig.*, 616 F. Supp. 2d 551, 564 (E.D. Pa. 2009) ("In this regard, the PSLRA alters the normal operation of inferences under Rule 12(b)(6), which requires that all reasonable inferences be construed in a light most favorable to plaintiffs.").

Under § 10(b) and Rule 10b-5(b), "[t]he requisite scienter can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198. Where Plaintiffs cannot demonstrate motive to defraud, "the strength of the circumstantial allegations must be correspondingly greater." *Id.* at 198-99. Recklessness in this context means "highly unreasonable" conduct that "represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* at 203. Thus, recklessness "must, in fact, approximate an actual intent to aid in the fraud." *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 267-69 (2d Cir. 1996).

1.      The Complaint Fails to Plead Particularized Facts Giving Rise
to a Strong Inference of Conscious Misbehavior or Recklessness

It is well settled that scienter "must be separately pled and individually supportable as to

each defendant; scienter is not amenable to group pleading." *C.D.T.S. No. 1 & A.T.U. Local*

*1321 Pension Plan v. UBS AG*, 2013 WL 6576031, at *6 (S.D.N.Y. Dec. 13, 2013), *aff'd sub*

*nom.*, *Westchester Teamsters Pension Funds v. UBS AG,* 604 F. App'x 5 (2d Cir. 2015).  For this

reason, allegations such as that "Defendants" knowingly "participated in the fraudulent scheme

designed to mask Evoqua's costs-cutting measures, … inability to properly integrate acquired

companies, and … improper revenue recognition practices" (¶ 272), and other such allegations

about the supposed knowledge of "Defendants" or "the Executive Defendants" (*e.g.*, ¶ 28) that

"are entirely conclusory and not specific to any Defendant" (*Kinra v. Chicago Bridge & Iron*

*Co.*, 2018 WL 2371030, at *6 (S.D.N.Y. May 24, 2018), are insufficient.  *See Lucescu v.*

*Zafirovski*, 2018 WL 1773134, at *9 (S.D.N.Y. Apr. 11, 2018) ("[W]hen a defendant is an

individual it is insufficient to allege that the corporation, as a whole, acted with the requisite

scienter and impute that intent to an individual defendant.").  Similarly, allegations that "upper

management," "senior management," and/or "top management" was involved in allegedly

improper revenue recognition practices (¶¶ 81-82, 86-88, 90, 98, 100, 103-04, 109, 112, 122-26),

and other similar allegations about what "senior management" stressed and what "top

management" was focused on (¶¶ 56, 64), are not pled with the requisite specificity.  *See*

*McCasland v. Formfactor Inc.*, 2008 WL 2951275, at *10 (N.D. Cal. July 25, 2008) (allegations

referring to company's "senior management" were insufficient).

Setting aside the allegations that impermissibly rely on group pleading, Plaintiffs'

remaining allegations do not give rise to an inference of scienter that is "cogent and at least as

compelling as any opposing inference of nonfraudulent intent." *Tellabs,* 551 U.S. at 324.  In

short, the Complaint fails to "establish what the defendants knew and when they knew it." *Foley v. Transocean Ltd.*, 861 F. Supp. 2d 197, 212 (S.D.N.Y. 2012).

<blockquote>

a.   *The Complaint Lacks Well-Pleaded Facts Suggesting that Keating, Stas, and Webster Acted With Scienter*

</blockquote>

As described below, none of the cited former employees are alleged to have had any meaningful interactions with Keating, Stas, or Webster that would have provided those employees with knowledge about the state of mind of any of those executives at the time of the challenged statements. Where, as here, former employees making accusations are "several levels down the reporting structure" from the executive defendants and lack "an apparently reliable basis for making statements about [executives'] responsibilities," those accusations are not an adequate basis to plead scienter. *In re Tibco Software, Inc. Sec. Litig*., 2006 WL 2844421, at *2 (N.D. Cal. Sept. 29, 2006). Nor does the Complaint reference "any actual reports reviewed by" Keating, Stas, or Webster that would support an inference that they intended to deceive, manipulate, or defraud investors. *Malin*, 499 F. Supp. 2d at 161.

***Ronald Keating***.  Other than the conclusory allegation that Keating made the challenged statements "recklessly or with actual knowledge that they were false or misleading" (¶ 24), all that is alleged about Keating's supposed scienter is the following:

- Keating and top management "adopted a policy or practice of seeking to cut its employment costs by taking increasingly pro-active steps to replace its older and more experienced (and expensive) sales employees with far less experienced (and less qualified and effective) employees." ¶ 48.  As described above (*supra* Sec. I.A.1.a), those allegations are consistent with the Company's public disclosures and do not show an "intent to deceive, manipulate, or defraud." *Tellabs,* 551 U.S. at 313, 319.

- The Former Senior Manager alleges that Keating had a "goal of forcing out Evoqua's more experienced and highly compensated personnel *to make the Company's financial statements look better in the short-run*." ¶ 51.  However, the Former Senior Manager offers no explanation for how he knew Keating's alleged motivations.  Nor is there any allegation that s/he had any contact with Keating and, in any event, the Former Senior Manager left the Company a year before the start of the Class Period.

*Id.*; *see Campo v. Sears Holding Corp.*, 635 F. Supp. 2d 323, 335 (S.D.N.Y. 2009) (scienter could not be inferred from statement of confidential witness who "left the company before the Class Period" and did not have "any contact with" defendants), *aff'd*, 371 F. App'x 212 (2d Cir. 2010). While it is self-evident that cutting employment costs (as was publicly disclosed) could "make the … financial statements look better," Plaintiffs and their witnesses offer no facts to suggest that Keating was consciously trying to sell out the future prospects for the business just to improve short term financial results.

- The Former Senior Sales Engineer alleges that, during a meeting of about 30 high performing sales personnel in early 2017, Keating stated that "the Company was going to go public" and he gave "a preview of the pitch that he planned to give on the roadshow with potential investors." ¶ 66. According to the Former Senior Sales Engineer, s/he "recalled thinking that it was curious and unrealistic" for Keating "to say that the Company was planning to grow by roughly 10% per year." *Id.* However, the Former Senior Sales Engineer's opinion about what were realistic growth targets for the Company is not entitled to weight in the scienter analysis. *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Axonyx, Inc.*, 374 F. App'x 83, 85 (2d Cir. 2010) (affirming dismissal of complaint where "appellants rely on opinions of confidential witnesses to support their allegations, but they fail to offer any factual underpinnings for those opinions"); *Ford v. VOXX Int'l Corp.*, 2016 WL 3982466, at *6 (E.D.N.Y. July 22, 2016) ("As a general matter, the mere opinions of confidential witnesses … are not actionable in securities fraud cases."). There is nothing alleged suggesting how the Former Senior Sales Engineer would even be in a position to know what was a realistic growth target for the Company as a whole. The more compelling inference is not that Keating intended to defraud but rather that he, the CEO, had a far better sense of what were realistic growth targets than the Former Senior Sales Engineer.

**Benedict Stas**. Other than the conclusory allegation that Stas made the challenged statements "recklessly or with actual knowledge that they were false and misleading" (¶ 25), all that is alleged about Stas's supposed scienter is that, according to the Former VP of Sales, "unreasonable sales targets" were set by "top management (at the level of the division head or the company CFO, Defendant Stas"). ¶ 58. In other words, the Former VP of Sales does not state that Stas set the sales targets but rather states that it was either Stas or a division head who set them. It is unsurprising that the Former VP of Sales does not know who set the sales targets because s/he does not state that s/he "had any contact" with Stas. *In re Am. Express Co. Sec. Litig.*, 2008 WL 4501928, at *8 (S.D.N.Y. Sept. 26, 2008), *aff'd sub nom.*, *Slayton v. Am.*

*Express Co.*, 604 F.3d 758 (2d Cir. 2010). Nor is there any allegation that the Former VP of Sales "would have knowledge of what [Stas] knew or should have known during the Class Period," as is required to adequately plead scienter. *Id.* Moreover, that the sales targets were unreasonable in the opinion of the Former VP of Sales does not suggest that Stas (even if he had set those targets) acted with scienter in doing so.

**Anthony Webster**. The Complaint contains no allegations about Webster's supposed scienter. The allegation that he received $2 million of compensation in connection with the IPO (which the Former VP of Sales "viewed as an unheard of amount for an HR professional at a company of Evoqua's size" (¶ 57)) is not relevant to the scienter inquiry. Nor does the conclusory allegation that "Defendant Webster was personally involved in the mass terminations to reduce the employee expenses at Evoqua" have any relevance to the scienter inquiry. ¶ 281.

### b.   *The Allegations Against Rodi Do Not Support Scienter*

The Complaint likewise lacks well-pleaded allegations that Rodi acted with scienter. As an initial matter, there are no allegations that Rodi had any role in, or knowledge about, the reduction-in-force activities or the alleged integration issues. With regard to the revenue recognition allegations, the Complaint simply parrots the conclusory assertions of the discredited former employees, Schuck and Moriarty, *see supra* Sec. I.A.6.b, whose exaggerated inferences do not support a finding of scienter:

- The Complaint alleges, based solely on Schuck's Rhode Island court filing, that certain actions of others were taken "with the knowledge and approval" of Rodi. ¶ 85. But a plaintiff cannot establish scienter by "merely tack[ing] on conclusory assertions that [conduct was] done 'at [the defendant]'s direction'" or with the defendant's "knowledge and approval." *PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 493 (S.D.N.Y. 2017). Neither the Complaint nor the Rhode Island filing on which it relies allege that Schuck ever "had any contact with" Rodi or explain how she "would have knowledge of what [Rodi] knew." *Am. Express*, 2008 WL 4501928, at *8.

- The Complaint relies entirely on Moriarty's Rhode Island court filing to assert that

45

certain actions of others were taken "*under the direction of Defendant Rodi*." ¶ 102. Again, conclusory allegations of this type stating that actions were taken at a defendant's "direction" are not sufficient. *PetEdge*, 234 F. Supp. 3d at 493. As with Schuck, there is no allegation in the Complaint or in Rhode Island that Moriarty ever had any contact with Rodi or any explanation how Moriarty would have known whether particular actions were taken at Rodi's direction. *See Am. Express*, 2008 WL 4501928, at *8; *Tibco*, 2006 WL 2844421, at *2.

- The Complaint also alleges, again based solely on Schuck's Rhode Island court filing, that Rodi (and Andrew Creathorn, the Vice President and General Manager of N/B-Aquatics) "negotiated the sale of several project filters and a stock filter order with a customer, Neuman Pools," that "*after* Creathorn and Defendant Rodi succeeded in getting the contract for this order executed, the order was sent to Sales for processing, and 'shipped' during that last week," and that the filters were actually not manufactured until months after the revenue was recognized. ¶ 94. But even taking these allegations as true—itself a stretch in light of the Rhode Island Department of Labor Board of Review's rejection of Schuck's testimony—Rodi's (and Creathorn's) involvement is only alleged to have been in connection with the negotiation of the order, and his role is alleged to have been complete once the contract was executed. There is no allegation that he was involved after that point or that he had any role in, or knowledge of, when the product was manufactured or when the revenue was recognized. *See Janbay*, 2012 WL 1080306, at *4 ("Where sham transactions are alleged, *specific facts* about each one of these transactions are required.").

### c.     *The Complaint Fails to Plead Corporate Scienter*

Where, as here, a complaint fails to raise a strong inference of scienter with regard to the individual defendants, then, to plead scienter as to the corporate entity, the complaint must create a strong inference that someone else "whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194-95 (2d Cir. 2008).[20]  To do so, Plaintiffs must show that "someone whose scienter is imputable to the corporate defendants and who was responsible for the statements made was at least reckless toward the alleged falsity of those statements." *Id.* at 197

---

[20]     The circumstances in which a complaint may adequately plead corporate scienter without imputing the knowledge of *any* particular individual to the company are exceedingly rare and not present here; courts have cited an announcement that a company "had sold one million SUVs in 2006, and the actual number was zero" as an example of a misstatement "so dramatic [that it] would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false." *Dynex*, 531 F.3d at 195-96.

(emphasis omitted).  "[I]n making this determination, the Court should consider the individual's relative seniority at the issuing entity and the connection between the executive's role and the fraudulent statements."  *Barrett v. PJT Partners, Inc*., 2017 WL 3995606, at *7 (S.D.N.Y. Sept. 8, 2017).  Courts "have generally found that 'management level' employees can serve as proxies for the corporation."  *Id.*

Here, Plaintiffs have not adequately pleaded a corporate scienter theory because the Complaint lacks well-pleaded allegations that any "sufficiently senior [Evoqua] director or officer … with some oversight over the public-facing misrepresentation" acted with scienter. *Barilli v. Sky Solar Holdings, Ltd.*, 2019 WL 2250445, at *24 (S.D.N.Y. May 23, 2019).  The only members of Evoqua's senior management mentioned in the Complaint and alleged to have played any role in the challenged statements are Keating and Stas.  Because the Complaint lacks well-pleaded allegations that either of them acted with scienter (*see supra* Sec. I.B.1.a), there is no basis to impute scienter to the Company.

2.   Plaintiffs' Motive Allegations Fail as a Matter of Law and Logic

Plaintiffs allege that the Executive Defendants engaged in the supposedly fraudulent scheme in order to generate for themselves "huge insider trading profits" from stock sales in the IPO and SPO.  ¶ 273.  This theory fails as a matter of law and logic because the timing of the Executive Defendants' stock trading undercuts any inference of scienter.  Indeed, at the end of the Class Period, the Executive Defendants not only retained significant holdings of Evoqua stock but had actually ***increased*** their cumulative holdings.  The far more compelling inference therefore is that they were focused on the Company's long-term success.

*First*, while Plaintiffs allege in conclusory fashion that the Executive Defendants' stock trades were "unusual in their amount and in their timing" (¶ 274), Plaintiffs do not explain why they believe that the timing or the amount of the trades was unusual or suspicious.  "While

unusual executive stock trading under some circumstances may give rise to an inference of fraudulent intent, executive stock sales, standing alone, are insufficient to support a strong inference of fraudulent intent." *Lululemon*, 14 F. Supp. 3d at 584-85. Rather, insider trading may support allegations of scienter only where the trades are made "at times calculated to maximize the personal benefit from undisclosed inside information." *City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.*, 967 F. Supp. 2d 771, 798 (S.D.N.Y. 2013).

Here, there are no allegations that any Executive Defendant sold shares at any time other than in connection with the IPO and SPO, which "is not uncommon or otherwise suspicious." *See In re AFC Enters. Sec. Litig.*, 348 F. Supp. 2d 1363, 1373 (N.D. Ga. 2004), *aff'd sub nom.*, *Exec. Risk Indem., Inc. v. AFC Enters.*, 279 F. App'x 793 (11th Cir. 2008). In connection with the IPO, Plaintiffs allege stock sales by Rodi (17% of his holdings), thereby acknowledging the lack of sales by Keating, Stas, and Webster. ¶ 275. With regard to the SPO, Plaintiffs allege stock sales by Webster (28% of his holdings), Rodi (29%), Stas (33%), and Keating (44%). ¶ 275.[21]

The Class Period continued for seven months after the SPO, and no Executive Defendant is alleged to have made any additional stock trades during that time, further undermining any argument for scienter. *See In re KeySpan Corp. Sec. Litig.*, 2003 U.S. Dist. LEXIS 20964, at *26 (E.D.N.Y. Nov. 21, 2003) ("A broad temporal distance between stock sales and a disclosure of bad news defeats any inference of scienter."); *Reilly v. U.S. Physical Therapy, Inc.*, 2018 WL 3559089, at *14 (S.D.N.Y. July 23, 2018) ("[C]ourts in this Circuit are frequently skeptical that stock sales are indicative of scienter where no trades occur in the months immediately prior to a

---

[21]   The figures cited by Plaintiffs take into account only common stock holdings, not vested options. If vested options are included in the analysis, Rodi sold 15% of his cumulative holdings in the IPO and 17% in the SPO, while Webster, Stas, and Keating sold 14%, 18%, and 19% of their respective cumulative holdings in the SPO.

negative disclosure.").  Indeed, in cases involving similar stock sales an equally long (or shorter) distance from the close of the Class Period, courts in this Circuit have held that the trading in question is not indicative of scienter.  *See, e.g., Reilly*, 2018 WL 3559089, at \*14-15 (no inference of scienter where one defendant sold 42% of his non-restricted shares, followed by another 41% of his non-restricted shares, and the other defendant "sold all or nearly all of his non restricted shares," because "[n]one of the defendants sold any stock in the final 100 days of the class period—the exact timing when insiders would have rushed to cash out"); *City of Brockton Ret. Sys. v. Shaw Grp., Inc.*, 540 F. Supp. 2d 464, 468, 475 (S.D.N.Y. 2008) (no inference of scienter where executive sold 37.7% of his shares because he sold the shares ten weeks before the end of the class period).  As one court has explained, "the law in [the Second] Circuit is clear that … stock sales are not indicative of scienter when they are more than two months before the announcement in question."  *In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 345 (W.D.N.Y. 2008); *see also In re Gildan Activewear, Inc.*, 636 F. Supp. 2d 261, 271 (S.D.N.Y. 2009) (no scienter where sales occurred five months before the negative announcement).

*Second,* the stock holdings of Keating, Stas, and Webster actually *increased* during the Class Period.  Based on public filings, Keating held 138,025 shares of Evoqua common stock just before the IPO compared to 435,057 shares at the end of the Class Period; Stas held 13,478 shares of Evoqua common stock just before the IPO compared to 206,017 shares at the end of the Class Period; and Webster held 3,369 shares of Evoqua common stock just before the IPO compared to 79,002 shares at the end of the Class Period.[22]  Those facts are "wholly inconsistent with fraudulent intent."  *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004); *see also In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 763

---

[22]     Keating Form 3 dated 11/1/17 and Form 4 dated 3/21/18; Stas Form 3 dated 11/1/17 and Form 4 dated 3/21/18; Webster Form 3 dated 11/1/17 and Form 4 dated 6/20/18.

(S.D.N.Y. 2018) (increase in stock holdings through vesting of exercisable options "undermine[d] an inference that defendants, through their sales, sought to capitalize on the necessarily time-limited artificial inflation of [the company]'s stock price"); *Cozzarelli v. Inspire Pharm., Inc.*, 549 F.3d 618, 622, 628 (4th Cir. 2008) (stock sales were not suspicious because "[d]espite the[ir] sales, all three of the directors actually increased their net holdings in [the company] ... through the acquisition of vested stock options," which "hardly suggest[s] that the defendants sought to dump their shares at an inflated price"). Indeed, "dozens of cases dismiss complaints on scienter grounds where ... motive allegations were undermined by increases in total holdings." *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 290 n.182 (S.D.N.Y. 2006); *see also San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 814 (2d Cir. 1996). Given the Executive Defendants' extensive stock holdings at the close of the Class Period, it would be "nonsensical to impute dishonest motives to [them] when each of them suffered significant losses" when share prices declined. *Plumbers & Steamfitters Local 773 Pension Fund v. Can. Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010); *see also In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 313-14 (D.N.J. 2001).[23]

Lastly, Plaintiffs' allegation that "numerous other directors and employees" sold Evoqua stock (¶ 276) is wholly irrelevant because the Complaint lacks any factual allegations that any such individuals knew that the Company's disclosures were false or misleading. *See Alaska Laborer Emp'rs Ret. Fund v. Scholastic Corp.*, 2010 WL 3910211, at *7 (S.D.N.Y. Sept. 30, 2010) ("The complaint alleges no statements or conduct attributable to the non-defendant purchasers. Their sales may not be used to prove Defendants' scienter."); *Borochoff v.*

---

[23]    Moreover, Keating and Stas entered into lock-up agreements in connection with the IPO (Keating Form 4 dated 11/8/17; Stas Form 4 dated 11/8/17), which further undermines any inference of scienter. *See Osher v. JNI Corp.*, 256 F. Supp. 2d 1144, 1165 (S.D. Cal. 2003) (it was "unclear . . . why defendants—if they were so eager to rid themselves of … stock—would have entered into the lock-up agreements. …").

*GlaxoSmithKline PLC*, 2008 WL 2073421, at *8 (S.D.N.Y. May 9, 2008) (similar), *aff'd sub nom.*, *Avon Pension Fund v. GlaxoSmithKline PLC*, 343 F. App'x 671 (2d Cir. 2009); *Bldg. Trades United Pension Tr. Fund v. Kenexa Corp.*, 2010 WL 3749459, at *11 (E.D. Pa. Sept. 27, 2010) (because company's president and chief operating officer was "a non-defendant, his sales are not relevant to evaluate the scienter of Defendants").

### 3.   Plaintiffs' "Core Operations" Allegations Are Insufficient

Plaintiffs attempt to bolster their fraud claim by invoking the so-called "core operations" or "core business" doctrine and alleging that Evoqua's Products segment and its Neptune-Benson acquisition were "importan[t]" to the Company and therefore that "Defendants can be presumed to have had knowledge of adverse facts" about those topics because they worked at the Company for "many years." ¶¶ 277, 285. However, "core business" allegations generally are not "independently sufficient to raise a strong inference of scienter." *Mechel OAO*, 811 F. Supp. 2d at 872. That is because attempts to "impute knowledge of a corporation's workings to officers based on the officers' high position in the company or the critical nature of the operation at issue" fail to adequately plead that any particular defendant acted with scienter. *Pearlstein v. BlackBerry Ltd.*, 93 F. Supp. 3d 233, 247 (S.D.N.Y. 2015) ("[I]t is well established that accusations founded on nothing more than a defendant's corporate position are entitled to no weight."), *aff'd sub nom.*, *Cox v. Blackberry Ltd.*, 660 F. App'x 23 (2d Cir. 2016). Rather, to plead scienter, plaintiffs must adequately allege that "defendants were aware of *specific information* contradicting their … statements." *Id.*

As described above, Plaintiffs point to no such specific information. Where, as here, "none of plaintiff's other allegations support an inference of scienter, … the 'core operations doctrine' cannot bolster it." *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 343 (S.D.N.Y. 2011). Moreover, "courts have required that the operation in question constitute *nearly all* of a

company's business before finding scienter based on the 'core operations doctrine'" (*id.*), and here Plaintiffs make no such allegation.  *See also Thomas v. Shiloh Indus., Inc.*, 2017 WL 1102664, at *4 (S.D.N.Y. Mar. 23, 2017) (similar).  Plaintiffs acknowledge that the Products segment was, at the time, only one of Evoqua's three segments (and not even the largest of those segments), while Neptune-Benson was merely one of five businesses within the Products segment.  ¶¶ 283-84; *see Ferrellgas*, 2018 WL 2081859, at *19 (core operations doctrine did not apply because segment at issue "comprised approximately 30% of [company]'s business").

> ### 4.  Taken Together, Plaintiffs' Allegations Fail to Support a Strong Inference of Scienter

Plaintiffs' allegations do not raise a strong inference of scienter.  The former employees' descriptions of Evoqua's reduction-in-force activities are largely consistent with the Company's own disclosures about the VSP, and the Complaint contains no allegations about what (if anything) any Executive Defendant knew about any negative impact of the reduction-in-force activities at the time of the challenged statements.  Both former employees making allegations about supposed integration issues left Evoqua well before the Class Period and do not profess to have any knowledge about the status of any integrations at the time of the challenged statements.

At the heart of these allegations is Plaintiffs' claim that the reduction-in-force activities were a bad idea and that Evoqua would have been better off had it kept its more senior sales staff and integration personnel.  Plaintiffs may dispute the soundness of those business decisions, but that does not give rise to a securities claim.  At most, the Complaint consists of inactionable allegations of a failed business strategy or mismanagement.  *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977) ("Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement.").  The securities laws simply were "not designed to provide an umbrella cause of action for the review of management practices,

nor is 'fraud by hindsight' a viable basis upon which to challenge management practices that ultimately result in losses." *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004), *aff'd sub nom.*, *Albert Fadem Tr. v. Citigroup Inc.*, 165 F. App'x 928 (2d Cir. 2006); *see also Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 682-83 (D. Colo. 2007) ("[A] plaintiff may not 'bootstrap' a claim for internal corporate mismanagement . . . by alleging that the corporation or its directors failed to disclose that mismanagement . . . .  To hold otherwise . . .  would be to eviscerate the obvious purpose of the *Santa Fe* decision.").

      As to the entirely separate and unrelated revenue recognition allegations, the Complaint relies heavily on the counterclaims brought in the Rhode Island litigation by the now judicially discredited Schuck and Moriarty but, despite their clear desire to impugn the Company to the maximum extent possible, they do not assert (nor do any of the other former employees assert) that they had any meaningful contact with any Executive Defendant or that they had any direct knowledge that any Executive Defendant was aware of the supposed channel stuffing or other similar alleged practices during the Class Period.  In light of Schuck's and Moriarty's (and the other individuals') lack of involvement in Evoqua's revenue recognition process, lack of any personal knowledge of the Company's accounting decisions, lack of background in accounting, and lack of access to company-wide financial information, the more "compelling" (non-fraud) inference, *Tellabs,* 551 U.S. at 314, is that there were no material revenue recognition issues (which is why the Company's auditors were able to issue an unqualified opinion on the financial statements even after the Company disclosed that there had been some internal control weaknesses related to revenue recognition that did not result in any reported misstatements).

### C.     The Complaint Fails to Adequately Plead Loss Causation

      The Exchange Act claims also should be dismissed because Plaintiffs fail to plead "loss causation."  To plead loss causation, "a plaintiff must plausibly allege that the subject of the

fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72, 74 (2d Cir. 2013) (emphasis omitted). Here, Plaintiffs fail to adequately allege the requisite "causal link" between the alleged misconduct and any investor losses. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172-73 (2d Cir. 2005).

There are three categories of alleged misstatements or omissions that Plaintiffs seek to link to supposedly corrective disclosures: those concerning reduction-in-force activities, integration of acquisitions, and revenue recognition. Plaintiffs attempt to plead loss causation by pointing to three supposedly "corrective" disclosures that allegedly revealed that prior statements about those topics were false or misleading. They assert that the May 8, 2018 and August 7, 2018 announcements of Evoqua's 2Q18 and 3Q18 financial results, respectively, were partial disclosures and that the "truth" was purportedly revealed on October 30, 2018, when Evoqua announced its 4Q18 and FY18 financial results. ¶¶ 10-11, 134-45.

Taking each of these supposed "corrective" disclosures in turn, on May 8, 2018, Evoqua announced that it had lowered its full-year FY18 Adjusted EBITDA guidance, reducing the top of its guidance range from $255 million to $245 million. 5/8/18 8-K, Ex. 99.1 at 1; *id.*, Ex. 99.2 at 19. Plaintiffs allege that the drop in Evoqua's stock price following that announcement was attributable to the fact that Evoqua "needed to reduce its earnings guidance." ¶ 10. This modification to a forward-looking estimate cannot possibly be a correction of any material fact about reduction-in-force activities, integration of acquisitions, or revenue recognition.

Similarly, Plaintiffs allege that the drop in Evoqua's stock price following the Company's announcement of its 3Q18 financial results on August 7, 2018 was attributable to the fact that

"Evoqua announced earnings that fell short of Wall Street consensus estimates" (¶ 10),

announcing "revenue of $342.5 million and Adjusted EBITDA of $58.0 million (at the low end

of its prior guidance and $3 million or 5% below the consensus expectation)." ¶ 136.  In other

words, according to Plaintiffs' own allegations, any losses to investors from this drop in

Evoqua's stock price were attributable to market disappointment about the Company's earnings

announcement, not any corrective disclosure.

Indeed, Plaintiffs concede that the May 8, 2018 and August 7, 2018 announcements "*did

not disclose* Evoqua's revenue inflating activities or the nature and extent of the Company's

ongoing problems with trying to integrate its acquisitions." ¶ 10.  The May 8, 2018 and August

7, 2018 announcements also are not alleged to have "reveal[ed] some then-undisclosed fact"

about the third category of alleged misconduct, the reduction-in-force activities.  *Cent. States*,

543 F. App'x at 75.  Indeed, those announcements do not say anything at all about that topic.

(The lack of corrective disclosures about the reduction-in-force activities is, of course,

unsurprising, as there was nothing to "reveal" insofar as the reduction-in-force activities had

been repeatedly discussed publicly by the Company since before the IPO.)

For these reasons, there is no basis to infer loss causation from either the May or August

2018 announcements.  The market may not have liked the news on those dates, and the stock

price fell, but that does not mean that the loss was caused by the claimed earlier misstatements,

as those announcements revealed nothing about the truth of those earlier statements.  *See In re

Merrill Lynch Tyco Research Sec. Litig.*, 2004 WL 305809, at *3 (S.D.N.Y. Feb. 18, 2004)

(dismissing complaint for failure to adequately allege loss causation because supposedly

corrective disclosure did "not discuss the subject matter of the alleged fraud").

That leaves the October 30, 2018 announcement.  Plaintiffs allege that Evoqua's stock

price dropped "[i]n response" to Evoqua's announcement of "materially decreased revenues[24]

and further reduced guidance, which it attributed to 'acquisition integration issues,' 'supply chain

disruptions,' and 'an extended delay on a large aquatics project'" as well as the announcement

that "management had determined that Evoqua's business had to be re-structured—yet another

stunning admission coming less than a year after the Company went public." ¶ 11; *see also* ¶¶

139-41 (similar).[25]  In other words, Plaintiffs do *not* attribute the drop in stock price and resulting

investor losses following the October 2018 disclosure to the reduction-in-force activities or the

alleged revenue recognition issues but rather to an array of other factors.[26]  As a result, they not

only fail to show loss causation—*they negate it*.  *See Scholastic*, 2010 WL 3910211, at *6-7

("Plaintiffs must point to a specific stock price reduction due to the alleged offending conduct,

the improper recognition of revenue, failure to maintain reserves or improper accounting of

goodwill."); *Janbay v. Canadian Solar, Inc*., 2013 WL 1287326, at *14-15 (S.D.N.Y. 2013)

(revenue recognition allegations failed to adequately plead loss causation even though company

stated that it "may" revise its net revenues for a particular quarter because alleged corrective

disclosure "ma[de] no mention of purported sham transactions or deficient internal controls, and

thus could not have revealed any 'truth' regarding [the] purported fraud").

Moreover, Plaintiffs cite the reports of securities analysts who reacted to the October 30

disclosure (¶¶ 11, 142-44), but none of those analysts referred to the reduction-in-force activities

---

[24]     Compared to Company forecasts and analyst expectations.  *See* ¶ 139.

[25]     The Company actually referred to "acquisition system integration issues," not "acquisition integration issues." 10/30/18 8-K, Ex. 99.1 at 1.

[26]     A month *after* the putative Class Period ended, the Company disclosed that it had identified certain accounting control weaknesses (12/11/18 10-K at 136-37), and the Complaint contains no allegation that that disclosure caused any decline in Evoqua's stock price.  For good reason: as noted above, the Company also disclosed at that time that its consolidated financial statements (a) had been reviewed by its auditors; (b) fairly represented, in all material respects, its financial position, results of operations, and cash flows; (c) were in conformity with GAAP; and (d) did not require or warrant any restatement, adjustments, or changes to previously released financial results.  *Id.*

or any revenue recognition issues as the reason why they were "shocked" or why their assessment of Evoqua had changed.  Rather, as Plaintiffs acknowledge, the analysts "expressed concerns over the magnitude of the shortfall, credibility of management, and the Company's ability to integrate future acquisitions."  ¶ 142.  So even the alleged market reaction does not tie the loss to any claimed earlier misstatement.

As to Plaintiffs' theory that the "acquisition system integration issues" referenced in Evoqua's October 30, 2018 announcement (10/30/18 8-K, Ex. 99.1 at 1) revealed that its prior integration-related statements were false or misleading, Plaintiffs are looking at an ant under a microscope and declaring it a monster.  While the Complaint alleges that "Defendants misled investors concerning the success of Evoqua's growth-through-integration business model" (¶ 6), the allegedly corrective disclosure related merely to one particular type of problem in one particular transaction—and a financially miniscule one, at that.

As Plaintiffs acknowledge, "[i]n announcing Evoqua's FY2018 results, Defendant Keating stated that '*ERP integration at Neptune-Benson*, supply chain disruptions influenced by tariffs, and the delay of a large aquatics project primarily led to our fourth quarter challenges.'" ¶ 285.  "'ERP integration at Neptune-Benson" refers to Evoqua's "SAP Enterprise Resource Planning ('ERP') tool."  ¶ 73.  There is no well-pleaded allegation that the October 30, 2018 disclosure revealed any truth about any integration issues other than issues arising from the alleged facts that Neptune-Benson had been using "a different accounting system from the rest of Evoqua," that it was taking longer than expected for those accounting systems to be integrated, and that certain inventory needed to be disposed of "resulting from the migration of … Neptune-Benson[] to a new ERP system."  ¶¶ 73, 140.  The 4Q18 financial statements specifically quantified the added costs associated with the write-off of that obsolete inventory as part of the

migration of Neptune-Benson to a new ERP system, with those costs amounting to $2.6 million (*see* 12/11/18 10-K at 62), or approximately 1.5% of the Company's Adjusted EBITDA for the year.  Numbers of that size are not generally considered material, *see supra* Sec. I.A.6.a, and thus it is not plausible to infer that an immaterial cost variance caused a roughly 35% drop in the price of Evoqua's stock.

To plead loss causation, Plaintiffs must adequately show that the supposedly corrective disclosure would "allow a factfinder to ascribe some rough proportion of the whole loss to the defendants' supposed misconduct."  *Scholastic*, 2010 WL 3910211, at *6-7.  In light of the fact that (a) the one item Plaintiffs highlight was financially immaterial, (b) at the same time, the Company also announced disappointing financial results, a restructuring of its business, supply chain disruptions, and an extended delay on a large aquatics project, and (c) the Neptune-Benson ERP integration issues are just one slice of the supposed integration-related issues alleged in the Complaint, Plaintiffs have not adequately pled that any investor losses were caused by any supposed integration-related misstatements or omissions.  *See In re Francesca's Holdings Corp. Sec. Litig.*, 2015 WL 1600464, at *22 ("Certainly [the company's] stock price declined following the ... press releases, but Plaintiffs have failed to show how the ... disclosure is related to the fraud claims and why the ... disclosure they focus on caused the decline, as opposed to the simultaneous disclosure of [other conditions]"); *In re Downey Sec. Litig.*, 2009 WL 736802, at *15 (C.D. Cal. Mar. 18, 2009) ("[T]he public disclosures … do not contain a disclosure of wrongdoing, and, at best, demonstrate only that the market learned of and reacted to [the company's] 'poor financial health' rather than any alleged fraud.").[27]

---

[27]     A plaintiff may alternatively plead loss causation by pointing to the "materialization of the risks that were concealed by the alleged misrepresentations or omissions" rather than market reaction to a corrective disclosure.  *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 551 (S.D.N.Y. 2008), *aff'd,* 597 F.3d 501 (2d Cir. 2010).  Here, Plaintiffs proceed only on a corrective disclosure rather than materialization of the risk theory.

**D.     The Control Person Claim (Count II) Should Be Dismissed**

The Court should dismiss the § 20(a) control person liability claim because Plaintiffs fail to adequately plead a "primary violation" of § 10(b) and Rule 10b-5. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007). The Complaint also fails to allege that any Defendant was a "culpable participant" (*id.*) in any fraud for the same reasons it fails to adequately plead scienter. *See supra* Sec. I.B.

**E.     The Insider Trading Claim (Count III) Should Be Dismissed**

To state a Section 20A claim, a plaintiff "must plead as a predicate an independent violation of the [Exchange] Act." *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 704 (2d Cir. 1994). Accordingly, Plaintiffs' "failure to allege a violation of the Exchange Act precludes plaintiffs['] recovery under section 20A." *Magna Int'l*, 967 F. Supp. 2d at 801. Similarly, the allegation that the Exchange Act Defendants violated § 10(b), Rule 10b-5, and Rule 10b5-1 "by selling shares of Evoqua common stock while in possession of material, nonpublic adverse information" (¶ 325) fails because the Complaint does not adequately plead the essential elements of materiality and scienter. *See supra* Secs. I.A, I.B; *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976) (scienter is an element of all private causes of action under § 10(b) and Rule 10b-5).

In addition, Plaintiffs fail to adequately plead a Section 20A claim in connection with stock sales surrounding the IPO because Plaintiffs did not trade "contemporaneously with the purchase or sale of securities" by Defendants. 15 U.S.C. § 78t-1(a); *see also Brodzinsky v. FrontPoint Partner LLC*, 2012 WL 1468507, at *4 (D. Conn. Apr. 26, 2012) ("[A] plaintiff needs to have purchased shares contemporaneously with an alleged insider sale to assert an insider trading claim under Section 10(b)."). Although the term "contemporaneous" is not statutorily defined, "[w]ithin the Second Circuit, courts have considered as contemporaneous

trades that occurred within a reasonable period of time, usually within a few days of each other."
*Brodzinsky*, 2012 WL 1468507, at *4.

Here, the certifications filed by Plaintiffs in connection with the motion for lead plaintiff
status show that Louisiana Sheriffs first purchased shares of Evoqua stock on December 22,
2017 (ECF No. 24-1 at 4)—over a month *after* the IPO—and that City of Omaha did not
purchase Evoqua stock until June 2018 (ECF No. 21-2 at 4)—seven months after the IPO.
Accordingly, neither has adequately pled contemporaneous trading in connection with the IPO.

## II.  THE SECURITIES ACT CLAIMS SHOULD BE DISMISSED

### A.  Rule 9(b) Applies to the Securities Act Claims

It is well settled that "the heightened pleading standard of Rule 9(b) … applies to claims
brought under Section 11 and Section 12(a)(2) of the Securities Act … when the claim[s]
sound[] in fraud," *i.e.*, when the Securities Act claims are "premised on allegations of fraud."
*Rombach*, 355 F.3d at 167, 171.  "This wording is cast in terms of the conduct alleged, and is not
limited to allegations styled or denominated as fraud or expressed in terms of the constituent
elements of a fraud cause of action."  *Id.* at 171.  Even though "[f]raud is not an element or a
requisite to a claim under Section 11 or Section 12(a)(2)," nevertheless, "claims under those
sections may be—*and often are*—predicated on fraud."  *Id.*  In determining whether a claim is
predicated on fraud, courts look beyond blanket disclaimers from plaintiffs and examine whether
the "wording and imputations of the complaint are classically associated with fraud" and whether
plaintiffs have offered "any other [non-fraudulent] basis for the claims."  *Id.* at 172.

Here, the allegations—even in connection with the Securities Act claims—include classic
fraud language, such as that Evoqua and its senior management allegedly "engaged in accounting
misconduct," "materially inflated Evoqua's reported revenues, income, and EBITDA," engaged
in "serious breaches of GAAP," "improperly recognize[d] revenue," "improperly deferr[ed]

payment of its expenses," engaged in "channel stuffing" practices, and "concealed the weakness

of its business by offering increasingly steep discounts and extended payment terms to customers

as the IPO approached, all in a desperate effort to 'stuff the channels' and 'pull-forward' sales."

¶¶ 384, 390, 396, 426-29; *see Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 2017 WL

3891676, at *2 (D. Del. Sept. 6, 2017) (Securities Act claims sounded in fraud because

complaint alleged that defendants "were misleading borrowers about the benefits of a federal

student loan rehabilitation program" and "were engaged in improper and unlawful loan servicing

and debt collection practices," which "are allegations of intentional misconduct"); *Belodoff v.

Netlist, Inc.*, 2008 WL 2356699, at *5-6 (C.D. Cal. May 30, 2008) (allegation that defendants

failed to disclose channel stuffing was "grounded in fraud"; "[n]o reasonable jury could conclude

that Defendant carried out the channel stuffing practice, which implies an intent to overstate

revenue, and yet failed to disclose such practice through anything other than the intent to

deceive").  Because Plaintiffs have not offered any separate basis for their Securities Act claims,

their disclaimer that they do not allege fraud for the purposes of those claims (¶¶ 15, 331) is

insufficient to avoid the application of Rule 9(b).  *See In re Axis Capital Holdings Ltd. Sec.

Litig.*, 456 F. Supp. 2d 576, 598 (S.D.N.Y. 2006) ("Courts have repeatedly noted that the

insertion of a simple disclaimer of fraud is insufficient.").

     Moreover, here, "the false and misleading statements and omissions alleged for both sets

of claims pertain to the exact same underlying events." *Lighthouse Fin. Grp. v. Royal Bank of

Scot. Grp., PLC*, 902 F. Supp. 2d 329, 339 (S.D.N.Y. 2012), *aff'd sub nom.*, *IBEW Local Union

No. 58 Pension Trust Fund & Annuity Fund v. Royal Bank of Scot. Grp., PLC*, 783 F.3d 383 (2d

Cir. 2015).  Plaintiffs do not separately plead any events in the Securities Act part of their

Complaint that are not also pled in the Exchange Act part.  ¶ 331.  Not only are the underlying

events the same, but the Securities Act allegations themselves are nearly word for word the same as the allegations that form the basis for Plaintiffs' fraud-based Exchange Act claims. *Compare*, *e.g.*, ¶¶ 146-47 *and* 375-76 (identical allegations in Exchange Act and Securities Act parts of the Complaint); ¶¶ 154-55 *and* 383-84 (same). Simply put, "a core theory of fraud permeates the entire complaint" and thus Rule 9(b) applies. *Navient Corp.*, 2017 WL 3891676, at *2.[28]

**B.    Whether Rule 9(b) or Rule 8 Is Applied, the Section 11 and 12(a)(2) Claims (Counts IV and V) Should Be Dismissed**

1.    <u>Plaintiffs Do Not Plead Any Material Misstatements or Omissions</u>

Plaintiffs assert claims against the Company, the Director Defendants, Stas, and the Underwriter Defendants for violation of Section 11 of the Securities Act and against the Company and the Underwriter Defendants for violation of Section 12(a)(2) of the Securities Act. Like Section 10(b) of the Exchange Act, Sections 11 and 12(a)(2) of the Securities Act require that the challenged statements be material and that they be false or misleading at the time they were made. *See* 15 U.S.C. § 77k(a); 15 U.S.C. § 77l(a)(2); *Police & Fire Ret. Sys. of Detroit v. La Quinta Holdings Inc.*, 2017 WL 4082482 at *5, 12 (S.D.N.Y Aug. 24, 2017) (Nathan, J.) ("[t]he standard for determining whether a defendant made a material misstatement or omission is essentially the same under Section 10(b), Section 11, and Section 12"), *aff'd*, 735 F. App'x 11 (2d Cir. 2018). Similarly, the Securities Act's safe harbors for forward-looking statements parallel those in the Exchange Act, *see* 15 U.S.C. § 77z-2(c)(1)(A) & (B), the bespeaks caution doctrine is equally applicable in both contexts, *see Rombach*, 355 F.3d at 171-73, "expressions of puffery and corporate optimism" are equally inactionable in both contexts, *see id.* at 174, and, as

---

[28]    In any event, the allegations underlying the Securities Act claims fail to satisfy even Rule 8 and the *Twombly/Iqbal* plausibility requirement.

noted (*supra* Sec. I.A.3 & n.15), *Omnicare*'s requirements about what is necessary to adequately plead a claim premised on an opinion statement applies in both contexts as well.

Here, the challenged statements identified in the Complaint's Securities Act claims are merely a subset of the challenged statements underlying the Complaint's Exchange Act claims, and Plaintiffs' explanations for why those statements were supposedly false or misleading are no different.  *Compare, e.g.*, ¶¶ 146-47, 148-49, 150-51 *with* ¶¶ 375-76, 377-78, 379-80.  Accordingly, the Securities Act claims fail to plead an actionable misstatement or omission for the same reasons as set forth with respect to the Exchange Act claims, *supra* Sec. I.A.

### 2. The Complaint Negates Loss Causation

Where "the absence of loss causation is apparent on the face of the complaint," claims pursuant to Sections 11 and 12(a)(2) can and should be dismissed.  *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 253-55 (S.D.N.Y. 2003).  This concept is referred to as "negative causation" and it "precludes recovery for price declines that are not the result of an alleged misrepresentation." *Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*, 2010 WL 148617, at *11 (S.D.N.Y. Jan. 14, 2010) (dismissing Section 11 and 12(a)(2) claims because of plaintiff's inability to "establish a causal relationship between Defendants' alleged misrepresentations and subsequent declines in [the company]'s stock price").

Here, as discussed above, the Complaint negates loss causation.  With regard to the May 8, 2018 and August 7, 2018 announcements, Plaintiffs attribute the drops in Evoqua's stock price to, respectively, the fact that Evoqua "needed to reduce its earnings guidance" and the fact that "Evoqua announced earnings that fell short of Wall Street consensus estimates."  ¶ 10; *supra* Sec. I.C.  Indeed, Plaintiffs concede that those announcements "*did not disclose* Evoqua's revenue inflating activities or the nature and extent of the Company's ongoing problems with trying to integrate its acquisitions," and they likewise said nothing about the reduction-in-force

activities.  *Id.*  With regard to the October 30, 2018 announcement, Plaintiffs plead that the drop

in Evoqua's stock price was attributable to an array of factors that (a) does not include reduction-

in-force activities or revenue recognition, and (b) only references an immaterial issue related to

"acquisition system integration issues."  *Supra* Sec. I.C.  Accordingly, the absence of loss

causation is apparent on the face of the Complaint, and the Section 11 and 12(a)(2) claims should

be dismissed.

> 3.   <u>Plaintiffs Lack Standing to Bring the 12(a)(2) Claim</u>

Only purchasers in a public offering of securities, rather than purchasers in the secondary

market, have standing to bring § 12(a)(2) claims.  *See Yung v. Lee*, 432 F.3d 142, 149-50 (2d Cir.

2005).  Here, the Complaint lacks the requisite allegations that Plaintiffs purchased securities

directly in the IPO or the SPO.  For this purpose, allegations that shares were purchased

"pursuant or traceable to the … Registration Statements" (¶ 343) are insufficient.  *See Pub.*

*Emps. Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 714 F. Supp. 2d 475, 484 (S.D.N.Y. 2010)

(dismissing § 12(a)(2) claim for lack of standing because "rather coyly, the Complaint makes

such allegations as that '[p]laintiffs and other Class members purchased or otherwise acquired

Certificates pursuant and/or traceable to the defective Prospectus Supplements'"); *Johnson v.*

*Sequans Commc'ns S.A.*, 2013 WL 214297, at *16 (S.D.N.Y. Jan. 17, 2013) (similar).[29]

---

[29]   Nor, for that matter, does the conclusory allegation that Louisiana Sheriffs purchased shares traceable to the SPO (¶ 343) adequately plead standing to assert a Section 11 claim in connection with the SPO.  "When a company has issued shares in multiple offerings under more than one registration statement, … a greater level of factual specificity will be needed before a court can reasonably infer that shares purchased in the aftermarket are traceable to a particular offering."  *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1107-08 (9th Cir. 2013) ("[E]xperience and common sense tell us that when a company has offered shares under more than one registration statement, aftermarket purchasers usually will not be able to trace their shares back to a particular offering.").  All circuit courts that have addressed the issue have held that conclusory allegations of traceability (such as those pled here) are not sufficient to plead Section 11 standing.  *See In re ARIAD Pharms. Sec. Litig.*, 842 F.3d 744, 756 (1st Cir. 2016) ("[A]lmost by definition, a general allegation that a plaintiff's shares are traceable to the offering in question is nothing more than a formulaic recitation of that element.  Accordingly, we agree with the other circuit that has squarely addressed this issue and hold that such general allegations alone are not sufficient to avoid dismissal."); *Century Aluminum*, 729 F.3d at 1107-08; *but see Fort Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co.*, 862 F. Supp. 2d 322, 339 (S.D.N.Y. 2012) ("The pleading requirement for Section 11 standing is satisfied by

Plaintiffs' certifications show that they did not purchase any shares "in" the IPO or the

SPO.  The certifications show that Louisiana Sheriffs first purchased shares of Evoqua stock on

December 22, 2017 (ECF No. 24-1 at 4)—over a month *after* the IPO—and that City of Omaha

did not purchase Evoqua stock until June 2018 (ECF No. 21-2 at 4), well after both the IPO and

the SPO.  Nor does either certification show any share purchases at the SPO price of $22.00 per

share—which would have been the purchase price had either Plaintiff purchased shares in the

SPO.  *Compare* ¶ 268 ("The SPO was priced at $22.00 per share on the morning of March 15,

2018, prior to the opening of the market.") *with* ECF No. 24-1 at 4 (reflecting purchases of

Evoqua stock by Louisiana Sheriffs on March 15, 2018 for $21.9370/share, $21.8242/share, and

$21.9867/share) *and* ECF No. 21-2 at 4 (no purchases by City of Omaha in March 2018 or at

$22/share); *see also In re Mun. Mortg. & Equity, LLC*, 876 F. Supp. 2d 616, 660 (D. Md. 2012)

(complaint "d[id] not provide supporting details to make a plausible claim that [a plaintiff]

purchased directly in the SPO" because it alleged that the SPO price was $26.51 per share and

plaintiff bought shares at $26.32, which was "inconsistent with the SPO facts as alleged in the

Complaint"), *aff'd sub nom.*, *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874 (4th Cir. 2014).

In addition, Plaintiffs may only bring a Section 12(a)(2) claim against "'statutory

seller[s]'" who either "(1) 'pass[] title, or other interest in the security, to the buyer for value,' or

(2) 'successfully solicit[] the purchase [of a security]'" through the use of a prospectus

containing material misstatements or omissions.  *In re Morgan Stanley Info. Fund Sec. Litig.*,

592 F.3d 347, 359 (2d Cir. 2010) (quoting *Pinter v. Dahl*, 486 U.S. 622, 642, 647 (1988)).

Plaintiffs do not allege that they purchased shares from the Securities Act Defendants (including

from any particular Underwriter Defendant), or that any particular Defendant directly solicited

---

general allegations that plaintiff purchased pursuant to or traceable to a false registration statement."); *Caiafa*, 525 F.
Supp. 2d at 407 (same).

their alleged purchases.  *See UBS AG*, 2012 WL 4471265, at *27 (dismissing Section 12(a)(2)

claim because complaint contained no "allegations regarding the transfer of title to plaintiffs"

and was "devoid of any mention of the manner in which the underwriters solicited the sale of

securities or whether any of its solicitations were actually successful").  As such, Plaintiffs lack

standing to bring the Section 12(a)(2) claim.

### C.     The Control Person Claim (Count VI) Should Be Dismissed

The Court should dismiss the Section 15 control person liability claim because Plaintiffs

fail to adequately plead a "primary violation" of Section 11.  *ECA*, 553 F.3d at 207.

### CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be granted in its entirety

and the Complaint should be dismissed with prejudice.

Dated:      June 26, 2019                              Respectfully submitted,

                                                       FRIED, FRANK, HARRIS, SHRIVER
                                                         & JACOBSON LLP

                                                       By: _____ *s/ Scott B. Luftglass* _____
                                                                         Scott B. Luftglass

                                                       Peter L. Simmons
                                                       Samuel P. Groner
                                                       One New York Plaza
                                                       New York, New York 10004-1980
                                                       Telephone: (212) 859-8000
                                                       Facsimile:  (212) 859-4000
                                                       scott.luftglass@friedfrank.com
                                                       peter.simmons@friedfrank.com
                                                       samuel.groner@friedfrank.com

                                                       *Attorneys for Defendants Evoqua Water*
                                                       *Technologies Corp., Ronald C. Keating,*
                                                       *Benedict J. Stas, Anthony Webster, Martin*
                                                       *Lamb, Nick Bhambri, Gary Cappeline, Judd*
                                                       *Gregg, Brian R. Hoesterey, Vinay Kumar,*
                                                       *and Peter M. Wilver*

STEPTOE & JOHNSON LLP

By: _____*Charles Michael*_____
Charles Michael

Charles Michael
1114 Avenue of the Americas, Suite 3500
New York, NY 10036
Telephone: (212) 506-3900
Facsimile: (646) 506-3950
cmichael@steptoe.com

Michael Dockterman
(pro hac vice application to be filed)
115 South LaSalle Street, Suite 3100
Chicago, Illinois 60603
(312) 577-1300
mdockterman@steptoe.com

*Attorneys for Defendant Kenneth Rodi*