UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/30/20

City of Omaha Police and Fire Retirement System, *et al.*,

Plaintiffs,

–v–

Evoqua Water Technologies Corp., *et al.*,

Defendants.

18-cv-10320 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

This is a securities class action brought on behalf of all persons and entities who purchased or acquired the publicly traded common stock of Evoqua Water Technologies between November 1, 2017 and October 30, 2018 (the Class Period). Lead Plaintiffs City of Omaha Police and Fire Retirement System and Louisiana Sheriffs' Pension & Relief Fund allege that they purchased Evoqua's common stock during this period at an artificially inflated price. Defendants have moved to dismiss Plaintiffs' Complaint for failure to state a claim. For the reasons that follow, the Court GRANTS the motion in part and DENIES it in part.

## I. BACKGROUND

The following facts are drawn from the allegations in Plaintiffs' Amended Class Action Complaint, Dkt. No. 42, which are taken as true at this stage of the litigation. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 110-11 (2d Cir. 2010).

The Court also considers "(1) documents attached to or incorporated by reference in the complaint, (2) documents integral to and relied upon in the complaint, even if not attached or incorporated by reference, (3) public disclosure documents required by law to be, and that have

1

been, filed with the SEC, and (4) facts of which judicial notice properly may be taken." *Bd. of Trs. of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 865 (S.D.N.Y. 2011), *aff'd sub nom.*, *Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012). For the purposes of this motion, Defendants have submitted numerous SEC filings ranging from October 3, 2017 to June 20, 2018, and Plaintiffs do not dispute that the Court may rely on these documents. *See* Def. Br. at xii-xiv (listing these documents).

### A. The Defendants

Plaintiffs bring claims against numerous Defendants under both the Securities Act of 1933, 15 U.S.C. § 77a *et seq*., and the Exchange Act of 1934, 15 U.S.C. § 78a *et seq*. Defendants Evoqua, Ronald Keating, and Benedict Stas are subject to claims under both statutes.

Evoqua Water Technologies is a Delaware corporation with its principal place of business in Pennsylvania. Compl. ¶ 22. It specializes in water technology and treatment. "Evoqua purports to be a leading provider of mission-critical water-treatment solutions, offering services, systems, and technologies to support a client's full water lifecycle needs." *Id.* ¶ 22. The corporation that is now Evoqua has gone through several acquisitions and renamings. It was once known as U.S. Filter, and it eventually became Siemens Water. *Id.* ¶ 35. In 2013, AEA, a private-equity fund, acquired Siemens Water and renamed the company Evoqua. *Id.* ¶¶ 2, 34-35. Plaintiffs also name as Defendants AEA and various funds affiliated with AEA; collectively, these are the AEA Fund Defendants. *Id.* ¶ 31.

During the time period at issue, Defendant Ronald Keating served as Evoqua's CEO and President. *Id.* ¶ 24. He also served as a member of Evoqua's Board of Directors. *Id.* Defendant Benedict Stas served as its Executive Vice President, CFO, and Treasurer. *Id.* ¶ 25. Defendant Kenneth Rodi served as Executive Vice President, Products Segment President. *Id.* ¶ 26. "Prior to joining Evoqua in May 2016, Rodi served as Chief Executive Officer of Neptune-Benson," a

corporation that Evoqua acquired, "from 2013 to 2016." *Id.* Defendant Anthony Webster served as Evoqua's Executive Vice President, Chief Human Resource Officer. *Id.* ¶ 27. These individuals are collectively the Executive Defendants.

Plaintiffs also bring Securities Act claims against members of Evoqua's Board of Directors: Ronald Keating, Martin Lamb, Nick Bhambri, Garry Cappeline, Judd Greg, Brian R. Hoesterey, Vinay Kumar, Peter M. Wilver. *Id.* ¶¶ 348-354. These are collectively the Director Defendants. And Plaintiffs bring their Security Act claims against eleven underwriters of Evoqua's common stock offerings, including J.P. Morgan and Goldman Sachs. *Id.* ¶¶ 356-366. These are collectively the Underwriter Defendants.

## B. Evoqua's Public Offerings

In 2017, Evoqua took steps to conduct an initial public offering (IPO) and thus become a publicly traded corporation. *Id.* ¶ 3. As part of that going-public transaction, it was required to file various paperwork with the SEC. In October 2017, Evoqua filed a Form S-1 Registration Statement for IPO of shares of its common stock. *Id.* ¶ 40. Evoqua also filed a Prospectus, dated November 1, 2017. *Id.* It then announced the offering of about 28 million shares of common stock, priced at $18.00 per share. *Id.* The offering closed on November 7, 2017. *Id.* In the offering, AEA sold about 25% of its Evoqua shares, retaining about 40% of the company's common stock. *Id.* ¶ 41.

A few months later, Evoqua filed paperwork for a secondary public offering (SPO) of its common stock. ¶ 131. The final Registration Statement for the SPO was filed on March 12, 2018. The SPO Prospectus was filed on March 16, 2018. *Id.* The SPO materials announced that specified stockholders would sell 17,500,000 shares of common stock at $22.00 per share. *Id.* As part of the SPO, AEA sold about 24% of its Evoqua shares, "retaining about 30.9% of the Company's common stock and approximately 52.5% of the voting power of the Company's

outstanding common stock."  *Id.* ¶ 132.

## C.  Evoqua Attempted to Raise Pre-IPO Revenues

"Unbeknownst to investors, in the period leading up to the IPO and the start of the Class Period, Evoqua was struggling to derive as much net income from its operations as Defendants had hoped in order to maximize the proceeds from the IPO."  Compl. ¶ 45.  In this period, therefore, Evoqua took "two significant cost-cutting measures" in order to improve short-term profitability.  *Id.*  First, Evoqua fired or forced into retirement experienced employees in sales and integration management, and then replaced them with less experienced, lower paid staff. Second, Evoqua artificially inflated its income through various accounting tricks, such as reporting anticipated income years before it should have appeared in financial statements.  This financial chicanery successfully boosted pre-IPO revenues.  But it all but guaranteed Evoqua would perform poorly after the offerings.  The Court reviews these allegations in detail.

### 1.  Evoqua Fired or Retired Key Employees

#### a.  Sales Employees

In the years leading up to the IPO, "Evoqua implemented a wide-scale program to terminate (either voluntarily or involuntarily) its most experienced sales personnel."  *Id.* ¶ 46. "Evoqua management believed that this would reduce costs and improve Evoqua's net income and short-term financial performance, and make the Company more attractive to potential investors, prior to a hoped for sale or IPO in or around the second half of 2017."  *Id.*  Evoqua went about this by offering early-retirement packages to older and experienced employees.  *Id.* ¶ 52.  And for those employees who remained, it set sales quotas that were practically impossible to achieve.  These inflated quotas achieved "dual objectives": they reduced the commissions Evoqua paid to its sales staff, and the resulting decline in total compensation caused many employees to leave.  *Id.* ¶ 47; *see also id.* ¶ 66 (explaining Evoqua's commission structure).  All

in all, "Evoqua 'retired' or otherwise terminated about 600 people in the years immediately preceding the IPO." ¶ 57. Evoqua internally referred to this policy, at least in part, as the Voluntary Separation Plan (VSP).

Evoqua then replaced these experienced sales employees with "far less experienced (and less qualified and less effective) employees." *Id.* ¶ 48. This decision had pernicious effects: it "resulted in an exodus of information and institutional knowledge from the Company, which adversely affected existing customer relations and had a significant negative impact on its ability (a) to generate new sales before the IPO, and (b) to generate revenue after the IPO." *Id.* ¶ 46. The replacement employees "fell far short of having the kind of extensive experience, understanding of the market for Evoqua products and services, proven sales skills and established relationships with customers that were necessary to maintain (let alone increase) sales compared to what their terminated predecessors had generated." *Id.* ¶ 47.

According to Plaintiffs, these problems were magnified by the nature of Evoqua's business. The sales cycle in the water-treatment industry, especially for the sorts of "larger and more expensive municipal or other custom projects" that Evoqua often engaged in, could take several years. *Id.* ¶ 49. From start to finish, public water-work projects often require bidding, government hearings, environmental assessments, community-group involvement, and post-project services. *Id.* "A sales person who has stayed with the customer through the complete cycle would be much better equipped to handle the ins-and-outs of such a lengthy project, and to anticipate and address the customer's requirements with respect to ensuring the success of the project." *Id.* By eliminating its experienced sales staff, Evoqua "lost [the] significant institutional knowledge" required to effectively manage these projects. *Id.*

### b. Integration Employees

Evoqua did not just nudge sales employees into retirement—it did the same with its

employees who managed integrating newly acquired companies. Acquisitions of other companies are crucial to Evoqua's business strategy; indeed, Evoqua is a "serial acquirer." *Id.* ¶ 44. And a "critical issue for any company that grows inorganically through acquisitions – like Evoqua – is how it successfully it has integrated its acquisition targets." *Id.* In the same time period, Plaintiffs allege that Evoqua also "terminated personnel with the most experience integrating acquiring companies." *Id.* ¶ 71. "After eliminating those with proven integration capabilities, Evoqua was left only with employees with no experience in this critical area." *Id.*

Plaintiffs' Complaint contains allegations from various anonymous, former employees of Evoqua (the Confidential Witnesses, or CWs). Several CWs made allegations as to Evoqua's lackluster integration efforts. Moreover, "Evoqua also attempted to cut costs by using the cheapest available systems that were not customized to handle the unique concerns that would arise from integrating the companies Evoqua acquired (for example, the field in the software for inputting part numbers would not take the full number Evoqua had assigned to it)." *Id.* ¶ 72. Another former employee "stated that Evoqua had issues with integration because it was unwilling to allocate sufficient resources to this task." *Id.* ¶ 75.

Plaintiffs focus in on one of the acquired companies, Neptune-Benson, as emblematic of these problems. For example, one CW alleged that the Neptune-Benson acquisition was "poorly done" because of a series of delays and lack of resources. *Id.* ¶ 75. That CW also alleged that there "was no visible accretion from Evoqua's acquisitions." *Id.*

### 2. Evoqua Inflated Its Financial Reports

Plaintiffs also allege that "in the period prior to the IPO (as well as after), Evoqua personnel engaged in practices that had the effect of artificially and materially inflating its reported revenue, income, and EBITDA, in violation of [Generally Accepted Accounting Principles (GAAP)]." *Id.* ¶ 78. These financial tricks, "none of which were publicly disclosed,

had the effect of presenting a materially inflated picture of Evoqua's financial performance, growth rate, and prospects as presented to investors in the IPO Offering Materials (as well as subsequently issued financial statements), while also concealing the extent of Evoqua's inability to achieve organic growth." *Id.*

Evoqua engaged in several forms of financial tricks. Plaintiffs allege that it shipped products and recognized their revenue, even though the products were subject to "broad rights of return." *Id.* It also shipped products that customers had not yet agreed to purchase, often to third-party storage vendors. This practice is known as "inventory parking." *Id.* ¶ 89; *see also id.* ¶ 83 ("To artificially inflate their reported sales and related revenue, Evoqua personnel also booked revenue on the shipment of product where the customer had either not yet agreed to purchase the product at issue, or had only agreed to take delivery at a later date (including in situations where Evoqua personnel, knowing the customer's position, would instead arrange to ship the product to a third party storage vendor that, at Evoqua's expense, agreed to hold (or 'park') the relevant product inventory until an end-user customer actually agreed to accept delivery and assume the risks and liabilities of ownership)"). And Evoqua recognized revenue on products that had not been shipped at all or that Evoqua had not yet even manufactured. Plaintiffs allege that these practices violated Generally Accepted Accounting Principles (GAAP).

In addition to these financial schemes, "Evoqua also delayed payment to vendors as a way to temporarily improve its financials." *Id.* ¶ 110. And Evoqua engaged in improper "channel stuffing" practices, "which had the effect of concealing the extent to which Evoqua was struggling to grow organically." *Id.* ¶ 121. These practices included "offering customers steep discounts and extended payment terms of as long as 60, 90 or 120 days—and even indefinite 'paid when paid' payment terms." *Id.*

**D. Evoqua's Disappointing 2018 Performance and Fall in Share Price**

These steps allowed Evoqua to increase its profitability on paper in the months before the IPO. But they also sacrificed long-term stability and profits—by taking these measures, Evoqua all but guaranteed lackluster future performance. *Id.* ¶ 4. For example, by firing experienced salespeople and employees who managed integrating newly acquired companies, Evoqua found it harder to retain and obtain clients and to seamlessly incorporate its many acquisitions. During the Class Period, therefore, the writing was on the wall: Evoqua would come up short after the IPO.

Plaintiffs allege that these strategies caught up with the company in 2018. Just a few months after the SPO, Evoqua began to miss financial expectations. In May 2018, Evoqua reduced "its EBITDA guidance for fiscal 2018 from $235 million-$255 million to $235 million-$243 million, 5% below the prior consensus expectation." *Id.* ¶ 134. On the day of the announcement, Evoqua's stock price fell 8.4%. *Id.* ¶ 135. And in August 2018, Evoqua's third-quarter results were "at the low end of its prior guidance and $3 million or 5% below the consensus expectations." *Id.* ¶ 136. Market watchers described the results as disappointing, and the firm's stock price once again fell. *Id.* ¶¶ 136, 137.

In October 2018, Evoqua's fourth-quarter results were again lower than expected. Evoqua lowered its financial forecasts for FY2018 and informed investors that it now expected revenues to be between $1.33 billion to $1.34 billion, "an increase of approximately 7% to 7.4% over 2017 versus a prior expectation range of $1.34 billion to $1.37 billion, which would have represented an increase of 7% to 10% over the previous year." *Id.* ¶ 139. And Evoqua informed investors that it expected the company's "full-year Adjusted EBITDA to be in the range of $213 million to $217 million, an increase of 2.6% to 4.5% over the previous year, versus a prior Adjusted EBITDA expectation range of $235 million to $245 million, which would have

represented an increase of 13% to 18% over 2017." ¶ 139. To be clear, Evoqua still expected its revenues and Adjusted EBITDA to *increase* from the previous year—but just not as much as previously forecasted. *Id.* As a result of this news, "Evoqua's stock price plummeted $4.78 per share, or approximately 35%, to close at $9.02 per share on October 30, 2018." *Id.* ¶ 145. And financial analysts continued to express concern about the company's performance. *See id.* ¶¶ 142-144.

Plaintiffs contend that these financial missteps were written in the cards. By firing key employees and using financial tricks to pull forward revenue, Defendants all but guaranteed that the company would come up short in future quarters.

### E.  Litigation Between Evoqua and Former Employees

Plaintiffs also support their theories of liability with filings in state-court proceedings involving two former Evoqua employees, Matthew Moriarty and Jennifer Schuck. The Court takes judicial notice of the publicly available judicial filings in these proceedings. *See Gantt v. Ferrara*, No. 15-CV-7661 (KMK), 2017 WL 1192889, at *14 (S.D.N.Y. Mar. 29, 2017) ("[A] court may take judicial notice of matters of public record, which include . . . pleadings in another action." (internal quotation marks omitted)). Moriarty is "a former Evoqua Sales Representative and Sales Director at Neptune-Benson who then became a Channel Sales Director at Evoqua's NB/Aquatics unit until he was terminated around the time of the November 2017 IPO." Compl. ¶ 101. Schuck "was Neptune-Benson's Director of Supply Chain before Evoqua acquired it in April 2016 and who then became Materials Manager at Evoqua's NB/Aquatics unit." *Id.* ¶ 81.

On October 22, 2018, Evoqua sued Moriarty and Schuck in Rhode Island Superior Court. Evoqua alleged that the two employees "have used and disclosed confidential and proprietary information belonging to the Company, solicited the Company's employees and customers, and are engaging in competing business on their own behalf and on behalf of Competing Entities."

Def. Ex. 25, ¶ 1.  Evoqua asserted claims of breach of contract, breach of duty of loyalty, unfair competition, misappropriation of trade secrets, and unjust enrichment, among others.  *See id.* ¶¶ 110-169.  In November 2018, Moriarty and Schuck each answered Evoqua's complaint and filed their own counterclaims.  *See* Def. Exs. 26, 27.  These counterclaims contained many of the same allegations of financial impropriety that Plaintiffs allege here.  For example, Schuck alleged that Evoqua engaged in a slew of "accounting tricks" and kept a "second set of 'books'" to keep track of its actual revenues.  Def. Ex. 27 at ¶¶ 33, 34.  In January 2019, the Rhode Island Court held a hearing on Evoqua's preliminary injunction motion.  See R.I. Litigation 4/18/19 Tr. at 3-4.  The Court granted Evoqua's motion and characterized some portions of Moriarty's testimony as "completely absurd" and a "complete fabrication."  *Id.* at 15.

In another Rhode Island proceeding, Schuck sought unemployment benefits on the theory that she had been constructively discharged because the Company was engaged in "egregious," "unethical," and "illegal" conduct in which she would not participate.  The Rhode Island Department of Labor Board of Review rejected her request, finding that "[t]here [was] no credible testimony or evidence to support" her allegations.  4/23/19 Decision ¶ 3.

### F.  Revenue Recognition Review

On December 11, 2018, Evoqua disclosed in its annual SEC filing that it had identified certain accounting internal control weaknesses related to revenue recognition.  12/11/18 10-K at 136-37.  It stated that those issues did not result in any reported misstatements or warrant any adjustments to Evoqua's previously reported financial statement.  And it stated that management had determined that Evoqua's consolidated financial statements fairly represented its final position.  Evoqua's external auditor, Ernst & Young, issued an unqualified opinion on the Company's financial statements, meaning that it judged the statements as fairly presented.  *Id.*

### G. Procedural History

In October 2018, shortly after Evoqua's stock price fell, Plaintiffs filed this lawsuit. The Lead Plaintiffs in this matter are the City of Omaha Police and Fire Retirement System and the Louisiana Sheriffs' Pension & Relief Fund. *Id.* ¶¶ 20, 21. They both allege that they purchased Evoqua common stock during the class period. *Id.* On April 3, 2019, Plaintiffs filed the operative complaint. Plaintiffs seek to certify "a class consisting of all persons and entities that purchased, or otherwise acquired, the securities of Evoqua during the Class Period," excluding Defendants. *Id.* ¶ 297. On June 26, 2019, Defendants moved to dismiss Plaintiffs' Amended Complaint. Dkt. No. 67, 70. That motion is now before the Court.

## II. LEGAL STANDARD

On a motion dismiss under Rule 12(b)(6), a court must "accept[] all factual allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 128 (2d Cir. 2011) (quoting *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009)). But the Court does not accept legal conclusions as true: "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), the complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim achieves "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Plausibility is "not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully," *id.*, and if plaintiffs cannot "nudge[] their claims across the line from conceivable to plausible, their complaint must be dismissed," *Twombly*, 550 U.S. at 570. "Plausibility . . . depends on a host of considerations: the full factual

picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

In addition to these universal pleading requirements, Plaintiffs face two additional burdens at this stage of litigation: Rule 9(b), which heightens pleading standards for all allegations of fraud, and the Private Securities Litigation Reform Act (PSLRA), which heightens pleading standards for certain claims under the Exchange Act. The Court discusses these pleading burdens where applicable below.

## III. THE BESPEAKS-CAUTION DOCTRINE RENDERS SOME STATEMENTS NON-ACTIONABLE

To begin, the Court concludes that many of Defendants' statements are forward looking and non-actionable under the bespeaks-caution doctrine. Plaintiffs thus cannot rely on them to support a claim under either the Exchange Act or the Securities Act.

Two doctrines—one statutory, the other judge-made—protect certain forward-looking statements from serving as the basis for claims of securities fraud. *SEC v. Thompson*, 238 F. Supp. 3d 575, 602 (S.D.N.Y. 2017) ("the federal securities laws have two separate, but similar, protections for forward-looking statements"). First, the PSLRA creates a statutory "safe harbor" for certain statements. But the safe harbor "does not apply to statements made in connection with an initial public offering, such as an IPO prospectus." *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 398 (S.D.N.Y. 2017), *aff'd*, 757 F. App'x 35 (2d Cir. 2018); *see* 15 U.S.C. §§ 77z–2(b)(2)(D), 78u–5(b)(2)(D); *Johnson v. Sequans Commc'ns S.A.*, No. 11 cv. 6341 (PAC), 2013 WL 214297, at *10 (S.D.N.Y. Jan. 17, 2013). Because many of the challenged statements here are contained in Evoqua's IPO materials, the Court does not focus on the PSLRA safe harbors.

Second, courts have long protected forward-looking statements, even those made in connection with an IPO, under the bespeaks-caution doctrine. The bespeaks-caution doctrine "is a corollary of the well-established principle that a statement or omission must be considered in context." *Iowa Pub. Employees' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010) (internal quotation marks omitted). "A forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading . . . In such circumstances, it cannot be supposed by a reasonable investor that the future is settled, or unattended by contingency." *Id.*; *see also P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 96–97 (2d Cir. 2004). "It is settled that the bespeaks-caution doctrine applies only to statements that are forward-looking." *MF Glob., Ltd.*, 620 F.3d at 142. And for its protections to apply, the doctrine requires the forward-looking statements to come with cautionary language. "[C]autionary language [that] did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss" is insufficient. *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002); *accord Gregory*, 297 F. Supp. 3d at 398.

In short, under the bespeaks-caution doctrine, "alleged misrepresentations in a stock offering are immaterial as a matter of law [if] it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering." *Halperin*, 295 F.3d at 357; *see also Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." (citation omitted)). The protection of the bespeaks-caution doctrine extends to both claims under the Securities Act and the Exchange Act. *See MF Glob., Ltd.*, 620

F.3d at 141 n.8 ("Though we originally applied bespeaks caution to an action under § 10(b) of the 1934 Securities Exchange Act, 15 U.S.C. § 78j(b), we have since applied the doctrine to actions under § 11 and § 12(a)(2) of the 1933 Securities Act." (internal citations omitted)).

Defendants argue that many of the challenged statements are non-actionable because they are forward looking and protected by the bespeaks-caution doctrine. Evoqua made the following forward-looking statements in its IPO Prospectus:

- "In order to maintain and enhance our customer relationships, we intend to continue to invest in our sales force." Compl. ¶ 150.
- "Our future growth depends, in part, on our ability to develop or acquire new products, services and solutions, identify emerging technological trends in our target end markets and maintain the integrity of our information technology systems."
- "Continue to evaluate and pursue accretive tuck-in acquisitions to add new technologies, attractive geographic regions and end-markets." *Id.* ¶¶ 146, 169, 375, 387.
- "These strategic [tuck-in] acquisitions will enable us to accelerate our growth in our current addressable market, as well as in new geographies and new end market verticals." *Id.* ¶¶ 146, 375, 387.
- "We will continue to actively evaluate acquisition opportunities that are consistent with our business strategy and financial model . . ." *Id.* ¶¶ 146, 387.

Defendant Keating also made the following statements in calls in earnings calls:

- December 1, 2017: "Our future growth will come from both organic sales initiatives and through a systematic M&A process." *Id.* ¶¶ 159, 179.
- December 1, 2017: "We expect to expand our service reach, enhance our technological capabilities, and accelerate our sales and profit growth rates through our disciplined M&A process." *Id.* ¶ 159.
- May 8, 2018: "Our future growth will come from both organic sales initiatives and through a systematic M&A process." ¶¶ 213, 233.

These statements are forward-looking; they refer to expectations and predictions about the future. Yet Plaintiffs allege that these statements are actionable for two reasons. First, they claim that a few of these statements "are partly statements of present fact," because Defendants at times used verbiage like "intend[ing] to *continue*" investing in the sales force. Pl. Br. at 40.

To be sure, Plaintiffs are correct that "[a] statement may contain some elements that look forward and others that do not," and "forward-looking elements" may be "severable" from "non-forward-looking" elements. *MF Glob., Ltd.*, 620 F.3d at 144. "Mixed present and future statements are not entitled to the safe harbor with respect to the part of the statement that refers to the present." *In re Supercom Inc. Sec. Litig.*, No. 15 CIV. 9650 (PGG), 2018 WL 4926442, at *21 (S.D.N.Y. Oct. 10, 2018) (internal quotation marks and citation omitted).

However, Defendants' use of the verb *continue* does not remove these statements from the bespeaks-caution doctrine's protective umbrella. Courts have consistently found such statements to be protected. In *Maverick Fund, L.D.C. v. Comverse Tech., Inc.*, the District Court explained that "when the present-tense portion of mixed present and future statements does not provide specific information about the current situation, but merely says that, whatever the present situation is, it makes the future projection attainable, the present-tense portion of the statement is too vague to be actionable apart from the future projection." 801 F. Supp. 2d 41, 59 (E.D.N.Y. 2011) (citing *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 255-56 (3d Cir. 2009) (holding that a company's statement that it was "on track" to meet a future projection did "not transform the statements, or any part of them, into non-forward-looking assertions outside of the Safe Harbor")). This is because "'[s]uch an assertion is necessarily implicit in every future projection.'" *Id.* (quoting *Avaya*, 564 F.3d at 255); *see also Supercom*, 2018 WL 4926442, at *21 ("The present tense portion of that statement – that Defendants had 'all the information in hand to support these numbers' – does not provide any specific information about SuperCom's current circumstances." (quoting an earnings call)); *Gissin v. Endres*, 739 F. Supp. 2d 488, 505 (S.D.N.Y. 2010) ("[T]o the extent that there are assertions of current fact in the statements proffered as fraudulent, they refer to the present only as a means for gauging future

possibilities and, 'when read in context, cannot meaningfully be distinguished from the future projection of which they are a part.'" (quoting *Avaya*, 564 F.3d at 255)).

Second, Plaintiffs argue that Defendants did not provide adequate cautionary language, making the bespeaks-caution doctrine inapplicable. To be sure, cautionary language needs to be specific and meaningful for the doctrine to apply. Yet here, Defendants addressed precisely the risks that Plaintiffs allege. The Registration Statement cautioned that "we cannot guarantee that [the voluntary separation policy] will be effective or cost-efficient." 10/3/17 S-1 at F-28. Evoqua also noted that "any failure to retain our existing technical and sales personnel and other employees or to attract additional skilled personnel could have a material adverse effect our business, financial condition, results of operations or prospects." *Id.* And Evoqua include a page titled "**CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS.**" *Id.* at 56 (emphasis in original). On this page, Evoqua stated "forward-looking statements are only predictions and involve known and unknown risks and uncertainties, many of which are beyond our control." *Id.* The company then provided a slew of factors that "could cause actual results to differ materially from those expressed or implied by the forward-looking statements," such as "our ability to continue to develop or acquire new products, services and solutions and adapt our business to meet the demands of our customers," "our ability to implement our growth strategy, including acquisitions and our ability to identify suitable acquisition targets," and "risks associated with product defects and unanticipated or improper use of our products." *Id.*

To be sure, "[v]ague disclosures of general risks will not protect defendants from liability." *In re MF Glob. Holdings*, 982 F. Supp. 2d at 304; *see, e.g.*, *In re Barrick Gold Sec. Litig.*, No. 13-CV-3851 (SAS), 2015 WL 1514597, at *8 (S.D.N.Y. Apr. 1, 2015) ("[T]he cautionary language must be . . . tailored to the specific future projections, estimates, or opinions

that the plaintiffs challenge." (internal quotation marks omitted)). But these cautionary notes are a far cry from the sorts of generalized warning other courts have rejected. For example, in *In re Salix Pharmaceuticals, Ltd.*, the defendants used cautionary language such as "stating only that '[a]ctual results might differ materially from those indicated by these forward-looking statements as a result of various important factors, including those discussed in our press releases and SEC filings, including our Form 10-K for 2013.'" No. 14-CV-8925 (KMW), 2016 WL 1629341, at *11 (S.D.N.Y. Apr. 22, 2016) (quoting defendants' earnings call). The Court rejected this "brief and generic" language, noting that this "boilerplate disclaimer fails to identify even a single 'important factor' that could lead to different results . . . And the general reference to factors 'discussed in our press releases and SEC filings' fails to supply the necessary specificity." *Id.* Here, Defendants provided a list of more than ten specific factors. And the Court must consider that disclosure in the statements' broader contexts. *See, e.g.*, *Iowa*, 620 F.3d at 143 ("The touchstone of this inquiry" is context). Taken together, each of Evoqua's statements were "framed by acknowledgements of the complexity and numerosity" of obtaining successful outcomes from its changes to staffing. *See Singh v. Cigna Corp.*, 918 F.3d 57, 64 (2d Cir. 2019). Indeed, Defendants' "framing suggests caution (rather than confidence) regarding" the VSP's effects and its successful integration. *Id.*; *see also In re Frontier Commc'ns, Corp. Stockholders Litig.*, No. 17-CV-1617 (VAB), 2019 WL 1099075, at *16 (D. Conn. Mar. 8, 2019).

The Court therefore concludes that these forward-looking statements they would not be misleading to a reasonable investor. Plaintiffs thus cannot rely on any of them to support a claim for securities fraud under either the Exchange Act or the Securities Act.

## IV. OTHER CHALLENGED STATEMENTS ARE NON-ACTIONABLE PUFFERY

Statements of puffery are non-actionable as a matter of law because they are "too general to cause a reasonable investor to rely upon them." *City of Pontiac Policemen's & Firemen's Ret.*

*Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (internal quotation marks and citation

omitted); *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013). "Up to a point,

companies must be permitted to operate with a hopeful outlook: People in charge of an enterprise

are not required to take a gloomy, fearful or defeatist view of the future; subject to what current

data indicates, they can be expected to be confident about their stewardship and the prospects of

the business that they manage." *Rombach*, 355 F.3d at 174 (internal quotation marks omitted).

"Whether a representation is 'mere puffery' depends, in part, on the context in which it is made."

*In Petrobras Sec. Litig.*, 116 F.Supp.3d 368, 381 (S.D.N.Y. 2015).

Several of Defendants' statements fall into this category:

- "Experienced management team with proven operational capabilities that has made Evoqua an employer of choice. We are highly dependent on our leadership team, which consists of industry veterans with a track record of executing effective strategies and achieving profitable growth." Compl. ¶¶ 146, 203, 282, 375, 404.
- "After the AEA Acquisition, we began a transformation of our business into a global organization with an independent, professional management team. We believe our transformation has made us into a premier partner and employer in our industry, resulting in differentiated capabilities and talent within our organization." *Id.* ¶¶ 146, 375.
- "Our existing customer relationships, best-in-class channels to market and ability to rapidly commercialize technologies provide a strong platform to drive rapid growth in the businesses we acquire." *Id.* ¶¶ 146, 169, 375, 387.

These statements are "quite general, delivered in corporate jargon, and relate to future

expectations." *Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*,

No. 18-CV-00299 (AJN), 2019 WL 4601644, at *13 (S.D.N.Y. Sept. 23, 2019). A reasonable

investor would not rely on them. Accordingly, they are non-actionable puffery. *See id.*; *Nguyen*

*v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 488-89 (S.D.N.Y. 2018). Plaintiffs therefore

cannot rely on any of them to support a claim under either the Exchange Act or the Securities

Act.

## V. PLAINTIFFS HAVE STATED A CLAIM UNDER THE SECURITIES ACT

Plaintiffs allege two violations of the Securities Act. They allege that Evoqua, the Executive Defendants, the Director Defendants, and the Underwriter Defendants violated § 11 of the Securities Act. And they allege that Evoqua and the Underwriter Defendants violated § 12(a)(2) of the Securities Act. Defendants seek to dismiss these claims for a host of reasons: they argue that (1) Plaintiffs lack standing, (2) Plaintiffs have failed to allege falsity, and (3) Plaintiffs have failed to allege materiality. The Court rejects these arguments and concludes that Plaintiffs have stated a claim under both provisions of the Securities Act.

### A. Legal Standard

Section 11 of the Securities Act imposes liability on issuers and other signatories of a registration statement that "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). The statute creates a right of action for "any person" who acquired a security offered pursuant to a misleading registration statement. *Id.*; *see In re Initial Pub. Offering Sec. Litig.*, 241 F.Supp.2d 281, 344 (S.D.N.Y. 2003). "To allege a claim under Section 11 of the Securities Act, a plaintiff need show that a registration statement: (1) contained an untrue statement of material fact; (2) omitted to state a material fact required to be stated therein; or (3) omitted to state a material fact necessary to make the statement therein not misleading." *Arfa v. Mecox Lane Ltd.*, 10-cv-9053, 2012 WL 697155, at *4 (S.D.N.Y. Mar. 5, 2012) *aff'd*, 504 Fed. Appx. 14 (2d Cir. 2012) (citation omitted).

Section 12(a)(2) "provides similar redress where the securities at issue were sold using prospectuses or oral communications that contain material misstatements or omissions." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010); *accord Litwin*, 634

F.3d at 715; *see* 15 U.S.C. § 77*l*(a)(2).  To plead a claim under Section 12(a)(2), the plaintiff

must allege that: "(1) the defendant is a 'statutory seller'; (2) the sale was effectuated 'by means

of a prospectus or oral communication'; and (3) the prospectus or oral communication

'include[d] an untrue statement of a material fact or omit[ted] to state a material fact necessary in

order to make the statements, in the light of the circumstances under which they were made, not

misleading.'"  *Morgan Stanley*, 592 F.3d at 359 (quoting 15 U.S.C. § 77*l*(a)(2)).

Because Sections 11 and 12(a)(2) are "Securities Act siblings with roughly parallel

elements," courts typically analyze the two claims together.  *See Wachovia*, 753 F.Supp.2d at

368 ("Claims under Sections 11 and 12 are usually evaluated in tandem because if a plaintiff

fails to plead a cognizable Section 11 claim, he or she will be unable to plead one under Section

12(a).") (internal quotation marks and citations omitted).  Together, Sections 11 and 12(a)(2)

create "three potential bases for liability based on registration statements and prospectuses filed

with the SEC: (1) a material misrepresentation; (2) a material omission in contravention of an

affirmative legal disclosure obligation; and (3) a material omission of information that is

necessary to prevent existing disclosures from being misleading."  *Id.* (citing *Litwin v.*

*Blackstone Grp., L.P.*, 634 F.3d 706, 715-16 (2d Cir. 2011)).

Although Securities Act plaintiffs must plead the materiality of the alleged misstatement

or omission under Sections 11 and 12(a)(2), they need not allege scienter, reliance, or causation.

*Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016) ("Plaintiffs' claims under §§ 11 and 12(a)(2)

of the Securities Act do not require a showing of scienter, reliance, or loss causation."); *Morgan*

*Stanley*, 592 F.3d at 359; *Rombach*, 355 F.3d at 169 n.4.  "Issuers are subject to 'virtually

absolute' liability under section 11, while the remaining potential defendants under sections 11

and 12(a)(2) may be held liable for mere negligence."  *Morgan Stanley*, 592 F.3d at 359 (citing

*Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983)). "Thus, by contrast to Section 10(b), liability under Sections 11 and 12(a)(2) is both more narrowly defined and more readily triggered." *Wachovia*, 753 F.Supp.2d at 368.

**B. Rule 9(b) Applies to Plaintiffs' Securities Act Claims**

The Court must first determine the appropriate pleading standard to apply to Plaintiffs' Securities Act claims. The heightened pleading standard of the PSLRA does not apply to claims under the Securities Act. *Rombach*, 355 F.3d at 170. The heightened standard of Federal Rule of Civil Procedure 9(b), however, applies to Securities Act claims if they "are premised on allegations of fraud." *Id.* at 171. The parties here dispute whether Plaintiffs' claims sound in fraud and thus trigger this higher standard.

In *Rombach*, the Second Circuit made clear that this is not a formalistic inquiry. A plaintiff cannot evade the requirements of Rule 9 through artful pleading. Instead, courts must consider whether "the wording and imputations of the complaint are classically associated with fraud." *Id.* at 172. There, plaintiffs alleged that "the Registration statement was 'inaccurate and misleading;' that it contained 'untrue statements of material facts;' and that 'materially false and misleading written statements' were issued." *Id.* (quoting plaintiffs' complaint). Because "the wording and imputations of the [plaintiffs'] complaint [were] classically associated with fraud," the Second Circuit applied Rule 9(b). *Id.*

Here, Plaintiffs separate their claims under the Exchange Act from those under the Securities Act into different sections in the Complaint. They are also careful to omit allegations regarding scienter, loss causation, and the like in the latter section. And they expressly disclaim any allegation of fraud as to their Securities Act claims. *See, e.g.*, Compl. ¶ 430 ("Plaintiffs reallege every allegation contained above as if fully alleged in this Count, only to the extent, however, that the allegations do not allege fraud, scienter, or the intent of the Defendants to

defraud Plaintiffs or members of the Class."); *id.* ¶ 431 ("This Count does not sound in fraud, and any allegations of knowing or reckless misrepresentations or omissions in the Offering Materials are excluded from this Count.").

But these formalisms do not require the Court to apply Rule 8's more liberal standard. Courts in this District uniformly apply Rule 9(b) to Complaints that separate allegations in this manner, so long as the theories of liability are the same under both statutes. *See In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 598 (S.D.N.Y. 2006) ("Courts have repeatedly noted that the insertion of a simple disclaimer of fraud is insufficient."); *In re Alstom S.A. Secs. Litig.*, 406 F.Supp.2d 402, 410 (S.D.N.Y. 2005) ("Although Plaintiffs affirmatively state in the Complaint that their Securities Act claims do not sound in fraud, despite that disclaimer—conclusory, self-proclaimed and self-serving though it necessarily is—on a more objective reading it is clear that the claims are premised on factual allegations permeated with accusations of fraudulent conduct on the part of the defendants . . . Having made these broad averments portraying a pervasive and overarching scheme of fraud, one that apparently imbues all of the their specific causes of action and attendant claims of losses, Plaintiffs then attempt to retreat, apparently to escape the particularity requirement of Federal Rule of Civil Procedure 9(b) . . . However, Plaintiffs cannot so facilely put the fraud genie back in the bottle."); *see also Johnson v. NYFIX, Inc.*, 399 F. Supp. 2d 105, 122 (D. Conn. 2005) ("courts need not accept assertions in a complaint that a section 11 claim is not premised on fraud").

Plaintiffs' claims under the Securities Act are almost a mirror image of their Exchange Act claims. They rest on the same three theories: (1) Defendants' statements about sales are misleading because they did not fully disclose their policy of firing experienced sales personnel and replacing them with less experienced individuals, (2) Defendants' statements about

acquisitions are misleading because they did not disclose firing key integration staff and problems with Neptune-Benson, and (3) Defendants' financial statements are false because they improperly brought forward revenue from future quarters. The Court thus concludes that Rule 9(b) applies. *See, e.g.*, *In re BioScrip*, 95 F.Supp.3d at 742 ("Plaintiffs have staked their Securities Act claims upon the same factual allegations as their Rule 10b-5 claims and accordingly Rule 9(b) applies.").

Under Rule 9(b)'s heightened standard, Plaintiffs must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent" to succeed on their Securities Act claims. *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir.2000) (citation omitted); *accord Rombach*, 355 F.3d at 164.

### C. Louisiana Sheriffs Has Standing Under Section 11

Defendants challenge the statutory standing of one of the lead plaintiffs, Louisiana Sheriffs, to assert a § 11 claim. *See* Def. Br. 64 at n.29. "[A]ftermarket purchasers who can trace their shares to an allegedly misleading registration statement have standing to sue under § 11 of the 1933 Act." *Perry v. Duoyuan Printing, Inc.*, 10-cv-7235 (GBD), 2013 WL 4505199, at *10 (S.D.N.Y. Aug. 22, 2013) (quoting *DeMaria v. Andersen*, 318 F.3d 170, 178 (2d Cir. 2003)). To establish standing under § 11 at the motion-to-dismiss stage, therefore, Plaintiffs need only assert that they purchased shares "issued pursuant to, or traceable to the public offerings." *Id.* (citing *In re: WRT Energy Sec. Litig.*, 75 Fed.Appx. 839 (2d Cir. 2003) (internal quotation marks omitted)).

That is precisely the case here. Louisiana Sheriffs alleges that it purchased Evoqua stock pursuant or traceable to the offerings. *See* Compl. ¶ 343. This is enough to confer standing at this stage to assert a § 11 claim. *See In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326,

372-73 (S.D.N.Y. 2011) ("[T]he pleading requirement for Section 11 standing is satisfied by general allegations that plaintiff purchased pursuant to or traceable to [a] false registration statement.") (internal quotation marks omitted); *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F.Supp.2d 452, 491 (S.D.N.Y. 2006) (same); *see also In re Authentidate Holding Corp.*, No. 05 Civ. 5323 (LTS), 2006 WL 2034644, at *7 (S.D.N.Y. July 14, 2006) (holding that Section 11 plaintiffs "are not required to explain how their shares can be traced" at this stage).

### D.  Both Lead Plaintiffs Have Standing Under Section 12(a)(2)

Defendants also argue that both Lead Plaintiffs lack statutory standing to maintain their claim under § 12(a)(2) against Evoqua and the Underwriter Defendants.  Standing under Section 12(a)(2) is more strictly circumscribed than under Section 11, but Plaintiffs have again met their burden at this stage.

Section 12(a)(2) of the Securities Act provide relief only against a person who "offers or sells a security" and only to the person "purchasing such security from him."  And the statute applies only to transactions stemming from a public offering of a security, so "a Section 12(a)(2) action cannot be maintained by a plaintiff who acquires securities through a private transaction, whether primary or secondary."  *Yung v. Lee*, 432 F.3d 142, 149 (2d Cir. 2005) (citing *Gustafson v. Alloyd Co.*, 513 U.S. 561, 584 (1995)).  Section 12(a) "imposes liability on only the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers. Thus, a buyer cannot recover against his seller's seller."  *Pinter v. Dahl*, 486 U.S. 622, 644 n. 21 (1988).  And a plaintiff may bring a claim only against a "statutory seller" from which it "purchased" a security "pursuant to" the pertinent offering documents.  *See In re MF Global Holdings Ltd. Sec. Litig.*, 982 F.Supp.2d 277, 323 (S.D.N.Y.2013) (citing *In re Lehman Bros. Sec. & Erisa Litig.*, 799 F.Supp.2d 258, 311 (S.D.N.Y. 2011)).  "Whereas the reach of Section 11 is expressly limited to specific offering participants, the list of potential defendants in a Section

12(a)(2) case is governed by a judicial interpretation of section 12 known as the 'statutory seller' requirement." *Morgan Stanley*, 592 F.3d at 359; *see Pinter*, 486 U.S. at 643–47 & n. 21; *see also Wilson v. Saintine Exploration & Drilling Corp.*, 872 F.2d 1124, 1125–26 (2d Cir. 1989). An individual qualifies as a "statutory seller" if he: (1) "passed title, or other interest in the security, to the buyer for value," or (2) "successfully solicit[ed] the purchase [of a security], motivated at least in part by a desire to serve his own financial interests or those of the securities['] owner." *Pinter*, 486 U.S. at 642; *see also Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir. 1988). Thus, "privity between the buyer and seller is no longer required," and those who solicit sales in question for financial gain will be liable as statutory sellers under Section 12. *Commercial Union Assur. Co. v. Milken*, 17 F.3d 608, 616 (2d Cir. 1994).

Plaintiffs allege that the Underwriter Defendants solicited the purchase of securities for their own and the securities owners' interests. The Underwriter Defendants participated in the promotion and sale of Evoqua stock to investors. Compl. ¶ 372. The Underwriter Defendants also promoted their own financial interests by doing so—they collected "lucrative underwriting fees" for their roles in the IPO and SPO. *Id.* ¶ 370. And the Underwriter Defendants drafted and disseminated the Offering Materials. *Id.* ¶ 367. Similar allegations have been found to be sufficient for statutory standing, at the motion-to-dismiss stage, under § 12(a)(2). *See, e.g., Perry v. Duoyuan Printing, Inc.*, No. 10-cv-7235 (GBD), 2013 WL 4505199, at *12 (S.D.N.Y. Aug. 22, 2013) (finding statutory standing because plaintiffs "alleged that the Underwriters negotiated the IPO price, controlled the contents and dissemination of the Registration Statement and Prospectus, and offered to engage in transactions to stabilize, maintain or otherwise affect the price of the common shares during and after the offering" and because the underwriters received financial benefit from the offering); *In re Worldcom, Inc. Sec. Litig.*, 294 F.Supp.2d

392, 423 (S.D.N.Y. 2003); *see also In re IndyMac Mortgage-Backed Sec. Litig.*, 718 F.Supp.2d

495, 502 (S.D.N.Y. 2010) (finding that Plaintiffs had sufficiently pleaded standing under

12(a)(2) due to allegations that Underwriters solicited, sold, and distributed certificates, and that

they had done so for their own personal gain).  Moreover, the fact that Plaintiffs did not identify

which Underwriter Defendant they purchased shares from does not defeat their claim at this

stage.  *See Perry*, 2013 WL 4505199, at *12 ("[C]ourts within the Second Circuit do not require

that the putative class representative identify the specific underwriter from which it purchased

shares as long as the allegations are sufficient.").  The Court therefore concludes that Plaintiffs

have met their burden at this stage to demonstrate standing.

### E.  Defendants' Statements Regarding Evoqua's Sales

Given that Plaintiffs have alleged standing, the Court now turns to Plaintiffs' three

substantive theories of relief.  The Court first addresses Defendants' alleged misrepresentations

relating to its sales force.  As noted, Plaintiffs allege that Defendants violated §§ 11 and 12(a) by

repeatedly discussing its sales practices without mentioning the company's policy of

"terminat[ing] (either voluntarily or involuntarily) its most experienced personnel" and replacing

some of them "with far less qualified" individuals.  Compl. ¶ 46.  The Court concludes that

Plaintiffs have stated a claim under §§ 11 and 12(a) under this theory.

#### 1.  The Challenged Statements

The Court begins by reviewing the actionable statements made by Defendants in their

IPO and SPO materials which are relevant to this theory of liability.[1]  These statements include

those made in materials incorporated by reference into the IPO and SPO offering materials, like

---

[1] Because the Complaint quotes liberally from these materials, the Court does not provide them in full.  The Court instead provides excerpts and generally includes those portions which Plaintiffs emphasized in their Complaint through bold and italics.

Evoqua's FY2017 Form 10-K. *See* Compl. ¶ 387. Plaintiffs challenge the following statements (among others) regarding Evoqua's sales force as misleading:

- "In order to maintain and enhance our customer relationships, we intend to continue to invest in our sales force." *See, e.g.*, Compl. ¶¶ 8, 44, 70.
- Evoqua's "success depends to a significant extent on our ability to retain or attract a significant number of employees in senior management, skilled technical, engineering, *sales* and other key personnel." *See, e.g.*, ¶ 152 (emphasis added).
- "Failure to retain our existing senior management, skilled technical, engineering, sales and other key personnel or the inability to attract and retain new qualified personnel could materially adversely impact our ability to operate or grow our business." *See, e.g.*, ¶ 152.
- "We believe our strong brands, leading position in highly fragmented markets, scalable and global offerings, leading installed base and unique ability to provide complete treatment solutions will enable us to capture a larger share of our existing customers' water treatment spend while expanding with existing and new customers into adjacent end-markets and underpenetrated regions, *including by investing in our sales force* and cross-selling to existing customers." *See, e.g.*, ¶ 150 (emphasis added).
- "[C]ompetition for qualified technical personnel and for sales personnel with established customer relationships is intense." *See, e.g.*, *id.*

Plaintiffs allege that "[t]hese statements were materially false and misleading because the Company had . . . engaged in the systematic and pervasive termination of experienced sales personnel that devastated the businesses that Evoqua had acquired, eroded the Company's ability to sustain current revenues and generate future growth and gave rise to significant delays in product delivery and the services provided by Evoqua." *Id.* ¶ 147. Defendants however argue that Plaintiffs have not alleged falsity, as they must for their claims to succeed under either statute, because Evoqua disclosed this policy and Plaintiffs improperly rely on allegations from confidential witnesses.

### 2. The Confidential Witnesses

#### a. The Allegations

Plaintiffs rely heavily on the accounts of multiple Confidential Witnesses, former

Evoqua employees who were interviewed by Plaintiffs' counsel before filing the Complaint, to allege falsity. As a general matter, courts consider and take as true the statements of such witnesses at this stage, even when applying the heightened standards of Rule 9(b) and the PSLRA. *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) ([W]e find no requirement in existing law that, in the ordinary course, complaints in securities fraud cases must name confidential sources."). But a plaintiff may rest on information provided by anonymous sources only when they "are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Id.*; *accord Cornwell v. Credit Suisse Grp.*, 689 F.Supp.2d 629, 637 (S.D.N.Y. 2010).

These CWs form the core of Plaintiffs' theory of liability, and the Court reviews their allegations at length. Several confidential witnesses made allegations related to this theory. They agreed that before the IPO, Evoqua "adopted a policy or practice of seeking to cut its employment costs by taking increasingly pro-active steps to replace its older and more experienced (and expensive) sales employees with far less experienced (and less qualified and effective) employees." Compl. ¶ 48. Evoqua strong-armed many employees into retirement. *See id.* ¶ 52 ("Evoqua adopted a policy of offering early retirement to its older and most experienced employees about a year before the IPO."). And "[i]f the employees failed to take the offer of early retirement, they were then effectively forced out through other means." *Id.* For example, multiple CWs alleged that Evoqua adopted a policy of forcing out its sales employees by setting impossible-to-meet quotas. The Former VP of Sales "described Evoqua's use of 'impossible' sales targets and how the salesforce had 'serious issues' with the targets they were given." *Id.* ¶ 58; *see also id.* ¶ 55 (Former Technical Sales Manager describing "unobtainable" quotas and other ways in which Evoqua "forced out employees."), ¶ 60 (Former Northwest

District Operations Manager describing the same policies). And the Former Technical Sales Manager described other tactics Evoqua used to push out employees, such as "writing people up for nonsense reasons" and "employment . . . conduct that seemed to 'get rid' of people." *Id.* ¶ 55.

These qualified sales employees were then replaced by individuals with little experience in the industry and little ability to manage Evoqua's and its clients' complex needs. For example, the Former Senior Manager "confirmed that a similar scenario of other senior managers being replaced by persons with little or no industry experience happened on many other occasions." *Id.* ¶ 51. The Former Technical Sales Manager also stated that Evoqua "deliberately pushed out for the purpose of replacing them with inexperienced—and less expensive— personnel (many of whom had no relevant water treatment equipment experience or knowledge), regardless of the adverse impact that that would ultimately have on sales." *Id.* ¶ 55.

The Former Senior Manager stated that "although these measures were intended to and did result in materially increasing Evoqua's EBITDA in the period leading up to the IPO, they had negative medium and long-term effects by significantly reducing the amount of business (and related potential revenue) in the Company's sales funnel over time." *Id.* ¶ 49; *see also id.* ("By eliminating the Company's most experienced sales teams with the deepest understanding of the long-term sales cycle and relevant customer relationships, the Company lost significant institutional knowledge and damaged its long-term sales and growth prospects."). The Former Business Development Manager "confirmed that Evoqua's policy of eliminating older and more experienced employees had a significant adverse impact on the business." *Id.* ¶ 53. This employee "heard many complaints that projects were not getting completed, because the experienced personnel who knew how to get things done (including senior engineers as well as

senior sales personnel) were no longer there . . . Bids and proposals, and follow-ups on those proposals, were taking much longer than they should have to be completed and given to customers or prospective customers . . . Other projects were delayed, had missed deadlines, and were either not being completed or being completed late because there were simply not enough senior engineers left at Evoqua to get the work completed in a timely fashion." *Id.*

### b. The Court May Rely on These Allegations

Defendants however argue that Plaintiffs cannot rely on these CWs for two reasons. First, they contend that none of these witnesses were present for the entirety of the voluntary separation plan, and thus cannot speak to its effects. Second, and relatedly, they allege that Plaintiffs' own causal theory requires the conclusion that the VSP's effects would not be felt for months, if not years, after the IPO. Both arguments fail.

Defendants are correct that courts must pay particular attention to the timing of anonymous allegations and the CWs' bases for making such allegations. For example, in *In re Lululemon Sec. Litig.*, the plaintiffs' complaint contained allegations from CWs that certain quality-control issues were widespread and known to the Defendants. 14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015). The plaintiffs "relie[d] on the CWs in order to allege that defendants' statements were false and misleading under" a similar theory of misrepresentation as Plaintiffs here: "every time defendants spoke publicly about the high quality of the company's products or the fact that the company performed quality control testing during the Class Period, such statements were false and misleading because they failed to also disclose other quality control issues and types of product testing that were not being performed." *Id.* at 579. The Court rejected this theory of liability. It noted that "[n]o CW sets forth facts that suggest that any of the alleged statements were false when they were made . . . the [complaint] does not contain the kind of required specific factual allegations (by CWs or otherwise) that

suggest if, when, or how [the defendants] knew about the issue (or its magnitude) at any time prior to March 11, 2013.  Simply put, these allegations do not render the statements described herein, considered in context, false or misleading." *Id.* at 579-80.  The Court emphasized the core inquiry when reviewing allegations resting on CWs: "The Second Circuit has made clear that 'where plaintiffs rely on confidential personal sources,' those individuals must 'provide an adequate basis for believing that the defendants' statements were false.'" *Id.* (quoting *Novak*, 216 F.3d at 314.).  Indeed, this principle is well-grounded even in the Rule 8 pleading standard; an allegation is generally not plausible if the party making the allegation has no basis on which to form her belief.

But Plaintiffs do not face a similar issue here.  Evoqua began the VSP "about a year before the IPO," in the fall of 2016.  Compl. ¶ 52; see also 12/4/17 10-K at 121-22.  The VSP continued through 2017 and ended on March 31, 2018.  5/8/18 10-Q, Def. Ex. 10, at 23-24.  Many of the CWs were present during some or all of this period.  The Former Business Development Manager "stayed with the Company through late 2018."  Compl. ¶ 52.  The Former Technical Sales Manager "left in 2018."  *Id.* ¶ 56.  The Former VP of Sales stayed until January 2018.  *Id.* ¶ 57.  The Former Senior Sales Engineer left in May 2018.  *Id.* ¶ 66.  The Northwest District Operations Manager left Evoqua "in the fall of 2018."  *Id.* ¶ 60.  The Former Senior Sales Rep also left in "the fall of 2018."  *Id.* ¶ 62.  Others left earlier.  The Former Senior Manager "left in or around the second half of 2016."  *Id.*  ¶ 48.  The Former Technical Support & Sales Manager also left "in late 2016."  *Id.* ¶ 68.  The CWs therefore were present for some or all of the change in policy, and were in a position to comment on its potential risks.  These employees also had extensive experience working as salespeople in this industry.  Drawing all inferences in Plaintiffs' favor, these employees were in a position to comment on the riskiness of

Evoqua's strategy of changing its sales staff. At this stage of litigation, the Court therefore accepts these allegations as true.

Defendants also argue that, according to Plaintiffs own theory, Evoqua would not have felt the *effects* of this change in employment during this time. Plaintiffs allege that most of Evoqua's sales "involved long-term projects . . . with sales cycles often running one to five years." *Id.* ¶ 56. In their briefing, Plaintiffs thus argue that "eliminating experienced sales personnel with the best understanding of Evoqua's business and customer relationships would not be expected to have a significant impact on reported revenue in the short term (e.g., revenue from projects that had already been approved and were underway)—but it had a material adverse impact on Evoqua's sales pipeline and its ability to procure the large projects and service contracts it needed to generate growth over the next one to three years." Pl. Br. at 9. Defendants therefore claim that the CWs left too early to know what impact their change in staffing had on sales. In effect, Defendants claim that, according to Plaintiffs' own theory, only employees who worked for Evoqua in the months and years *after* the policy concluded would have an adequate basis to comment on its effects.

Defendants' argument, however, attacks a strawman. Taking Plaintiffs' allegations as true and drawing all reasonable inferences in their favor, they argue that Defendants' statements were misleading because they failed to disclose the inevitable results of their changes in employment. Indeed, Plaintiffs argue that "as of the IPO the Company had already damaged its sales pipeline and its medium- to long-term sales and growth prospects." Pl. Br. at 9. It is that damage to the pipeline—to future sales—that Plaintiffs allege was known to the Defendants at the time of these statements and therefore should have been disclosed. Many of the CWs worked on the sales staff and some occupied managerial positions. As noted, they had each had years of

experience in the industry and at Evoqua. For purposes of the pleading stage, the Court concludes that the CWs were adequately situated to know how a change in staffing would impact Evoqua's future sales.

### 3. Defendants' Disclosures Are Not Curative

Defendants also argue that they disclosed the very policy that Plaintiffs now challenge. In its IPO materials, Evoqua informed investors that it had "initiated a Voluntary Separation Plan (VSP) during the year ended September 30, 2016." 10/3/17 S-1 at F-30. Evoqua further explained that the "VSP plan includes severance payments to employees as a result of streamlining business operations for efficiency, elimination of redundancies, and reorganizing business processes." *Id.* Evoqua explained that VSP was a "restructuring plan[]" implemented "[t]o better align its resources with its growth strategies and reduce the cost structure." F-78. And Evoqua stated, as one of its "risk factors," that "[w]e have implemented a voluntary separation program intended to mitigate the risks associated with knowledge transfer, but we cannot guarantee that it will be effective or cost-efficient." *Id.* The Company also made a series of more general statements regarding its sales employees, some of which the Court quoted above. For example, Evoqua stated, again as one of its risk factors, that "[f]ailure to retain our existing senior management, skilled technical, engineering, sales and other key personnel or the inability to attract and retain new qualified personnel could materially adversely impact our ability to operate or grow our business." *Id.* ¶ 152.

Defendants are correct that "there can be no omission where the allegedly omitted facts are disclosed." *In re Progress Energy, Inc*., 371 F.Supp.2d 548, 552 (S.D.N.Y. 2005). This is known as the truth-on-the-market defense. As the Second Circuit has explained, "a misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market." *Ganino v. Citizens Utilities Co*., 228 F.3d

154, 167 (2d Cir. 2000).

Defendants' disclosures regarding Evoqua's Voluntary Separation Policy are insufficient for the defense to kick in and cure the misleading nature of their statements. To start, Plaintiffs allege several facts that are not disclosed. Defendants' disclosures say nothing of the allegation that if older employees did not take the retirement package, they were effectively forced out through other means, like impossible-to-meet sales quotas. *See* Compl. ¶ 52. For example, the former District Operations Manager noted that the voluntary separation policy did not capture employees who were otherwise laid off. *Id.* ¶ 60. The Former Senior Sales Rep agreed, noting that employees *outside* the VSP were "effectively forced to leave," including "experienced sales staff." *Id.* ¶ 62. These disclosures say nothing of the allegation that these experienced staff members were replaced with employees who lacked experience in sales. And these disclosures say nothing about what Plaintiffs allege was a *fait accompli*—that this policy would damage Evoqua's ability to retain clients and generate new sales. Indeed, the Defendants did not even disclose which employees—those in sales and integration management—were impacted by the VSP.

Moreover, drawing all inferences in Plaintiffs' favor, as the Court must at this stage, the risks disclosed by Defendants had *already* materialized as of the IPO and SPO. According to Plaintiffs, Evoqua's changes to its sales force were guaranteed to have a negative effect on sales after the IPO. Defendants' disclosures however were hypothetical. For example, Defendants point to statements like "failure to retain . . . sales . . . personnel . . . *could* materially adversely impact our ability to operate or grow our business" and "[w]ithout a sufficient number of skilled employees, our operations. . . *could* suffer." Compl. ¶¶ 151, 381 (emphases added). Warning of risks that that *could* occur at some *future date* does not warn investors that those risks have

already come to pass.  *See Rombach*, 355 F.3d at 173 ("Cautionary words about future risk

cannot insulate from liability the failure to disclose that the risk has transpired."); *In re Van der*

*Moolen Holding N.V. Sec. Litig*., 405 F. Supp. 2d 388, 400 (S.D.N.Y. 2005) ("to warn that the

untoward may occur when the event is contingent is prudent; to caution that it is only possible

for the unfavorable events to happen when they have already occurred is deceit." (internal

quotation marks and citation omitted)).  As Plaintiffs explain, "[n]owhere . . . did the IPO or SPO

Materials or Evoqua's other Class Period statements disclose how its employment practices in

the 24 months before the IPO had resulted in a wholesale replacement of experienced employees

by vastly less qualified new hires—and how as a result Evoqua's business and ability to have

'continued success' had already been adversely affected as of the IPO."  Pl. Br. at 10.  Because

Defendants' statements were hypothetical, they are not curative.

* * *

In short, Plaintiffs have stated a claim on their first theory of liability under the Securities

Act.  To be sure, Defendants can poke holes in this theory during discovery and demonstrate

falsity or immateriality.  Perhaps the new replacement employees were in fact able to maintain

their predecessors' sales figures.  Or perhaps Defendants are correct that, on net, Evoqua saved

money by retiring these employees even if it lost out on some sales, possibly rendering any

misstatement immaterial.  But at this stage of the litigation, the reports from the CWs are

sufficient to demonstrate falsity.

### F.  Defendants' Statements Regarding Evoqua's Acquisitions

Plaintiffs second theory of liability concerns Evoqua's statements regarding its

acquisitions and efforts at integrating those companies into its operations.  As noted, "Evoqua

[had] developed a business model of expansion through acquisition" in the years leading up to

the IPO.  Compl. ¶ 36.  In the eighteen months before its IPO, Evoqua completed eight

acquisitions, spending hundreds of millions of dollars. *Id.* ¶ 37. And it regularly opined about its acquisitions and integration efforts in its IPO and SPO materials. Plaintiffs allege that those statements were misleading, both because Evoqua terminated the staff members responsible for integration and because the company faced serious problems in integrating one of its new acquisitions, Neptune-Benson. The Court concludes that Plaintiffs have stated a claim under both Sections 11 and 12(b) under this theory of liability.

### 1. The Challenged Statements

Once again, the Court begins by reviewing some of the statements challenged by Plaintiffs. Evoqua made the following statements in its offering materials:

- "Our management team has also expanded our operations to new target markets and geographies and has demonstrated successful acquisition and integration capabilities." *Id.* ¶ 145.
- "Commercialize and drive adoption of nascent and newly acquired technologies by leveraging our sales channels and application expertise." *Id.* ¶ 204.
- "We believe that tuck-in acquisitions present a key opportunity within our overall growth strategy, which we will continue to evaluate strategically." *Id.* ¶ 146.
- "Continue to evaluate and pursue accretive tuck-in acquisitions to add new technologies, attractive geographic regions and end-markets." *Id.*
- "Our growth strategy includes acquisitions, and we may not be able to identify suitable acquisition targets or otherwise successfully implement our growth strategy." *Id.* ¶ 148.
- "We may have difficulty in operating or integrating any acquired businesses, assets or product lines profitably or in otherwise successfully implementing our growth strategy." *Id.*

Plaintiffs allege that "[t]hese statements were materially false and misleading because the Company had . . . terminated critical integration personnel, including the most experienced employees, impeding the Company's ability to successfully integrate the numerous companies that it had acquired." *Id.* ¶ 147.

## 2. The Confidential Witnesses

To demonstrate falsity, Plaintiffs once again rely heavily on allegations made by various Confidential Witnesses. For example, the Former Director of Materials "work[ed] directly on the integration of Evoqua's acquisitions." *Id.* ¶ 72. She stated that "Evoqua's efforts to integrate its pre-IPO acquisitions in 2016 and 2017 were adversely affected as Evoqua eliminated the individuals with the most experience integrating acquired companies." *Id.*; see also *id.* ¶ 73 ("The Former Director of Materials recounted that Evoqua's integration efforts were impacted by the fact that the group who did integration work . . . had 'shrunk drastically.'"). Similarly, the Former SAP Program Manager alleged that "Evoqua pressured higher paid employees to leave and brought in lower paid, less experienced employees." *Id.* ¶ 74. She alleged that because of this decision, "there was no visible accretion from Evoqua's acquisitions." *Id.* ¶ 75.

Plaintiffs point to a particular acquisition, that of Neptune-Benson, as emblematic of these problems. Neptune-Benson was "a leading provider of water filtration and disinfection products." *Id.* ¶ 37. Evoqua acquired Neptune-Benson in April 2016 for about $284 million, and the company "effectively became part of Evoqua's Product segment." *Id.* The Former Director of Materials recounted some of these issues, noting for example that Neptune-Benson "continued to use a different accounting system from the rest of Evoqua and was not on the Company's SAP Enterprise Resource Planning ('ERP') tool." *Id.* ¶ 73. The Former SAP Program Manager likewise "stated that Evoqua had issues with integration because it was unwilling to allocate sufficient resources to this task. She provided "the Neptune-Benson acquisition as an example of a poorly done integration." *Id.* ¶ 75.

## 3. Defendants' Arguments Against Falsity and Materiality Fail

Defendants make several arguments for why Plaintiffs have failed to state a claim as to this theory of liability. First, they argue that allegations from the two CWs discussed above

should be discounted because they "left the Company well before the Class Period." Def. Br. at 18. As discussed above, courts must consider the timing of CWs' allegations. Defendants are correct that both CWs left Evoqua's employment before the class period: the Former Director of Materials left in "late 2016," and the Former SAP Program Manager in March 2017. Compl. ¶¶ 72, 74. But there is no bright-line rule prohibiting courts from considering allegations that predate the Class Period. To the contrary, courts in this Circuit frequently consider such allegations in denying motions to dismiss. *See, e.g.*, *In re Scholastic Corp. Sec. Litig*., 252 F.3d 63, 72 (2d Cir. 2001) (holding that pre-class period data is relevant when evaluating scienter allegations); *Cornwell v. Credit Suisse Grp*., 689 F. Supp. 2d 629, 638 (S.D.N.Y. 2010) ("allegations concern[ing] reports made before the Class Period . . . persuade the Court that, when drawing all possible inferences in favor of the Lead Plaintiffs, this knowledge remained pertinent to the Defendants' public statements during the Class Period."). Here, the allegations from these two CWs support Plaintiffs' theory that Evoqua faced serious problems with integrations, in large part because it fired key staff overseeing this process. As in *Cornwell*, these "witnesses have been described well enough to allow the Court to conclude that a person in the position of each of the witnesses would have had access to the information alleged." 689 F. Supp. 2d at 638. Accepting Plaintiffs' well-pleaded allegations as true and drawing all inferences in their favor, these allegations are sufficient to make out this theory of liability.

Second, Defendants again argue that Evoqua's disclosures cure any misleading statements. Evoqua's IPO Prospectus stated that the Company might "have difficulty in operating or integrating any acquired businesses, assets, or product lines profitably." Compl. ¶ 30. Defendants thus claim that Plaintiffs' acquisition theory should fail as a matter of law. This argument fails because Defendants once again ask the Court to move the goalposts by

which their liability should be measured.  Reading their Complaint favorably and drawing all reasonable inferences in their favor, Plaintiffs allege that—*at the time that statement* was made—Evoqua had *already* fired integration staff and that the Neptune-Benson was *already* going poorly.  A hypothetical disclosure about potential future problems is therefore not curative.

Third, Defendants argue that some of the statements which Plaintiffs allege as misleading are in fact non-actionable puffery.  In particular, they point to Evoqua's statement that "[o]ur management team has also expanded our operations to new target markets and geographies and has demonstrated successful acquisition and integration capabilities."  *See, e.g.*, Compl. ¶ 146.  They argue that Evoqua's use of the word "success" makes this puffery.  But whether "a representation is 'mere puffery' depends, in part, on the context in which it is made."  *In Petrobras*, 116 F.Supp.3d at 381; *Arkansas Teacher Ret. Sys.*, 18 F.Supp.3d at 485 ("[W]hile a term like 'high quality' might be mere puffery or insufficiently specific to support liability in some contexts, it is clearly a material misrepresentation when applied to assets that are entirely worthless.").  To be sure, a representation that something is a "success" can be puffery.  Here, however, the word modifies a particular noun—acquisition and integration capabilities.  Drawing all reasonable inferences in Plaintiffs' favor, the statement in context represents that Evoqua *has* demonstrated these capabilities successfully.  Unlike statements other Courts have found to be puffery, this statement is not entirely "subjective" and can "be proven true or false."  *See Stokely-Van Camp, Inc. v. Coca-Cola Co.*, 646 F. Supp. 2d 510, 526 (S.D.N.Y. 2009).  The Court cannot conclude that *no* reasonable investor would rely on this statement, and thus puffery doctrine cannot defeat Plaintiffs' claim at this stage of litigation.

* * *

In short, Plaintiffs have stated a claim on their second theory of liability under the

Securities Act. Once again, the clarifying light of discovery may prove this claim has little merit. But at this stage, Plaintiffs have satisfied the burden of Rule 9(b).

### G. Defendants' Financial Results

Plaintiffs' final theory of liability is that Evoqua inflated its financial results for months through various accounting tricks, largely in violation of GAAP. The Court concludes that Plaintiffs have also stated a claim under both Sections 11 and 12(b) under this theory of liability.

### 1. The Challenged Statements

The Court begins by reviewing the statements Plaintiffs challenge as misleading. The statements in this category are partially qualitative, like the other ones the Court has discussed thus far. For example, Plaintiffs challenge the following:

- "Sales of goods and services are recognized when persuasive evidence of an arrangement exists, the price is fixed or determinable, collectability is reasonably assured and delivery has occurred or services have been rendered." Compl. ¶ 254.
- "Revenues from construction-type contracts are generally recognized under the percentage-of-completion method, based on the input of costs incurred to date as a percentage of total estimated contract costs." *Id.*

Plaintiffs allege that "these representations were materially false and misleading, as Defendants knowingly or recklessly caused Evoqua to issue financial statements that were predicated on fraudulent financial manipulations. In particular, Evoqua's financial statements artificially and improperly inflated the Company's revenue by employing fraudulent revenue recognition practices, including the use of outside vendors to store allegedly "sold" products when the risk of loss had not passed, recognition of revenue each quarter on fictitious sales and shipments on products, channel stuffing with unreported right of return, and premature recognition of revenue – all of which caused Evoqua's reported revenue during the Class Period to be materially overstated." *Id.* ¶ 255.

Plaintiffs also challenge the quantitative statements of financial data included in the IPO

and SPO materials. For example, they challenge the following statements:

- "For the fiscal year ended September 30, 2016, we generated revenue, net income and Adjusted EBITDA of $1.1 billion, $13.0 million and $160.1 million, respectively. For the fiscal year ended September 30, 2016, we generated pro forma revenue, pro forma net income and Adjusted EBITDA (pro forma as adjusted for contributions from insignificant completed acquisitions) of $1.2 billion, $16.8 million and $182.4 million, respectively." Compl. ¶ 154.

- Evoqua incurred "[r]estructuring and related business transformation costs" related to severance costs, including: "$16.9 million in fiscal 2016 . . . , a range of $19.8 million to $20.2 million in fiscal 2017, $16.9 million for the three months ended September 30, 2016 and a range of $0.9 million to $1.0 million in the three months ended September 30, 2017 related to our voluntary separation plan pursuant to which approximately 220 employees accepted separation packages." *Id.* ¶ 155.

They argue that "[t]hese statements were materially false and misleading because Defendants engaged in accounting misconduct that artificially and materially inflated Evoqua's reported revenues, income, and EBITDA in violation of GAAP, including, but not limited to, by: (i) improper revenue recognition and (b) understatement of expenses. These statements were also materially false and misleading because Evoqua also engaged in a range of other dubious and undisclosed "channel stuffing" practices which had the effect of concealing the extent to which Evoqua was struggling to grow organically." *Id.* ¶ 155.

## 2. The Confidential Witnesses

Plaintiffs again rely heavily on the allegations of Confidential Witnesses to support this theory. For example, the Former Senior Manager stated that "Evoqua had a history of sporadically 'bringing forward' revenues on long-term, multi-year service contracts with clients so that Evoqua could recognize the revenue in an earlier quarter, regardless of whether the relevant services had been performed at the time of billing." Compl. ¶ 98. The Former Senior Manager provided Evoqua's contracts with PSE&G and Con Edison as examples of this practice, noting that the Company's policy of "'pulling forward' the revenue on such contracts could

result in an extra $50,000 to $150,000 in revenue for a current quarter, but at the expense of the following quarter." *Id.* Similarly, the Former SAP Program Manager "reported that Evoqua was booking revenue at the letter of intent stage and that service contracts were being recognized too early" and stated that "everything was frontloaded and aggressive." *Id.* ¶ 77. She pointed to a specific example: Evoqua improperly labeled certain costs related to its "contract with a Cincinnati-based company called Itelligence." *Id.*

Defendants argue that the Court should reject these allegations as not well-pleaded because none of the CWs worked in Evoqua's accounting department. As noted, Plaintiffs may rely on CWs only if they are "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 314. Defendants contend that because these CWs worked in sales positions, and not in Evoqua's accounting division, they cannot plausibly speak to its revenue-recognition practices. But at this stage, the Court must draw all inferences in Plaintiffs' favor. These experienced sales employees allege that they were involved in negotiating the deals and formalizing the contracts that led to revenues at Evoqua being recognized. Drawing all inferences in their favor, Plaintiffs plausibly allege that these CWs had sufficient knowledge about Evoqua's sales and revenue-recognition process to make plausible allegations about its accounting fraud.

### 3. Schuck and Moriarty's Allegations

Plaintiffs also point to allegations made in filings by Schuck and Moriarty in the Rhode Island state-court litigation. As noted, Jennifer Schuck was "Neptune-Benson's Director of Supply Chain before Evoqua acquired it in April 2016" and then became "Materials Manager at Evoqua's NB/Aquatics unit." Compl. ¶ 81. In her Rhode Island state-court counterclaim against Evoqua, she alleged several specific transactions that involved fraudulent accounting practices.

For example, she described a project called "American Dream," in which "the Company purchased a number of shipping containers, which were loaded with expensive filters and used to store the product for over a year, until the customer actually needed them delivered to the job site. To persuade the customer to go along with these arrangements . . . Evoqua offered the customer deeply discounted prices and extended payment terms (as well as free storage)." *Id.* ¶ 85. She also discussed "an expensive project in China, known as 'Ocean Park.'" She averred that [a]lthough Evoqua knew that the customer did not actually need the product—which included 13 filters and multiple UV units—until two years later in late 2018, to improve Evoqua's 2016 financial statements, Evoqua shipped the product to be warehoused in Hong Kong . . . to avoid internal scrutiny, although Evoqua agreed to pay for storage at $3,000 per month (for an estimated total cost of over $60,000), Evoqua arranged to have these costs nominally paid by one of NB/Aquatics' agents in Asia, with the understanding that Evoqua's N/B-Aquatics unit would reimburse the agent at a later date." *Id.* ¶ 84.

Defendants argue that the Court should ignore the factual allegations in these filings. But Courts in this District have made clear that there is no "bright-line rule prohibiting citations to allegations from other proceedings." *Hirsch v. Complex Media, Inc.*, No. 18 CIV. 5488 (CM), 2018 WL 6985227, at *10 (S.D.N.Y. Dec. 10, 2018); *accord In re Bear Stearns Mortgage Pass-Through Certificates Litig.*, 851 F.Supp.2d 746, 768 (S.D.N.Y. 2012) ("It makes little sense to say that information . . . which [the complaint] could unquestionably rely on if it were mentioned in a news clipping . . . is immaterial simply because it is conveyed in an unadjudicated complaint."). The Court does not craft such a rule here. To be sure, Defendants may be correct that Schuck and Moriarty's allegations lack merit—but that is not at issue on a motion to dismiss. Moreover, the finding of other courts that these individuals are not credible do not

compel this Court to ignore these allegations, both because those decisions do not bind the Court and because it is inappropriate to make a credibility determination at this stage. The Court therefore considers the allegations made in the state-court proceedings. And taking these allegations along with those made by the CWs, the Court concludes that Plaintiffs have adequately pleaded falsity.

### 4. Plaintiffs Have Alleged Materiality

Defendants also argue that Plaintiffs have failed to plead materiality as to their accounting theory. "To prove a violation of the federal securities laws, plaintiffs must show that there is a 'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" *In re Duke Energy Corp. Sec. Litig.*, 282 F. Supp. 2d 158, 160 (S.D.N.Y. 2003) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)). Moreover, courts in this Circuit apply a materiality analysis specific to accounting claims: they compare the financial impact of the alleged violation to the Company's general finances. "[T]he Second Circuit and district courts within this Circuit have repeatedly held that accounting categorizations of such small magnitude, when compared against a company's much larger total assets, are not 'material.'" *In re UBS AG Sec. Litig.*, No. 07-cv-11225 (RJS), 2012 WL 4471265, at *23 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014) (quoting *JP Morgan*, 553 F.3d at 204) ("[C]hanging the accounting treatment of approximately 0.3% of [the company's] total assets from trades to loans would not have been material to investors" (internal quotation marks omitted)); *see also Garber v.. Legg Mason, Inc.*, 537 F.Supp.2d 597, 613 (S.D.N.Y. 2008) (holding that an omission regarding 0.4% in the company's annual revenue was immaterial because "[t]his share is simply too small to be material as a matter of law when considered in the broad context of the company's revenues and

expenses"); *Duke Energy*, 282 F.Supp.2d at 161 (collecting cases and holding that a 0.3% overstatement of the defendant's revenues was "an immaterial percentage as a matter of law").

The parties dispute whether Plaintiffs have alleged a material misrepresentation as to their accounting claims, and each accuses the other of comparing apples to oranges. This sort of analysis at the pleading stage is possible because several CWs and Schuck quantify some of the revenue they believe was misreported. For their part, Plaintiffs posit that they have alleged materiality by comparing the "at least $4.4 million worth of improperly recorded deals" to Evoqua's "net income of $6.4 million for FY 2017." Pl. Br. at 22. Defendants are correct, however, that this comparison widely misses the mark. The appropriate comparison is either between net income derived from the fraud and total net income, *or* revenue derived from the fraud and total revenue. As to the former, in FY17, Evoqua's publicly-reported conversation rate was 0.5%, 12/4/17 10-K at 68, meaning that only 0.5% of its revenue "flowed to the bottom line as net income." Def. Reply Br. at 8-9. "Applying that conversion rate to Plaintiffs' $4.4 million revenue figure yields a net income impact of *about $20,000*." *Id.* (emphasis in original). As to the latter, Plaintiffs allege $4.4 million revenue, and Evoqua's FY17 revenue was $1.25 billion. Plaintiffs thus allege an impact of 0.37% on Evoqua's revenue. Courts have stated that such a small a percentage, by itself, can evince a lack of materiality. *See, e.g.*, *In re Lone Pine Res., Inc.*, No. 12 CIV. 4839 GBD, 2014 WL 1259653, at *4 (S.D.N.Y. Mar. 27, 2014) ("An omission or misstatement that has an impact of less than 5% on a company's reported financial metrics is presumptively immaterial.").

Yet Defendants argument against materiality still fails at this stage. To start, Plaintiffs' do not limit their financial misconduct allegations to these types of transactions. They also allege that Evoqua engaged in improper "channel stuffing" practices, "which had the effect of

concealing the extent to which Evoqua was struggling to grow organically." Compl. ¶ 121. For example, Evoqua "offered unusually deep discounts and unusually long extended payment terms to incentivize customers to purchase products, particularly at the end of financial quarters." *Id.* ¶ 122. The Former Technical Sales Manager alleged that Evoqua "adopted a short-sighted strategy that was focused on trying to ramp up the Company's short-term sales numbers from smaller, short-term sales at the expense of cultivating larger projects and long-term customer relationships." *Id.* ¶ 124. Defendants' quantitative analysis fails to take these claims into account.

Moreover, the allegations Plaintiffs quantify are pled as *representative*, not entirely inclusive, of broader misconduct. The CWs and Schuck make clear that they give particular transactions as examples of broader accounting fraud and misconduct. For example, the Former VP of Sales alleged that about 10% "of the data in the Company's CRM system (used for tracking and managing the Company's sales pipeline/sales funnel information) was 'bad,' meaning that the prospective sales listed included deals that had either already closed, had stalled or been canceled, or had otherwise had their status misstated." Compl. ¶ 119. Reading the Complaint favorably, as the Court must, Plaintiffs allege misconduct far greater than the particular transactions discussed above. Plaintiffs are entitled to discovery as to the scope of this financial misconduct. Indeed, at this stage of litigation, Plaintiffs are not obligated to quantify each alleged GAAP violation. Even under the heightened standard of Rule 9(b), this would pose an almost insurmountable burden on plaintiffs before discovery.

And as this Court has explained, "[t]he Second Circuit has previously emphasized that courts cannot rely solely on the quantitative impact of a misstatement, but must consider quantitative factors in conjunction with qualitative factors." *BioScrip*, 95 F.Supp.3d at 738; *see*

*Litwin*, 634 F.3d at 719 (overturning District Court's conclusion that misstatement was immaterial solely because it fell below 5%). "If district courts were to simply apply the five percent rule of thumb in a rote manner, it would 'effectively sanction misstatements . . . so long as the net effect on revenues . . . was immaterial.'" *BioScrip*, 95 F. Supp. 3d at 738 (quoting *Litwin*, 634 F.3d at 719); *see also City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*, 875 F.Supp.2d 359, 368 (S.D.N.Y.2012) (observing that five percent threshold is "merely a rule of thumb" and that "materiality cannot be reduced to a numerical formula"). Instead of relying on a one-size-fits-all rule, the Court must engage in "a fact-specific inquiry." *ECA, Local 134 IBEW*, 553 F.3d at 197 (citing *Basic*, 485 U.S. at 240). Just as in *BioScrip*, Plaintiffs here allege misrepresentations related to "a particularly noteworthy segment of" Evoqua's overall business—its sales and integration management. *BioScrip*, 95 F.Supp.3d at 737-38; s*ee also Litwin*, 634 F.3d at 720 ("Even where a misstatement or omission may be quantitatively small compared to a registrant's firm-wide financial results, its significance to a particularly important segment of a registrant's business tends to show its materiality."). Accordingly, at this stage, the Court cannot conclude that the alleged overstatements of revenue were immaterial as a matter of law. *See City of Pontiac*, 875 F.Supp.2d at 368.

* * *

After the close of discovery, these GAAP violations may very well prove to be a small fraction of Evoqua's total revenue. Accepting their allegations as true and drawing all reasonable inferences in their favor, however, Plaintiffs have stated a claim under their accounting theory of liability. Plaintiffs have thus stated a Securities Act claim under all three of their theories.

## VI. PLAINTIFFS' EXCHANGE ACT CLAIMS FAIL BECAUSE THEY HAVE FAILED TO PLEAD SCIENTER

Plaintiffs' also allege that Evoqua, Ronald Keating, and Benedict Stas violated § 10(b) of the Exchange Act and SEC Rule 10b-5. Compl. ¶¶ 302-314. The Court concludes that Plaintiffs have failed to state a claim under these provisions because they have not put forward well-pleaded allegations that these three Defendants acted with scienter.

### A. Legal Standard

To maintain a private securities action under § 10(b) of the Exchange Act and SEC Rule 10b–5, "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 151 (2d Cir. 2010) (citation omitted). For purposes of this case, the Court focuses on the second of these requirements—scienter.[2]

Securities-fraud claims under § 10(b) and Rule 10b-5 must also satisfy two layers of heightened pleading requirements. First, they must satisfy Rule 9(b). *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). As discussed above, Rule 9(b) requires that a complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.* Second, "private securities fraud actions must also meet the PSLRA's pleading requirements or face dismissal." *Id.*; *see* 15 U.S.C. § 78u–4(b)(1). The PSLRA "specifically requires a complaint to demonstrate that the defendant made '[m]isleading

---

[2] Because the Court dismisses Plaintiffs' Exchange Act claims on scienter grounds, it does not address Defendants' separate argument that Plaintiffs have failed to plead loss causation.

statements [or] omissions. . . of a material fact,' 15 U.S.C. § 78u–4(b)(1), and acted with the '[r]equired state of mind' (the 'scienter requirement'), *id.* § 78u–4(b)(2)." *Emps. Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015). The PSLRA further requires that a plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.*

Plaintiffs rest their Exchange Act claims in part on the same statements discussed above. They argue that Defendants' statements in the IPO an SPO materials were misleading for the same reasons. Just like the Securities Act, the Exchange Act "impose[s] an obligation on speakers to be both accurate and complete." *In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 282 (S.D.N.Y. 2011). "[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014).

But unlike Sections 11 and 12(a), the duties of the Exchange Act go beyond just statements made in materials related to offerings. Plaintiffs thus also allege that Defendants made materially misleading statements "in Evoqua's quarterly earnings releases and earnings calls and its 2Q and 3Q 2018 Form 10-Qs and at investor presentations during the Class Period." Pl. Br. at 47. These statements, made by Evoqua and the Individual Defendants, largely mirror those made in the offering materials. *See, e.g.*, ¶ 233 (alleging that statement by Keating on Evoqua's 3Q 2018 earnings call that "[o]ur 2016 Neptune Benson platform acquisition positioned us solidly in the aquatics market . . ." was materially misleading), ¶ 199 (challenging slides for Keating's conference presentation stating that Evoqua had "[b]uilt out dedicated M&A team and standardized execution" as misleading). Because the Court does not address the parties' falsity or materiality arguments at to these statements, it is not necessary to review them

in detail.

**B. Plaintiffs Fail to Allege Scienter**

**1. The Scienter Requirement**

Under the PSLRA, in order to plead scienter, a plaintiff must allege facts with particularity that would give rise "to a strong inference that the defendant acted with the required state of mind." *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (quoting 15 U.S.C. § 78u–4(b)(2)). Scienter may be established by showing either: "(1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *Glaser v. The9, Ltd.*, 772 F.Supp.2d 573, 586 (S.D.N.Y. 2011) (internal citations omitted). When determining whether Plaintiffs alleged a strong inference of scienter, a court must consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007) (emphasis in original).

The PSLRA's "strong inference" requirement involves "taking into account plausible opposing inferences and considering plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Blanford*, 794 F.3d at 305. It is "not enough to set out facts from which, if true, a reasonable person could infer that the defendant acted with the required intent." *In re Advanced Battery Techs., Inc.*, 781 F.3d 638, 644 (2d Cir. 2015). Rather, "[t]he inference of scienter must be cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* A plaintiff adequately alleges a "strong inference" of scienter "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. "In determining whether this inference can be reasonably

drawn, courts must consider both the inferences urged by the plaintiff and any competing inferences rationally drawn from all the facts alleged, taken collectively." *ECA*, 553 F.3d at 198. In other words, the Court "must assess the complaint in its entirety, and not scrutinize each allegation." *Blanford*, 794 F.3d at 305.

Both Rule 9(b) and the PSLRA require that "[i]n a case involving multiple defendants, plaintiffs must plead circumstances providing a factual basis for scienter for each defendant; guilt by association is impermissible." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009); *accord C.D.T.S. No. 1 & A.T.U. Local 1321 Pension Plan v. UBS AG*, 2013 WL 6576031, at *6 (S.D.N.Y. Dec. 13, 2013), *aff'd sub nom.*, *Westchester Teamsters Pension Funds v. UBS AG*, 604 F. App'x 5 (2d Cir. 2015) (scienter "must be separately pled and individually supportable as to each defendant; scienter is not amenable to group pleading."); *The Penn. Ave. Funds v. Inyx Inc.*, No. 08-cv-6857 (PKC), 2010 WL 743562, at *12 (S.D.N.Y. Mar. 1, 2010) ("[G]roup pleading of scienter . . . runs afoul of the PSLRA's requirement that a plaintiff 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" (citation omitted)). The Court therefore reviews Plaintiffs' allegations as to each Securities Act Defendant.

### 2. The Individual Defendants

The Court first reviews the allegations supporting scienter as to the two individual Exchange Act Defendants, Ronald Keating and Benedict Stas.

### a. Plaintiffs' Theory of Motive

Plaintiffs first theory of scienter as to Defendants Keating and Stas rests on their sale of Evoqua stock in the Company's public offerings. Plaintiffs allege that these Defendants had the motive and opportunity to commit fraud based on trades that purportedly generated "huge insider trading profits." Compl. ¶ 273. In support of this theory, Plaintiffs lay out Defendants' trading

records from the IPO and SPO. For example, CEO Keating sold about 350,000 shares of Evoqua stock in the SPO, representing 44% of his holdings, for proceeds of about $7 million. *Id.* ¶ 275. Defendant Stas is alleged to have made similar trades in the SPO. *Id.*

Insider sales may contribute to an inference of scienter where a plaintiff can show that the trading activity was unusual. *See Rothman v. Gregor*, 220 F.3d 81, 94 (2d Cir. 2000). A stock sale may be deemed unusual when it is made at a time or in an amount that suggests that the seller is maximizing personal benefit from inside information. *Acito v. IMCERA Group, Inc*., 47 F.3d 47, 54 (2d Cir. 1995). "Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." *In re Scholastic*, 252 F.3d at 74–75. Here, there are no allegations that any Executive Defendant sold shares at any time other than in connection with the IPO and SPO.

At least one District Court has concluded that sales by executives during public offerings, like the ones here, categorically do not raise an inference of scienter. *See In re AFC Enters. Sec. Litig*., 348 F. Supp. 2d 1363, 1373 (N.D. Ga. 2004), *aff'd sub nom.*, *Exec. Risk Indem., Inc. v. AFC Enters*., 279 F. App'x 793 (11th Cir. 2008). In *AFC*, the Northern District of Georgia held that sales in public offerings by executives are "not uncommon or otherwise suspicious," noting that "the sale of stock is often the point of the offering," and therefore do not give rise to an inference of scienter. *Id.* (citing *Southland Sec. Corp. v. INSpire Ins. Sols., Inc*., 365 F.3d 353, 369 (5th Cir. 2004)). One Court in this District, however, has rejected this categorical rule. In *City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc*., Judge Koeltl explained that "the fact that the Individual Defendants' sales were the result of an IPO is not dispositive of the question whether all the facts and circumstances are sufficient for purposes of alleging sufficient

motive." 814 F. Supp. 2d 395, 421–22 (S.D.N.Y. 2011) ("The defendants' argument essentially amounts to a claim that an interest in stock sold in an IPO or significant public offering could *never* qualify as motive for purposes of scienter. This is plainly incompatible with the holding by the [Second Circuit] that 'motive [can be] sufficiently pleaded where plaintiff allege[s] that defendants misrepresented corporate performance to inflate stock prices while they sold their own shares.'" (quoting *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001))).

The Court agrees with Judge Koeltl—Second Circuit precedent forecloses the creation or application of a categorical rule here. However, the fact that the Individual Defendants sold only in public offerings cuts against an inference of scienter, because it suggests a motive that is "generally possessed by most corporate directors and officers." *Kalnit*, 264 F.3d at 139. Plaintiffs' other allegations relating to Keating and Stas' trading activity also cut against an inference of scienter. To start, Stas did not sell any shares in the IPO. And the Class Period continued for seven months after the SPO, but neither Keating nor Stas is alleged to have made any additional stock trades during that time. On Plaintiffs' theory of liability, it was during this period that Evoqua continued to remove key personnel and pull forward revenue, rendering its post-offering market crash a foregone conclusion—yet no Defendant sold any more shares. Nor did any Defendant trade in the weeks surrounding the first allegedly negative disclosure in May 2018, let alone in the *months* surrounding the ones that came later in 2018. "Indeed, courts in this Circuit are frequently skeptical that stock sales are indicative of scienter where no trades occur in the months immediately prior to a negative disclosure." *Reilly v. U.S. Physical Therapy, Inc.*, No. 17 CIV. 2347 (NRB), 2018 WL 3559089, at *14 (S.D.N.Y. July 23, 2018) (collecting cases); *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 271 (S.D.N.Y. 2009) ("Plaintiffs' allegations are empty vessels, as the trades occurred . . . many months before the

release of any negative information that caused [defendant's] stock price to plummet."). Moreover, Defendants' stock holdings actually increased during the Class Period. *See* Def. Br. at 49 (citing Keating Form 3 dated 11/1/17 and Form 4 dated 3/21/18; Stas Form 3 dated 11/1/17 and Form 4 dated 3/21/18). Plaintiffs also argue that Defendants' trades were suspicious based on their amount alone. But "without more, the amount of stock sold cannot be determinative . . . courts routinely find that raw sales numbers alone are insufficient to establish scienter." *Reilly*, 2018 WL 3559089, at *15 (collecting cases).

In short, it is well-established that "[w]hile 'unusual' executive stock trading under some circumstances may give rise to an inference of fraudulent intent, *executive stock sales, standing alone, are insufficient to support a strong inference of fraudulent intent*." *In re Bristol–Myers Squibb Sec. Litig.*, 312 F.Supp.2d 549, 561 (S.D.N.Y. 2004) (emphasis added); *accord Lululemon*, 14 F. Supp. 3d at 584–85. Plaintiffs here put forward no well-pleaded allegations giving rise to an inference of scienter based on Defendants' trading activity.

### b. Plaintiffs' Accounting Theory

Plaintiffs also attempt to allege scienter by resting on their accounting theory of liability. They argue that they have alleged "well-pled deliberate violations of GAAP," which in turn establish "strong circumstantial evidence of conscious misbehavior or recklessness." Pl. Br. at 52. This argument fails.

If there is no showing of improper motive, as is the case here, a plaintiff may establish scienter by "strong circumstantial evidence of conscious misbehavior or recklessness" by, among other things, "sufficiently alleg[ing] that the defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *ECA*, 553 F.3d at 199 (quotation marks and

citations omitted). To sufficiently "plead recklessness through circumstantial evidence, [a plaintiff] would have to show, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* at 202-03 (quotation marks and citation omitted). Although circumstantial evidence of conscious misbehavior or recklessness may support a strong inference of scienter, "the strength of the circumstantial allegations must be correspondingly greater if there is no motive." *Id.* at 199 (citation omitted). In the securities-fraud context, recklessness "must be conduct that is highly unreasonable, representing an extreme departure from the standards of ordinary care, not merely a heightened form of negligence." *In re Advanced Battery Techs., Inc.*, 781 F.3d at 644 (internal quotation marks and citation omitted). An "allegation that defendants behaved recklessly is weakened by their disclosure of certain financial problems prior to the deadline to file its financial statements." *Rombach*, 355 F.3d at 176. And as always, to determine whether the complaint raises a "strong inference" of scienter, courts must "take into account plausible opposing inferences" to determine whether the inference of scienter is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 323-24.

Plaintiffs cite the Second Circuit's decision in *Novak* as establishing a rule that "persuasive allegations" of GAAP violations "give rise to a strong inference of scienter of scienter as to a corporate defendants' CEO, CFO, and other senior officers." Pl. Br. at 52. But that is not what the Court in *Novak* held. Just the opposite: the Second Circuit made clear that "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim." *Id.* at 309. To succeed, Plaintiffs must put forward "evidence of

corresponding fraudulent intent," *separate and apart from* the accounting violations themselves. *Id.* (internal quotation marks omitted). The Second Circuit has long applied this standard, repeatedly holding that violations of GAAP are by themselves insufficient to state scienter. *See, e.g.*, *In re Advanced Battery Techs., Inc*., 781 F.3d at 644 ("Mere allegations of GAAP violations or accounting irregularities or even a lack of due diligence will not state a securities fraud claim absent evidence of corresponding fraudulent intent.") (citations omitted); *Chill v. Gen. Elec. Co*., 101 F.3d 263, 270 (2d Cir. 1996) ("Allegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim."); *Decker v. Massey-Ferguson, Ltd*., 681 F.2d 111, 120 (2d Cir. 1982) (holding that "allegations concerning the violation of generalized accounting principles" are insufficient to satisfy the scienter requirement).

Plaintiffs fail to supplement their allegations of GAAP violations with well-pleaded allegations of fraudulent intent. They point only to generalized allegations about "senior" and "upper" management and to allegations not implicating any of the named Defendants, both of which are insufficient to support an inference of scienter. *See* Pl. Br. at 53-54. Even Plaintiffs' oft-repeated allegation that "Evoqua's NB/Aquatics unit kept a 'second set of books' to help manage the deceptive practices it was involved in" is insufficient to support scienter, Pl. Br. at 53, because Plaintiffs do not allege that either Keating or Stas had any role in creating, maintaining, or reviewing this material. In effect, Plaintiffs' argument boils down to GAAP violations alone as the basis for scienter. In line with the Second Circuit cases discussed above, the Court rejects argument. *See also SEC v. Price Waterhouse*, 797 F.Supp. 1217, 1240 (S.D.N.Y. 1992) (stating that the recklessness standard in a securities fraud action "requires more than a misapplication of accounting principles").

### c. Plaintiffs' Remaining Allegations

The Court next reviews Plaintiffs' remaining allegations regarding the scienter of Keating and Stas, and likewise finds them insufficient.

***Ronald Keating***. To start, the Complaint contains a slew of conclusory allegations as to the scienter of Keating (and Stas). For example, Plaintiffs aver "Keating made the false and misleading statements and omissions recklessly or with actual knowledge that they were false and misleading." Compl. ¶ 24. Even under the relaxed standards of *Twombly* and *Iqbal*, these sorts of recitations of legal elements are plainly insufficient to allege scienter. Moreover, Plaintiffs make several allegations about the involvement of "upper management," "senior management," and "top management" throughout their Complaint. To take one example, the Schuck filing states that "Upper Management" directed sales employees "to deceptively inflate revenue and sales numbers." *Id.* ¶ 86. Courts have rejected attempts to plead scienter through generalized allegations like these that fail to focus on any particular defendants' state of mind. *See, e.g.*, *UBS AG*, 2013 WL 6576031, at *6; *Jackson v. Halyard Health, Inc*., No. 16-CV-05093-LTS, 2018 WL 1621539, at *9 (S.D.N.Y. Mar. 30, 2018) ("CW1 and CW2's statements as set forth in the [complaint] merely attest to alleged knowledge of 'senior management' or 'senior executives' other than the Individual Defendants, adding nothing to provide support for Plaintiff's conclusory allegation that the 'core executives' who had knowledge of the problems included the Individual Defendants.").

Plaintiffs also rely heavily on allegations about Keating from Confidential Witnesses. But none of these allegations pushes Plaintiffs' theory of scienter from mere plausibility to raising a cogent inference of scienter. For example, Plaintiffs point to allegations made by the Former Senior Sales Engineer, Pl. Br. at 61, who averred that he "attend a 'President's Council' meeting of roughly 30 high performing sales personnel in early 2017 at a 'nice venue' with

Defendant Keating and other members of Evoqua's executive leadership team, and recalled Keating saying that the Company was going to go public and giving a preview of the pitch that he planned to give on the roadshow with potential investors." Compl. ¶ 66. The employee "recalled thinking that it was curious and unrealistic for Keating to say that the Company was planning to grow by roughly 10% per year." *Id.* ¶ 66. But these allegations do not support Keating having a culpable state of mind; his statements at the conference merely reflect generic corporate optimism and do not speak to any of the three theories of liability.

The Former Senior Manager also averred that "defendant CEO Keating and Evoqua's top management, in anticipation of taking the Company public, had adopted a policy or practice of seeking to cut its employment costs by taking increasingly pro-active steps to replace its older and more experienced (and expensive) sales employees with far less experienced (and less qualified and effective) employees." *Id.* ¶ 48. But as noted, a plaintiff may rest on information provided by anonymous sources only when they "are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 314. Nothing in the Former Senior Manager's allegations suggests that she was in a position to speak to Keating's state of mind. She does not allege any particular communications she had with Keating or internal documents he reviewed regarding this policy. *See Campo v. Sears Holdings Corp*., 635 F. Supp. 2d 323, 335 (S.D.N.Y. 2009), *aff'd*, 371 F. App'x 212 (2d Cir. 2010) (dismissing for lack of scienter because Plaintiffs had not alleged that the relevant confidential witnesses "had any contact" with the defendants). Instead, the Former Senior Manager merely restates Plaintiffs' theory of liability and alleges that Keating "adopted" it. Even drawing all reasonable inferences in Plaintiffs' favor, the Former Senior Manager's allegations fail to raise the "cogent and

compelling" inference of scienter required by *Tellabs*, 551 U.S. at 324.

**Benedict Stas**.  The only non-conclusory allegation as to Stas comes from the Former VP of Sales, who alleged that "top management (at the level of the division head or the company CFO, Defendant Stas would . . . set sales targets that were literally impossible for the division to meet . . ." Compl. ¶ 58.  Even reading this allegation favorably, as the Court must, another individual at Stas's "level" could have set the unreasonable target.  And the Former VP of Sales does not allege any fact supporting that she was in a position to speak to Stas's state of mind.  This too, therefore, does not raise a cogent and compelling inference of scienter.

### d.  Plaintiffs' Core Operations Theory Cannot by Itself Support Scienter

In support of their scienter argument, Plaintiffs point to the core-operations doctrine.  *See* Pl. Br. at 55.  Under the "core operations" doctrine, "a court may infer 'that a company and its senior executives have knowledge of information concerning the core operations of a business,' such as 'events affecting a significant source of income.'"  *Supercom*, 2018 WL 4926442, at *31 (quoting *In re Express Scripts Holding Co. Sec. Litig.*, No. 16-cv-3338 (ER), 2017 WL 3278930, at *18 (S.D.N.Y. Aug. 1, 2017)).  In other words, this doctrine allows courts to draw an inference of scienter where the misrepresentations and omissions allegedly made by defendants were about their core operations.  *See In re Wachovia Equity Sec. Litig.*, 753 F.Supp.2d 326, 353 (S.D.N.Y. 2011).

It remains unresolved in the Second Circuit whether the core-operations doctrine survived the passage of the PSRLA, and many courts have "expressed doubts as to [the doctrine's] continuing import."  *See id.* ("the Second Circuit has yet to pass on the current viability and scope of the 'core operations' theory following the passage of the PSLRA in 1995 . . . the future of the doctrine may be tenuous.").  The Second Circuit has so far declined to

address this issue directly.  *See Frederick v. Mechel OAO*, 475 F. App'x 353, 356 (2d Cir. 2012) ("we have not yet expressly addressed whether, and in what form, the 'core operations' doctrine survives [the enactment of the PSLRA] as a viable theory of scienter.").  However, "the Second Circuit [has] commented," albeit in an unpublished opinion, "that the doctrine can 'provide supplemental support for allegations of scienter, even if [it] cannot establish scienter independently.'"  *In re Pretium Res. Inc. Sec. Litig.*, 256 F.Supp.3d 459, 474 (S.D.N.Y. 2017) (quoting *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 Fed. Appx. 10, 14 n.3 (2d Cir. 2011)).  Several Courts in this District have adopted this approach.  *See Schwab v. E*TRADE Fin. Corp.*, 258 F. Supp. 3d 418, 434 (S.D.N.Y. 2017); *In re Supercom*, 2018 WL 4926442, at *31; *In re Rockwell Med., Inc. Securities Litigation*, 2018 WL 1725553 (S.D.N.Y. 2018); *Express Scripts Holding*, 2017 WL 3278930, at *18; *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 595 (S.D.N.Y. 2011).  This Court has stated that it "agrees with these other courts that this doctrine continues to be valid in its narrowed form."  *Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*, No. 18-CV-00299 (AJN), 2019 WL 4601644, at *18 (S.D.N.Y. Sept. 23, 2019); *accord Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 163 (S.D.N.Y. 2015) ("courts within the Second Circuit have come to conflicting decisions, with the majority finding that the "core operations" doctrine may provide support for but not an independent basis of scienter.").

    To start, Plaintiffs have not put forward well-pleaded allegations that the Neptune-Benson acquisition was sufficiently core to Evoqua's business for the Court to infer that Defendants Keating and Stas were aware of its problematic integration.  Indeed, Neptune-Benson was one of eight acquisitions completed by Evoqua during this time period.  But even if Plaintiffs' Complaint did support this theory, the core-operations doctrine would be insufficient

by itself to support strong circumstantial evidence of scienter. *See Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 343 (S.D.N.Y. 2011) (noting that the doctrine only "bolsters the strength of the inference of scienter when plaintiff has *already* adequately alleged facts indicating that defendants might have known their statements were false." (emphasis added)).

In short, Plaintiffs have failed to allege that Defendants Keating or Stas acted with scienter as to any of their three theories of liability.

### 3. Corporate Scienter Is Also Lacking

Plaintiffs must also allege scienter as to Evoqua itself. "When [a] defendant is a corporate entity . . . the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital*, Inc., 531 F.3d 190, 195 (2d Cir. 2008). Corporate scienter may thus be established if a plaintiff pleads the requisite scienter for a certain individual who made a misrepresentation with knowledge of its falsity and whose intent can be attributed to the corporation. *Id.* Alternatively, Courts in this District will impute corporate scienter even if the corporation's agent making a misrepresentation did not individually have the requisite knowledge of the falsity of that statement if a sufficiently senior director or officer of the corporation with some oversight over the public-facing misrepresentation had such knowledge and did not intervene. *See Loreley*, 797 F.3d at 177 (noting that a plaintiff may adequately plead scienter as to a corporate defendant "by pleading facts sufficient to create a strong inference either (1) that someone whose intent could be imputed to the corporation acted with the requisite scienter or (2) that the statements would have been approved by corporate officials sufficiently knowledgeable about the company to know that those statements were misleading." *See Rex & Roberta Ling Living trust v. B Communications, Ltd*., 346 F. Supp. 3d 389, 409-410 (S.D.N.Y. 2018) ("[C]ourts in this district have generally coalesced around the view that there is not a

requirement that the same individual who made an alleged misstatement on behalf of a corporation personally possessed the required scienter." (internal quotation marks and citations omitted)).

Once again, Plaintiffs proffer conclusory allegations of scienter. For example, they allege that "Evoqua knowingly manipulated the sales backlog report to conceal the true state of the Company's revenue and future growth prospects." Compl. ¶ 112. These are plainly insufficient. And because Plaintiffs have not alleged scienter as to Defendants Keating or Stas, the Court cannot impute their scienter to Evoqua.

Plaintiffs instead rest on allegations regarding two other Evoqua employees. The first is **Anthony Webster**. Anthony Webster served as Evoqua's Executive Vice President, Chief Human Resource Officer. Compl. ¶ 27. To establish Webster's scienter, Plaintiffs point to the Former VP of Sales' allegation that Webster received $2 million of compensation in connection with the IPO, which the CW "viewed as an unheard of amount for an HR professional at a company of Evoqua's size." Compl. ¶ 57. This allegation, however, is unrelated to whether Webster had a culpable state of mind as to the theories of liability alleged here, and it does not raise a cogent inference of scienter.

The second is **Kenneth Rodi**. Kenneth Rodi served as Evoqua's Executive Vice President, Products Segment President. Compl. ¶ 26. "Prior to joining Evoqua in May 2016, Rodi served as Chief Executive Officer of Neptune-Benson from 2013 to 2016." *Id.* Plaintiffs argue that "it can be readily inferred that Defendant Rodi, by virtue of his long experience the water industry, was well aware" that, among other things, "the Company's draconian cuts to its salesforce had *already* impaired its ability to generate future sales as of the start of the Class Period." Pl. Br. at 57 (emphasis in original). But these sorts of "should have known" allegations

are insufficient to allege scienter. *See In re Lululemon Sec. Litig*, 14 F.Supp.3d at 574 ("'An allegation that a defendant merely ought to have known'" about reports or statements containing contrary facts 'is not sufficient to allege recklessness.'" (quoting *Kuriakose v. Fed. Home Loan Mortg. Corp*., 897 F. Supp. 2d 168, 184 (S.D.N.Y. 2012))).

Former employee Schuck also alleged in her state-court filing that "worked directly with NB/Aquatics planners to prematurely recognize revenue on a large project." Compl. ¶ 85. And Moriarty alleged that "in an effort to artificially inflate Evoqua's financials in preparation for the next acquisition, under the direction of Defendant Rodi, Moriarty and others were directed to work with customers to convince them to take delivery of orders much earlier than the customers required." *Id.* ¶ 102. Even if Rodi did act with scienter as to the accounting theory, however, Plaintiffs have not put forward any allegations that would support imputing this scienter onto Evoqua. For example, they do not allege that Rodi worked with other top executives or that any others in the corporation were aware of his actions. The Court thus concludes that Plaintiffs have failed to meet their burden to plead a "strong inference," *Tellabs*, 551 U.S. at 323, that Defendant Evoqua acted with scienter.

* * * * *

To be sure, Plaintiffs are correct that their factual allegations should be viewed "in their totality, rather than parsed piecemeal." Pl. Br. at 50 (citing *Tellabs*, 551 U.S. at 323). But even doing so, and reading their Complaint in the most favorable light, Plaintiffs have failed to put forward well-pleaded allegations that any of the three Exchange Act Defendants acted with scienter. The Court thus dismisses Plaintiffs' claim under § 10(b) of the Exchange Act and SEC Rule 10b-5.

## VII. PLAINTIFFS FAIL TO PLEAD AN ITEM 303 VIOLATION

Item 303 imposes specific "disclosure requirements on companies filing" reports on SEC

Forms 10–K and 10–Q. *Stratte–McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015). "Item 303's affirmative duty to disclose in Form 10-Qs can serve as the basis for a securities fraud claim under Section 10(b)." *Id.* In order to prevail under Item 303, a plaintiff must adequately allege that the defendant violated Item 303 and that the violative omissions were material. *Id.* at 103.

Item 303 requires that Evoqua's Form 10–K "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). According to the SEC's interpretive release regarding Item 303, "disclosure [under Item 303] is necessary 'where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial conditions or results of operations.'" *Stratte–McClure*, 776 F.3d at 101 (quoting Management's Discussion and Analysis of Financial Condition and Results of Operations, Securities Act Release No. 6835, Exchange Act Release No. 26,831, Investment Company Act Release No. 16,961, 43 SEC Docket 1330 (May 18, 1989)).

The Second Circuit has made clear that the SEC "has never gone so far as to require a company to announce its internal business strategies" under Item 303. *Stratte-McClure*, 776 F.3d at 105; *accord Steamfitters' Indus. Pension Fund v. Endo Int'l PLC*, 771 F. App'x 494, 498 (2d Cir. 2019) (holding that an alleged plan to restructure an acquired company's business model by, among other things, laying off executives, did not have to be disclosed under Item 303). Even assuming Defendants had a strategy to remove sales and integration employees and replace them with less experienced, less paid staff, that would be a business decision not requiring disclosure Item 303. The same is true for the claim of accounting fraud. Even assuming that

Evoqua overstated its income, this is not a trend or an event requiring disclosure under Item 303.[3]  Plaintiffs have thus failed to state a claim under Item 303 of Regulation S-K.

## VIII.    PLAINTIFFS' CONTROL-PERSON CLAIMS ARE DISMISSED IN PART

Plaintiffs also bring control-person claims under both the Exchange Act and the Securities Act.  Sections 15 and 20 of these respective statutes create liability for persons who control any person liable under other provisions of the statute, in effect extending the scope of liability beyond the primary violator.  Because control-person claims require an underlying violation, only Plaintiffs' § 15 claim survives dismissal.

### A.  Plaintiffs' Section 15 Claims Against the AEA Defendants Survive

The Court begins with Plaintiffs' § 15 claim against the AEA Defendants.  To recap, AEA is a private equity fund that purchased portions of Evoqua's predecessor company and renamed the acquired assets Evoqua.  Compl. ¶ 34.  The AEA Fund Defendants are eleven corporate entities, all related to AEA.  Section 15 imposes joint and several liability on "[e]very person who, by or through stock ownership, agency, or otherwise . . . controls any person liable under" § 11.  *In re Lehman Bros. Mortgage-Backed Sec. Litig.*, 650 F.3d 167, 185 (2d Cir. 2011) (citing 15 U.S.C. § 77o(a)).  To establish § 15 liability, a plaintiff must show a "primary violation" of § 11 and control of the primary violator by defendants.  *See ECA*, 553 F.3d at 206-07; *see also Morgan Stanley*, 592 F.3d at 358.[4]  Moreover, "[w]hether a person is a 'controlling

---

[3] In support of their position, Plaintiffs cite two SEC administrative orders.  But each order makes clear that its findings are "made pursuant to [an] Offer[] of Settlement and *are not binding on any other person or entity in this or any other proceeding*."  *Kirchner & Rodick, Exchange Act Rel.* No. 34-80947, 2017 WL 2591798, at *1 n.1 (June 15, 2017) (emphasis added); *Sunbeam Corp., SEC*, Rel. No. 7976, 2001 WL 616627, at *1 n.1 (May 15, 2001) (same); *see also In re Synovis Life Techs., Inc. Sec. Litig.*, 2005 WL 2063870, at *8 (D. Minn. Aug. 25, 2005) (acknowledging that these SEC orders are not "legal precedent" and therefore are not binding on any court).

[4] Courts in this District are divided as to whether culpable participation, an element of a § 20 claim, is also required for liability under § 15..  In *BioScrip*, this Court held not culpable participation is not required under § 15.  *See BioScrip*, 95 F.Supp.3d at 746 ("The only significant distinction is that § 20(a) carries with it the added element of culpable participation by the control person.").  The Second Circuit has not resolved this split in authority since that decision, and the Court sees no reason to depart from its earlier holding here.  *See In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 773 (S.D.N.Y. 2012) ("While the Second Circuit has yet to

person' is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss." *CompuDyne Corp. v. Shane*, 453 F.Supp.2d 807, 829 (S.D.N.Y. 2006) (citing *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 143 (S.D.N.Y. 1999)).

As noted, Plaintiffs have stated a claim for a § 11 primary violation, so they need only establish control as to AEA to state a claim under § 15. Control is defined as "the power to direct or cause the direction of the management and policies of [the primary violators], whether through the ownership of voting securities, by contract, or otherwise." *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1473 (2d Cir. 1996) (quoting 17 C.F.R. § 240.12b–2). The power to influence managerial decisions is not the same as "power to direct the management and policies of the primary violator." *In re Tronox, Inc. Sec. Litig.*, 769 F.Supp.2d 202, 208 (S.D.N.Y. 2011) (quoting *Fezzani v. Bear, Stearns & Co., Inc.*, 384 F.Supp.2d 618, 645 (S.D.N.Y.2004)). Rather, "[a]ctual control is essential to control person liability." *In re Blech Sec. Litig.*, 961 F.Supp. 569, 586 (S.D.N.Y. 1997).

Plaintiffs point to allegations from the Former SAP Program Manager, who "stated that AEA was calling all the shots at Evoqua, had handpicked CEO Keating and CFO Stas and then strong-armed them into doing the IPO," to establish control. But courts do not accept all allegations from CWs as true. Instead, the Court must consider whether the confidential witness was in a position to opine on the issue discussed. The SAP Program Manager worked in integration; she was "was responsible for all aspects of the SAP system (i.e., Systems, Applications and Products.)" *Id.* ¶ 74. Even drawing all inferences in its factor, Evoqua does not allege how this individual, who worked in mid-management, could have known whether

address the question of whether a plaintiff bringing a Section 15 claim must allege 'culpable participation,' a majority of judges in this District-including the undersigned-have held such an allegation is not required."); *see also In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 387 (S.D.N.Y. 2007) ("Unlike section 20(a), the plaintiff is not required to allege culpable participation by the controlling person in order to state a claim under section 15.").

AEA was "calling the shots," let alone handpicking the firm's senior leadership.

However, Plaintiffs remaining allegations are sufficient to state a Section 15 claim. Plaintiffs allege that the AEA Defendants controlled more than 50% of the voting power of all Evoqua equity shares. As of the IPO, the AEA Defendants controlled approximately 70.7% of Evoqua's voting power. Compl. ¶ 29. They also owned 58.% of the stock outright. *Id.* Even after the SPO, AEA continued to control approximately 52.5% of the voting power (and owned 30.9% of the stock). *Id.* Moreover, "Evoqua's SEC filings identified AEA as its 'Sponsor' and stated that Evoqua was a 'controlled company.'" *Id.* ¶ 30. And "Evoqua's SEC filings likewise stated 'because AEA controls a significant percentage of our common stock, it may influence all major corporate decisions.'" *Id.* Given the low pleading burden at this stage,[5] these allegations are sufficient to plead control. *Cf. In re Alstom SA*, 406 F.Supp.2d at 492 ("Minority stock ownership and the ability to appoint a minority of the board do not create power to direct management and policies, and thus do not constitute sufficient control."); *In re China Valves Tech. Sec. Litig.*, 979 F.Supp.2d 395, 414 (S.D.N.Y. 2013) (plaintiffs failed to state a claim of control person liability where defendant had 30 percent stock ownership).

### B. Plaintiffs' Section 15 Claim Against Keating and Stas Survives

Plaintiffs also assert their Section 15 claim against the Executive Defendants—Keating, Stas, Rodi, and Webster. Plaintiffs allege that Defendant Keating "signed or authorized the signing of" the IPO registration Statement and Prospectus and the SPO Registration Statement and Prospectus. Compl. ¶ 24. They make the same allegation as to Defendant Stas. *Id.* ¶ 25

---

[5] The AEA Defendants argue that Rule 9(b) applies to the control claims. However, "[a]llegations of control are not averments of fraud and therefore need not be pleaded with particularity." *In re Tronox, Inc. Sec. Litig.*, 769 F. Supp. 2d 202, 208 (S.D.N.Y. 2011) (quoting *In re Parmalat Sec. Litig.*, 414 F.Supp.2d 428, 440 (S.D.N.Y. 2006)). Thus, "[a]t the pleading stage, the extent to which the control must be alleged will be governed by Rule 8's pleading standard." *In re Tronox, Inc.*, 769 F. Supp. 2d at 208 (citation omitted).

(alleging that Stas "signed or authorized the signing of" these documents).  At the pleading stage, this is sufficient to make out a control claim against these individuals.  *See In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 773 (S.D.N.Y. 2012) (holding that allegations that individual defendants were officers and signed the registration statements at issue sufficient to "satisfy Plaintiffs' obligation to plead control"); *In re Alstom SA*, 406 F. Supp. 2d 433, 494–95 (S.D.N.Y. 2005) ("It comports with common sense to presume that a person who signs his name to a report has some measure of control over those who write the report." (internal quotation marks and alterations omitted)).

The same is not true, however, for Defendants Rodi and Webster.  Plaintiffs do not allege that these individuals signed any of the registration statements at issue.  Instead, they rest on a conclusory, generalized allegation that the "Executive Defendants possessed and exercised their power and authority to control the contents of the Company's SEC filings."  Compl. ¶ 28.  But officer status, by itself, is insufficient to plead control.  *See Alstom*, 406 F.Supp.2d at 494 ("status as officer or committee member is generally not enough to constitute control"); *Rich v. Maidstone Fin., Inc.*, No. 98 Civ. 2569, 2002 WL 31867724, at *11 (S.D.N.Y. Dec. 20, 2002).  Moreover, both Rodi and Webster were further down the corporate hierarchy than Keating and Stas, and Plaintiffs do not allege that their positions provided them control over the transactions at issue.  Plaintiffs have thus failed to plead a control claim under § 15 against Defendants Rodi and Webster.

### C. Plaintiffs' Section 20(a) Claim Fails

Plaintiffs allege control-person liability under § 20(a) of the Exchange Act against AEA and the Executive Defendants. Compl. ¶¶ 315-321; s*ee* 15 U.S.C. § 78t(a).  In order to establish a prima facie case of liability under § 20(a), a plaintiff must show a primary violation of the Exchange Act.  *See In re Alstom SA*, 406 F.Supp.2d 433, 486 (S.D.N.Y.2005) (citing

*Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998)).  As discussed above, Plaintiffs have failed to allege a primary violation of § 10(b).  Plaintiffs' Section 20 claim is therefore dismissed.

## IX.  PLAINTIFFS' INSIDER TRADING IS DISMISSED

Plaintiffs also claim that Defendants violated Section 20A of the Exchange Act, which makes individuals who violate § 10(b) and Rule 10b-5 liable to contemporaneous purchasers when they "purchas[e] or sell[] a security while in possession of material, nonpublic information."  15 U.S.C. § 78t–1(a).  Because this claim is contingent upon an underlying Exchange Act violation, Plaintiffs' Section 20A claim must also be dismissed.  *See Jackson Nat. Life Ins. Co. v. Merrill Lynch & Co*., 32 F.3d 697, 704 (2d Cir. 1994) ("We therefore hold that [plaintiff] cannot base its § 20A claim on a violation of §§ 11 or 12(2) of the '33 Act, and, in order to state a claim under § 20A, must plead as a predicate an independent violation of the '34 Act.  As it has not done so, the district court properly dismissed this count of the complaint."); *accord Gruber v. Gilbertson*, No. 16-CV-9727, 2019 WL 4458956, at *3 (S.D.N.Y. Sept. 17, 2019) ("[Section] 20A merely requires that an underlying violation of § 10(b) occurred."); *Kaplan v. S.A.C. Capital Advisors, L.P*., 40 F. Supp. 3d 332, 343 (S.D.N.Y. 2014) ("[I]n order to state a claim under Section 20A, a plaintiff must allege a predicate violation of the Securities Exchange Act of 1934.").

## X.  CONCLUSION

For the reasons stated above, the Court GRANTS in part and DENIES in part Defendants' motion to dismiss.  The Court DISMISSES the following claims: (1) Plaintiffs' Section 10(b) and Rule 10b-5 claim (Count I); (2) Plaintiffs' Section 20 control-person claim (Count II): (3) Plaintiffs' Section 20A insider-trading claim (Count III); (4) Plaintiffs Section 15 control-person claim against Defendants Rodi and Webster (Count VI).  The following claims

survive Defendants' motion to dismiss: (1) Plaintiffs' Section 11 claim (Count IV); (2) Plaintiffs'

Section 12(a)(2) claim (Count V); and (3) Plaintiffs' Section 15 control-person claim against

Keating, Stas, and the AEA Fund Defendants.  This resolves Dkt. No. 67, 70.

As oral argument is not necessary to the resolution of this motion, that request is

DENIED.  This resolves Docket No. 74.

The Court will schedule a status conference by separate order.


SO ORDERED.

Dated:  March ___30___, 2020
      New York, New York

_____
      ALISON J. NATHAN
      United States District Judge