**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Master File No. 1:18-cv-10320-JPC

IN RE EVOQUA WATER TECHNOLOGIES
CORP. SECURITIES LITIGATION

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL**
**APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION**

BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP
John C. Browne
Jeremy P. Robinson
Jai Chandrasekar
Christopher M. Miles
1251 Avenue of the Americas, 44th Fl.
New York, NY 10020

SCOTT+SCOTT ATTORNEYS AT LAW
   LLP
David R. Scott
William C. Fredericks
Randy Moonan
The Helmsley Building
230 Park Ave, 17th Floor
New York, NY 10169

*Counsel for Plaintiffs and Lead Counsel for*
*the Settlement Class*

Dated:  September 27, 2021

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................... iv

PRELIMINARY STATEMENT ....................................................................1

ARGUMENT .................................................................................................5

I.     THE PROPOSED SETTLEMENT MERITS FINAL APPROVAL ...................................5

     A.     Plaintiffs and Lead Counsel Have Adequately Represented the Settlement Class ................................................................................................7

     B.     The Settlement Was Reached After Arm's-Length Negotiations Supervised By an Experienced Mediator, and Following Extensive Discovery ....................................................................................8

     C.     The Proposed Settlement Is Fair, Reasonable, and Adequate In Light of the Costs and Risks of Further Litigation and Similar Factors ...........................10

          1.     The Risks of Establishing Liability and Damages Support Approval of the Settlement ......................................................11

               (a)     Risks To Proving Liability...........................................11

               (b)     Risks Related to Defendants' Negative-Causation and Due-Diligence Defenses, and To Plaintiffs' Proof of Damages ...........13

               (c)     Risks Related to Class Certification .............................15

               (d)     Conclusion .................................................................15

          2.     The Settlement Is Also Fair and Reasonable in Light of Realistically Recoverable Damages...........................................16

          3.     The Costs and Delays of Continued Litigation Support Approval of the Settlement................................................17

          4.     All Other Rule 23(e)(2)(C) Factors Also Support Approval ...................17

     D.     The Settlement Treats Class Members Equitably Relative to Each Other ...........19

     E.     The Reaction of the Settlement Class to the Settlement .......................................19

II.     THE PLAN OF ALLOCATION IS FAIR AND REASONABLE, AND SHOULD BE APPROVED ........................................................................20

III.     THE SETTLEMENT CLASS SHOULD BE CERTIFIED.............................................22

IV.    THE NOTICE TO THE SETTLEMENT CLASS SATISFIED THE
REQUIREMENTS OF RULE 23 AND DUE PROCESS..................................................22

CONCLUSION...........................................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*In re Advanced Battery Techs., Inc. Sec. Litig.*,
  298 F.R.D. 171 (S.D.N.Y. 2014) ....................................................................24

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
  568 U.S. 455 (2013) ........................................................................................7

*In re Barrick Gold Sec. Litig.*,
  314 F.R.D. 91 (S.D.N.Y. 2016) .......................................................................7

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
  909 F. Supp. 2d 259 (S.D.N.Y. 2012) ......................................................19, 20

*In re Blue Apron Holdings, Inc. Sec. Litig.*,
  2021 WL 345790 (E.D.N.Y. Feb. 1, 2021) ....................................................23

*In re Canadian Superior Sec. Litig.*,
  2011 WL 5830110 (S.D.N.Y. Nov. 16, 2011) ...............................................16

*In re China Sunergy Sec. Litig.*,
  2011 WL 1899715 (S.D.N.Y. May 13, 2011) ................................................17

*Christine Asia Co. v. Yun Ma*,
  2019 WL 5257534 (S.D.N.Y. Oct. 16, 2019) ................................................15

*In re Citigroup Inc. Sec. Litig.*,
  2014 WL 2112136 (S.D.N.Y. May 20, 2014) ..................................................5

*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974)......................................................................6, 8, 10

*D'Amato v. Deutsche Bank*,
  236 F.3d 78 (2d Cir. 2001)...............................................................................8

*Eisen v. Carlisle & Jacquelin*,
  417 U.S. 156 (1974)........................................................................................22

*In re Evoqua Water Tech. Corp. Sec. Litig.*,
  450 F. Supp. 3d 379 (S.D.N.Y. 2020)............................................................11

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
  2015 WL 6971424 (S.D.N.Y. Nov. 9, 2015)..............................................8, 14

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
674 F. App'x 37 (2d Cir. 2016) ...........................................................................8

*In re FLAG Telecom Holdings, Ltd. Sec. Litig.*,
2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010) ..........................................8, 10, 19, 20

*In re Gilat Satellite Networks*, *Ltd.*,
2007 WL 1191048 (E.D.N.Y. Apr. 19, 2007) ......................................................17

*Goldberger v. Integrated Res., Inc.*,
209 F.3d 43 (2d Cir. 2000) ..................................................................................6

*In re IMAX Sec. Litig.*,
283 F.R.D. 178 (S.D.N.Y. 2012) ........................................................................20

*In re Luxottica Grp. S.p.A. Sec. Litig.*,
233 F.R.D. 306 (E.D.N.Y. 2006) ........................................................................11

*In re Marsh ERISA Litig.*,
265 F.R.D. 128 (S.D.N.Y. 2010) ........................................................................15

*In re Merrill Lynch & Co. Rsch. Reports Sec. Litig.*,
2007 WL 313474 (S.D.N.Y. Feb. 1, 2007) ..........................................................17

*In re NASDAQ Market-Makers Antitrust Litig.*,
187 F.R.D. 465 (S.D.N.Y. 1998) ........................................................................10

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
330 F.R.D. 11 (E.D.N.Y. 2019) ............................................................................6

*In re Qudian Inc. Sec. Litig.*,
2021 WL 2383550 (S.D.N.Y. June 8, 2021) ........................................................23

*Robbins v. Koger Props., Inc.*,
116 F.3d 1441 (11th Cir. 1997) ..........................................................................15

*Shapiro v. JPMorgan Chase & Co.*,
2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014) ......................................................10

*In re Signet Jewelers Ltd. Sec. Litig.*,
2020 WL 4196468 (S.D.N.Y. July 21, 2020) ......................................................20

*In re Veeco Instruments Inc. Sec. Litig.*,
2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007) ..........................................10, 15, 19

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
396 F.3d 96 (2d Cir. 2005) ...........................................................................5, 6, 22

*Weinberger v. Kendrick*,
    698 F.2d 61 (2d Cir. 1982)................................................................................8

*Yang v. Focus Media Holding Ltd.*,
    2014 WL 4401280 (S.D.N.Y. Sept. 4, 2014)..................................................8

## STATUTES AND RULES

PSLRA, 15 U.S.C. § 78u-4(a)(7).....................................................................23

Fed. R. Civ. P. 23 ............................................................................... *passim*

In accordance with Fed. R. Civ. P. 23(e), Lead Plaintiffs Louisiana Sheriffs' Pension & Relief Fund ("Louisiana Sheriffs") and City of Omaha Police & Fire Retirement System ("Omaha P&F"), together with additional proposed class representative City of Hallandale Beach Police Officers' & Firefighters' Personnel Retirement Trust ("Hallandale P&F" and, with Lead Plaintiffs, "Plaintiffs"), on behalf of themselves and the Settlement Class, respectfully submit this memorandum of law in support of their motion for final approval of: (1) the proposed $16,650,000.00 settlement for the benefit of the Settlement Class (the "Settlement"), and (2) the proposed plan of allocation of the proceeds of the Settlement (the "Plan of Allocation").[1]

## PRELIMINARY STATEMENT

Plaintiffs are pleased to present for the Court's approval their agreement to settle this securities class action in full in exchange for a cash payment of $16,650,000. The Settlement represents a favorable result for the Settlement Class in light of the serious risks that Plaintiffs faced in proving their claims, including the substantial risks to proving falsity, materiality, and damages at summary judgment or trial. This recovery was achieved after multiple years of vigorous litigation and after extensive arm's-length negotiations between experienced counsel involving a skilled mediator. For the reasons set forth herein, Plaintiffs respectfully submit that the proposed Settlement is fair, reasonable, and adequate; satisfies all the standards for final approval under Rule 23 of the Federal Rules of Civil Procedure; and should be approved.[2]

---

[1]    Unless otherwise noted, capitalized terms have the meanings given them in the Stipulation and Agreement of Settlement dated May 28, 2021 (ECF No. 133-1) (the "Stipulation"), or in the Joint Declaration of Jeremy P. Robinson and William C. Fredericks in Support of (A) Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation and (B) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses (the "Joint Declaration" or "Joint Decl."), filed herewith. Citations herein to "¶ __" and "Ex.__" refer, respectively, to paragraphs in, and exhibits to the Joint Declaration.

[2]    The Joint Declaration is an integral part of this submission and, for the sake of brevity in this memorandum, the Court is respectfully referred to it for a detailed description of, among other things: the history of the Action (¶¶ 23-63); the nature of the claims asserted (¶¶ 29-34); the negotiations leading to

The Settlement is the product of Plaintiffs' substantial litigation effort. This effort started nearly three years ago when Plaintiffs and Lead Counsel began investigating the securities law claims at issue through the review of hundreds of SEC filings, analyst reports, and news articles. They also located and interviewed thirty-three (33) former Evoqua employees regarding the events at issue. Using this vast trove of information, Plaintiffs prepared a detailed 164-page amended complaint. They then opposed Defendants' extensive motions to dismiss. Although the Court dismissed Plaintiffs' securities fraud claims under the Exchange Act, Plaintiffs were successful in getting the Securities Act claims sustained. Next, Plaintiffs engaged in extensive discovery efforts, which included the production, review, and analysis of the over 1.6 million pages of documents obtained from Defendants and multiple third parties, including Evoqua's external auditors. Plaintiffs also fully briefed their motion for class certification, defended the depositions of representatives of each Plaintiff, and deposed Defendants' class certification expert. Further, Plaintiffs consulted extensively with multiple experts, including a damages expert, a forensic accounting firm, and a leading securities law scholar (who opined on Defendants' Securities Act "traceability" arguments). As such, when the Settlement was reached, Plaintiffs and Lead Counsel possessed a thorough and well-developed understanding of the strengths and weaknesses of the case.

The Settlement is also the result of extensive arm's-length negotiations between experienced counsel, which were overseen by and directly involved an independent mediator with decades of experience in securities litigation—Greg Danilow, Esq., of the nationally known Phillips ADR alternative dispute resolution firm. As part of these negotiations, the Parties participated in two full-day mediation sessions, which involved the preparation of detailed written

the Settlement (¶¶ 64-72); the risks and uncertainties of continued litigation (¶¶ 75-92); and the terms of the Plan of Allocation for the Settlement proceeds (¶¶ 100-108).

mediation statements on liability and damages and responding to follow-up questions from Mr. Danilow. ¶¶ 64-67. At the conclusion of the second session, Mr. Danilow made a "mediator's proposal" that the Parties agree to continue negotiations within a relatively narrow dollar range. ¶ 67. All Parties accepted that proposal and, after several weeks of additional negotiations, agreed to settle the Action for $16,650,000.00 in cash, which was within the range that the mediator had proposed. ¶¶ 68-71.

The $16.65 million Settlement is a favorable result for the Settlement Class given the substantial risks of continued litigation. This was not a case where Plaintiffs could point to restated financial statements or a parallel government enforcement action to bolster their claims. Instead, Plaintiffs faced many significant risks to establishing both liability and damages in trying to prove their case. Indeed, the Court dismissed Plaintiffs' securities fraud claims under the Exchange Act—leaving Plaintiffs with only their claims under the Securities Act based on Defendants' allegedly defective Offering Materials for Evoqua's November 2017 initial public offering (the "IPO") and March 2018 secondary public offering (the "SPO"). ¶¶ 38, 77.

By way of brief summary, Plaintiffs surviving Securities Act claims alleged that the Offering Materials misled investors concerning (1) Evoqua's financial results by inflating its revenues, net income, and EBITDA; (2) the strength of Evoqua's sales force; and (3) the success of Evoqua's integration of acquired companies. ¶ 78.

Proving these surviving Securities Act claims, however, was no simple matter. As a threshold issue, Defendants raised novel "tracing" arguments to challenge the claims based on Evoqua's SPO. If successful, such arguments would have significantly reduced recoverable damages by limiting them to claims based on the IPO only. ¶ 84. Defendants also vehemently denied that Evoqua's statements were false or misleading. For example, they argued that Evoqua's

sales force reductions were fully disclosed in the Offering Materials, which precluded liability for those allegations. ¶ 79. Defendants also argued that they had not improperly inflated revenue or violated GAAP. *Id.* In that regard, Defendants pointed to the unqualified audit opinions given by Evoqua's independent auditor for the periods at issue. *Id.* Defendants also disputed that they misrepresented the success of Evoqua's integration of its acquisitions, arguing that these statements were not actionable and that, in any event, the risk of integration difficulties was adequately disclosed to investors. *Id.*

Further, Defendants challenged materiality, arguing that none of the alleged misrepresentations were material because they concerned only a portion of Evoqua's business. ¶ 80. For example, Defendants asserted that to the extent there was any improper revenue recognition at all (which they disputed), it was sufficiently small that would not be material to a reasonable investor. Defendants also claimed that Evoqua's staff cuts strengthened—rather than weakened—the Company, and that any alleged "omissions" regarding them were thus also immaterial. *Id.*

Defendants also advanced various affirmative defenses. For example, Defendants (except Evoqua) all argued that they conducted adequate due diligence in connection with the Offerings— a defense that, if proven, would preclude their liability for any misrepresentations. ¶ 82. All Defendants also pursued a "negative-causation" defense, *i.e.* that the declines in Evoqua's stock price were caused by factors unrelated to the alleged misrepresentations. ¶ 81. If Defendants had succeeded on this defense, they would have substantially reduced or even eliminated recoverable damages. *Id.*

Further, absent a settlement, the Parties faced the prospect of protracted litigation, including the completion of fact and expert discovery, summary judgment, a complex trial, post-

trial motions on both liability and damages, and the inevitable appeals. ¶ 85. The Settlement avoids these risks and delays while providing a meaningful, certain, and immediate $16.65 million benefit to the Settlement Class.

The Court-appointed Lead Plaintiffs and additional Class Representative Hallandale P&F—the institutional investors that actively supervised this litigation—all join with Lead Counsel in strongly supporting the Settlement. Further, although the October 12, 2021 deadline for Settlement Class Members to object (or to request exclusion from the Settlement Class) has not yet passed, to date no one has objected to the Settlement—and only one individual has requested exclusion.[3] Accordingly, and as further discussed below, Plaintiffs respectfully submit that the Settlement is fair, reasonable, and adequate, and merits final approval by the Court.

The Court should also approve the Plan of Allocation, which Lead Counsel developed in consultation with their damages expert, as it provides a reasonable method for allocating the net Settlement proceeds among eligible class members based, as is customary in securities actions, on when they purchased and (if applicable) sold their Evoqua shares.

## ARGUMENT

## I.   THE PROPOSED SETTLEMENT MERITS FINAL APPROVAL

Federal Rule of Civil Procedure 23(e) requires judicial approval for any compromise or settlement of class-action claims. *See* Fed. R. Civ. P. 23(e). A class-action settlement merits approval where the court finds it "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

The Second Circuit has recognized that public policy favors the settlement of disputed claims among private litigants, particularly in class actions. *See Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) ("*Visa*") ("We are mindful of the 'strong judicial

---

[3]      If any objections are received after this filing, Plaintiffs will address them in their reply papers.

policy in favor of settlements, particularly in the class action context.'") (citation omitted). In ruling on final approval of a class settlement, a court should examine both the negotiating process leading to the settlement, and the settlement's substantive terms. *See Visa*, 396 F.3d at 116; *In re Citigroup Inc. Sec. Litig.*, 2014 WL 2112136, at *2-3 (S.D.N.Y. May 20, 2014).

Rule 23(e)(2) provides that courts should determine whether a proposed settlement is "fair, reasonable, and adequate" after considering whether:

> (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). Similarly, the Second Circuit has historically held that courts should consider following factors from *City of Detroit v. Grinnell Corp*. in evaluating class settlements:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

495 F.2d 448, 463 (2d Cir. 1974) (citations omitted), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000), *see also Visa*, 396 F.3d at 117.

The Advisory Committee Notes to the 2018 amendments to the Federal Rules note that the four factors set forth in Rule 23(e)(2) are not intended to "displace" any factor previously adopted by a Court of Appeals, but "rather [seek] to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Advisory Committee Notes to 2018 Amendments. Plaintiffs will therefore discuss the Settlement's

"fairness, reasonableness, and adequacy" principally under the four factors listed in Rule 23(e)(2), while also discussing application of relevant, non-duplicative *Grinnell* factors. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 29 (E.D.N.Y. 2019) (noting that "the new Rule 23(e) factors to add to, rather than displace, the *Grinnell* factors"). In any event, as discussed below, ***all*** of the above factors strongly support approval here.

    **A.**    **Plaintiffs and Lead Counsel Have**
              **Adequately Represented the Settlement Class**

In weighing approval, a court should consider whether "the class representatives and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A); *see also In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 99 (S.D.N.Y. 2016) ("the adequacy requirement 'entails inquiry as to whether: (1) plaintiffs' interests are antagonistic to the interest of other members of the class and (2) plaintiffs' attorneys are qualified, experienced and able to conduct the litigation'").

Here, there is no antagonism or conflict between Plaintiffs and the proposed class. Plaintiffs, like the other Settlement Class Members, purchased Evoqua common stock during the Class Period, and they were all injured by the same alleged misstatements. If Plaintiffs were to prove their claims at trial, they would also prove the Settlement Class's claims. *See Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 460 (2013) (the investor class "will prevail or fail in unison" because claims are based on common misrepresentations and omissions).

Moreover, it is respectfully submitted that Plaintiffs and Lead Counsel have vigorously represented the Settlement Class both by prosecuting the Action for nearly three years and by negotiating a favorable $16.65 million Settlement. Lead Counsel also note that they are well qualified and highly experienced in securities litigation (*see* firm resumes at Joint Decl. Exs. 6A-3 and 6B-3), and achieved a successful result here against highly regarded opposing counsel. ¶ 122. Accordingly, Plaintiffs and Lead Counsel have adequately represented the Settlement Class.

**B.     The Settlement Was Reached After Arm's-Length Negotiations Supervised
By an Experienced Mediator, and Following Extensive Discovery**

Courts must also consider whether a proposed settlement "was negotiated at arm's length."

Fed. R. Civ. P. 23(e)(2)(B), and traditionally also consider certain other related factors in assessing

the "procedural" fairness of a settlement, including: (i) whether counsel had an adequate

understanding of the case's strengths and weakness based on "the stage of the proceedings and the

amount of discovery completed,"[4] (ii) any indicia of collusion;[5] and (iii) the involvement of an

independent mediator. These factors also strongly support approval of the Settlement.

First, the Settlement was reached only after arm's-length negotiations conducted under the

auspices of Greg Danilow, a mediator with the nationally known Phillips ADR firm who has over

40 years' experience in litigating securities class actions. *See* Declaration of Greg Danilow (Ex.

4), at ¶¶ 2-3. As Mr. Danilow's declaration attests, the settlement negotiations were conducted on

an arms'-length basis throughout. *Id.* ¶ 11. Further, the $16.65 million Settlement that was

ultimately reached—although not until after two separate full-day mediation sessions had failed to

produce an agreement—was "within the range" for a "fair and reasonable" settlement that Mr.

Danilow had independently proposed as part of his "mediator's proposal" that ultimately broke the

Parties' impasse. *Id.* ¶¶ 8-9. These facts powerfully support a finding that the Settlement is

procedurally fair and free of collusion. *See, e.g., D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d

Cir. 2001) (mediator's involvement in settlement negotiations "helps to ensure that the proceedings

---

[4]     *See Grinnell*, 495 F.2d at 463 (third factor); *see also In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 2015 WL 6971424, at *4 (S.D.N.Y. Nov. 9, 2015) ("the question is whether the parties had adequate information about their claims such that their counsel can intelligently evaluate the merits of plaintiff's claims, the strengths of the defenses asserted by defendants, and the value of plaintiffs' causes of action for purposes of settlement"), *aff'd*, 674 F. App'x 37 (2d Cir. 2016).

[5]     *Weinberger v. Kendrick*, 698 F.2d 61, 74 (2d Cir. 1982) ("the absence of any indication of collusion, the protracted settlement negotiations, the ability and experience of plaintiffs' counsel, [and] the extensive discovery preceding settlement . . . are important indicia of the propriety of settlement negotiations").

were free of collusion and undue pressure"); *Yang v. Focus Media Holding Ltd.*, 2014 WL 4401280, at *5 (S.D.N.Y. Sept. 4, 2014) (participation of highly qualified mediator "strongly supports a finding that negotiations were conducted at arm's length and without collusion."); *In re FLAG Telecom Holdings, Ltd. Sec. Litig.*, 2010 WL 4537550, at *14 (S.D.N.Y. Nov. 8, 2010) (finding that proposed settlement was fair and reasonable "is strengthened by the fact that [it] was reached in an extended mediation").

Moreover, as noted above, the Parties and their counsel were well informed about the strengths and weaknesses of the case before they agreed to settle. Here, for example, Plaintiffs and Lead Counsel conducted a thorough pre-filing investigation by, *inter alia*, reviewing hundreds of SEC filings, analyst reports, investor conference call transcripts, Company press releases, and new articles. ¶ 26. They also identified, located, and interviewed thirty-three (33) former Evoqua employees regarding the events and claims at issue. ¶ 27. Plaintiffs and Lead Counsel also obtained and reviewed over 1.6 million pages of documents produced by Defendants and non-parties in discovery. ¶¶ 45-47. In addition, Plaintiffs and Lead Counsel consulted extensively with experts in accounting, damages, and the legal requirements of "tracing" under the Securities Act—in addition to all the other work they did to analyze and understand the relevant law and facts as part of their comprehensive briefing of the numerous issues raised in the Defendants' Motions to Dismiss. ¶¶ 36-37, 52-53. In addition, as part of the Parties' extended settlement negotiations, all Parties exchanged detailed mediation statements, which further informed the Parties of the strengths and weaknesses of each side's case. ¶ 65.

The Plaintiffs themselves strongly support the Settlement, which is another factor that weighs in favor of approval. Indeed, the Plaintiffs are sophisticated institutional investors of the exact type envisioned by the PSLRA to lead securities class actions like this one. *See* Declaration

of Osey McGee on behalf of Louisiana Sheriffs (Ex. 1) at ¶¶ 3, 6; Declaration of James Sklenar on behalf of Omaha P&F (Ex. 2) at ¶¶ 3, 8, and Declaration of Alan B. Miller on behalf of Hallandale P&F (Ex. 3) at ¶¶ 3, 6. A settlement reached "under the supervision and with the endorsement of a sophisticated institutional investor"—let alone three, as here—"is 'entitled to an even greater presumption of reasonableness.'" *In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115809, at *5 (S.D.N.Y. Nov. 7, 2007).

Finally, the judgment of the two co-Lead Counsel firms, who are both highly experienced in securities class-action litigation, is entitled to "great weight." *Shapiro v. JPMorgan Chase & Co.*, 2014 WL 1224666, at *2 (S.D.N.Y. Mar. 24, 2014); *accord In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 474 (S.D.N.Y. 1998) (courts consistently give "'great weight' . . . to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation"). Both Lead Counsel firms here strongly endorse the Settlement.

### C.   The Proposed Settlement Is Fair, Reasonable, and Adequate In Light of the Costs and Risks of Further Litigation and Similar Factors

In determining whether a class action settlement is "fair, reasonable, and adequate," the Court must also consider whether "the relief provided for the class is adequate, taking into account . . . the costs, risks, and delay of trial and appeal" and similarly relevant factors. Fed. R. Civ. P. 23(e)(2)(C). In most cases, this will be the most important factor in analyzing a proposed settlement. *See Grinnell*, 495 F.2d at 455 ("most important factor" is "strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement.").[6]

---

[6]      Indeed, this factor under Rule 23(e)(2)(C) essentially encompasses at least six of the nine factors of the traditional *Grinnell* analysis. *See Grinnell*, 495 F.2d at 463 ("(1) the complexity, expense and likely duration of the litigation; . . . (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; . . . (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation") (citations omitted).

As a threshold matter, courts "have long recognized that [securities class action] litigation is notably difficult and notoriously uncertain." *FLAG Telecom*, 2010 WL 4537550, at *15. Accordingly, such suits "readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation." *In re Luxottica Grp. S.p.A. Sec. Litig.*, 233 F.R.D. 306, 310 (E.D.N.Y. 2006). This case was no exception.

As detailed in the Joint Declaration and below, continuing the litigation here through completion of depositions, expert discovery, trial, and inevitable appeals would have presented numerous significant risks—and necessarily involved substantial costs and delays—all without any assurance of obtaining a better (or indeed any) recovery. ¶¶ 75-89. Indeed, the proposed $16.65 million Settlement represents approximately 10.3% to 11.6% of Plaintiffs' estimated maximum reasonably recoverable damages (assuming Plaintiffs prevailed on liability on all of their surviving Securities Act claims), and thus represents a highly favorable "bird in the hand" given the litigation risks here. ¶¶ 90-92.

### 1.     The Risks of Establishing Liability and <u>Damages Support Approval of the Settlement</u>

While Plaintiffs believe that their claims are meritorious, they recognize that this Action presented several substantial risks to establishing both liability and damages.

### (a)     Risks To Proving Liability

At the motion-to-dismiss stage, Judge Nathan dismissed Plaintiffs' Exchange Act claims based on a finding that Plaintiffs did not plead sufficient facts to adequately alleged a "strong inference" of scienter, as required for such claims. And while the Court permitted the Securities Act claims to proceed, it expressly warned that discovery might show that the statements at issue were not materially false. *See In re Evoqua Water Tech. Corp. Sec. Litig.*, 450 F. Supp. 3d 379, 412 (S.D.N.Y. 2020) ("the clarifying light of discovery may prove this claim has little merit").

Here, Plaintiffs alleged that Defendants made three types of materially misleading misstatements. One, the Offering Materials' statements about Evoqua's sales capabilities were materially misleading because they did not adequately disclose the extent to which Evoqua had cut experienced sales staff, and replaced them with less experienced personnel. ¶ 78. Two, Defendants' statements about Evoqua's successful integration of recently acquired companies were misleading, given undisclosed integration problems with its Neptune-Benson subsidiary and certain other acquired entities. *Id*. And, three, Evoqua's financial statements had materially inflated the Company's performance by improperly recognized revenue in violation of GAAP. Each of these three categories of statements (and related omissions) faced substantial arguments from Defendants that the statements were not false or misleading (and at minimum were not materially so), and/or were otherwise not actionable. *Id*.

**Falsity:** *First*, Defendants argued that Evoqua's personnel reductions and Evoqua's "voluntary separation plan" could not have been misleading, because they actually strengthened the Company. Defendants also contended that any claimed negative impact on Evoqua's business from employee terminations was based on the statements of only a small number of disgruntled former employees, and that these claims were rebutted by internal Company documents. ¶ 79. Defendants also argued that the sales staff reductions were adequately disclosed in Evoqua's Offering Materials or other filings. *Id*.

*Second*, with respect to the claimed misstatements concerning Evoqua's purportedly successful integration of recently acquired companies, Defendants argued that they had made no affirmative, actionable statements about the "success" of Evoqua's integration efforts. ¶ 79. They also asserted that Evoqua had in any event adequately disclosed the risk that it might have difficulty integrating such companies. *Id*.

*Third*, Defendants denied that they had improperly recognized any revenue or otherwise violated GAAP, and pointed to the fact that Evoqua's auditors (KPMG) had issued an unqualified opinion for all periods at issue. ¶ 79. While Plaintiffs believed they had meritorious responses to these arguments, they nevertheless faced significant challenges in litigating these issues.

**Materiality:** Even if successful in establishing falsity, Plaintiffs would have faced additional hurdles in establishing the *materiality* of each of the alleged false statements. For example, Defendants contended that even if there were some negative effects from its staff cuts they would not be considered material by a reasonable investor. ¶ 80. Similarly, Defendants argued that the acquired companies that allegedly had integration problems accounted for only a small percentage of Evoqua's total reported revenues, and thus also would not be considered material by a reasonable investor. *Id*. And, Defendants also asserted that the total amounts of revenue that Plaintiffs claimed were improperly recognized related only to a small fraction of Evoqua's total reported revenue. *Id*.

In addition, Defendants urged that certain of its statements were also immaterial because the Offering Materials adequately disclosed certain relevant facts (*e.g.*, the nature and scope of Evoqua's voluntary separation plan), or otherwise adequately cautioned investors of the risk that certain allegedly adverse circumstances (such as integration difficulties) might come to pass. ¶ 79.

### (b)      Risks Related to Defendants' Negative-Causation and Due-Diligence Defenses, and To Plaintiffs' Proof of Damages

Even if Plaintiffs proved that statements in Evoqua's Offering Materials were materially false or misleading, all Defendants (except Evoqua) could still have avoided liability by demonstrating that they exercised "reasonable care" in conducting due diligence regarding Evoqua's operations prior to the Offerings. Such Defendants would have argued that their actions

satisfied the applicable standard of care, and that they were thus they immune from Securities Act liability. ¶ 82.

Equally serious, all Defendants (including Evoqua) pursued a "negative causation" defense by arguing that the declines in the price of Evoqua common stock that Plaintiffs had identified were caused ***not*** by the disclosure of the alleged misrepresentations, but rather by other negative news that was not causally connected to the alleged fraud. ¶ 81. For example, Defendants argued that large price declines on May 8, 2018 and August 7, 2018 had no causal connection to any alleged misstatements because the disclosures on those dates did not concern Evoqua's alleged revenue recognition, staff cuts, or integration-related problems. *Id*. Similarly, Defendants argued that even if other large Evoqua stock declines (such as one that occurred on October 30, 2018) did occur on dates where there had been at least some disclosure relating to an issue in the case (*e.g.*, disclosure relating to certain integration issues on October 30, 2018), the relevant news disclosed on such dates was not a significant factor in causing any decline in Evoqua's stock price. *Id*. If successful, such arguments would have substantially reduced (or even eliminated altogether) Plaintiffs' and the Settlement Class's recoverable damages.

In addition, Defendants also argued that, even if liability was found and their defenses rejected, Plaintiffs' expert had overestimated maximum realistically recoverable damages (at $144.2 to $161.9 million), and that such damages were no more than half that amount. ¶ 83.

These disputed issues regarding negative causation and damages would have presented a prototypical battle of the experts at trial. There is no way to predict with any degree of certainty which expert's opinions the jury would have accepted. Had the jury accepted some or all of Defendants' expert's views, damages would been materially reduced, and potentially eliminated altogether. The Settlement eliminates those risks and provides a certain recovery for the Settlement

Class. *See Facebook*, 2015 WL 6971424, at *5 ("[D]amages would be subject to a battle of the experts, with the possibility that a jury could be swayed by experts for Defendants, who could minimize or eliminate the amount Plaintiffs' losses. Under such circumstances, a settlement is generally favored over continued litigation."); *Veeco*, 2007 WL 4115809, at *9 ("a very lengthy and complex battle of the parties' experts likely would have ensued at trial, with unpredictable results. These risks as to liability strongly militate in favor of the Settlement.").

### (c)        Risks Related to Class Certification

The Parties agreed to settle the Action while Plaintiffs' class certification motion was still pending. Specifically, Defendants filed an expert report which raised novel legal issues, including that any certified class should exclude all those who purchased shares on or after the SPO because of alleged difficulties in establishing "tracing" with respect to SPO purchasers. ¶¶ 56, 84. While Plaintiffs believe that Defendants' novel arguments were misplaced—and submitted their own expert affidavit from a leading securities law scholar to further support Plaintiffs' position—there was nevertheless risk that Defendants' argument might be accepted. Had Defendants prevailed on this argument, class-wide damages would have likely been reduced by more than half. ¶ 84. The risk that Plaintiffs might not succeed in certifying the full class proposed in their motion supports approval of the Settlement. *See Christine Asia Co. v. Yun Ma,* 2019 WL 5257534, at *13 (S.D.N.Y. Oct. 16, 2019) ("the risk of maintaining a class through trial supports the approval of a settlement"); *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 140 (S.D.N.Y. 2010) ("the uncertainty surrounding class certification supports approval of the Settlement").

### (d)        Conclusion

In sum, Plaintiffs faced substantial risks to proving the issues of liability, negative causation and damages, and even faced risk on class certification. And, of course, even if Plaintiffs prevailed at summary judgment and trial, Defendants would likely have filed post-trial motions

and appeals, thereby likely leading to additional years of litigation. *See, e.g., Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1448-49 (11th Cir. 1997) (jury verdict of $81 million for plaintiffs against accounting firm reversed on appeal on causation grounds, and judgment entered for defendant). The presence of such risks further weighs strongly in favor of approving the Settlement.

### 2.    The Settlement Is Also Fair and Reasonable in Light of Realistically Recoverable Damages

Plaintiffs submit that the $16.65 million Settlement is also a favorable result when considered in relation to the maximum damages that could realistically be established at trial and the risks of the litigation. Assuming that Plaintiffs prevailed on liability issues at trial (which was far from certain), Plaintiffs' damages expert estimated that maximum reasonably recoverable damages ranged from $144.2 million to $161.9 million for the Securities Act claims that survived dismissal, with the range depending on the trading model used.[7] ¶ 90. Accordingly, the Settlement represents approximately 10.3% to 11.6% of these maximum recoverable damages. ¶ 92. Importantly, this range assumes Plaintiffs' complete success in establishing Defendants' Securities Act liability, and that the trier of fact would reject all of Defendants' negative causation arguments on damages. ¶ 91. In short, even if Defendants' *prima facie* liability were established, negative causation arguments (which Defendants vigorously pursued) risked reducing any actual Plaintiffs' recovery at trial to a much lower amount, or potentially nothing at all. *Id*.

This level of recovery is above the norm is securities class actions and thus supports approval of the Settlement. *See, e.g., In re Canadian Superior Sec. Litig.*, 2011 WL 5830110, at

---

[7]    If the Exchange Act claims dismissed by the Court were revived through a successful appeal they would permit additional damages. However, because these claims were dismissed, the value of such claims is relatively small here, as they would be particularly difficult to prove even if they had not been dismissed, given that Exchange Act claims require proof of each defendants' intent to defraud (scienter), and also impose a demanding burden of proving loss causation on plaintiffs.

*2 (S.D.N.Y. Nov. 16, 2011) (approving a settlement representing 8.5% of maximum damages, which the court noted "exceed[s] the average recovery in shareholder litigation"); *In re China Sunergy Sec. Litig.*, 2011 WL 1899715, at *5 (S.D.N.Y. May 13, 2011) (noting that average settlements "have ranged from 3% to 7% of the class members' estimated losses"); *In re Merrill Lynch & Co. Rsch. Reports Sec. Litig.*, 2007 WL 313474, at *10 (S.D.N.Y. Feb. 1, 2007) (approving a recovery of approximately 6.25%, which was "at the higher end of the range of reasonableness").

Moreover, it is respectfully submitted that the fact that $16.65 million Settlement was within the range of "fairness, reasonableness and adequacy" that was independently proposed by the highly experienced mediator in this matter also strongly confirms the reasonableness of the Settlement in light of the maximum realistically recoverable damages in this action. *See* Danilow (Ex. 4), at ¶¶ 8-9.

### 3.    The Costs and Delays of Continued Litigation Support Approval of the Settlement

While the Settlement was not reached until after document discovery was nearly complete, the time and costs involved in continuing to litigate this case through completion of fact discovery (including depositions), expert discovery and summary judgment—let alone through a trial and the inevitable post-trial motions and appeals—would still have been ***very*** substantial. Indeed, it is widely recognized that "[s]ecurities class actions are generally complex and expensive to prosecute."  *In re Gilat Satellite Networks*, *Ltd*., 2007 WL 1191048, at *10 (E.D.N.Y. Apr. 19, 2007).  Accordingly, this factor also weighs heavily in favor of approving the Settlement.

### 4.    All Other Rule 23(e)(2)(C) Factors Also Support Approval

Rule 23(e)(2)(C) also instructs courts to consider whether the relief provided for the class is adequate in light of "the effectiveness of any proposed method of distributing relief to the class,

including the method of processing class-member claims;" "the terms of any proposed award of attorney's fees, including timing of payment;" and "any agreement required to be identified under Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2)(C)(ii)-(iv). These factors either further support approving the Settlement or are neutral, and certainly provide no basis for finding the Settlement inadequate.

First, the procedures for processing Settlement Class Members' claims and distributing the Settlement's proceeds to eligible claimants in cases of this type are well-established. In sum, the net Settlement proceeds will be distributed to eligible class members who submit required Claim Forms and supporting documentation to the Court-appointed Claims Administrator, A.B. Data, Ltd. ("A.B. Data")—a highly experienced claims administration firm. A.B. Data will (a) review and process submitted claims under the supervision of Lead Counsel, (b) provide claimants with an opportunity to cure any deficiencies and bring any unresolved claims disputes to the Court, and (c) ultimately send claimants their *pro rata* share of the Net Settlement Fund (following entry of a final "Distribution Order" by the Court).[8] This type of claims processing is standard in securities class actions (as neither Plaintiffs nor Evoqua possess individual investors' trading data that would otherwise allow the Parties to create a "claims-free" process to distribute Settlement funds).

Second, the relief provided the Settlement Class under the Settlement is also adequate when the terms of the proposed attorney's fee award is considered. As discussed in the accompanying Fee Memorandum, the proposed attorneys' fees of 25% of the Settlement Fund is fair and reasonable in light of Lead Counsel's work and the results achieved in the face of substantial litigation risk. Indeed, the percentage fee requested reflects a substantial *discount* from Plaintiffs' Counsel's total lodestar—as it is a "negative" lodestar multiplier of 0.6. ¶ 116. Moreover, nothing

---

[8]     The Settlement is not a claims-made settlement.  If the Settlement is approved, Defendants will have no right to the return of any portion of Settlement based on the number or amount of Claims submitted. *See* Stipulation ¶ 13.

in the Settlement is contingent on the approval of attorneys' fees, which are subject to separate approval by the Court. *See* Stipulation ¶ 16.

Lastly, courts should consider the fairness of a proposed settlement in light of any other agreements required to be identified under Rule 23(e)(3).  *See* Fed. R. Civ. P. 23(e)(2)(C)(iv). Here, there are no such other agreements, as the only agreement is the Stipulation itself.

> ### D.  <u>The Settlement Treats Class Members Equitably Relative to Each Other</u>

The Settlement also treats Settlement Class members equitably relative to one another. As noted at § II below, under the Plan of Allocation all eligible claimants will receive their *pro rata* share of the recovery based on the amount and timing of their transactions in Evoqua common stock. And each Plaintiff will receive precisely the same kind of *pro rata* recovery, calculated under the same Plan of Allocation provisions, as other Settlement Class Members.

> ### E.  <u>The Reaction of the Settlement Class to the Settlement</u>

One important factor set forth in *Grinnell,* but not included in Rule 23(e)(2), is the reaction of the class to the Settlement. *See, e.g.*, *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 909 F. Supp. 2d 259, 266 (S.D.N.Y. 2012); *FLAG Telecom*, 2010 WL 4537550, at *16; *Veeco*, 2007 WL 4115809, at *7.

Pursuant to the Preliminary Approval Order, A.B. Data began mailing copies of the Notice Packet (consisting of the Notice and Claim Form) to potential Settlement Class Members and their nominees on August 2, 2021. *See* Declaration of Eric J. Miller Regarding (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date (Ex. 5) ("A.B. Data Decl."), at ¶¶ 2-5. As of September 24, 2021, A.B. Data had sent a total of 24,402 copies of the Notice Packet to potential Settlement Class Members and nominees. *See id.* ¶ 8. In addition, the Summary Notice was published in *Investor's Business Daily* and transmitted over the *PR Newswire* on August 16, 2021. *See id.* ¶ 9. The Notice set out

the essential terms of the Settlement and informed potential Settlement Class Members of, among other things, their right to object to any aspect of the Settlement (or to opt out of the Settlement Class), as well as the procedure for submitting Claim Forms.

While the October 12, 2021 deadline set by the Court for Settlement Class Members to object or exclude themselves from the Settlement Class has not yet passed, to date no objections—and just one request for exclusion—have been received. ¶ 99; A.B. Data Decl. ¶ 12. As provided in the Preliminary Approval Order, Plaintiffs will address any objections or additional "opt-out" requests that may be received in reply papers (which are to be filed October 25, 2021). To date, however, the class's reaction—like all of the applicable Rule 23(e)(2) factors—also strongly supports a finding that the Settlement is fair, reasonable, and adequate.

## II. THE PLAN OF ALLOCATION IS FAIR AND REASONABLE, AND SHOULD BE APPROVED

A plan for allocating settlement proceeds, like the settlement itself, should be approved if it is fair, reasonable, and adequate. *See In re IMAX Sec. Litig.*, 283 F.R.D. 178, 192 (S.D.N.Y. 2012); *Bear Stearns*, 909 F. Supp. 2d at 270. A plan of allocation is fair and reasonable as long as it has a "rational basis." *In re Signet Jewelers Ltd. Sec. Litig.*, 2020 WL 4196468, at *13 (S.D.N.Y. July 21, 2020); *FLAG Telecom*, 2010 WL 4537550, at *21. Generally, a plan of allocation that reimburses class members based on the relative strength and value of their claims is reasonable. *See Signet*, 2020 WL 4196468, at *13. In determining whether a plan of allocation is reasonable, "courts give great weight to the opinion of experienced counsel." *Id.*

Here, the proposed Plan of Allocation (or "Plan") was developed by Lead Counsel in consultation with Plaintiffs' expert consultant on damages, and was set forth in full in the Notice mailed to potential Settlement Class Members. *See* A.B. Data Decl. (Ex. 5), Ex. A, at 15-19. Lead Counsel respectfully submit that the Plan provides a fair and reasonable method to allocate the Net

Settlement Fund among Settlement Class Members who submit valid Claim Forms, based on the damages they suffered and the risks of establishing their claims. ¶ 107.

The Plan calculates a Recognized Loss Amount for each purchase or acquisition of Evoqua common stock during the Class Period. Claimants who purchased shares of Evoqua common stock in or traceable to the IPO or SPO—that is, claimants who purchased shares of Evoqua common stock (a) directly in either the IPO or SPO, (b) during the period after the IPO and before the SPO (when all shares were traceable to the IPO), or (c) who purchased shares after the SPO through the end of the Class Period and are able to submit documentation tracing the shares they purchased to shares issued in the IPO or SPO—will be eligible for a "Securities Act Loss Amount" under the Plan based on the measure of damages provided under § 11(e) of the Securities Act. ¶ 103.

Claimants who purchased Evoqua common shares on the open market that cannot be traced to either Offering will have an Exchange Act Loss Amount calculated based on the difference between the artificial inflation in the stock on the date of purchase and the date of sale, or the difference between the purchase price and the sale price—the traditional method for measuring damages under Section 10(b) of the Exchange Act. ¶ 104. However, the Exchange Act Loss Amount calculated on those claims will be discounted by 85% to reflect the Court's prior dismissal of those claims, and the major challenges that would be faced in trying to both (a) revive them and (b) ultimately prove them at trial. ¶ 105; *see also* fn. 7, *supra*.

For each purchase or acquisition of Evoqua common stock during the Class period, the Recognized Loss Amount will be the greater of the claimant's Securities Act Loss Amount (if any) and his or her Adjusted Exchange Act Loss. ¶ 106. The sum of a claimant's Recognized Loss Amounts for all purchases and acquisitions of Evoqua common stock in the Class Period is the

Claimant's "Recognized Claim," and the Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims. *Id*.

Lead Counsel believe that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as result of the conduct alleged in the Action. ¶ 107. Moreover, as noted above, as of September 24, 2021, more than 24,400 copies of the Notice, which contained the Plan of Allocation and advised Settlement Class Members of their right to object to the Plan of Allocation, had been sent out—yet no objections to the proposed Plan have been received.  *See* ¶ 108; A.B. Data Decl. ¶ 8.

## III.   THE SETTLEMENT CLASS SHOULD BE CERTIFIED

In connection with the Settlement, the Parties have stipulated to the certification of the Settlement Class for purposes of the Settlement. As detailed in Plaintiffs' motion for preliminary approval of the Settlement, the Settlement Class satisfies all the requirements of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure. See ECF No. 134 at 18-24. There has been no objection to certification. Accordingly, Plaintiffs respectfully request that the Court certify the Settlement Class under Rules 23(a) and (b)(3). *See* ECF No. 134 at 18-24.

## IV.   THE NOTICE TO THE SETTLEMENT CLASS SATISFIED THE REQUIREMENTS OF RULE 23 AND DUE PROCESS

The Notice to the Settlement Class satisfied the requirements of Rule 23(c)(2)(B), which requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173-75 (1974). The Notice also satisfied Rule 23(e)(1), which requires that notice of a settlement be "reasonable" – *i.e.*, it must "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Visa*, 396 F.3d at 114.

Both the substance of the Notice and the method of its dissemination to potential members of the Settlement Class satisfied these standards. The Court-approved Notice includes all the information required by Federal Rule of Civil Procedure 23(c)(2)(B) and the PSLRA, 15 U.S.C. § 78u-4(a)(7), including: (i) an explanation of the nature of the Action and the claims asserted; (ii) the definition of the Settlement Class; (iii) the amount of the Settlement; (iv) a description of the Plan of Allocation; (v) an explanation of the reasons why the Parties are proposing the Settlement; (vi) a statement indicating the attorneys' fees and costs that will be sought; (vii) a description of Settlement Class Members' right to opt-out of the Settlement Class or to object to the Settlement, the Plan of Allocation or the requested attorneys' fees or expenses; and (viii) notice of the binding effect of a judgment on Settlement Class Members.

As noted above, in accordance with the Court's Preliminary Approval Order, the Court-approved Claims Administrator (A.B. Data), began mailing copies of the Notice Packet to potential Settlement Class Members on August 2, 2021. *See* A.B. Data Decl. ¶¶ 3-5. As of September 24, 2021, A.B. Data had disseminated 24,402 copies of the Notice Packet to potential Settlement Class Members and nominees. *See id.* ¶ 8. In addition, Lead Counsel caused the Summary Notice to be published in *Investor's Business Daily* and transmitted over the *PR Newswire* on August 16, 2021. *See id.* ¶ 9. Copies of the Notice, Claim Form, and Stipulation were made available on the settlement website maintained by A.B. Data beginning on August 2, 2021. *See* A.B. Data Decl. ¶ 11. This combination of individual mail to all Settlement Class Members who could be identified with reasonable effort, supplemented by notice in an appropriate, widely circulated publication, transmitted over the newswire, and set forth on internet websites, was "the best notice . . . practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B); *see, e.g.*, *In re Qudian Inc. Sec. Litig.,* 2021 WL 2383550, at *3 (S.D.N.Y. June 8, 2021); *In re Blue Apron Holdings, Inc. Sec.*

*Litig.,* 2021 WL 345790, at *4 (E.D.N.Y. Feb. 1, 2021); *In re Advanced Battery Techs., Inc. Sec. Litig.*, 298 F.R.D. 171, 182-83 (S.D.N.Y. 2014).

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court approve the proposed Settlement and the proposed Plan of Allocation as fair, reasonable, and adequate, and in accord with the Parties' Stipulation of Settlement, enter the [proposed] final Judgment in the form previously filed with the Court as Exhibit B to the Stipulation (ECF No. 133-1, at 109-120).


Dated:  September 27, 2021                          Respectfully submitted,

                                                    BERNSTEIN LITOWITZ BERGER
                                                      & GROSSMANN LLP

                                                    */s/ Jeremy P. Robinson*
                                                    John C. Browne
                                                    Jeremy P. Robinson
                                                    Jai Chandrashekar
                                                    Christopher M. Miles
                                                    1251 Avenue of the Americas, 44th Fl.
                                                    New York, NY 10020
                                                    Telephone: (212) 554-1400
                                                    Facsimile: (212) 554-1444
                                                    johnb@blbglaw.com
                                                    jeremy@blbglaw.com
                                                    jai@blbglaw.com
                                                    Christopher.Miles@blbglaw.com


                                                    SCOTT+SCOTT ATTORNEYS AT LAW
                                                      LLP

                                                    */s/ William C. Fredericks*
                                                    David R. Scott
                                                    William C. Fredericks
                                                    Randy Moonan
                                                    The Helmsley Building
                                                    230 Park Ave, 17th Floor
                                                    New York, NY 10169

Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
david.scott@scott-scott.com
wfredericks@scott-scott.com
rmoonan@scott-scott.com

*Counsel for Plaintiffs and Lead Counsel for
the Settlement Class*

KLAUSNER, KAUFMAN, JENSEN
    & LEVINSON, P.A.
Robert D. Klausner
Stuart A. Kaufman
7080 Northwest 4th Street
Plantation, FL 33317
Telephone: (954) 916-1202
Facsimile: (954) 916-1232
bob@robertdklausner.com
stu@robertdklausner.com

*Additional Counsel for Lead Plaintiff
Louisiana Sheriffs and Additional Proposed
Class Representative Hallandale P&F*

#3054000